# EXHIBIT

# 1

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River,
A Tributary of the Pacific Ocean

| | |
|---|---|
| **In re: WATERS OF THE KLAMATH RIVER BASIN** | Case No. WA1300001 |
| Klamath Irrigation District,<br>        Movant, | **EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| United States Bureau of Reclamation,<br>        Respondent. | |

## MOTION

Pursuant to ORCP 79A(1)(a)(b), Klamath Irrigation District ("KID") respectfully moves the court for an <u>emergency</u> preliminary injunction enjoining the United States Bureau of Reclamation ("Reclamation") from knowingly and willfully using stored water contrary to the water rights determined in the Amended and Corrected Findings of Fact and Order of Determination ("ACFFOD") unless or until this Court stays the ACFFOD pursuant to ORS 539.180. This motion is supported by the entire trial court file, the declarations of Nathan Rietmann, Gene Souza, Grant Knoll, Shane Cheyne, Justin Grant, Ken Schell, Andy King, Paul Crawford, and Rodney Cheyne submitted herewith, and the points and authorities provided below.

## POINTS AND AUTHORITIES

### A.    INTRODUCTION

Klamath Irrigation District ("KID") is bringing this <u>emergency</u> motion for preliminary injunction to enjoin the United States Bureau of Reclamation from brazenly usurping this Court's authority and causing KID irreparable harm.

{7756/007/01218980.DOC}

Page 1 -    <u>EMERGENCY</u> MOTION FOR PRELIMINARY INJUNCTION

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    Right now, this court is reviewing the water rights determinations in the Amended

2    and Corrected Findings of Fact and Order of Determination ("ACFFOD") entered in the

3    Klamath Adjudication. While this review is pending, water must be distributed in

4    accordance with the ACFFOD pursuant to ORS 539.170 unless this Court grants a stay

5    pursuant to ORS 539.180. Under ORS 539.180, a stay may only be issued if the

6    requesting party posts a bond and agrees "to pay all damages that may accrue by reason

7    of the [ACFFOD] not being enforced."

8    This court has not stayed the ACFFOD pursuant to ORS 539.180. However, the

9    United States Bureau of Reclamation ("Reclamation") is acting as though it is above the

10   law and planning to unlawfully divert 150,000 to 275,000 acre-feet of stored water from

11   Upper Klamath Lake contrary to the ACFFOD without so much as requesting, let alone

12   obtaining, a stay from this court pursuant to ORS 539.180.

13   This flagrant violation of the ACFFOD and usurpation of this Court's authority

14   directly injures Klamath Irrigation District ("KID") and its constituent members, which

15   own water rights to the stored water Reclamation is planning to unlawfully divert from

16   UKL contrary to the ACFFOD.

17   Many of these injuries will be irreparable. By distributing water contrary to the

18   ACFFOD without requesting and obtaining a stay pursuant to ORS 539.180, Reclamation

19   is depriving KID and its constituent landowners of their legal right to notice, opportunity

20   for hearing, and an impartial judicial determination from this Court on whether a stay of

21   the ACFFOD should be granted. Reclamation is also depriving KID and its constituents

22   of their right to have any stay conditioned upon Reclamation posting a bond and agreeing

23   "to pay all damages that may accrue by reason of the [ACFFOD] not being enforced."

24   What is more, many Klamath farmers are already on the brink of insolvency due

25   to water shortages Reclamation has unlawfully caused in prior years. If Reclamation is

26   not restrained, and there is another season in which stored water is unlawfully diverted

and flushed down the river contrary to the ACFFOD, it will likely cause a number of

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    farmers to go under.  Legal damages from a takings case—which, if the most recent
2    Klamath takings case is any indication, would take almost 20 years to conclude—would
3    provide no relief to farmers who are forced to close their business or sell their land this
4    year or next.

5         The balance of the equities tips clearly in favor of granting an injunction. The law
6    plainly requires stored water in UKL to be distributed in accordance with the ACFFOD
7    unless this court grants a stay pursuant to ORS 539.180. Reclamation knows it must
8    follow the ACFFOD unless a stay is obtained, and a bond is posted.  Federal law says so;
9    state law says so; the Solicitor's Office of Interior says so; Reclamation's prior
10   submissions to this court say so; and this Court has said so. Yet Reclamation still acts as
11   though abiding by the ACFFOD is merely optional for it.

12        Moreover, none of the interests Reclamation has in diverting stored water contrary
13   to the ACFFOD provide a reason for denying relief. Reclamation says it is flushing
14   stored water in UKL down the Klamath River contrary to the ACFFOD to fulfill its
15   obligations under the ESA. But the ESA does not give Reclamation any new authority to
16   violate the ACFFOD. Instead, it merely tells Reclamation to use whatever discretion it
17   *already* possesses to support endangered species.

18        Similarly, Reclamation sometimes says it is using stored water in UKL to fulfill
19   trust obligations it has to the Hoopa Valley and Yurok Tribes, both of which are located
20   in California. But Reclamation's trust obligations to the tribes in California afford no
21   water rights to use stored water in UKL, as neither Tribe (nor Reclamation on their
22   behalf) has ever claimed a water right in UKL in the Klamath Adjudication.

23        The public interest requires Reclamation to follow the law.  If Reclamation needs
24   water to meet its various environmental and trust obligations it can acquire that water
25   lawfully, not by usurping the power of this Court and unlawfully distributing stored water
26   to which KID owns the water rights under the ACFFOD. This is particularly true, where,
     as here, Reclamation's unauthorized diversion of stored water to which KID owns the

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    water rights actually constitutes a crime under Oregon law. ORS 540.720 ("No person

2    shall use without authorization water to which another person is entitled, or willfully

3    waste water to the detriment of another."); ORS 540.990(1) ("Violation of…ORS

4    540.720…is a Class B misdemeanor").

5         For all of these reasons, KID requests that this Court grant injunctive relief

6    enjoining Reclamation from distributing stored water in UKL except in accordance with

7    the water rights determined in the ACFFOD, unless it first obtains a stay and posts a bond

8    sufficient to cover "all damages" the stay might cause.

9    **B.**    **LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS**

10        ORCP 79 states that a preliminary injunction may be ordered "[w]hen it appears

11    that a party is entitled to relief demanded in a pleading," and that relief "consists of

12    restraining the commission or continuance of some act, the commission or continuance of

13    which during the litigation would produce injury to the party seeking the relief."  ORCP

14    79(A)(1)(a). A preliminary injunction may also be ordered "[when it appears that the

15    party against whom a judgment is sought is doing or threatens, or is about to do, or is

16    procuring or suffering to be done, some act in violation of the rights of a party seeking

17    judgment concerning the subject matter of the action, and tending to render the judgment

18    ineffectual." ORCP 71A(1)(b).  A preliminary injunction requires five days' notice to the

19    party against whom an injunction is sought.  ORCP 79(C)(1).

20        "When determining whether to issue a preliminary injunction, courts consider,

21    among other things, the likelihood that the party requesting the injunction will ultimately

22    prevail on the merits of its claim and whether, if the injunction is not issued, the party

23    will be irreparably harmed during the litigation of the claim.  Courts also balance the

24    harm to the movant against harm to the opposing party and the public if the injunction is

25    issued." *Elkhorn Baptist Church v. Brown*, 366 Or. 506, 518–19 (2020).  Put another

26    way, "[t]he office of a preliminary injunction is to preserve the status quo so that, upon

       the final hearing, full relief may be granted." *Oregon Educ. Ass'n v. Oregon Taxpayers*

{7756/007/01218980.DOC}

Page 4 -    <u>EMERGENCY</u> MOTION FOR PRELIMINARY INJUNCTION

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1  *United PAC*, 227 Or. App. 37, 45 (2009) (quoting *State ex rel. v. Mart*, 135 Or. 603, 613

2  (1931)).

3  **C.    ARGUMENT**

4  **1.    Water in UKL Reservoir Must be Distributed in Accordance with the**
   **ACFFOD Issued by OWRD, Unless a Stay is Granted and a Bond is**
5  **Posted**

6       This Court is well aware of the historical background of the Klamath

7  Adjudication.  In 1975, the State of Oregon commenced a general stream adjudication of

8  the waters of the Klamath Basin pursuant to ORS in Chapter 539. (Declaration of Nathan

9  Rietmann ("Rietmann Dec."), at ¶ 2.)  The purpose of a general stream adjudication is to

10  quantify and determine all state and federal reserved water rights vested prior to the

11  adoption of Oregon's 1909 water code.  ORS 539.010.

12       Oregon law specifically grants OWRD authority to adjudicate federal reserved

13  water rights, in addition to water rights arising under state law.  ORS 539.010(7) ("[T]he

14  Water Resources Department may adjudicate federal reserved rights.").  The State of

15  Oregon's power to adjudicate federal reserved water rights in the Klamath Adjudication

16  has also been specifically confirmed by the Ninth Circuit Court of Appeals.  *United*

17  *States v. Oregon*, 44 F.3d 758, 770 (9th Cir. 1994) ("We hold that the Klamath Basin

18  adjudication is in fact the sort of adjudication Congress meant to require the United States

19  to participate in when it passed the McCarran Amendment."); *see also White Mountain*

20  *Apache Tribe v. Hodel*, 784 F2d 921, 924 (9th Cir. 1986) ("The state court does have the

21  authority to adjudicate tribal water rights.  The Congress has said so . . . the United States

22  Supreme Court has said so . . . the Arizona Supreme Court has said so . . . and we have

23  said so.  It is time that the Tribe accept the proposition as true.").  This ability to

24  adjudicate federal water rights is consistent with the U.S. Supreme Court's recognition

25  that the purpose of Oregon's general stream adjudication process is to obtain "a complete

26  ascertainment of *all existing rights*."  *Pac. Live Stock Co. v. Lewis*, 241 U.S. 440, 447–48

    (1916) (emphasis added). It is also consistent with the U.S. Supreme Court's recognition

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   that in Oregon's water adjudication process, "[a]ll claimants are required to appear and

2   prove their claims; *no one can refuse without forfeiting his claim*, and all have the same

3   relation to the proceeding." *Id.* (emphasis added); *see also* ORS 539.210 ("Any claimant

4   who fails to appear in the proceedings and submit proof of the claims of the claimant

5   shall be barred and estopped from subsequently asserting any rights theretofore acquired

6   upon the stream or other body of water embraced in the proceedings, and shall be held to

7   have forfeited all rights to the use of the water theretofore claimed by the claimant.").

8       On March 6, 2013, thirty-eight (38) years after the State of Oregon initiated the

9   Klamath Adjudication, the OWRD filed its Findings of Fact and Final Order of

10  Determination in Klamath County Circuit Court. (Rietmann Dec. at ¶ 3.)  Subsequently,

11  on February 28, 2014, the State of Oregon entered an Amended and Corrected Findings

12  of Fact and Final Order of Determination ("ACFFOD") with the Klamath County Circuit

13  Court.[1]  (*Id.* at ¶ 4.)  Once the ACFFOD was entered, the state and federal water rights

14  comprehensively determined therein became fully enforceable, pursuant to ORS

15  537.130(4).

16      While the judicial phase of the Klamath Adjudication is pending, water in UKL

17  must be distributed in accordance with the ACFFOD.  *See* ORS 539.170 ("While the

18  hearing of the order of the Water Resources Director is pending in the circuit court, and

19  until a certified copy of the judgment, order or decree of the court is transmitted to the

20  director, the division of water from the stream involved in the appeal ***shall be made in***

21  ***accordance with the order of the director***.") (emphasis added).  This requirement that

22  water be distributed in accordance with OWRD's order pending completion of judicial

23  review has been specifically affirmed by the U.S. Supreme Court.  *Pac. Live Stock Co.*,

24  241 U.S. at 447–48 ("[I]t is within the power of the [State of Oregon] to require that,

25  _____

26  [1]https://www.oregon.gov/OWRD/programs/WaterRights/Adjudications/KlamathRiverBa
    sinAdj/Pages/default.aspx

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   pending the final adjudication, the water shall be distributed according to the board's

2   order [i.e. Final Order of Determination], unless a suitable bond be given to stay its

3   operation.").

4          Any party to the Klamath Adjudication that wishes may seek a stay from this

5   Court, contingent upon judicial approval and the posting of "a bond or an irrevocable

6   letter of credit issued by an insured institution as defined in ORS 706.008, . . . in such

7   amount as the judge may prescribe, conditioned that the party will pay *all damages* that

8   may accrue by reason of the determination not being enforced." ORS 539.180. This

9   Court has indeed heard and considered several requests for stays from several parties to

10  the Klamath Adjudication. (*See* Rietmann Dec., Exs. B–C.) Indeed, as this Court has

11  already noted, the bond must be large enough to pay all damages that may accrue from

12  the determination not being enforced, and the size of the bond does not limit the amount

13  of damages for which the movant may be liable. (*Id.* at Ex. C.) To date, Respondent

14  Reclamation has not moved to stay the ACFFOD's determination of either its or KID's

15  rights, and has not posted any bond to cover the damages that would be caused by such a

16  stay.

17         None of this is news to Reclamation. Reclamation is well aware of the fact that it

18  has no right to release this stored water. In fact, recent guidance issued by *Reclamation*

19  *itself* noted that, in light of the ACFFOD, Reclamation lacks the authority to divert stored

20  water for its own in-stream purposes:

21         Using stored water that is otherwise subject to the beneficial
            use by Klamath Project beneficiaries to augment or otherwise
22         produce instream flows in the Klamath River, either in
            Oregon or California, *is not authorized under the ACFFOD*.
23         Reclamation therefore cannot release water previously stored
            in priority and otherwise required for beneficial use by
24         Klamath Project beneficiaries from Upper Klamath Lake for
            the specific purposes of producing instream flows in the
25         Klamath River either in Oregon or California.

26  (Rietmann Dec., Ex. F at 23 [emphasis added].) Reclamation itself has conceded that

    what it is doing is not lawful.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1        Reclamation is also fully aware of the enforceability of the ACFFOD and the

2  requirements for a stay and a bond. In fact, Reclamation has specifically *opposed* prior

3  attempts by water rights holders seeking a stay. (*Id.* at Ex. M.) In doing so, Reclamation

4  noted that the rights found in the ACFFOD "are 'in full force and effect' at this time."

5  (*Id.* at 3.) Reclamation has argued that the bond amount cannot be nominal or "miserly,"

6  noting that "[t]he intent of the statute [ORS 539.180] is clear from its plain language and

7  context: a stay bond needs to be set in an amount to ensure the payment of the damages

8  resulting from the stay." (*Id.* at 9.) Further, Reclamation has noted in briefs to this Court

9  that, because the ACFFOD is in full force and effect, "[t]he status quo is that the Project

10  water rights [found in the ACFFOD] are now enforceable. Oregon's adjudication statutes

11  could not be more clear on this point." (*Id.* at 45.)

12        Because Oregon statute and prior orders of this Court expressly state—and

13  Reclamation concedes—that the ACFFOD is fully enforceable unless and until a stay is

14  issued and a bond is posted, KID clearly has the legal right to an injunction preventing

15  Reclamation from violating the ACFFOD. This is particularly true where, as discussed

16  below, Reclamation has recently violated the ACFFOD during last year's irrigation

17  season and has again made clear that it will do so this year as well.

18     **2.**    **Reclamation is Not Abiding by the Water Rights Determined in the**
19              **ACFFOD, and Intends to Continue Violating Those Rights**

20         *a.*    *Reclamation has No Right Under the ACFFOD to Use Stored Water*
                  *for Its Own Instream Purposes*

21        In 2019 and 2020, Reclamation violated the terms of the ACFFOD by releasing

22  so-called "flushing flows"—i.e., water discharged for non-consumptive, instream uses

23  meant to benefit coho salmon in California—of stored water in UKL. (Souza Dec. at

24  ¶ 7.) These flushing flows were necessarily made from stored water in UKL, as the

25  discharge through the Link River Dam *vastly* exceeded the inflow into UKL at the time.

26

{7756/007/01218980.DOC}
Page 8 -  <u>EMERGENCY</u> MOTION FOR PRELIMINARY INJUNCTION

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   (*Id.* at ¶ 7.)  These releases violated the ACFFOD, and were made without seeking a stay

2   or posting the necessary bond.[2]

3        The ACFFOD determined that "[t]he United States is the owner of a right to store

4   water in Upper Klamath Lake to benefit the separate irrigation rights for the Klamath

5   Reclamation Project." This storage right authorizes Reclamation to store up to 486,828

6   acre-feet per year in UKL reservoir between the elevations of 4,143' and 4,136' "for

7   agricultural irrigation, stockwater and domestic uses."  (Rietmann Dec. at Ex. A at

8   KBA_ACFFFOD_07060.) The storage right does not give Reclamation the right to use

9   the water that it stores for purposes of enhancing instream flows in the Klamath River.

10  *Cookinham v. Lewis*, 58 Or. 484, 492 (1911) (holding that a primary storage right "does

11  not include the right to divert and use stored water, which must be the subject of the

12  secondary permit"); *see also* Rietmann Dec., Ex. A at KBA_ACFFOD_07083–84

13  (explaining the principle that "the right to store water is distinct from the right to use

14  stored water").

15       Accordingly, while the right store water in UKL reservoir is owned by

16  Reclamation, the secondary right to beneficially use the stored water is owned by KID

17  and other water right holders within the Klamath Project.  (Rietmann Dec. at Ex. A at

18  KBA_ACFFOD_07083–84.)  The ACFFOD provides that "[b]eneficial users within the

19  Klamath Project hold a 1905 water right to beneficially use the water that the United

20  States stores in Upper Klamath Lake reservoir for "irrigation, domestic and incidental

21  stock watering uses."  (Rietmann Dec., Ex. A, at KBA_ACFFOD_007058, 007061,

22  007075–82.)  The ACFFOD also recognizes that KID, and other irrigation districts within

23  the Klamath Project, "represent the beneficial users' interests with respect to the

24  ─────────────
[2] Reclamation also has not acquired these rights through any other lawful means, such as
25  purchasing, leasing, or being granted limited licenses to use these rights.  Although the
water rights recognized for KID and the farmers it serves are for irrigation use, any water
26  rights that KID and its farmers hold which are not needed for irrigation may be leased
instream pursuant to Sections 1 and 2, Chapter 445, Oregon Laws 2015 (codified as a
note in the Oregon Revised Statutes immediately following ORS 539.170).

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1  beneficial use component of the water rights recognized in [the ACFFOD]." (*Id.* at

2  KBA_ACFFOD_007045, 007082.)

3      KID's secondary water rights to *stored water* in UKL reservoir cannot be "called"

4  or curtailed by any water rights—even senior water rights—*in the Klamath River*. "Once

5  water from a natural source has been legally stored, use of the stored water is subject only

6  to the terms of the secondary permit that grants the right to use of stored water."  Op.

7  Att'y Gen. OP-6308 (1989); *see also* ORS 540.210(3) ("The distribution and division of

8  water shall be made according to the relative and respective rights of the various users

9  *from the ditch or Reservoir*.") (emphasis added); OAR 690-250-0150(4) ("Use of legally

10  stored water is governed by the water rights, if any, which call on that source of water.");

11  *Tudor v. Jaca*, 178 Or. 126, 147–148 (1945) (impounded water may only be used to

12  satisfy the secondary right). Because of this, "legally stored water *is not subject to call by*

13  *senior rights to natural flow, even if the stored water originated in that stream*."  Op.

14  Att'y Gen. OP-6308 (1989) (emphasis added).

15      Although the ACFFOD does not grant Reclamation the right to use stored water in

16  UKL reservoir, and KID's secondary water rights in UKL reservoir cannot be curtailed

17  based on any senior water right in the Klamath River, Reclamation is nevertheless

18  distributing vast quantities of stored water out of UKL reservoir through the Link River

19  Dam to provide enhanced instream flows in the Klamath River in California.  In 2020,

20  starting on April 17, 2020, Reclamation released 32,889 acre-feet of stored water from

21  UKL reservoir for this purpose.  (Souza Dec. at ¶ 7.)  Reclamation then continued to

22  release an additional 90,414 acre-feet of stored water throughout the irrigation season for

23  its own instream purposes, totaling 123,303 acre-feet, *without* a call for that water from a

24  water rights holder.  (*Id.* at ¶ 8.)  This water would have been sufficient to irrigate another

25  45,668 acres of farmland.  (*Id.*)

26      Reclamation is planning the same type of impermissible stored water releases for

2021.  Documents distributed by Reclamation in February 2021 show that, regardless of

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   the actual level of inflows into UKL, a large release is planned for mid-April.  (Souza

2   Dec., Ex. C at 16.)  This type of a release, which vastly exceeds the amount of inflow into

3   UKL at that time, is not natural or live flow.  (Souza Dec. at ¶ 14.)  Instead, it is—

4   obviously and necessarily—the release of previously stored water.  Moreover, this large

5   spike in releases is not in response to an expected sudden and temporary call for water

6   from a water rights holder, but rather for Reclamation's own in-stream purposes to

7   provide additional water for juvenile salmon.    (Souza Dec. at ¶ 15.)    Similarly,

8   Reclamation has indicated that it intends to continue discharging stored water throughout

9   the irrigation season for its own in-stream purposes, without a call from any holder of a

10   right to use stored water.  (Souza Dec. at ¶ 16.)  It is clear Reclamation intends to violate

11   the ACFFOD during the 2021 irrigation season as well.

12           *b.     No Stay has been Sought and No Bond has been Posted*

13           As set out above, Reclamation is well aware the ACFFOD is in effect and controls

14   the distribution of water in UKL, unless and until a stay is issued and whatever bond this

15   Court orders is posted.  Reclamation participated in prior requests for a stay by filing

16   briefs and submitting arguments to this Court (*see* Rietmann Dec., Ex. M), and was

17   served with this Court's opinions and orders noting the necessity of a stay and a bond.

18   (*Id.*, Exs. B and C.)

19           Nevertheless, Reclamation has decided to grant itself a stay of the ACFFOD, and

20   continue acting as though it has no effect.  Reclamation has not sought nor received an

21   order granting a stay of any part of the ACFFOD, nor has it posted a bond that would

22   cover "all damages" arising from such a stay.  Because no stay has been issued and no

23   bond has been posted, as expressly required by both statutory law and orders of this

24   court, KID's case is meritorious and an injunction against further deprivations should

25   issue.

26   / / /

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1

        *c.*     *A preliminary injunction is necessary to maintain the status quo, and entitlement to an injunction is clearly set forth in Oregon statutes*

2       As Reclamation has previously realized, Oregon statutes create a unique situation

3    insofar as they specifically require water to be distributed in accordance with the

4    ACFFOD during the pendency of the proceeding—absent a stay and corresponding

5    bond—irrespective of the ultimate outcome of the litigation.  To quote Reclamation's

6    prior briefs, ""[t]he status quo is that the Project water rights [found in the ACFFOD] are

7    now enforceable.  Oregon's adjudication statutes could not be more clear on this point."

8    (Rietmann Dec., Ex. M, at 45.)  In that sense, therefore, the likelihood of prevailing on

9    the underlying claims is wholly immaterial to whether KID is entitled to injunctive relief

10   now.  While review of the ACFFOD is pending, KID is entitled to have water distributed

11   in accordance with the water rights determined in the ACFFOD unless this court grants a

12   stay pursuant to ORS 539.180, irrespective of whether the ultimate decree modifies or

13   changes the ACFFOD.

14      This makes perfect sense in light of such a complex water adjudication.  OWRD

15   took almost four decades to reach the decision in the ACFFOD.  This litigation has

16   already been pending for approximately seven years.  Even a conservative estimate of the

17   litigation suggests it will take another eight or ten years to complete.  Therefore, how

18   water is distributed in the interim—a period which may itself span two decades—is of

19   great importance to the water rights holders.  The ultimate judgment or decree in this case

20   will *never* govern how water was to be distributed here, today, in 2021.  Thus, the

21   relevant question is whether KID is likely to prevail on its claim in this motion that

22   Reclamation may not knowingly distribute stored water contrary to the water rights

23   determinations in the ACFFOD unless Reclamation obtains a stay from this court

24   pursuant to ORS 539.180.  The law on this "could not be more clear on this point," as

25   Reclamation has pointed out.  (Rietmann Dec., Ex. M at 45.)

26   */ / /*

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    Specifically, ORS 539.130(4) states:

2        The determination of the department [i.e. ACFFOD] shall be in full force
        and effect from the date of its entry in the records of the department, unless
3        and until its operation shall be stayed by a stay bond as provided by ORS
        539.180
4

5    ORS 539.170 states:

6        While the hearing of the order of the Water Resources Director is pending
        in the circuit court, and until a certified copy of the judgment, order or
7        decree of the court is transmitted to the director, the division of water from
        the stream involved in the appeal shall be made in accordance with the
8        order of the director [i.e. ACFFOD]."

9    ORS 539.180 states in relevant part:

10        At any time after the determination of the Water Resources Director has
        been entered of record, the operation thereof may be stayed in whole or in
11        part by any party by filing a bond or an irrevocable letter of credit issued by
        an insured institution as defined in ORS 706.008 in the circuit court
12        wherein the determination is pending, in such amount as the judge may
        prescribe, conditioned that the party will pay all damages that may accrue
13        by reason of the determination not being enforced.

14    It is beyond dispute that KID has an existing statutory right to have the ACFFOD

15    enforced as it is now during the pendency of the judicial phase of the Klamath

16    Adjudication.  Reclamation has conceded as much.

17        d.    *Regardless of how the Court determines the exceptions Reclamation
            has filed, Reclamation's current use would* still *not be allowed*
18

19    What is more, this particular dispute will ultimately be found in KID's favor,

20    regardless of how this Court rules on the exceptions before it.  Even after this case is fully

21    resolved, Reclamation would *still* not be permitted to do what it is presently doing under

22    Oregon law.  Reclamation has not asserted any claim that it has a right to use the water it

23    stores in UKL for instream purposes in the Klamath River.   While Reclamation has

24    claimed that the Project's use rights should be held in its name, and not directly by the

25    irrigators, it has not filed any exception to KID's water rights asserting stored water in

26    UKL  may  be  used  for  instream  purposes,  rather  than  irrigation.    Given  that

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   Reclamation *has never* claimed the right to use stored water in UKL for instream

2   purposes during the 46-years the adjudication has been pending, KID will prevail on its

3   claim, to the extent that it asserts that the right to use stored water is specifically the right

4   to use stored water *for irrigation*. There simply is no dispute in this proceeding in regard

5   to whether Reclamation stores water in UKL for irrigation use within the Klamath Project

6   or for purposes of providing instream flows in the Klamath River.  It is the former, and

7   Reclamation has never suggested differently.

8         **3.    KID and Its Members Suffer Significant, and Irreparable, Injury as a Result of Reclamation's Refusal to Abide by the Terms of the ACFFOD**

9

10      Both KID and its members suffer serious, extensive, and often irreparable injury to

11   their rights when Reclamation simply ignores the ACFFOD and releases stored water

12   without a corresponding water right, thereby flouting the law and this Court's jurisdiction

13   to decided whether the ACFFOD shall be enforced or stayed while its review is pending.

14   The unauthorized release of stored water obviously detrimentally impacts KID and all of

15   its members, as less water is therefore available to be used in irrigation.

16      The most serious effects are felt by KID's members.  Numerous irrigators within

17   KID will not survive another year of severe water restrictions.  (Crawford Dec. at ¶ 22;

18   King Dec. at ¶ 11 ["If Reclamation again flushes the stored water down the river this

19   year, and I receive no, or only a very small amount of water, I will almost certainly have

20   to file for bankruptcy."]; Knoll Dec. at ¶ 12 ["If the Bureau flushes our water down the

21   river this year, and I am unable to irrigate this year, I will likely have to consider filing

22   for bankruptcy, or selling parts of the farm and equipment to make it through the year."];

23   Grant Dec. at ¶ 18 ["If there is no or very little water this year, my business will not be

24   able to survive this year."].)  Indeed, some have already begun liquidating significant

25   portions of their business to stay afloat.  (Schell Dec. at ¶¶ 7–11 [noting he is liquidating

26   his cow herd because of the difficulties finding feed for them when pasture fields cannot

be irrigated].)  Even those who may be able to survive this year will be on the brink of

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1  bankruptcy. (*See* S. Cheyne Dec. at ¶¶ 17–18 [noting that if Reclamation creates another
2  water shortage this year, it will "fully deplete my available cash reserves for the farm,"
3  and if there is another water shortage next year, "I would certainly need to file for
4  bankruptcy"]; Knoll Dec. at ¶ 12 ["If I am able to get some water, I might be able to
5  squeak by through this year, but I certainly could not make it through two more years like
6  that."]; Grant Dec. at ¶ 18; Schell Dec. at ¶ 16 [noting he may be able to make it through
7  a few more years, but only because he is "liquidating half of my business . . . If
8  Reclamation actually prevents us from irrigating t all, it won't even be that long"].)

9       Farming, as a business, requires significant up-front expenses and obligations to
10  prepare for and produce the crop, with virtually no income for months or years until the
11  returns from the crop's productions are realized. (Crawford Dec. at ¶ 17 ["The biggest
12  expenses I have during the year are for mortgages, leases, fertilizer, and pesticides. Most
13  of these are fixed costs, in that they must be incurred before I know what my yields will
14  be that year or even what fields will be able to be irrigated."]; Knoll Dec. at ¶ 8 ["The
15  vast majority of these expenses—approximately 75 percent of them—must be paid up-
16  front before irrigation even begins."]; Grant Dec. at ¶ 14 [noting most costs "must be
17  incurred before the irrigation season even begins"].) Klamath farmers undertook
18  significant costs in the form of land rental obligations, mortgage payments, operating
19  loans, equipment loans, water assessments, infrastructure, and expenditures for seed,
20  fertilizer, pesticides, fuel, and other necessary items long before Reclamation indicated it
21  intended to release stored water in 2021 for its own purposes and not for irrigation. (*See*
22  Crawford Dec. at ¶ 17; King Dec. at ¶ 8 ["[M]ost of the expenses I have associated with
23  farming a particular area are already incurred by the time I learn that Reclamation plans
24  to flush our stored water down the river."].) Many Klamath farmers do not operate with a
25  large profit margin, which leaves them particularly vulnerable when Reclamation violates
26  the law by flushing stored water down the river without a right to do so. (Crawford Dec.
    at ¶¶ 16, 18 [noting that, of the $480,000 in gross revenue generated in a year,

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   approximately $450,000 must go to pay expenses]; King Dec. at ¶ 7; Knoll Dec. at ¶ 9

2   [noting he must get at least a 75 percent yield to break even]; Grant Dec. at ¶ 13 [profit

3   margin of 20-25%].)

4       When Reclamation makes unilateral decisions to seize these water rights it does

5   not own by releasing stored water for the benefit of individuals or obligations that have

6   no right to use that water, it cripples these farmers.  (Crawford Dec. at ¶ 22 [noting

7   business  "likely could not survive" another water shortage, and "I would need to

8   consider bankruptcy, or beginning to liquidate some of the equipment and property I own

9   to cover my expenses"]; King Dec. at ¶ 7 [with significant water shortage, "I will not be

10  able to break even"]; Schell Dec. at ¶ 15 [noting losses in successive years due to

11  Reclamation-caused water shortages].)   Farmers are left with no way to pay off the

12  expenses and debts they undertook to prepare the land for farming.  (*See* Crawford Dec.

13  at ¶ 22.)  Many farmers are forced to work additional jobs to subsidize their farms, which

14  are already a full-time job.  (*See* Crawford Dec. at ¶ 20; S. Cheyne Dec. at ¶ 14 [noting he

15  has worked full-time as a project manager since 2010]; Schell Dec. at ¶¶ 14–15.)   Nor

16  are these impacts limited to the year in which Reclamation actually takes the water:

17  many of the crops in the Klamath Basin are actually on multi-year rotations, and water

18  shortages in any particular year have multi-year effects.  (*See.* S. Cheyne Dec. at ¶ 8

19  [noting his farm rotates an alfalfa field every four to seven years; "The younger stands

20  may be able to survive a season of water shortage, but will last significantly fewer

21  seasons, because of the water stress."]; Crawford Dec. at ¶ 13 ["Because I will be unable

22  to irrigate 240 acres of my land this year due to Reclamation-induced water shortages,

23  those crops will die.  I will need to replant them next year.  That means that, for alfalfa

24  crops that I planted this year, I will have twice the expenses initially."]; Knoll Dec. at ¶

25  11 [noting some of his crops are "more sensitive to water shortages" and that if he is

26  "unable to water the rye grass I planted last year, it won't survive the year"].)

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    Additionally, when water shortages cause crop shortages, the businesses that
2    Klamath farmers supply turn elsewhere to get the crops they need.  (*See* Crawford Dec. at
3    ¶ 19 ["Not only is having water necessary to keep the multi-year crops alive, but it's
4    critical for me to have product to supply my customers.  A significant amount of business
5    goes to only a few customers.  If I'm unable to supply my customers with the hay and
6    alfalfa I farm, they need to go elsewhere to purchase it."].)  Often, these customers are
7    difficult or impossible to get back.  (Crawford Dec. at ¶ 19 ["Because they need a
8    consistent supply of [my crops], they are unlikely to switch back to me if I cannot
9    consistently provide it.  If I lose these customers, they cannot readily be replaced, since
10   these business relationship are cultivated over a number of years."].)This is compounded
11   by the fact that, just last year, Reclamation undertook a similar seizure of water rights,
12   releasing massive amounts of stored water for its own instream purposes.  (Souza Dec. at
13   ¶¶ 6–8, 11.)  When water shortages are perpetuated over successive growing seasons, the
14   increased likelihood of bankruptcy or foreclosure increases dramatically.  (Crawford Dec.
15   at ¶ 11 [noting that, because of Reclamation-induced water shortages, "I was barely able
16   to scrape by last year"].)  Farmers are at serious risk of permanent and irreparable
17   injury—such as bankruptcy and the loss of farms and land—if Reclamation is not
18   enjoined from violating the ACFFOD.

19   The water shortages caused by Reclamation releasing stored water for its own
20   instream purposes also cause emotional harm to the farmers in the Klamath Project.  (*See*
21   S. Cheyne Dec. at ¶ 20 [noting these shortages are "extremely stressful" because he does
22   not "know whether I will be able to make ends meet when they happen"; noting also prior
23   water restrictions almost "bankrupted" him, and it "took me more than a decade to
24   recover from that"]; Schell Dec. at ¶¶ 11, 13 [noting difficulty of deciding to liquidate
25   cow herd he has maintained for 50 years].)  Reclamation's continued flouting of
26   established water rights has caused multi-generational farming families to sincerely doubt
     the continued viability of farming in the Klamath Basin.  (*See* S. Cheyne Dec. at ¶¶ 3, 21

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1  [family has been farming here since the early 1900s; "Several of my children have
2  expressed interest in running the business, but with the consistent water shortages, I do
3  not feel like I can recommend this business to them in the Klamath Basin as a career
4  decision. I've told them that if they want to farm, they should look for land elsewhere."];
5  Knoll Dec. at ¶ 13 ["Farming is a tradition in my family. . . . All three of my oldest
6  children are interest in agriculture nd love farming. I would like to be able to pass the
7  farm onto them someday."].) As one farmer put it, while "[c]ontinuing this heritage is
8  important to me . . . I've told [my children] that if they want to farm, they should look for
9  land elsewhere." (*See* S. Cheyne Dec. at ¶¶ 3, 21; *see also* Knoll Dec. at ¶ 14 ["I don't
10 know whether, as a parent, I should encourage [my kids] to stay in the Klamath area . . . I
11 can't encourage my kids to go into a business that has been so difficult and volatile for
12 me."].)

13    Aside from the tangible physical losses that follow Reclamation's flouting of the
14 ACFFOD, KID and its members are deprived of valuable and important legal rights as
15 well. The ACFFOD is fully enforceable unless and until a stay is issued by this Court.
16 *See* ORS 539.170. Critically, Reclamation's seizure of water rights under the ACFFOD
17 prevents KID from the right to have the issue of whether a stay is warranted determined
18 by this Court. As Reclamation itself has previously argued, whether to issue a stay is
19 always a matter of discretion for this Court. (Rietmann Dec., Ex. M, at 16–18.) Forcing
20 Reclamation to move for a stay, should it need one, provides KID with due process, and
21 the ability to contest or dispute particular arguments Reclamation might make for or
22 against implementation of the ACFFOD. By simply taking KID's water rights,
23 Reclamation becomes the decision-maker, and usurps this Court's proper authority.

24    Additionally, even if a stay is warranted, this Court has already held that no stay
25 may be granted except upon the posting of a bond and an agreement to pay "all damages"
26 that may be caused by the stay. (Rietmann Dec., Exs. B and C.) This language is quite
   broad, and intended to cover any harm that might fall on KID and its members as the

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    result of a stay in this litigation.  That includes not only the value of the water itself, but

2    the significant amount of consequential damages that will accrue if Reclamation

3    continues to release stored water for unauthorized purposes.  (*See id.* [noting that the

4    obligation to "pay all damages that may accrue by reason of the determination not being

5    enforced" is "in addition to the bond," and the bond "does not limit or cap that

6    obligation," subjecting those who would seek a stay "to a significant liability"].)  This

7    requirement—both the posting of the bond and the agreement to pay damages—provide

8    significant considerations to KID and its members' adjudicated rights.  It ensures all

9    parties are clear where damages will lie in the event they occur.  And the provision of a

10   bond ensures that certain amounts of money will be reserved to cover the farmers' losses.

11        Lastly, whether or not the ACFFOD is presently enforceable impacts other legal

12   rights and obligations which impact KID and Reclamation.  While discussed in more

13   detail below, if the ACFFOD is presently enforceable, Reclamation has only very narrow

14   discretion in releasing previously stored water, because it may not do so differently than

15   the ACFFOD dictates and cannot use stored water for in-stream ESA purposes.  Just a

16   few months ago, Reclamation and the Office of the Solicitor reached that very

17   conclusion, noting "[t]o the extent Reclamation releases water previously appropriated

18   and stored in priority from Upper Klamath Lake for a beneficial use, including in the

19   State of California, the use must be consistent with the ACFFOD or applicable federal

20   law." (*See* Rietmann Dec., Exs. D, E, and F.)  Because of this, Reclamation "cannot

21   release water previously stored in priority and otherwise required for beneficial use by

22   Klamath Project beneficiaries from Upper Klamath Lake for the specific purposes of

23   producing instream flows in the Klamath River." (*Id.* at 23.)  Determinations of

24   discretion by Reclamation impact how Reclamation operates the Klamath Project,

25   including whether it purchases or leases KID's water rights for in-stream purposes (as

26   opposed to merely seizing them).

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    Reclamation's failure to abide by the terms of the ACFFOD has and is causing

2    numerous severe and irreparable injuries, including the imminent loss or bankruptcy of a

3    number of family farms; the loss of KID's legal right to have stays determined by this

4    court; and the loss of a bond to cover "all damages" associated with the stay.

5    Additionally, whether the ACFFOD is presently enforceable impacts how Reclamation

6    discharges its other legal responsibilities in operating the Klamath Project.

7    **4.    The Endangered Species Act Does Not Authorize the Use of Stored
         Water in UKL Without a Water Right**

8

9    Reclamation may contend the Endangered Species Act empowers it to use stored

10    water in UKL reservoir for instream purposes without a water right. This contention is

11    wholly without merit.

12    It is well-established that the ESA imposes obligations on federal agencies, but

13    does not expand the authority of agencies to act beyond the power the agency otherwise

14    possesses. *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1510 (9th Cir. 1995) ("[The ESA]

15    directs agencies to 'utilize their authorities' to carry out the ESA's objectives; it does not

16    expand the powers conferred on an agency by its enabling act.'") (quoting *Platte River*

17    *Whooping Crane v. FERC*, 962 F.2d 27, 34 (D.C. Cir. 1992)).    The D.C. Circuit

18    described as "far-fetched" the argument that the general consultation requirements of the

19    ESA expand agencies' authority to act beyond their enabling acts. *See Platte River*

20    *Whooping Crane*, 962 F.2d at 34.    This principle has not only been upheld by the Ninth

21    and D.C. Circuits, but also the Fifth Circuit. *See Am. Forest & Paper Ass'n v. U.S. EPA*,

22    137 F.3d 291, 299 (5th Cir. 1998) ("We agree that the ESA serves not as a font of new

23    authority, but as something far more modest: a directive to agencies to channel their

24    *existing* authority in a particular direction.")

25    The Supreme Court recently weighed in on an analogous issue in *National*

26    *Association of Home Builders v. Defenders of Wildlife* ("*Home Builders*"), 551 U.S. 644

(2007).    At issue in *Home Builders* was a conflict between the ESA's consultation

{7756/007/01218980.DOC}

Page 20 -  <u>EMERGENCY</u> MOTION FOR PRELIMINARY INJUNCTION

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1  requirement under 16 U.S.C. § 1536(a)(2) and a requirement under the Clean Water Act

2  that the EPA turn over authority to issue discharge permits to a state if the state met nine

3  specified criteria. *Home Builders*, 551 U.S. at 651–52. The Ninth Circuit held the ESA

4  required the agency to consider whether turning over this authority to the states would

5  create jeopardy for an endangered species, even though the requirement to turn over

6  authority was mandatory if the nine criteria were met. *Id.* at 655–57. The Supreme

7  Court, noting the Circuit split on the issue created by this holding and the D.C. Circuit's

8  holding in *Platte River Whooping Crane*, reversed. *Id.* at 657. In doing so, it noted that

9  the ESA's general consulting obligation under 16 U.S.C. § 1536(a)(2) does not effect an

10  implied repeal of previously-enacted statutes. *Id.* at 662–66. As such, it imposes no

11  consultation obligation on agency actions that are mandatory, and can only apply where

12  the actions of the agency are discretionary. *Id.* at 666–67.

13      The Supreme Court's holding in *Home Builders* establishes an important principle

14  that supports the holdings of *Sierra Club*, *Platte River Whooping Crane*, and *American

15  Forest & Paper Association* by analogy. Where an agency lacks discretion, there is no

16  requirement to consult under Section 7 of the ESA. *See Cottonwood Envtl. Law Ctr. v.

17  U.S. Forest Serv.*, 789 F.3d 1075, 1086–87 (9th Cir. 2015) ("[I]f an agency has no

18  discretion to take any action that might benefit the threatened species, Section 7

19  consultation would be 'a meaningless exercise.'") (quoting *Envtl. Prot. Info. Ctr. v.

20  Simpson Timber Co.*, 255 F.3d 1073, 1085 (9th Cir. 2001)); *see also Home Builders*, 551

21  U.S. at 669 (noting the ESA's "no-jeopardy duty covers only discretionary agency

22  actions and does not attach to actions . . . that an agency is required by statute to

23  undertake once certain specified triggering events have occurred"). This is because the

24  ESA does not grant the agency any additional powers to act it did not already possess.

25  *Am. Forest & Paper Ass'n*, 137 F.3d at 299; *Sierra Club*, 65 F.3d at 1510; *Platte River

26  Whooping Crane*, 962 F.2d at 34. Instead, the ESA requires the agency to discharge the

discretionary powers it was given in other statutes in accordance with the ESA.    16

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   U.S.C. § 1536(a)(2).  Similarly, an agency's non-discretionary obligations or duties under

2   other statutes are not modified, discharged, or excused by the consultation and no-

3   jeopardy requirements of the ESA.

4          The ESA does not modify, remove, or discharge the other obligations Reclamation

5   has under the Reclamation Act, which require it to act in accordance with state water law

6   in the purchase, condemnation, "control, appropriation, use, or distribution of water."

7   *See California v. United States*, 438 U.S. 645, 674–75 (1978) ("The legislative history of

8   the Reclamation Act of 1902 makes it abundantly clear that Congress intended to defer to

9   the substance, as well as the form, of state water law.").   More particularly, the

10  Reclamation Act states:

11           Nothing in this Act shall be construed as affecting or intended
             to affect or to in any way interfere with the laws of any State or
12           Territory relating to the control, appropriation, use, or
             distribution of water used in irrigation, or any vested right
13           acquired thereunder, and the Secretary of the Interior, in
             carrying out the provisions of this Act, shall proceed in
14           conformity with such laws, and nothing herein shall in any way
             affect any right of any State or of the Federal Government or of
15           any landowner, appropriator, or user of water in, to, or from
             any interstate stream or the waters thereof.
16

17  43 U.S.C. § 383.  Thus, while Reclamation is specifically given the authority to condemn

18  property rights—such as the right in Oregon to use water, *see* ORS 307.010(1)(b)(D)—

19  where necessary, *see* 43 U.S.C. § 421 (Reclamation may "acquire any rights or property"

20  deemed necessary "by purchase or condemnation under judicial process"), it does not

21  have the right to do so without complying with the Reclamation Act, which requires

22  adherence to state law.  As set forth in *Sierra Club*, *Platte River Whooping Crane*, and

23  *American Forest & Paper Association*, and supported by the Supreme Court's decision in

24  *Home Builders*, the ESA does not expand the authority of an agency to take actions it is

25  not otherwise empowered to take.  Thus, the ESA does not entitle Reclamation to use

26  stored water in UKL reservoir without a water right; rather it creates an obligation that

Reclamation use its discretionary powers to avoid jeopardy to endangered species.  It is

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   the Reclamation Act that empowers Reclamation to acquire Oregon water rights through

2   purchase or condemnation.  *See* 43 U.S.C. § 421.  However, such rights must be acquired

3   in accordance with state law.  *See* 43 U.S.C. § 383; *California v. United States*, 438 U.S.

4   at 674–75.

5          Reclamation's own interpretation of its discretion supports this conclusion.  As

6   mentioned above, recent guidance from the Office of the Solicitor and Reclamation's

7   own reassessment of its discretion has concluded that it lacks discretion to release stored

8   water from UKL other than for the beneficial use of KID and other irrigators.  (*See*

9   Rietmann Dec., Ex. F at 23; Rietmann Dec., Ex. E at 5–6 [concluding that Reclamation

10  lacks discretion to modify or independently determine the amount of water necessary for

11  beneficial use].

12         Additionally, if Reclamation truly requires water for some purpose other than what

13  is set forth in the ACFFOD, Reclamation may compensate KID or others to lease their

14  water rights instream. Alternatively, Reclamation may purchase KID's water rights and

15  lease them instream itself in accordance with law. In the past, Reclamation has obtained

16  limited licenses authorizing it to use stored water in UKL for instream purposes in

17  accordance with law with the tacit agreement of KID and other Project irrigators. (Souza

18  Dec. at Exs. A and B.)  But now, Reclamation is simply usurping this Court's authority

19  and granting itself a de facto stay of the ACFFOD in open defiance of the law. In short,

20  the ESA provides no basis for Reclamation to violate the ACFFOD.

21         **5.    The Equities Clearly Favor a Preliminary Injunction Here**

22         As discussed at length above, Reclamation clearly knows that releasing stored

23  water from UKL for its own in-stream purposes is unlawful under state and Federal

24  statutory law, prior orders of this Court, and its own internal legal guidance.  Oregon

25  statutes unequivocally state that a water rights determination by OWRD in a general

26  stream adjudication is fully enforceable during judicial review of that decision.  *See* ORS

    539.130(4) ("The determination of the department shall be in full force and effect from

{7756/007/01218980.DOC}
Page 23 -  <u>EMERGENCY</u> MOTION FOR PRELIMINARY INJUNCTION

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1  the date of its entry in the records of the department, unless and until its operation shall

2  be stayed by a stay bond as provided by ORS 539.180."); ORS 539.170 ("While the

3  hearing of the order of the Water Resources Director is pending in the circuit court, and

4  until a certified copy of the judgment, order or decree of the court is transmitted to the

5  director, the division of water from the stream involved in the appeal shall be made in

6  accordance with the order of the director."); ORS 539.180 (noting enforcement may be

7  stayed by posting of a bond "conditioned that the party will pay all damages that may

8  accrue by reason of the determination not being enforced").   This Court has recognized

9  the same thing, noting that any party that wants a stay of the ACFFOD pending these

10 judicial proceedings must seek such a stay and must be prepared to both post a bond and

11 agree to pay "all damages" that may result from the failure to abide by the terms of the

12 ACFFOD.  (Rietmann Dec., Ex. B.)  Even Reclamation itself has recognized that it lacks

13 discretion to release stored water for purposes other than beneficial use, as determined

14 under the ACFFOD, or to re-evaluate for itself what constitutes beneficial use.  (*See*

15 Rietmann Dec., Ex. F at 23 [Reclamation Reassessment]; Rietmann Dec., Ex. E at 5–6

16 [concluding that Reclamation lacks discretion to modify or independently determine the

17 amount of water necessary for beneficial use].)  And Reclamation is very aware of how it

18 may discharge its obligations *lawfully*, because it has leased KID's water rights in the

19 past, when necessary.  (Souza Dec., Exs. A and B.)

20      Nevertheless, Reclamation persists in acting unlawfully.  It did so last year when it

21 released large amounts of stored water for in-stream purposes in both a spring "flushing

22 flow" and then throughout the irrigation season, without obtaining a stay or leasing these

23 rights from KID or other irrigators.  And it has already announced it will do so again this

24 year, planning another flushing flow for mid-April, and then continual releases of stored

25 water from UKL, not based on the call of an irrigator or water rights holder, but instead

26 to satisfy its own purposes.  Reclamation has no right to act unlawfully, and both equity

and the public interest require Reclamation—like everyone else—to abide by the law.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    Reclamation's unlawful acts cause significant and irreparable injury to KID and its

2    constituent members.  If Reclamation is permitted to continue depriving KID's irrigators

3    of their rights to use stored water, numerous family farms face an imminent danger of

4    closing.  These losses are irreparable:  even if a farm could succeed in a takings case and

5    be awarded damages in a takings case some 10 or 20 years from now, the business will be

6    closed and the land sold.  These injuries cannot be remedied through a later damages

7    claim, but must be enjoined by the Court now.

8    The ESA provides no basis for finding the equities tip in favor of permitting

9    Reclamation's unlawful actions.  The ESA did not expand the authority of agencies such

10   as Reclamation to do acts they were otherwise not permitted to do.  Instead, it merely

11   directed that agencies such as Reclamation are to discharge whatever authority they have

12   in accordance with the ESA.  The ESA does not provide a basis for Reclamation to

13   *expand* its authority under the Reclamation Act or state law, and does not permit it to

14   unilaterally seize water in violation of the ACFFOD.  Further, Reclamation is fully aware

15   of how to comply with both the ESA and the ACFFOD, because it has *specifically*

16   received a limited license to use Klamath Project irrigators' water rights in the past to

17   supplement instream flows.  (Souza Dec., Exs. A and B.)  There simply is no basis to

18   conclude that the ESA supports Reclamation's actions here.

19   Given the clearly impermissible nature of Reclamation's actions, the injury to KID

20   and its members, and Reclamation's awareness of how to conduct these activities

21   lawfully, the balance of equities tips heavily in KID's favor.  Reclamation should be

22   forced to comply with the ACFFOD—a proceeding it is well aware of and has actively

23   participated in—just like every other water rights' holder in the Klamath Basin.

24   / / /

25   / / /

26   / / /

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

**6.    An Injunction from this Court is Necessary to Enforce the Terms of the ACFFOD**

Ultimately, this Court must act to stop the unlawful acts described above.  KID tried bringing suit to enforce these rights in federal court in 2019, only to be told that that suit was not a suit for the "administration" of water rights in a general stream adjudication and be procedurally barred by the intervention of the downstream Tribes.  *See Klamath Irr. Dist. v. Bureau of Reclamation*, No. 1:19-cv-00451-CL, 2020 WL 5751560, at *8 (D. Or. Sept. 25, 2020).

KID then requested that OWRD intervene to stop Reclamation from unlawfully releasing stored water last year, in 2020.  (*See* Rietmann Dec., Ex. G.)  OWRD refused to take action, and KID was forced to file an administrative suit to compel it to discharge its duty.  (*Id.*, Ex. H.)  The Marion County Circuit Court ultimately found in KID's favor, and directed OWRD, via the watermaster for the Klamath Basin, "to immediately stop the distribution, use and/or release of Stored Water from UKL without determining that the distribution, use and/or release is for a permitted purpose by users with existing water rights of record or determined claims to use the Stored Water in the UKL."  (*Id.*, Ex. I, p.2.)  OWRD *still* refused to act, and sought a stay pending appeal and a motion to reconsider the order, both of which were curtly denied.  (*Id.*, Ex. J [Order Denying Stay Pending Appeal]; Ex. K [Order Denying Motion for Reconsideration].)  In denying the motion for reconsideration, the Court noted that OWRD had "continued to allow the Bureau of Reclamation to take Stored Water without determining the Bureau's right to do so."  (*Id.*, Ex. K at 1.)  To date, OWRD has refused to take *any* actual affirmative action to prevent Reclamation from unlawfully diverting stored water, and a hearing for OWRD to show cause in re: contempt is currently set for May 26, 2021 in front of the Marion County Circuit Court.  (*Id.*, Ex. L.)

KID is loathe to add more complexity to such a complex case or more work for this Court, given the significant tasks it already has.  Unfortunately, at this point, KID has no other options.  This Court *must* act to prevent Reclamation from unlawfully diverting

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    water.  OWRD has wholly abdicated its duty to intervene and enforce the ACFFOD, and

2    it therefore must fall to the courts to do so.

3    **D.    CONCLUSION**

4          Despite federal law, Oregon law, OWRD orders, this Court's orders, and its own

5    internal guidance all being to the contrary, Reclamation nevertheless persists in violating

6    the water rights KID and its members hold under the ACFFOD in the Klamath

7    Adjudication.  There simply is no lawful basis for Reclamation to release stored water

8    from UKL to satisfy its own in-stream purposes, without having obtained a stay from this

9    Court and posted a bond or purchased or leased these rights from irrigators.

10   Nevertheless, Reclamation violated the ACFFOD in the 2020 irrigation season and has

11   now announced it intends to violate the ACFFOD again in the 2021 irrigation season.

12   This unlawful activity must be enjoined.  It causes tremendous and irreparable harm to

13   KID and the farmer's impacted by the water shortage.  KID requests that this Court grant

14   this motion for preliminary injunction, and order Reclamation not to release stored water

15   from UKL for purposes other than those set forth in the ACFFOD.

16          DATED this 29th day of March 2021.

17

18                                              Respectfully submitted,

19

20   Dated: March 29, 2021                      RIETMANN LAW P.C.

21

22                                              *s/ Nathan R. Rietmann*
                                                Nathan R. Rietmann, OSB #053630
23                                              1270 Chemeketa St. NE
                                                Salem, Oregon 97301
24                                              503-551-2740
25                                              nathan@rietmannlaw.com
                                                Attorney for Petitioner
26

1

**CERTIFICATE OF SERVICE**

2

3      On March 30, 2021, I caused to be served a true and correct copy of NOTICE OF

4 APPEARANCE OF COUNSEL FOR KLAMATH IRRIGATION DISTRICT to be

5 served using the Oregon Judicial Department Odyssey File and Serve system for service

6 to the electronic service contacts registered in this case at the email addresses as recorded

7 on the date of service in the eFiling system, and by first class mail on those listed on the

8 current service list at the postal addresses provided by the Klamath County Circuit Court.

9      DATED:  March 29, 2021                RIETMANN LAW P.C.

10

11                                             s/Nathan R. Rietmann

12                                             _____
                                              Nathan R. Rietmann, OSB #053630
13                                             1270 Chemeketa St. NE
                                              Salem, Oregon 97301
14                                             503-551-2740
                                              nathan@rietmannlaw.com
15

16

17

18

19

20

21

22

23

24

25

26

{7756/007/01218980.DOC}

Page 28 -  <u>EMERGENCY</u> MOTION FOR PRELIMINARY INJUNCTION

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

| | |
|---|---|
| **IN THE MATTER OF THE WATERS OF THE KLAMATH RIVER BASIN** | Case No. WA1300001<br><br>**DECLARATION OF PAUL CRAWFORD IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Paul Crawford, hereby declare as follows:

1.      I am a farmer who is a member of the Klamath Irrigation District ("KID"). I have personal knowledge and am competent to testify to the facts set forth below.

2.      I am the sole proprietor of Crawford Family Farms.  I farm several hundred acres of land in the Klamath Basin.  This year, we set up for 585 acres of farming, mostly alfalfa, hay, and some pasture land.  I manage the finances for the farm, and am very familiar with the amount of debt held, the revenues of the farm, costs of operation and maintenance, and the overall financial health of the business.

3.      I understand that Klamath Basin farmers will not receive enough stored water to fulfill their water rights, which under the Klamath Adjudication are 3.5 acre-feet per acre per irrigation season.  As of now, roughly 240 acres of the area I farm will be a total loss, because Reclamation will not allow them to receive any water.

4.      Instead of letting the farmers use the stored water to irrigate their crops, Reclamation intends to release a large amount of stored water down the river to help support the fish and the downstream tribes.  This water, if it was not flushed down the river, could be used by farmers such as myself.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1        5.     My farm has been operating in the Klamath area since 2011.  I grew up farming,

2 but then left and joined the military.  After serving, I came back to the Klamath area in 2011 to

3 start farming again.

4        6.     I mostly grow alfalfa and hay.  On an average year, I probably farm 300 acres of

5 alfalfa, roughly 100 acres of orchard grass, and another 100 acres of orchard grass and alfalfa

6 blend.  I rotate through some other grains as well, and sometimes have about 80 acres of winter

7 wheat.

8        7.     Our irrigation season usually starts around mid-April.  It takes about two weeks to

9 charge the system to the point that water can actually be diverted onto my farmland.  If the

10 system begins charging around April 1, I can usually begin irrigating around April 10 or April

11 15.

12       8.     A delay in the start of the irrigation season is a huge problem for farmers like me.

13 One year, I wasn't able to start irrigating until May 1, and a significant portion of my plants were

14 already burning up.  Just observing the plants, you could see that they were wilted and stunted.

15       9.     This is particularly true of alfalfa and grain crops.  By April 20 in most years, if I

16 have not irrigated my winter grain crops, they will be dead.  They may start growing stalks later

17 in the season if irrigation is started, but they won't produce a head or will produce a much

18 smaller head, which is the useful part of grain crops.

19       10.    Alfalfa is slightly more flexible, and I am usually OK if I can begin irrigating by

20 April 25, or at the very latest, May 1, if the weather has not been too dry during the spring.  In a

21 dry year, such as this one, beginning to irrigate on May 1 is too late.

22       11.    My understanding is that last year the entirely Klamath Project only received was

23 approximately 140,000 acre-feet of water.  With a significant amount of groundwater pumping, I

24 was able to get essentially 1.5 acre-feet per acre with which to irrigate.  Because this

25 significantly reduced our yield sizes, I was barely able to scrape by last year.

26       12.    In order to understand the harm that water shortages cause to farmers such as

myself, it is important to understand the growing cycle of the crops we use.  Alfalfa, for instance,

{7756/007/01218810.DOC}

Page 2 -    DECLARATION OF PAUL CRAWFORD

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1  is a seven to ten year crop.  The first year, the year in which I plant it, I don't make any money

2  off of it, and in fact lose money.  Then, after that, I'm able to recoup my initial expenses and

3  begin making money off of it.

4     13.    Because I will be unable to irrigate 240 acres of my land this year due to

5  Reclamation-induced water shortages, those crops will die.  I will need to replant them next year.

6  That means that, for alfalfa crops that I planted this year, I will have twice the expenses initially,

7  and will need to wait twice as long before I can recoup the investment on those lands.

8     14.    Late irrigation starts also significantly reduce the yield from our first cutting.  I

9  derive a large part of the total yield per acre (probably 40% of the total yield) from the first

10  cutting of the grass.  Getting a late start that reduces the yield from that first cutting can be

11  devastating in and of itself.

12     15.    Additionally, a number of plants, such as alfalfa, will enter a dormancy stage if

13  they encounter a longer period of dry weather.  This means that the soil needs to be more heavily

14  saturated and for longer than is typical to essentially "wake up" the plant and prompt it to begin

15  growing again.  If I have a late start, additional water is required just to convince the plants to

16  begin growing again.

17     16.    My gross revenue for the farm, in an average to a good year, is just under

18  $500,000, maybe $480,000 or $485,000.  Of that, approximately $450,000 is for expenses.    In

19  other words, our profit margin is only approximately $50,000, in an average to good year.

20     17.    The biggest expenses I have during the year are for mortgages, leases, fertilizer,

21  and pesticides.  Most of these are fixed costs, in that they must be incurred before I know what

22  my yields will be that year or even what fields will be able to be irrigated.

23     18.    I try to manage risk by having low overhead costs and only growing crops that

24  have relatively high profit margins, but I only have a small margin within which to make the

25  business work.

26     19.    Not only is having water necessary to keep the multi-year crops alive, but it's

critical for me to have product to supply my customers.  A significant amount of business goes to

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    only a few customers.  If I'm unable to supply my customers with the hay and alfalfa I farm, they

2    need to go elsewhere to purchase it.  Because they need a consistent supply of it, they are

3    unlikely to switch back to me if I cannot consistently provide it.  If I lose these customers, they

4    cannot readily be replaced, since these business relationship are cultivated over a number of

5    years.

6          20.     In prior years, I have had to work full-time jobs, particularly during the winter

7    months, in order to make ends meet.  In the winters of 2017 and 2018, I worked as a foreman for

8    a potato packing facility.

9          21.     If the Klamath Project were to get 120,000 acre-feet and I could begin irrigating

10    by May 1, I might be able to break even this year.  I wouldn't be making money, but I would at

11    least be able to cover my expenses for the year.  If the total amount of water the Project receives

12    is any less than that, or starts any later than that, I will be in real trouble.

13          22.     If there is a water shortage or the irrigation season is delayed because

14    Reclamation is releasing stored water for its own purposes, to go to the fish and the downstream

15    tribes, I will not be able to grow as many crops.  If I don't grow crops or have a lower yield, I

16    can't make as much money.  The business likely could not survive such a situation.  I would

17    need to consider bankruptcy, or beginning to liquidate some of the equipment and property I own

18    to cover my expenses.

19    / / /

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

{7756/007/01218810.DOC}
Page 4 -    DECLARATION OF PAUL CRAWFORD

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

/ / /

/ / /

/ / /

/ / /

23.     Even if I don't file for bankruptcy, being forced to sell equipment or property is a huge blow to my business.  I need both the equipment and the property to farm, which means that if I have to sell it one year, I don't have it the next year to grow my crops.  If I can't grow as many crops, it means my revenue will be lower, which means that my profit margin will be even smaller.  Therefore, even one year's worth of water shortages can have lasting impacts that can't easily be quantified.

I declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct.

_____

Paul Crawford

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.con

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

| | |
|---|---|
| **IN THE MATTER OF THE WATERS OF THE KLAMATH RIVER BASIN** | Case No. WA1300001 |
| | **DECLARATION OF JUSTIN GRANT IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Justin Grant, hereby declare as follows:

1.      I am a farmer who is a member of the Klamath Irrigation District ("KID"). I have personal knowledge and am competent to testify to the facts set forth below.

2.      My family has been farming in the Klamath Basin for at least three generations. I personally began farming here in 2013, and farm approximately 300 acres. My business is organized as Justin Grant Farms LLC.

3.      My understanding is that farmers such as myself will likely receive little to no water this year, due to water shortages caused by Reclamation flushing stored water down the river without a water right. While I have an adjudicated water right to use up to 3.5 acre-feet of water per acre during the irrigation season, I would be lucky to see even 0.5 acre-feet of water for some of my land. Other parts of my farm will not get any water.

4.      I run the farm with some help from members of my family. I used to have a full-time employee, and two part-time employees, as recently as 2019. However, because of the water shortages, I had to let them go. I do not anticipate being able to rehire employees, due to the ongoing water shortages. We would absolutely hire additional workers, if Reclamation did not flush our stored water down the river.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1      5.     I grow primarily hay, alfalfa, timothy grass, orchard grass, oat, and wheat, and
2  raise cattle as well.

3      6.     Our typical irrigation season is from mid-April through October. Some of our hay
4  crops are still in the fields up until November 1, weather depending.

5      7.     Several of the crops we grow, including grains such as wheat and oats, as well as
6  hay, are annual crops. Some of these, such as alfalfa, receive multiple cuttings per year. If the
7  start of the irrigation season is delayed, this can mean that we are not able to make as many
8  cuttings in a year, which diminishes the yield per acre.

9      8.     Besides simply reducing the number of cuttings in a year, delays in irrigation
10  starting means that the plants are very water-stressed during the beginning of their growing
11  season. Since the biggest yield is from the first cutting, a delay in irrigation not only reduces the
12  number of cuttings, but reduces the yield from each cutting.

13      9.     Additionally, when irrigation is delayed, it is more difficult to get the crops to
14  begin growing, and more water than normal is required to even get them started. This inefficient
15  use of water, combined with the lower yields, severely hinders the ability to farm with a delayed
16  start date. Reclamation's release of stored water for its own purposes can create irrigation delays.
17  Often, there are requirements that UKL must be maintained at certain elevations to protect
18  endangered sucker fish. Reclamation distributing stored water for its own instream purposes
19  reduces the amount of water above the required UKL lake elevations that may be used for
20  irrigation.

21      10.    In many years, the Bureau leaves us with little water to irrigate because they have
22  released the stored water for their own purposes. These water restrictions cause long-reaching
23  damages to my business.

24      11.    A number of the crops I grow are perennial, meaning that they are harvested for a
25  number of years before a field is replanted. Grass and alfalfa are good examples of this. Alfalfa
26  fields will usually be harvested for six to seven years between plantings, while grass can be
harvested eight to ten years before being replanted.

{7756/007/01218808.DOC}
Page 2 -   DECLARATION OF JUSTIN GRANT

12.     Farming involves significant up-front costs with long delays before the crops actually result in revenue. I have very substantial and fixed costs that must be paid, regardless of whether I am permitted to irrigate in a given year. These include mortgages on the farmland, servicing debt on my farming equipment, expenses for seed (since most of my planting must occur before I find out whether Reclamation is flushing water down the river), fertilizer, power, and water (irrigation assessments). Fees associated with water include assessments paid to the irrigation districts to maintain canals and drains, which must be kept in working order even if no water flows through them that year.

13.     In a good year, I might have a net profit of 20%-25%. The remaining amount of gross income (approximately 75%-80%) reflects costs necessary to operate the farm. Most of those are fixed costs that I need to pay regardless of the farm's income. These include costs for land rent, water assessments (which must be paid regardless of whether we receive water), equipment and operating debt, seed, fuel, fertilizer, pesticides, and other necessary equipment.

14.     The vast majority of these costs must be incurred before the irrigation season even begins. Approximately two-thirds of my expenditures occur between February and June.

15.     Water shortage relief is not guaranteed, and what is received is far less than the value of the water rights I give up, which have been valued at $600 per acre-foot. The water shortage relief that we have received in prior years is even far below what it costs to operate the land. Even when the land is being idled, it still requires maintenance, including planting cover crops and spraying, which entails significant costs.

16.     In 2015, we idled some land and received relief payments of $385 per acre. This amount barely covered expenses.

17.     Last year, water shortage relief payments for idled land were only $185 per acre, which does not even come close to what is necessary to break even.

18.     If there is no or very little water this year, my business will not be able to survive this year. Without the water KID and I own rights to, I cannot grow crops, and therefore cannot generate revenue to pay debt and maintain the business. Even with some water and water

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    shortage assistance, my business would be very lucky to survive this year and another year with

2    a water shortage.

3         I declare under penalty of perjury under the laws of the State of Oregon that the foregoing

4    is true and correct.

5

6    _____

7    Justin Grant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

| | |
|---|---|
| **IN THE MATTER OF THE WATERS OF THE KLAMATH RIVER BASIN** | Case No. WA1300001<br><br>**DECLARATION OF ANDY KING IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Andy King, hereby declare as follows:

1.      I am a farmer who is a member of the Klamath Irrigation District ("KID"). I have personal knowledge and am competent to testify to the facts set forth below.

2.      I am the sole proprietor of Kings Farm & Ranch LLC.  I farm approximately 400 acres in the Klamath Basin.  I manage the finances for the farm, and am very familiar with the amount of debt held, the revenues of the farm, costs of operation and maintenance, and the overall financial health of the business.

3.      I have been farming here since 1993, about 28 years ago.

4.      I farm hay and alfalfa, and occasionally some grains.

5.      Our irrigation season is typically April through October.  Under my adjudicated water rights, I have the right to use up to 3.5 acre-feet of water per acre each year to maintain my crops.  However, my understanding is that Reclamation may reduce the amount of stored water I can use this year, because it plans to release that stored water down the Klamath River to benefit downstream tribes and fish.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

6.    My gross revenue in a good to average year is approximately $200,000 to $250,000. The biggest expenses my business has are for mortgages and leases, which must be paid annually, as well as fertilizer and pesticides.

7.    When the amount of water I receive to irrigate with is reduced by Reclamation, my crop yields are also reduced. Often, it means I get fewer cuttings on each of my acres. Because the profit margin is relatively small, if I don't received at least half of my water in a given year due to shortages Reclamation causes, I will not be able to break even, in that the farming will not even cover the costs of what it took to produce. Obviously, this does not provide enough income for me to live on.

8.    One of the problems with these water shortages is that most of the expenses I have associated with farming a particular area are already incurred by the time I learn that Reclamation plans to flush our stored water down the river, instead of letting us irrigate with it. I have already leased or mortgaged the property, and paid money for fertilizer, pesticide, and seed.

9.    I have lived through water shortages before. In the early 2000s, Reclamation shut off water entirely to irrigators, which caused many farmers to go bankrupt. I was only able to survive that shortage because I received some relief.

10.    Last year, I fallowed 100 acres because I was not able to get water to irrigate it, again due to Reclamation flushing stored water down the river, rather than allowing it to be used for irrigation. I received approximately $200 to $230 an acre to fallow it. This is less than one-eighth of what these fields would have yielded if I could farm them, and is not enough to cover all of the expenses associated with them.

/ / /

/ / /

/ / /

/ / /

/ / /

{7756/007/01218803.DOC}
Page 2 -    DECLARATION OF ANDY KING

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1       11.    If Reclamation again flushes the stored water down the river this year, and I

2  receive no, or only a very small amount of water, I will almost certainly have to file for

3  bankruptcy. It simply is not possible to meet the costs and expenses of my business if I am not

4  able to grow crops.

5      I declare under penalty of perjury under the laws of the State of Oregon that the foregoing

6  is true and correct.

7

8                                Andy King

9                                  Andy King

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

**IN THE MATTER OF THE WATERS OF THE KLAMATH RIVER BASIN**

Case No. WA1300001

**DECLARATION OF GRANT KNOLL IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION**

I, Grant Knoll, hereby declare as follows:

1.     I am a farmer who is a member of the Klamath Irrigation District ("KID"). I am also a board member of KID. I have personal knowledge and am competent to testify to the facts set forth below.

2.     I am the owner and operator of Knoll Ranch LLC. I farm approximately 850 acres of farmland that I own. I farm additional land that I rent and do custom farming as well.

3.     My father started this business in 1986, and I took over the business from him. This business has been operating in the Klamath area for 35 years.

4.     I grow predominantly grass seed. My main varieties are tall fescue grass and perennial rye grass. Because I grow these grasses for seed production, the growing season is somewhat different than many farmers in this area.

5.     Most grass and hay farmers in this area grow grass for forages, from which they will get multiple cuttings during a single season. Because of this, if they are delayed in receiving water, or if water is temporarily turned off, they may get one bad crop and be able to cut it off and still get additional cuttings of the grass.

{7756/007/01219067.DOC}
Page 1 -   DECLARATION OF GRANT KNOLL

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1      6.      Grass seed, however, requires the entire growing season, so I have only one

2   harvest on a particular crop each year. Additionally, grass seed farms are very sensitive to

3   getting the proper moisture early in the season. If there is a delay in the start date for irrigation,

4   it does not simply delay my harvest or reduce my yield: it can wipe me out for the entire season.

5      7.      Our typical irrigation season starts on April 15. If I don't have water started by

6   May 1, I will not be able to bring in a crop for that year. May 1 is essentially the drop-dead date

7   for me to start irrigating.

8      8.      In a good year, the farm can bring in between $800,000 and $1,200,000 in gross

9   revenue. However, the majority of that goes to pay expenses on the farm. The biggest annual

10   expenses include mortgages, operating loans, and equipment loans. Additional expenses I have

11   to incur to run the farm include fertilizer and fuel. The vast majority of these expenses—

12   approximately 75 percent of them—must be paid up-front before irrigation even begins. In other

13   words, I have to take on these expenses before I find out whether Reclamation will be flushing

14   all of our stored water down the river.

15      9.      If the irrigation season is even delayed slightly, it will severely harm the yield I

16   can get from my crops. Last year, the start date was a little late, and I got only about a 50

17   percent yield on my acreage in KID. Realistically, I need at least a 75 percent yield to break

18   even. Even with that level of a yield, I don't make any money from it; it simply isn't losing

19   money that year.

20      10.     A delay until June will completely wipe me out for the year.

21      11.     All of my crops are perennial, meaning they typically last for more than one

22   season. However, some are less tolerant to water shortages than others. Perennial rye grass, for

23   instance, is more sensitive to water shortages. If I'm unable to water the rye grass I planted last

24   year, it won't survive the year, and I will need to re-plant the field. This is expensive and costly.

25      12.     If the Bureau flushes our water down the river this year, and I am unable to

26   irrigate this year, I likely have to consider filing for bankruptcy, or selling parts of the farm and

{7756/007/01219067.DOC}

Page 2 -   DECLARATION OF GRANT KNOLL

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    equipment to make it through the year.  If I am able to get some water, I might be able to squeak

2    by through this year, but I certainly could not make it through two more years like that.

3         13.    Farming is a tradition in my family.  My dad started this farm, and my brother and

4    I took it over from him.  We split the land, and have kept farming.  I have four children now,

5    ages 6, 10, 13, and 15.  All three of my oldest children are interested in agriculture and love

6    farming.  I would like to be able to pass the farm onto them someday.

7         14.    However, Reclamation-induced water shortages have created a real dilemma for

8    me.  While I would like to pass on the farm to my kids, and they would like to continue farming,

9    I don't know whether, as a parent, I should encourage them to stay in the Klamath area, because

10   I never know when Reclamation will simply ignore our water rights and flush the stored water

11   down the river.  I can't encourage my kids to go into a business that has been so difficult and

12   volatile for me.

13        I declare under penalty of perjury under the laws of the State of Oregon that the foregoing

14   is true and correct.

15

16                                      _____

17                                      Grant Knoll

18

19

20

21

22

23

24

25

26

{7756/007/01219067.DOC}
Page 3 -   DECLARATION OF GRANT KNOLL

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

**IN THE MATTER OF THE WATERS OF THE KLAMATH RIVER BASIN**

Case No. WA1300001

**DECLARATION OF NATHAN RIETMANN IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION**

I, Nathan Rietmann, hereby declare as follows:

1.    I am an attorney and general counsel for the Klamath Irrigation District ("KID"). I have personal knowledge and am competent to testify to the facts set forth below.

2.    In 1975, the State of Oregon commenced a general stream adjudication of the waters of the Klamath Basin pursuant to ORS in Chapter 539.

3.    On March 6, 2013, thirty-eight (38) years after the State of Oregon initiated the Klamath Adjudication, the Oregon Water Resources Department ("OWRD") filed its Findings of Fact and Final Order of Determination in Klamath County Circuit Court.

4.    Subsequently, on February 28, 2014, the State of Oregon entered an Amended and Corrected Findings of Fact and Final Order of Determination ("ACFFOD") with the Klamath County Circuit Court.

5.    I have reviewed the Klamath Adjudication findings of OWRD contained in the ACFFOD.  True and correct copies of relevant excerpts of the ACFFOD are included as **Exhibit A** to this declaration.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1      6.     I have reviewed a letter opinion from this Court relating to requested stays of the
2    ACFFOD sought by various water users dated July 15, 2013.  A true and correct copy of this
3    opinion is attached as **Exhibit B** to this declaration.

4      7.     I have reviewed an order from this Court dated September 3, 2013 denying stays
5    of the ACFFOD requested by various water users.  A true and correct copy of this order is
6    attached as **Exhibit C** to this declaration.

7      8.     I have reviewed a memorandum dated January 14, 2021 issued by the Office of
8    the Solicitor of the Department of the Interior entitled "Use of Water Previously Stored in
9    Priority for Satisfaction of Downstream Rights."  A true and correct copy of this memorandum is
10   included as **Exhibit D** to this declaration.

11     9.     I have reviewed a memorandum dated January 14, 2021 issued by the Office of
12   the Solicitor of the Department of the Interior entitled "Analysis of Klamath Project contract to
13   determine discretionary authority in accordance with the November 12, 2020 Letter of the
14   Secretary of the Interior."  A true and correct copy of this memorandum is included as **Exhibit E**
15   to this declaration.

16    10.    I have reviewed a document dated January 2021 issued by the Bureau of
17   Reclamation entitled "Reassessment of U.S. Bureau of Reclamation Klamath Project Operations
18   to Facilitate Compliance with Section 7(a)(2) of the Endangered Species Act."  A true and
19   correct copy of this reassessment is included as **Exhibit F** to this declaration.

20    11.    I drafted an e-mail to counsel for OWRD on behalf of KID on April 22, 2020,
21   formally advising them that Reclamation was diverting stored water from UKL without a water
22   right permitting the diversion.  A true and correct copy of this e-mail is attached as **Exhibit G** to
23   this declaration.

24    12.    As general counsel for KID, I filed a lawsuit against OWRD in Marion County
25   Circuit Court in 2020, Case No. 20CV17922, seeking to force OWRD to discharge its statutory
26   obligations to distribute water according to the ACFFOD.  A true and correct copy of the
       complaint is attached as **Exhibit H** to this declaration.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    13.    The Marion County Circuit Court ultimately found in KID's favor and granted

2    summary judgment to KID in an October 13, 2020 order.  A true and correct copy of the order

3    granting KID summary judgment is attached as **Exhibit I** to this declaration.

4    14.    OWRD then moved to stay the decision pending appeal, which the Marion

5    County Circuit Court denied in a letter opinion dated December 17, 2020.  A true and correct

6    copy of the opinion denying OWRD's motion to stay pending appeal is attached as **Exhibit J** to

7    this declaration.

8    15.    OWRD then moved for reconsideration of an earlier motion to dismiss.  The

9    Marion County Circuit Court again denied this motion on January 8, 2021.  A true and correct

10   copy of the order denying OWRD's motion for reconsideration is attached as **Exhibit K** to this

11   declaration.

12   16.    Even after these denials, OWRD has refused to confirm that it will discharge its

13   duties related to the ACFFOD and stop Reclamation from releasing stored water without a water

14   right.  Because of this, KID filed a motion seeking an order to show cause in re: contempt against

15   OWRD.  A true and correct copy of that order setting a hearing to show cause in re: contempt is

16   attached as **Exhibit L** to this declaration.

17   17.    I have reviewed a prior memorandum filed by Reclamation in this case opposing

18   a requested stay by certain water users that makes clear Reclamation knows water must be

19   distributed in accordance with the ACFFOD unless a stay is granted.  A true and correct copy of

20   this memorandum is attached as **Exhibit M** to this declaration.

21   I declare under penalty of perjury under the laws of the State of Oregon that the foregoing

22   is true and correct.

23

24   _____

25   Nathan Rietmann

26

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "A"

**BEFORE THE DIRECTOR**
**OF THE WATER RESOURCES DEPARTMENT**
**OF THE STATE OF OREGON**

**KLAMATH BASIN GENERAL STREAM ADJUDICATION**

| | |
|---|---|
| In the Matter of the Claim of<br>ADY DISTRICT IMPROVEMENT<br>COMPANY; COLLINS PRODUCTS LLC;<br>MARJORIE DIVINE; VICTOR DIVINE;<br>ENTERPRISE IRRIGATION DISTRICT;<br>DAVID GRIFFITH; GARY GRIFFITH;<br>KAREN GRIFFITH; NORA GRIFFITH; DON<br>JOHNSTON AND SON; EARL KERNS;<br>SHIRLEY KERNS; KLAMATH BASIN<br>IMPROVEMENT DISTRICT; KLAMATH<br>DRAINAGE DISTRICT; KLAMATH<br>IRRIGATION DISTRICT; LELAND WOODS<br>TRUST; EDNA LILLY; JOHN LILLY;<br>BRADLEY S. LUSCOMBE; MALIN<br>IRRIGATION DISTRICT; MIDLAND<br>DISTRICT IMPROVEMENT COMPANY;<br>MODOC LUMBER COMPANY; PINE<br>GROVE IRRIGATION DISTRICT; PIONEER<br>DISTRICT IMPROVEMENT COMPANY;<br>PLEVNA DISTRICT IMPROVEMENT CO;<br>POE VALLEY IMPROVEMENT DISTRICT;<br>REAMES GOLF AND COUNTRY CLUB<br>INC; SHASTA VIEW IRRIGATION<br>DISTRICT; SUNNYSIDE IRRIGATION<br>DISTRICT; TULELAKE IRRIGATION<br>DISTRICT; UNITED STATES<br>DEPARTMENT OF INTERIOR, U.S.<br>BUREAU OF RECLAMATION; UNITED<br>STATES DEPARTMENT OF INTERIOR,<br>U.S. FISH AND WILDLIFE SERVICE; VAN<br>BRIMMER DITCH COMPANY; WINEMA<br>HUNTING LODGE; RANDY WALTHALL<br>AND INTER-COUNTY TITLE COMPANY | CORRECTED PARTIAL ORDER OF<br>DETERMINATION<br><br>Water Right Claims (OAH Case 003):<br><br>194 (Griffith/Devine);<br><br>211 (Leeland Woods Trust);<br><br>285 (Lilly);<br><br>289, 290, 291, 292, 293, 294, 295, 296,<br>297, 298, 299 (Bureau of Reclamation);<br><br>312, 317 (U.S. Fish and Wildlife<br>Service);<br><br>321-1, 321-2, 321-3, 321-4, 321-5,<br>321-6, 321-7, 321-8, 321-9, 321-10,<br>321-11, 321-12, 321-13, 321-14,<br>321-15, 321-16, 321-17, 321-18, 322-1,<br>322-2, 322-3, 323-1, 323-2, 323-3, 324<br>(Klamath Project Water Users) |

The GENERAL FINDINGS OF FACT of the FINAL ORDER OF DETERMINATION is incorporated as if set forth fully herein.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

Page 1 of 271

KBA_ACFFOD_07017

*Findings of Fact Pertaining to Identity of KPWU and Relationship of KPWU to Irrigation Districts and Beneficial Users of Water*

73. Certain parties collectively referred to as "Klamath Project Water Users" or "KPWU" filed claims jointly. KPWU consists of KID, KDD, KBID, ADIC, EID, MID, MDIC, PGID, PDIC, PVID, SVID, SID, TID, Johnston, Modoc, Luscombe, Walthall and Inter-County Title, Reames, Winema, and VBDC.

74. Each of the KPWU is a distinct claimant. *(See, e.g.,* OWRD Ex. 1, at 6938, 6950-6998.) The claims of KPWU were filed jointly due to the common reliance on specific appropriations as the basis for the water rights claimed, and due to the inter-related nature of the use of water in the Klamath Project. (Van Camp Direct, ¶ 14; OWRD Ex. 1 at 6937, 6946.) Except when otherwise identified, each of the KPWU asserted an undivided interest in each right claimed, appurtenant to all lands within their claims. In general, water is delivered to land within the KPWU claims pursuant to contracts between Reclamation and (1) members of KPWU or (2) landowners on whose behalf KPWU claims are asserted, or pursuant to contracts between members of KPWU and Reclamation under which a KPWU member has committed to deliver water to another party who is a party to a contract with Reclamation. *(See, e.g.,* Van Camp Direct, ¶ 14.)

75. Members of KPWU who are not themselves landowners or who do not themselves own all of the land identified as the place of use in a claim have filed their claims in the following manner as illustrated by KID (OWRD Ex. 1, p. 7030):

Claimant:     Klamath Irrigation District (KID), on behalf of itself and its members and on behalf of all landowners and holders of possessory interests in land and holders of title within the KID and on behalf of landowners and holders of possessory interests in land and holders of title in Oregon and served by KID's distribution system and on behalf of any entities who have authorized the KID to file on their behalf. ...

76. The following persons originally among the KPWU withdrew their claims: Don Vincent, Ralph Stearns, Gary Orem, Berlva Pritchard, and Klamath Hills District Improvement Company. *(See* Van Camp Direct, ¶ 14.) In addition, in other documents in this adjudication proceeding, Collins and Plevna are identified as among the KPWU. Collins and Plevna filed claims separately (Claims 289 and 290), and on the KPWU claims as filed were not joint claimants with the other KPWU parties. Collins and Plevna's individual claims are discussed separately below.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

Page 29 of 271

KBA_ACFFOD_07045

## B. Water was applied to beneficial uses with reasonable diligence

The United States argues that compliance with the procedure set forth in the 1905 Act is sufficient to establish a vested water right. As described in detail in Section I.K.4 below, OWRD concludes that a vested water right cannot be established under the 1905 Act without application of water to a beneficial use. OWRD therefore addresses the evidence of application of water to a beneficial use and concludes that, as to the place of use set forth herein for each claim recognized in this Partial Order of Determination with a May 19, 1905 priority date, water was applied to beneficial use with reasonable diligence.[13]

The Findings of Fact set forth, in detail, the extensive efforts made to construct and complete the Klamath Project works and to apply water to beneficial uses. These efforts stretched over a period of more than 60 years, with the completion of the Klamath Project occurring in 1972. By the time of its completion, the Klamath Project was capable of serving over 220,000 acres. Not all of this land is irrigated in any given year. In 1972, for example, 193,160 acres were irrigated. (Bunse Direct, ¶ 82.) In 1951, this figure was approximately 190,000 acres. (Wee Direct, ¶ 56.)

Importantly, the evidence shows continual effort throughout the 60-plus year period to expand water storage capacities, irrigation works and put more land under irrigation, with the vast majority of the work having been completed within 46 years. While such a period is beyond what would be considered reasonable diligence for a small irrigation development, it is warranted given the size and complexity of the Klamath Project and the absence of any considerable gaps in development efforts. Comparatively lengthy periods have been considered to constitute diligent development for other significant, but considerably smaller irrigation projects in Oregon. *See, e.g.*, *Wapinitia Irrigation Co. v. Water Users Corp. of Juniper Flat*, 141 Or 504, 507-08 (1932) (34-year development period for development of 12,000 acres of irrigation considered reasonable); *In re Water Rights of Deschutes River and Tributaries*, 134 Or 623, 641, 676 (1930) (20-year development period for development of 48,000 acres considered reasonable). *See also* GENERAL CONCLUSIONS OF LAW CONCERNING PRE-1909 CLAIMS. Based on the facts in this case, OWRD concludes that water was applied to a beneficial use with reasonable diligence on the place of use set forth in the Water Right Claim Description for each claim recognized in this Partial Order of Determination with a May 19, 1905 priority date.

## C. Purposes of Use

The permissible purposes of use for the water rights arising under the May 19, 1905 Notice are defined by several principles. First, under ORS 539.210 and OAR 690-030-

---

[13] Both the United States and KPWU contend that the 1905 Act dispensed with the common law requirement that, in order to establish a vested water right, water must be applied to a beneficial use with "reasonable diligence." *See* GENERAL CONCLUSIONS OF LAW CONCERNING PRE-1909 CLAIMS. Because OWRD concludes that water was applied to the described place of use with reasonable diligence, it is unnecessary to reach this question.
CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07057

0085, the purposes of use that may be recognized are limited to those which have been properly claimed. Second, the use of water must be recognized as a beneficial use under Oregon law. Third, the water must have been applied to the beneficial use claimed. Fourth, the purposes of use may be limited by the United States' characterization of the intended appropriation as described in the May 19, 1905 Notice. Finally, because the United States was authorized to make the May 19, 1905 Notice under the Reclamation Act of 1902, 43 USC §§ 372 *et seq.*, 32 Stat 388 ("Reclamation Act"), the permissible purposes of use may be limited by the Reclamation Act.

The United States' claims based on the May 19, 1905 Notice include the purposes "provided for by…the Reclamation Act, as amended and supplemented, including irrigation, reclamation, domestic, and other authorized uses." (OWRD Ex. 1 at 01254 and 02921.) KPWU's equivalent claims initially identified "irrigation and stock" as the purposes of use. (*See, e.g.,* OWRD Ex 1. At 06925.) KPWU subsequently clarified that certain of the uses it had considered to be "irrigation" might be more appropriately considered "domestic" or "municipal" uses. (OWRD Ex. 1 at 07843.) Finally, in testimony, KPWU further clarified that there are no separate diversions of water for stock uses and that there is no municipal use within the Klamath Project. (Van Camp Direct at ¶ 16.) KPWU's claimed purposes of use, as clarified, are therefore irrigation and domestic uses, with stock water use incidental to irrigation.

Irrigation, domestic, and incidental stock water uses, in addition to the use of water for storage were each recognized as beneficial uses under Oregon law at the time of the May 19, 1905 appropriation. Each of these claimed uses remains a recognized beneficial use under Oregon law today. OAR 690-300-0010.

The evidence shows that water has been put to beneficial use within the Klamath Project for irrigation, domestic and incidental livestock uses, and storage of water.

The May 19, 1905 Notice provides that "the United States intends to use the above described waters in the operation of works for the utilization of water in the State of Oregon under the provisions of the act of Congress…known as the Reclamation Act." The Reclamation Act therefore defines and limits the purposes of use that the United States intended to and could permissibly develop under the May 19, 1905 Notice.

Section 1 of the Reclamation Act provides that the reclamation fund established by the Act is to be used for "the construction and maintenance of irrigation works for the storage, diversion, and development of waters for the reclamation of arid and semiarid lands…." A relevant dictionary definition of reclamation is "[t]he process of bringing economically unusable land to a higher dollar value by physically changing it; *e.g.* draining a swamp, irrigating desert, replanting a forest." Black's Law Dictionary 880 (6th Edition, Abridged 1991).

Each of the uses claimed and put to beneficial use within the Project fall within the definition of "reclamation," with one exception. In its Claims 312 and 317, which

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295,  296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9,  321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18,  322-1,  322-2, 322-3, 323-1, 323-2, 323-3, and 324

**D. Use of Water for Storage: Claims 294, 322-3, and 324**

KPWU made several claims for storage of water for use by the Project. Claims 322-1, and 322-2, are based on alleged storage made *prior to* the May 19, 1905 Notice. These two claims are discussed in Section II, below. Claims 322-3 and 324 are based on the May 19, 1905 Notice. Claim 322-3 is for storage of 629,780 acre-feet of water in Upper Klamath Lake and 18,500 acre-feet of water in Lake Ewauna, each with a storage season of January 1 through December 31. For the reasons described in Subsection 1, directly below, Claim 322-3 is denied. Claim 324 is for storage of 34,000 acre-feet of water in Tule Lake, with a storage season of January 1 through December 31. For the reasons described in Subsection 2, below, Claim 324 for storage in Tule Lake is denied.

The United States also filed a storage claim based on the Notice of Appropriation of May 19, 1905. Claim 294 is for storage of 486,828 acre-feet in Upper Klamath Lake, with a season of storage of January 1 through December 31. Claim 294 also claims the right to store water in Gerber Reservoir, Clear Lake Reservoir, Anderson Rose Reservoir, Tulelake Sump, Wilson Reservoir, Spring Lake, and Keno Reservoir (including Lake Ewauna), Harpold Reservoir, Malone Reservoir, Miller Lake and Nuss Lake.

Claim 294 is allowed for storage of water in Upper Klamath Lake from tributaries above Upper Klamath Lake. Gerber Reservoir, Clear Lake Reservoir, Malone Reservoir, and Harpold Reservoir are located in the Lost River Basin, which is not a part of this Klamath River Basin Adjudication. The remainder of the claimed storage facilities are rediversions of water or regulating reservoirs as discussed below.

1. Storage in Upper Klamath Lake

The evidence supports a right to store water in Upper Klamath Lake year around, and a right to appropriate water from storage in Upper Klamath Lake for agricultural irrigation, stockwater and domestic uses during specified seasons of use. As part of its original plans for the Klamath Project, Reclamation envisioned construction of a dam at the outlet of Upper Klamath Lake. In approximately 1916, Copco, which operated power generation facilities downstream of Upper Klamath Lake and on the Klamath River, offered that it would itself construct Link River Dam to provide benefit both to Copco and the Klamath Project. An agreement was made whereby Copco was allowed to make modifications at the outlet of Upper Klamath Lake, and to construct a dam, in order to provide storage and regulation of storage. (Wee Direct, ¶ 47; Bunse Direct, ¶ 63; U.S. Ex. 10001 at 2935, 2905, 2954, 2947.) The United States has historically stored water in and Project irrigators have historically made use of water from Upper Klamath Lake between elevation 4143.3 and elevation 4136. (Van Camp Direct at 33.) The best estimate of the capacity between these elevations is 486,830 acre-feet. This is the "active" storage capacity of Upper Klamath Lake. The total storage capacity of Upper Klamath Lake, including "inactive" storage, is 629,870 acre-feet. Based on these capacities, annual volume within Upper Klamath Lake may not exceed 629,870 acre-feet, of which 486,830 acre-feet is active storage.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

Page 44 of 271

KBA_ACFFOD_07060

As described in detail below, the right to store water in Upper Klamath Lake is held by the United States. As a result, the United States' Claim 294 is recognized and KPWU's equivalent Claim 322-3 is denied. As described in Section I.K.4, below, the right of beneficial use of water in the Project is held by the beneficial users. This applies to the right to the use of both live flow and stored water. As a result, KPWU's Claim 323-3 for appropriation of water actively stored in Upper Klamath Lake is recognized within Klamath Project Consolidated Claim 321-17/293/323-3. Because the source of water in Lake Ewauna is Upper Klamath Lake via the Link River, it is treated as a regulating reservoir rather than as a source of water. As a result KPWU's Claim 323-3 for appropriation of water from Lake Ewauna is denied.    Finally, KPWU's Claim 324 is denied for the reasons set forth below.

## 2.  Storage in Tule Lake Sump, Lower Klamath Lake and Miller Lake

KPWU's Claim 324 is a claim for storage of water in Tule Lake. By granting Claim 294, the Proposed Order recognizes Tule Lake Sump and areas of Lower Klamath Lake and Miller Lake as "regulating" facilities or reservoirs. OWRD clarifies the characterization of these water bodies as follows.

Tule Lake Sump has no known natural outlets. (Mayer Direct at 17.) As natural "storage," it is neither necessary nor appropriate to recognize a separate right for storage in the Tule Lake Sump, as Claim 324 asserts. Water is pumped at the D Pumping Plant from Tule Lake Sump to the P Canal system and Lower Klamath NWR. (Lesley Direct at 68.) The D Pumping Plant is effectively a point of rediversion that makes use of return flows and water entering Tule Lake Sump from operations of irrigation works. Such rediversion and use of return flows is permitted under the rights claimed pursuant to the Reclamation Act and the Act of 1905. Tule Lake Sump's natural storage role should be recognized within the context of Project operations, but no separate storage right should be recognized. Claim 324 is denied.

Similarly, water "stored" in areas of Lower Klamath Lake and Miller Lake is either return flow or water already diverted for use in the Project. The United States is entitled to reuse of return flows within the Project, and may similarly utilize rediversion facilities for the permissible purposes of the Project. The United States has not claimed a separate storage right for storage in these areas; therefore, no separate right is recognized.[15] It is

---

[15] In any event, it is not possible to determine from the evidence in the record the volume of water that is artificially stored, or the area in which it is stored. The record does demonstrate that these areas historically included natural storage in the form of Lower Klamath and Miller Lakes, and that water in these areas can only be characterized as artificial storage to the extent that water is stored in a way that it would not naturally have occurred. The record also demonstrates that water was naturally "stored" in Lower Klamath Lake throughout the year at an elevation up to 4084 feet. U.S. Ex. 15008 at 1, 2, 42, 49 (Darr, 1923) (lowest measured level of lake was 4084.1, at which elevation "practically" the entire area was flooded; the measurement was taken on September 15, 1908, at which point the flood waters would have receded, and outflow to Klamath River would have ceased).  Above this, water may have seasonally flowed back into the Klamath River.  In addition, the only attribute that need be recognized of the water CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295,  296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9,  321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18,  322-1,  322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07061

a fifth Plevna point of diversion at NE¼ NW¼, Section 19, T 39 S, R 8E, WM. As discussed in the preceding section OWRD considers the point of diversion in the SE¼ SW¼ Sec. 18 and the point of diversion in NE¼ NW¼, Section 19 to be one and the same, and of these two OWRD will recognize only the point of diversion in NE¼ NW¼, Section 19. In addition, the Proposed Order recognized a total of 39 cfs from the five Plevna points of diversion, which exceeds the 30 cfs originally claimed. OWRD has allowed rates as provided in the Proposed Order for the four Plevna points of diversion listed above, being 8, 8, 7 and 9 cfs, respectively. However, the four points of diversion recognized for Plevna herein are limited to a combined total of 30 cfs.

The rates associated with each measurement station are listed in the Water Right Description for the Klamath Project Consolidated Claim 321-17/293/323-3 and Claims 312 and 317.

## K. Ownership of Water Rights Recognized based on the May 19, 1905 Notice[33]

The United States and KPWU both assert ownership of the rights claimed based on the May 19, 1905 Notice. As described in this section of the Opinion, OWRD concludes that the United States and the beneficial users of the water, represented in this proceeding by the KPWU entities, both hold interests in the recognized water rights.

### 1. ORS Chapter 539 Contemplates that an Adjudication Will Identify the "Owner" of the Water Right

One of the objectives of a water rights adjudication under ORS Chapter 539 is to determine the "owner" of a particular water right. Once the adjudication process is complete, OWRD is ultimately required to issue water rights certificates for valid claims that, among other things, set "forth the *name* and post-office address *of the owner of the right....*" ORS 539.140. Where multiple individuals or entities claim an interest in the same appropriation of water, OWRD must determine the proper owner or owners of the right.

As relevant here, ORS 537.250(2) contemplates that a certificate may be issued to a "district," as defined in ORS 540.505,[34] or to a "government agency," a term broad enough to encompass federal agencies such as the Bureau of Reclamation or the United

---

[33] A recent Oregon Supreme Court decision addresses issues related to the ownership of water rights in the Klamath Project. *Klamath Irrigation Dist. v. United States*, 345 Or 638 (2009). That proceeding, however, involved only beneficial or equitable interests in any water rights that might be determined for the Klamath Project in this Adjudication proceeding. It did not address and did not purport to address title interests in the water rights, which are determined herein. *Id.* at 36 n14.

[34] ORS 540.505(1) states that:
   "District" means an irrigation district formed under ORS chapter 545, a drainage district formed under ORS chapter 547, a water improvement district formed under ORS chapter 552, a water control district formed under ORS chapter 553 or a corporation formed under ORS chapter 554.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07073

States Fish and Wildlife Service. Moreover, KPWU, the United States and the Klamath Tribes entered a stipulation in this case that provides:

> With respect to claims 289, 290, 293-299, 312, 317, 321-324, 194, 211, 285-288, and 291-292, the Parties stipulate and agree that where [the Bureau of] Reclamation, the [United States Fish and Wildlife] Service, KPWU, or others have filed separate claims in the Adjudication for the same water right with respect to the same use and the same place of use, and such water right determined in the Adjudication shall be limited to the beneficial use. The Parties further stipulate and agree that only one water right is to be determined in such circumstances in the Adjudication . . . . The Parties further recognize, without admission, *that more than one party or person may hold an interest in that adjudicated water right.*

Contest Dismissal Agreement and Stipulation Between Klamath Project Water Users, the Klamath Tribes, and the United States; Order of the Hearing Officer in Case 003, *nunc pro tunc* December 6, 2002. (Emphasis added).

It is with these considerations in mind that this Partial Order of Determination sets forth the interests of relevant parties in the water rights at issue in this case. The legal principles governing this matter are discussed next.

2. State Ownership of Water

The rights being adjudicated in this proceeding are *use* rights. The corpus of the water—or the water itself—"belongs to the public" and is held in trust by the state. *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 US 142 (1935) (nonnavigable waters); *Shively v. Bowlby*, 152 US 1 (1894) (navigable water held by the United States "in trust for the future States"; title vests in the several States, when organized and admitted to the Union"); *Jones v. Warmsprings Irr. Dist.*, 162 Or 186, 196 (1939) (water in naturally occurring watercourse is "nobody's property" and "belongs to the public"). A water right is a right to the use of the water—a usufructary right. *In re Hood River*, 114 Or 112, 195 (1924) ("No one has any property in the water itself but a simple usufruct."); *In re North Powder River*, 75 Or 83, 93 (1915) ("it is not the water but the use of it for a particular purpose that is the limit of the right"). *See generally* 49 Or Ops Atty Gen 284, 308-09.

3. The Question of who "Owns" or "Holds" the Water Rights Claimed in this Case is One of Oregon Law

Under Section 8 of the Reclamation Act of 1902 ("1902 Reclamation Act"), state law controls the question of who "owns" or "holds" project water rights. Section 8 provides, in relevant part:

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

Page 58 of 271

KBA_ACFFOD_07074

> Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriators, or user of water in, to, or from any interstate stream or the waters thereof.

43 USC § 383, Act of June 17, 1902, 32 Stat 388. Thus, it is necessary to look to *Oregon* law to determine who should "own" or "hold" the rights to Klamath Project Water rights.

Ownership of irrigation rights in projects built pursuant to the Reclamation Act have been the subject of several Supreme Court decisions. *Nevada v. United States*, 463 US 110 (1983); *California v. United States*, 438 US 645 (1978); *Nebraska v. Wyoming*, 325 US 589 (1945); *Ickes v. Fox*, 300 US 82 (1937). These decisions confirm that the question of ownership is one of state law. In *California*, the Court held that state law governs in Reclamation Projects unless there is a specific congressional directive to the contrary. *California*, 438 US at 665, 668, 678. There is no directive to the contrary with regard to the question of ownership of the rights. Under Section 8, the state's law of appropriation is controlling, and this law also bears on the question of ownership. Finally, the Supreme Court has looked to the law of the state in each case considering ownership of project water rights. *Nevada*, 436 US at 126; *Nebraska*, 325 US at 613-15; *Ickes*, 300 US at 94-95.

### 4. Interests held by the beneficial users

#### a. The beneficial users hold an interest in the recognized rights for the purpose of beneficial use

The beneficial users of water appropriated pursuant to the May 19, 1905 Notice hold a legal interest in rights recognized based on this appropriation for the purpose of beneficial use.[35] This interest is supported by three well-settled principles of Oregon's common law of water rights.

The first principle is that one person can appropriate water for the use of another person. "An appropriation may be made by one person for the future use of another and for future use upon lands which the appropriator does not then own, or which he does not contemplate owning, and which he never does own." *See In re Water Rights of Hood River*, 114 Or 112, 137, 227 P 1065 (1924) (notice of appropriation posted by irrigation district's predecessor); *See also In re Waters of Deschutes River*, 134 Or 623, 655, 286 P

---

[35] The discussion of ownership interests in this Partial Order of Determination is limited to rights initiated under Oregon law prior to February 24, 1909.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07075

563, *modified and reh'g denied*, 294 P 1049 (1930) (discussing irrigation district role and citing *Hood River*). In the context of this case, this principle means that the United States' role in filing the notice of May 17, 1905, does not in preclude the beneficial users from holding a legal interest in the right.

The second principle is that water rights are appurtenant to land: they are attached to and travel with the land. *Teel Irrigation Dist. v. Water Resources Dept.*, 323 Or 663, 668 (1996).[36] Since the beneficial users of water are typically the owners of the land that the water is intended to benefit, treating the water right as an appurtenance rather than a more freely alienable property interest supports the beneficial user holding a legal interest in the right.

Third, under Oregon law, state water rights arise through application of water to beneficial use. *In re Water Rights of Silvies River*, 115 Or 27, 64-65 (1925). Under Oregon's water code, the actual beneficial use of water is the basis for recognized water rights. *Alexander v. Central Oregon Irrigation District*, 19 Or App 452, 457 (1974). This principle has remained consistent since Oregon's first recognition of appropriative water rights. *See In re Waters of Umatilla River*, 88 Or 376, 168 P 922 (1917), *modified and aff'd on reh'g*, 172 P 97 (1918) (noting that the principle that "beneficial use shall be the basis, the measure, and the limit of all rights to the use of water" had been "well supported by court decisions" before being "crystallized into statutory form by the Act of February 27, 1913, Chapter 279"). The beneficial user's critical role in establishing the water right supports the beneficial user holding a legal interest in the right for the purpose of the beneficial use.[37]

United States Supreme Court precedent provides persuasive support for the conclusion that, under Oregon common law, the beneficial user holds a legal interest in a water right for the purpose of beneficial use. *Ickes v. Fox*, 300 US 82 (1937), and

---

[36] The appurtenancy principle does not make water rights inseparable from land. *See Haney v. Neace-Stark Co.*, 109 Or 93, 114-116 219 P 190 (1923) (citing *Williams v. Altnow*, 51 Or 275 (1908), *Whited v. Calvin*, 55 Or 98 105 P 396 (1909), *Porter v. Hough*, 51 Or 318 102 P 728 (1908) and the predecessor to the current transfer statute, ORS 540.510, *et seq.*, which now states that "all water used in this state shall remain appurtenant to the premises upon which it is used and no change in use or place of use of any water for any purpose may be made without compliance with [enumerated statutory procedures]").

[37] The Klamath Tribes, in their Response to the Opening Briefs of the United States and the Klamath Project Water Users ("Klamath Tribes' Response"), argue that the first element of a pre-1909 water right, intent to appropriate to a beneficial use, "determines ownership of water rights for irrigation projects in Oregon." Klamath Tribes' Response at 19. Under this theory, the beneficial user does not have an ownership interest in the water right. *Id.* The Klamath Tribes' Response relies heavily on language in *Nevada Ditch Co. v. Bennett*, 30 Or 59, 45 P 472 (1896), which compares Colorado water law, where an intent to appropriate is not required, and Oregon law, which requires such an intent. The Court suggests that, where intent is required, the one with the intent might be considered the "principal" rather than the beneficial user. *Nevada Ditch Co.*, 30 Or at 97. This, however, is dictum. The Court goes on to state: "As to who, in general, would own the appropriation when completed, it is not necessary for us to say at this time." *Id* at 98. The Klamath Tribes' reliance upon statements that may speak to ownership in *Nevada Ditch Co.* is therefore unpersuasive. As in other western states, beneficial use is the basis for a recognized water right.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07076

*Nebraska v. Wyoming* 325 US 589 (1945), reach a common conclusion: under both the Reclamation Act and the law of the states involved, the legal ownership of the water right is vested in the individual who makes beneficial use of the water. As noted above, the question of the ownership of project water rights is one of state law. This means that *Ickes* and *Nebraska*, which relied on the water law of states other than Oregon, are not binding precedent. However, the principles underlying the Supreme Court's decision in each case apply also in Oregon: (1) perfection of a water right requires beneficial use, and (2) a water right is appurtenant to the land on which it is used.[38,39] *Ickes*, 308 US at 93-96; *Nebraska* at 613-14. *Ickes* and *Nebraska* are therefore highly persuasive.

Based on principles of Oregon's common law pertaining to water rights and on the persuasive value of *Ickes* and *Nebraska*, the beneficial user of water holds a legal interest in a water right for the purpose of beneficial use. This principle applies to pre-1909 water right claims unless modified by statute. As described below, the 1905 Act does not alter the beneficial users' legal interest in the use of water appropriated pursuant to the notice of May 17, 1905.

*b. Oregon's Act of February 22, 1905, Or. Gen Laws, 1905, Ch. 228 ("1905 Act") does not change this outcome*

Neither the requirement of beneficial use as the basis of the water right nor the principle of appurtenancy is altered by Oregon's Act of February 22, 1905, Or. Gen Laws, 1905, Ch. 228 ("1905 Act"). As a result, the 1905 Act does not alter the analysis in the preceding section or its conclusion: beneficial users hold a legal interest in water rights acquired under the 1905 Act for the purpose of beneficial use.

---

[38] Finally, a recent decision by the Idaho Supreme Court is consistent with *Ickes* and *Nebraska*. *United States v. Pioneer Irrigation District*, No. 31790 (Idaho, filed March 9, 2007). The Court first found that, under the Reclamation Act of 1902, the ownership of water rights appropriated pursuant thereto was a question of state law. *Id.* at 7. The Court then determined that, because Idaho law required application of water to a beneficial use for an appropriative right to vest, the beneficial user owned the right for the purpose of beneficial use. *Id.* at 10-14. The court also recognized the connection between beneficial use and ownership of water rights as a "common theme" in United States Supreme Court cases concerning ownership of water rights appropriated pursuant to the Reclamation Act. *Id.* at 10. A companion case filed on the same day reached the same conclusion. *Bray v. Pioneer Irrigation District*, No. 31794 (Idaho, filed March 9, 2007). As with *Ickes* and *Nebraska*, this case is based on Idaho law, and thus not binding as precedent. But as with *Ickes* and *Nebraska*, the state-law principles the Court relied on exist in Oregon as well, and the decision is therefore persuasive.

[39] A third case, *Nevada v. United States*, 463 US 110 (1983), found that the beneficial users of the water held only an equitable interest, and not a legal interest, in the use of water. *Nevada* is distinguishable because the issue of legal ownership of the water rights at issue in that case had previously been determined in a separate proceeding, in which neither the beneficial users of the rights nor the irrigation districts chose to appear. *Nevada v. United States*, 463 U.S. 110, 122–26 and n9 (1983).

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

Page 61 of 271

KBA_ACFFOD_07077

Section 2 of the 1905 Act sets out a specific procedure for the United States to appropriate water for federal irrigation projects:

> Whenever the proper officers of the United States, authorized by law to construct works for the utilization of water within this State, shall file in the office of the State Engineer a written notice that the United States intends to utilize certain specified waters, the waters described in such notice and unappropriated at the time of the filing thereof shall not be subject to further appropriation under the laws of this State, but shall be deemed to have been appropriated by the United States; provided that within a period of three years from the date of filing such notice the proper officer of the United States shall file final plans of the proposed works in the office of the State Engineer for his information; and provided further that within four years from the date of such notice the United States shall authorize the construction of such proposed work.

The United States argues that compliance with this procedure is sufficient to establish a vested water right. Specifically, the United States equates the phrase "deemed to have been appropriated by the United States" with the acquisition of a vested water right. Because the procedure does not mention beneficial use of water, the United States argues that the 1905 Act does not require beneficial use as a requirement to obtain a vested water right. The United States then argues that it holds title to the vested water right, because the United States established a water right without the efforts of the beneficial users of the water.

A careful review of the 1905 Act establishes that the legislature did not intend to dispense with the beneficial use requirement. Compliance with the statutory procedure established a superior claim to water as against appropriators subsequent in time to their notice, *see Nevada Ditch Co. v. Bennett*, 30 Or 59, 89, 45 P 472 (1896), but a right based on that claim did not vest until application of water to a beneficial use.

The goal of statutory interpretation is to determine the intent of the legislature. *Portland General Electric Co. v. Bureau of Labor and Industries*, 317 Or 606, 610 (1993). Under *PGE*, "the text and context of the statute" serves as "the first level of analysis" in statutory interpretation. *Id.* The context of a statute includes other provisions of the same statute and provisions of related statutes. *Id.* at 611. Rules of statutory construction bearing on the interpretation of text and context guide this first level of analysis. *Id.*

Textually, the statute does not address, much less supersede, the principles of beneficial use or appurtenancy. Oregon's courts are hesitant to read a statute to depart from long-established rules. *See e.g. Baker v. City of Lakeside*, 343 Or 70, 76, 164 P3d 259 (2007) (court hesitant to read statute to depart from procedural rule in effect for over 100 years); *State v. Miller*, 309 Or 362, 368, 788 P2d 974 (1990) (court considered fact that no previous statute on the same subject – DUII – had ever been interpreted to require

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

Page 62 of 271

KBA_ACFFOD_07078

suggested culpable mental state). The 1905 Act's failure to explicitly declare that the longstanding principles of appurtenancy and beneficial use are superseded therefore weighs against the United States's preferred interpretation.

In place of an explicit declaration, the United States relies on the provision declaring that compliance with the required procedure results in unappropriated water that is subsequently "deemed to have been appropriated by the United States." "Appropriation" is therefore the key term for the purposes of determining interests in water rights subject to Section 2 of the 1905 Act. If "appropriation," as the term is used in this context, means "acquisition of a vested water right," then the 1905 Act would not require application of water to a beneficial use as a prerequisite for acquiring a vested water right.[40]

One of the rules of construction bearing on the interpretation of a statute's text and context provides that "words of common usage typically should be given their plain, natural, and ordinary meaning." *Id.* Another rule provides that absent legislative intent to the contrary or other evidence of a different meaning, legal terms in a statute are presumed to have been used in their legal sense. *Bradley v. U.S.*, 410 US 605 (1973); *Cordon v. Gregg*, 164 Or 306, 312 (1940).

In the context of western water law, and in Oregon water law particularly, "appropriation" could be characterized generally as a legal term of art. Prior to the 1905 Act, "appropriation" had been defined by numerous Oregon Supreme Court opinions. These opinions generally defined the term either as (1) "application of water to a beneficial use" or (2) a process involving intent to apply water to a beneficial use, diversion from a natural stream (at least where required for the application to beneficial use), and actual application to a beneficial use. *See, e.g., Grande Ronde Electrical Co. v. Drake*, 46 Or 243, 249 (1905); *Beers v. Sharpe*, 44 Or 386, 395 (1904); *Oregon Const. Co. v. Allen Ditch Co.*, 419 Or 209, 218 (1902).

However, these were not the only meanings given to "appropriation" by pre-1905 Oregon water law statutes. In *Grande Ronde Electrical Co.*, the Oregon Supreme Court found that, given the text as a whole of the statute in which the term "appropriation" appeared, neither of the above definitions was applicable. Instead, the court found that "appropriation" meant the condemnation of riparian water rights of other users. 46 Or at 249.

As a result of these multiple uses of the term, the Oregon Supreme Court found, in *Klamath Irrigation District v. United States*, 348 Or 15, 38 (2010), that the meaning of "appropriation" was "open" (i.e., subject to interpretation based on the context of the term's use) when the 1905 Act was enacted.[41]

---

[40] It is unclear what effect this interpretation might have on the appurtenancy principle. Because we conclude that the United States' interpretation is incorrect, we decline to speculate on this issue.

[41] "It follows from *Nevada Ditch* that, in designating the United States as the appropriator of the water right, the legislature did not necessarily intend to signify that either the United States or the users owned the water rights.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07079

Because of the multiple uses of the term "appropriation" in pre-1905 water law statutes and case law, it is necessary to carefully examine the context of the term's usage. In the case of the 1905 Act, the statutory context amply demonstrates that "appropriation" was intended to refer only to the requirements for filing a valid notice of intent to appropriate, and not in the sense of having fulfilled all requirements to obtain a vested water right.

Section 1 of the 1905 Act is titled "Appropriation of Water." It provides the notice requirements for "[a]ny person, association, or corporation hereafter *intending* to acquire the right to the beneficial use of any waters...." (Emphasis added). The section deals solely with notice procedures, and there is no suggestion that mere compliance with the notice procedure results in the acquisition of a vested water right, or that compliance is deemed beneficial use. Rather, the section provides only the means by which a private party may demonstrate notice of *intent* to beneficially use water. By titling Section 1 "Appropriation of Water," the Oregon Legislature defined the term "appropriation" in a way that does not equate it to the acquisition of a vested water right.

When considered in the broader context of Oregon water law, this definition of "appropriation" is unsurprising.  Under Oregon's common law of water rights, the priority date of a vested water right may relate back to the date an *intent* to beneficially use water first existed, even if beneficial use is not actually made until later (provided that application to a beneficial use is completed with reasonable diligence). Because of the difficulty of verifying an intent to act, it was frequently required that notice of this intent be made. If the notice was valid, it provided the "place in line" that enabled the subsequent application of the relation back doctrine once beneficial use was made. In Section 1, therefore, the "appropriation" made is that of a place in line, rather than the acquisition of a vested right.  It is an "appropriation" that becomes a perfected, vested right only upon application to a beneficial use.

"Use of the same term throughout a statute indicates that the term has the same meaning throughout the statute." *PGE*, 317 Or at 611. Therefore, the meaning given to "appropriation" in Section 1 of the 1905 Act applies to Section 2.[42] The title of Section 2 is very similar to the title of Section 1: "Appropriation of Water by United States."

---

Rather, under *Nevada Ditch*, the meaning of that term was open at the time that the 1905 legislature used it." *Klamath Irrigation District*, 348 Or at 38.

The *Klamath Irrigation District* court specifically reserved the question of whether the 1905 Act intended to dispense with the beneficial use requirement. *Id.* at 47 n20.

The term "appropriation" appears outside of Sections 1 and 2 in just one other location in the 1905 Act. Section 5, entitled "Decrees Adjudicating Water Rights", provides that "[s]uch decree shall in every case declare, as to the water right adjudged to each party, whether riparian or by *appropriation*, the extent, the priority, amount, purpose, place of use, and, as to water used for irrigation, the specific tracts of land to which it shall be appurtenant...." (Emphasis added). This use of the term does not add to the contextual understanding of Sections 1 and 2, because it is merely used to identify the two existing systems of water rights in Oregon: riparian and appropriative.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07080

Section 2, like Section 1, provides the "appropriator" a place in line and the opportunity to acquire a vested right relating back to the date of a valid notice of appropriation.

The clause in Section 2 providing that "[n]o adverse claims" could be acquired except as might formally be released does not alter this conclusion. Rather, this clause is simply a recognition of the relation back doctrine. Once the United States acquired its place in line, someone with a later place in line could not defeat the United States' priority, even if the person with the later place in line applied water to a beneficial use before the United States. By filing its notice under the 1905 Act, the United States acquired a place in line. It did not, however, acquire a vested water right.

In addition to comporting with the context of the 1905 Act, this interpretation of "appropriation" fits better in the context of Oregon water law as a whole. First, Section 2 provides that "the waters described in such notice and unappropriated at the time of the filing thereof shall not be subject to further appropriation under the laws of this state...." If "appropriation" is defined for the purposes of Section 2 as the acquisition of a vested right, Section 2 would defeat the priority of those who had a prior intent to beneficially use water, and who might have expended resources in the construction of diversion works, but who had not applied water to a beneficial use prior to the United States' filing of its notice. The water those individuals or entities intended to use could not, under such an interpretation, be considered "appropriated," so the United States would be able to "appropriate" it and establish a senior priority. The end result of this interpretation is that prospective water users would no longer have been able to rely on the principle of relation back.

A 1905 Oregon Attorney General Opinion concluded that this was not the intent of the 1905 Act. Referring to a private individual who had initiated the notice process under Section 1 of the 1905 Act shortly before the United States filed its notice, the Opinion states: "I am of the opinion that the United States can not intervene and defeat a private appropriation of waters after the private appropriation has been duly initiated." 1 Opp Atty Gen Ore 173 (1905). As support for this conclusion, the Opinion cites the doctrine of relation back. *Id.*

Second, equating "appropriation" under the 1905 Act with the acquisition of a vested right would have removed the requirement of beneficial use, at least as to the lands covered by any valid notice of the United States, which by the time of the 1905 Act was a "well understood" component of acquiring a vested water right in Oregon. *Oregon Const. Co v. Allen Ditch Co.*, 41 Or 209, 218 (1902). As a policy matter, allowing acquisition of vested rights without beneficial use would have removed a significant incentive to the actual beneficial use of water, and thus undermined the central policy goal of both the Reclamation Act and Oregon's pre-1909 water law.[43]

---

[43] While, as the Proposed Order notes, in Oregon "the legislative power includes the authority to write a seemingly absurd law," (*see also Young v. State*, 161 Or App 32 (1999)), a statutory interpretation that gives rise to absurdity will only be countenanced when it is the only plausible interpretation. Proposed Order at 19. Where a statute has two or more plausible meanings, the statute must be interpreted to avoid absurdity. Here there is no need to resort to

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07081

The 1905 Oregon Attorney General Opinion similarly concluded that beneficial use remained the basis of vested water rights under the 1905 Act. The Opinion treated the "appropriation" accomplished by complying with the terms of the 1905 Act as merely the first step in the acquisition of a vested right. After referring to waters "which said applicant has so appropriated by posting his notice at the point of diversion and filed in the office of the county clerk," the Opinion states that "an appropriation does not become final and perfected until the works by which the water is diverted, so as to be actually used, are completed." 1 Opp Atty Gen Ore 173 (1905).

In sum, "appropriation" was, at the time of the 1905 Act, a term that was susceptible to more than one meaning in statutory and common water law. The context provided by the other provisions of the 1905 Act demonstrates that the legislature chose to define "appropriation" for the purposes of the 1905 Act as the acquisition of a place in line, which could be converted to a vested right by application to beneficial use. This interpretation is supported by the context of Oregon's pre-1905 water law as a whole. Because the 1905 Act disturbed neither the beneficial use requirement nor the appurtenancy principle, the beneficial user holds a legal interest in water rights appropriated pursuant thereto for the purpose of beneficial use.

### 5. Interests held by irrigation district entities

OWRD recognizes that the beneficial users are, for the most part, listed as claimants in the claims pertaining to the Klamath Reclamation Project. However, the irrigation entities comprising the Klamath Project Water Users can be said to represent the beneficial users' interests with respect to the beneficial use component of the water rights recognized in this Partial Order of Determination.

OWRD does not resolve here the relationships between the irrigation entities and their members. Specifically, it is possible that the beneficial users could have transferred their legal interest in the water right for the purpose of beneficial use to the irrigation entities, while the beneficial users retain a beneficial interest in the right for purpose of beneficial use. While the irrigation entities operate under varying statutory authorities, each type of entity has sufficient authority to hold legal interests in water rights.[44] Whether this has occurred with respect to any given irrigation entity depends on the statutory and contractual relationships between the irrigation entities and their members. Based on the record before us, we conclude that it is neither necessary nor appropriate to define these relationships or their effects here.

---

arguments from absurdity. Given the context of the 1905 Act, defining "appropriation" as the acquisition of a place in line is a far more plausible interpretation, even independent of policy considerations.

[44] The irrigation entities include irrigation districts formed under ORS Chapter 545, corporations for irrigation, drainage, water supply or flood control under ORS Chapter 554, and drainage districts under ORS Chapter 547. In addition, the Klamath Irrigation District has become the functional successor the Van Brimmer Ditch Company, which was organized under and 1891 statute. Statutory authority to hold legal interests in water rights is found, respectively, in ORS 545.523, ORS 554.080, and ORS 547.305.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07082

### 6. Interests Held by the United States

While the beneficial users hold a legal interest in the water right for the purpose of beneficial use under Oregon law, they are not the sole legal owners of the water right. The United States holds legal interests in the right for the purpose of re-use. The United States also holds a separate right for storage of water in Upper Klamath Lake for the benefit of the irrigation rights recognized in this Partial Order of Determination. These interests are described in detail below.

#### a. Re-use Rights

The United States holds a legal interest in the water right for the purpose of re-use of return flows.[45] Under Oregon law, re-use of return flows is permitted within the boundaries of a Federal Reclamation Project. In Oregon "an owner may recapture waste and seepage water before it leaves his land." *Cleaver v. Judd*, 238 Or 266, 271 (1966). For this purpose, where the land lies within the boundaries of a federal reclamation project, the reclamation project as a whole is regarded as the "owning" entity (i.e., legal interest holder). *Id.* at 273; *see also Ide v. United States*, 263 US 497, 508 (1924) (return flows in the Shoshone Project were not subject to appropriation because the United States had the right to reuse the return flows). Therefore, the United States has an interest in project water rights for the purpose of the re-use of return flows.[46]

#### b. Right to store water in Upper Klamath Lake

Under both modern and pre-1909 Oregon law, distinct water rights are issued for storage of water. The current statutory structure provides for application for a reservoir permit, and requires that the applicant follow the same process set forth for other water use permits. ORS 537.400. In the case of storage for irrigation, two permits are granted. *Id.* The permit to establish the reservoir is the "primary" permit, and the permit to irrigate is the "secondary permit." *Id.* OWRD has also recognized rights for storage initiated under pre-1909 law. *See* Final Decree, In the Matter of the Determination of the Relative Rights of the Various Claimants to the Water of the Umatilla River and its Tributaries, a

---

[45] In these proceedings, the parties have referred to water that has been diverted and applied to land in the project, but not consumptively used by crops, and thus either reapplied to land or available for further application, as "return flows". See, e.g., Klamath Tribes' Response at 47. In Oregon case law, such water is also referred to as "waste" or "seepage" water. OWRD will follow the practice of the other parties in referring to such water as "return flows."

[46] Both the United States and the Klamath Tribes argue that the United States' interest in re-use of return flows supports their position that the United States is the sole owner of project water rights. United States' Response at 21-22; Klamath Tribes' Response at 54-58. *Cleaver* does not stand for this principle. Instead, the Oregon Supreme Court carefully qualified its discussion of ownership, holding only that the reclamation project would be "treated" as the owning entity for "the purpose of applying the principle...." *Id.* at 272-73. While the United States has an interest in the re-use of return flows, it does not follow that this interest means that the United States is the sole "owner" or "holder" of the project water rights.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07083

Tributary of the Columbia River, in Umatilla County, Oregon, September 9, 1916, pp. 225-26, 242-43 (decreeing a right for storage in Cold Springs Reservoir) (attached hereto as Appendix B). As a water right, a right for storage of water initiated prior to 1909 is subject to the same requirements for appropriation and vesting as other pre-1909 water rights. Thus, for example, a pre-1909 storage right does not vest unless applied with reasonable diligence to a beneficial use.

Because the right to store water is distinct from the right to use stored water, different principles governing the determination of ownership apply. Under modern Oregon law, in addition to application to beneficial use, development of a storage right requires (1) an applicant; (2) the applicant's right to use the land where the water will be stored; and (3) construction and operation of the storage facility. *See, e.g.,* OAR 690-310-040(1)(a)(F), 690-330-010. Similarly, pre-1909 principles require an actor with the intent to appropriate, diversion to storage (which of necessity requires the construction and operation of the storage facility), and, in order to construct the storage facility, the right to use the site where the water will be stored.

Where the same entity or individual is the initial appropriator, the constructor and operator of the storage facility, and the holder of a right to use the site for storage, then that entity or individual possesses sufficient interest in the storage right to be declared the owner of the storage right. Depending on the circumstances, certain use rights short of fee simple ownership of a site may also create sufficient interest in the storage right for the holder of the use right to be declared the owner of the right. While a storage right also requires application to beneficial use in order to vest, the separation of storage and use rights means that the beneficial user maintains a legal interest in the use right, but does not necessarily possess a similar interest in the storage right by virtue of beneficial use.

Applying these principles to the facts in this case, the United States is the owner of a right to store water in Upper Klamath Lake to benefit the separate irrigation rights recognized for the Klamath Reclamation Project in this Partial Order of Determination.

The May 19, 1905 Notice constitutes the necessary intent to appropriate. Oregon legislation enacted in 1905 granted the United States the right "for the purpose of aiding in the operations of irrigation and Reclamation" to use "any part or all of the beds of said lakes [including Upper Klamath Lake] for the storage of water". General Laws of Oregon at 63 (January 20, 1905) ("1905 Oregon Storage Law"). Effectively, the law granted the United States a statutory license over the named lakes for the purpose of storage of water in connection with the Klamath Project.[47] This statutory license provides the United States with the right to use the bed of the named lakes sufficient to serve as the basis for

---

[47] It is important to note, however, that the 1905 Oregon Storage Law does not itself grant a storage right, as the Klamath Tribes appear to argue. (*See* Klamath Tribes' Response at 17-18.) The language of the 1905 Oregon Storage Law is clear on this point. The legislation granted the right to use the beds "for the storage of water." This is a right that is distinct from the right to actual storage of water. One is a property interest in the lake bed, the other is a property interest in the use of water.

CORRECTED PARTIAL ORDER OF DETERMINATION for OAH CASE 003

Claims 194, 211, 285, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 312, 317, 321-1, 321-2, 321-3, 321-4, 321-5, 321-6, 321-7, 321-8, 321-9, 321-10, 321-11, 321-12, 321-13, 321-14, 321-15, 321-16, 321-17, 321-18, 322-1, 322-2, 322-3, 323-1, 323-2, 323-3, and 324

KBA_ACFFOD_07084

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "B"





CAMERON F. WOGAN
Circuit Judge

# Circuit Court of the State of Oregon
### for KLAMATH COUNTY
316 Main Street
KLAMATH FALLS, OREGON 97601
(541) 883-5624, ext. 244
Fax: (541) 882-6109

Beth Dunaway
Judicial Assistant

Sandra Goebel
Court Clerk

July 15, 2013

SENT BY ELECTRONIC MAIL AND U.S. MAIL -

Elizabeth Howard
Dunn, Carney, et al.
851 S.W. 6th Street, Suite 1500
Portland, Oregon 97204

Adam Orford
Marten Law
1001 S.W. 5th Avenue
Portland, Oregon 97204

Dominic Carollo
Law Offices of Ronald Yokim
Post Office Box 2456
Roseburg, Oregon 97470

Richard Fairclo
Attorney at Law
409 Pine Street
Klamath Falls, Oregon 97601

BJ Matzen
Attorney at Law
435 Oak Street
Klamath Falls, Oregon 97601

William Ganong
Attorney at Law
514 Walnut Avenue
Klamath Falls, Oregon 97601

Justin Throne
Attorney at Law
280 Main Street
Klamath Falls, Oregon 97601

Paul Simmons
Somach, Simmons & Dunn
500 Capitol Mall, Suite 1000
Sacramento, California 95814

Darsee Staley
Assistant Attorney General
Oregon Department of Justice
1162 State Street
Salem, Oregon 97301

Sarah Weston
Assistant Attorney General
Oregon Department of Justice
1162 State Street
Salem, Oregon 97301

Steve Shropshire
Jordan Ramis PC
2 Centerpointe Drive
Lake Oswego, Oregon 97035

Carl Ullman
Attorney at Law
5162 West Shore Road
Anacortes, Washington 98221

All Attorneys
Re:  Matter of the Waters of the Klamath Basin
July 15, 2013
Page 2

Barbara Scott-Brier
Assistant Attorney General
U.S. Department of Justice
800 S.W. Broadway Street
Portland, Oregon 97205

David Harder
Assistant Attorney General
U.S. Department of Justice
999 18th Street, Suite 370
Denver, Colorado  80202

Bruce Bernard
Assistant Attorney General
U.S. Department of Justice
999 18th Street, Suite 370
Denver, Colorado 80202

      Re:    In the Matter of the Waters of the Klamath River Basin
               Case No: WS1300001/WS1300002/WS1300003 and WS 1300004

Dear Counsel:

*INTRODUCTION AND BACKGROUND*

      These petitions pit upstream and downstream farmers, ranchers, and others against each other.  After about 38 years of work, an order was filed March 7, 2013 that determines the rights of over 730 claims to the waters of the Klamath Basin.

      Now, around 40 upstream farmers, ranchers, and businesses want parts of that order to be stayed and not in effect.  Many disagree, including 15 downstream irrigation districts that serve hundreds of farmers and ranchers in the Klamath Basin, the Medford and Rogue River Irrigation Districts, the State of Oregon, the Klamath Tribe and the United States.  The proposed stays could be in effect until this case is concluded in the Circuit Court which the parties estimate would be 5-10 years.

      Four requests for stays have been filed.  In cases WS1300001 and WS1300002, upstream farmers and ranchers want to limit the water that the order says will go to downstream farmers, ranchers and the Tribe and have that water provided to only them.  In case WS1300003, an upstream ranch seeks to stop the enforcement of certain claims granted by the order.  In case WS1300004, an upstream ranch is asking to stay the part of the order that denied his own claim to water.

      Of course the court's job is nothing more and nothing less than to follow the law.

All Attorneys
Re: Matter of the Waters of the Klamath Basin
July 15, 2013
Page 3

*SUMMARY OF DECISION*

The requests for a stay in cases WS1300001 and WS1300002 are denied because, contrary to law, they would elevate petitioners over everyone so they would be the only ones to get extra water if downstream rights are curtailed as they request.

I also decide that as a condition of any stay, the party seeking it must agree to "pay all damages that may accrue by reason of the determination not being enforced." ORS 539.180 This obligation is in addition to the bond and the amount of the bond does not limit or cap that obligation. In case WS1300003 Mr. Orford should notify me if his client would like to pursue or withdraw its petition for stay in view of this ruling. His client may want to withdraw its request for a stay because this ruling may make it subject to a significant liability. If it would like to pursue its request for a stay, I will then consider the many other arguments relating to whether the stay is mandatory or discretionary and will decide if one is to be granted. If one is granted, we will then set and conduct a further hearing on the amount of the bond.

The parties in case WS1300004 have the right to file further briefs and present arguments so I make no rulings on it at this time. I have set it for a status conference for July 24th, 2013 at 1:30 p.m. when we will set a time for oral arguments.

*EXPLANATION IN CASES WS1300001 AND WS1300002*

In cases WS1300001 and WS1300002 the petitioners ask for a stay of certain water rights but that these rights be stayed only <u>as to themselves.</u> They rely upon the language of ORS 539.180 that says that the order filed March 7, 2013 can be stayed " in part…" The question is what is meant by the words "in part." When interpreting a statute, "[t]he first step remains an examination of text and context." *State v. Gaines, 346 Or. 160 (2009).*

Like most western states, Oregon adheres to the water law known as the prior appropriation doctrine which generally provides that a person may acquire a right to appropriate, or use, water "on a 'first come, first served' basis by diverting water and applying it to a beneficial use." *Teel Irrigation District v. Water Resources Dept of the State of Oregon, 323 Or. 663, 666-667 (1996).* That law provides context for ORS 539.180.

The effect of these proposed stays is to give the petitioners <u>alone</u> the benefit of the water right that was stayed. That violates the prior appropriation doctrine because those with more senior and better rights would not get any part of the water as they should. Thus, the term "in part" does not mean that a water right can be stayed only for the benefit of certain other water users as requested.

All Attorneys
Re: Matter of the Waters of the Klamath Basin
July 15, 2013
Page 4

*EXPLANATION ABOUT THE OBLIGATION TO PAY ALL DAMAGES*

     The law generally provides that someone who wants to stay or stop the effect of a lawful order or ruling while they appeal it must be prepared to pay for harm caused to the other party by the stay.  Issues have developed about how those damages are paid.

     To get a stay a party must file a bond or irrevocable letter of credit "…in such amount as the judge may prescribe, conditioned that the party will pay all damages that may accrue by reason of the determination not being enforced."  ORS 539.180  The petitioners want their potential liability to be limited to the amount of the bond.  I now conclude that the obligation to pay damages is in addition to the bond and the amount of the bond is not a limit or cap to that promise because that is simply what the statute says.  ORS 539.180; *State v. Gaines, 346 Or. 160 (2009)*.  Furthermore, three times the Oregon legislature has rejected proposed amendments that would have created such a cap.  The effect of this law is straight forward:  If a water user is wrongfully harmed because of a stay, they should get paid for their entire loss.

     Mr. Simmons should present an appropriate order.

             Sincerely yours,

             CAMERON F. WOGAN
             Circuit Court Judge

CFW/bad

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "C"

1

2      **FILED** 9/3/13

3      *B&.*
       Circuit Court Clerk          Date

       By_____DEPUTY

4

5                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

6                              FOR THE COUNTY OF KLAMATH

7      In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River,
                                  A Tributary of the Pacific Ocean

8

9      In Re:                                │ Case Nos.    WS1300001, WS1300002
10                                           │              WS1300003, WS1300004
       WATERS OF THE KLAMATH RIVER           │
11     BASIN.                                │
                                             │ **ORDER (1) DETERMINING**
12                                           │ **OBLIGATIONS OF STAY PETITIONERS**
                                             │ **REGARDING "ALL DAMAGES" AND**
13                                           │ **(2) DENYING PETITIONS FOR STAY OF**
                                             │ **UPPER BASIN CONTESTANTS**
14

15

16            By order dated June 20, 2013, the Court consolidated all of the following for hearing on

17     the merits of common issues: (i) Petition for Partial Stay of Findings of Fact and Order of

18     Determination by Upper Basin Contestants as to OAH Case 003 (Claims 294, 321-1, 321-4,

19     321-6, 321-9, KPCC 321-17/293/323-3) (Case No. WS1300001); (ii) Petition for Partial Stay of

20     Findings of Fact and Order of Determination by Upper Basin Contestants as to Certain Tribal

21     Claims (Case No. WS1300002); (iii) Petition for Stay by Contestant Mathis Family Trust of

22     Claim 668 (Wood River), Claim 669 (Crooked Creek), Claim 670 (Fort Creek), and Claim 622

23     (Upper Klamath Lake) (Case No. WS1300003); and (iv) Petition for Partial Stay of Findings of

24     Fact and Order of Determination by River Springs Ranch Co. as to Denial of Claim 131 (Case

25     No. WS1300004).  In each of the consolidated cases, the petitioner or petitioners seek, under

26     ORS 539.180, a partial stay of the Findings of Fact and Order of Determination, Klamath River

27     Basin General Stream Adjudication, March 7, 2013.  Petitioner River Springs Ranch Co. is

28     among the parties collectively identified as Upper Basin Contestants and thus among the

1    Petitioners in Case Nos. WS1300001 and WS1300002, but is the sole Petitioner in Case

2    No. WS1300004.

3        The Court has considered all of the papers and other filings of the parties related to the

4    consolidated hearing issues received on or before July 3, 2013, and heard oral argument on July 2

5    and 3, 2013, at which Elizabeth Howard appeared for Petitioners collectively known as Upper

6    Basin Contestants, Adam Orford appeared for Petitioner Mathis Family Trust, Dominic Carollo

7    appeared for Petitioner River Springs Ranch Co., Carl Ullman appeared for Respondent Klamath

8    Tribes, David Harder and Bruce Bernard appeared for Respondent United States, Paul Simmons

9    and William Ganong appeared for Respondents collectively known as Klamath Project Water

10   Users, Darsee Staley and Sarah Weston appeared for Respondent the State of Oregon, and Steven

11   Shropshire appeared for Respondents Rogue River Valley Irrigation District and Medford

12   Irrigation District. The Court thereby being fully advised, on July 15th, 2013 and August 15th,

13   2013, filed decision letters, attached hereto and incorporated by this reference.

14       **IT IS HEREBY ORDERED AS FOLLOWS:**

15       1.    Under ORS 539.180, the potential liability of a party who obtains a stay is not

16   limited to the amount prescribed by the Court for a bond or letter of credit (collectively, "bond").

17   As a condition of any stay under ORS 539.180, the party seeking it must agree to "pay all

18   damages that may accrue by reason of the determination not being enforced." This obligation to

19   pay all damages that may accrue by reason of the determination not being enforced is in addition

20   to the bond and the amount of a bond is not a limit or cap to that obligation.

21       2.    In addition, the petitions for partial stay in Case Nos. WS1300001 and

22   WS1300002 are denied in their entirety because they do not request a lawful stay, for reasons

23   stated in the attached decision letter.

24       3.    Further proceedings in Case No. WS1300003 and Case No. WS1300004 will

25   occur under the prior order of consolidation or bifurcated, or both, as determined by the Court.

26   ///

27   ///

28   ///

1    IT IS HEREBY ORDERED this ___3___ day of ~~August~~ September 2013.

2

3

4                                        CAMERON P. WOGAN
                                         Circuit Court Judge
5

6    Submitted by:
     Paul S. Simmons, OSB 971386
7    Attorneys for Tulelake Irrigation District
     Authorized Representative Attorney for Parties
8    Identified as Klamath Project Water Users

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WS1300001–WS1300004 – ORDER (1) DETERMINING OBLIGATIONS OF STAY PETITIONERS RE: "ALL DAMAGES"
AND (2) DENYING PETITIONS FOR STAY OF UBC                                                                -3-

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "D"



United States Department of the Interior
OFFICE OF THE SOLICITOR
Washington, D.C.  20240

January 14, 2021

Memorandum

To:        Secretary

From:      Solicitor

Subject:   Use of Water Previously Stored in Priority for Satisfaction of Downstream Rights

Pursuant to your November 12, 2020, letter, the Solicitor's Office has been undertaking a thorough review of the Klamath Project ("Project") contracts and relevant legal authorities that guide the Bureau of Reclamation's (Reclamation's) discretion in the operation of the Project, in parallel with Reclamation's effort to prepare a reassessment document.  In doing so, the Solicitor's Office identified tribal water rights as being an important threshold issue in determining which Project operations can be placed in the environmental baseline, and advised Reclamation that Ninth Circuit and Federal Circuit courts have viewed tribal water rights as being generally senior to irrigation rights connected to the Project.  Reclamation does not dispute the existence or priority of tribal water rights, but has requested input on whether water previously stored in priority can ever be released for satisfaction of unquantified, downstream federally reserved water rights held by the Yurok and Hoopa Valley Tribes (hereinafter collectively referred to as "the Yurok and Hoopa Tribes").

This memorandum addresses that question and ultimately concludes that water previously stored in priority is not available for satisfaction of downstream federally reserved water rights, and is instead bound by the terms of the Klamath Basin Adjudication ("KBA").

## I.    <u>Background</u>

As noted by the federal courts, "[s]everal constraints [in the operation of the Klamath Project] force Reclamation to walk a water-management tightrope in dry years." *Kandra v. United States*, 145 F. Supp. 2d 1192, 1197 (D. Or. 2001) (internal citations omitted). Reclamation's management is made more difficult "because the Upper Klamath Lake is relatively shallow and, therefore, the Klamath Project's storage capacity is limited." *Pacific Coast Federation of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1231 (N.D. Ca. 2001) (hereinafter "*Pacific Coast.*").

The issue is further complicated by the fact that Endangered Species Act (ESA) compliance and tribal trust compliance have historically been conflated in the operation of the Klamath Project.  Put differently, in the absence of quantified tribal water rights, the United States has taken the position that ESA compliance serves as a proxy for its minimum duty to the tribes because that tribal water right "cannot [be] any less than the quantity that would have been needed to avoid reducing appreciably the likelihood of … the survival of these same fish." *Baley v. United States*, 134 Fed. Cl. 619, 672–73 (2017) ("*Baley I*") (noting that ESA compliance and

1

the unique tribal trust requirements in the operation of the Klamath Project are "essentially a similar standard.") (internal citations omitted). But in reality, ESA compliance and tribal trust obligations are legally distinct.

There are—in effect—distinct categories of tribal water rights in connection with the Project: the Klamath Tribes' right to certain lake levels in Upper Klamath Lake ("UKL"), and the Yurok and Hoopa Tribes' in-stream flow rights for the Klamath River. The Klamath Tribes' rights to water levels in UKL have been quantified under McCarran Amendment proceedings in Oregon, and are not at issue for purposes of this memorandum. The Yurok and Hoopa Tribes' in-stream rights—while clearly identified by the federal courts—have not been fully quantified by an adjudication or enacted settlement.

In order to fully appreciate the issue presented here, it is necessary to briefly examine the relationship between the tribal rights, and their impact on Project operations as described by the federal courts.

Tribal water rights on the Klamath were first recognized in the *Adair* litigation. *See United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983). There, the Ninth Circuit affirmed a district court determination that the Klamath Tribes had reserved on-reservation hunting and fishing rights upon establishment of the Reservation. *Id.* at 1398. The court held that those rights carried with them federally reserved water rights to support the tribal fishery. *Id.* at 1414. Further, because treaty rights are not "a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted," the priority date for those reserved water rights predated the establishment of the reservation and were set at "time immemorial."[1] *Id.* at 1413–14 (quoting *United States v. Winans*, 198 U.S. 371, 381 (1905)).

As mentioned above, these rights have since been administratively adjudicated and quantified, as part of the Klamath Basin Adjudication ("KBA") in Oregon, which culminated in the Amended and Corrected Findings of Fact and Order of Determination ("ACFFOD"). The ACFFOD, *inter alia*, quantifies the Klamath Tribes' federally reserved water rights, and "thus, the Klamath Tribes have a legally enforceable federal right to maintain streamflow levels as quantified." *Hawkins v. Bernhardt*, 436 F. Supp. 3d 241, 251 (D.D.C. 2020). Accordingly, Reclamation must operate the project such that UKL lake levels satisfy the Klamath Tribes' quantified, senior right.[2]

The Yurok and Hoopa Tribes also have federally reserved water rights connected to the establishment of their reservations. Like the Klamath Tribes, the origin of those water rights is in reserved fishing rights, recognized at the establishment of their reservations. *See Parravano v. Babbitt*, 70 F.3d 539 (9th Cir. 1995).

---

[1] Put another way, the treaty recognized rights that had been exercised by the Klamath Tribes pre-European contact and promised not to *impair* those rights. Thus, unlike other treaties whose purpose was to provide agricultural land in exchange for cession of traditional hunting and fishing grounds, the Klamath Tribes retained those rights, and thus priority date for the Klamath Tribes' water rights necessarily was prior to treaty execution, and thus described as "time immemorial." *Adair*, 723 F.2d at 1413–14.

[2] Due to a stipulation signed by the Klamath Tribes, United States, and Project water users, this senior right will not be enforced against the Project until the KBA is complete. So, Reclamation has not yet had to actually operate the Project to satisfy these UKL levels.

Courts have considered *all* tribal rights—the UKL rights held by the Klamath Tribes and the in-stream rights held by the Yurok and Hoopa Tribes—as being generally senior to any other water rights connected to the Project. *See Baley v. United States*, 942 F.3d 1312, 1322 (Fed. Cir. 2019) ("*Baley II*"). But, unlike the Klamath Tribes, the Yurok and Hoopa Tribes water rights are unquantified. Thus, while Reclamation has clear direction as to how to satisfy the federally reserved water rights held on behalf of the Klamath Tribes, it does not have as specific direction as to how to satisfy the rights of the Yurok and Hoopa Tribes.[3]

Reclamation's obligations with respect to the Yurok and Hoopa Tribes is of critical importance to the review process directed in the Secretary's Letter because it guides whether Reclamation can consider any stored water as unavailable for satisfaction of federally reserved water rights, and thus only available for distribution to water users under Oregon law.[4]

## II.    Use of Stored Water for Satisfaction of Unquantified Downstream Rights

Three critical facts guide whether use of water previously stored in priority is subject to release for satisfaction of the Yurok and Hoopa Tribes' water rights: (1) the Yurok and Hoopa Tribes' water rights are currently unquantified; (2) Reclamation has some degree of discretion to determine how best to satisfy its trust obligations absent quantified water rights; but (3) that discretion is not unbound, and Reclamation is subject to the terms of the KBA.

As an initial matter, it is worth re-emphasizing that federally reserved water rights connected to the Yurok and Hoopa Tribes' respective reservations exist specifically to maintain a fishery reserved to tribal members upon establishment of the reservations. *Parravano*, 70 F.3d at 546. Therefore, the measure of water required to satisfy the tribal water rights is necessarily dependent on the health of the fishery, and the needs of the fish.[5] But, at its heart, the water right is a non-impairment right—i.e., the Tribes are entitled to prevent junior upstream diverters from reducing the flow of the river to the extent doing so is necessary for the protection of the tribal water right. *See id.*

And while courts have clearly recognized the existence and seniority of the Yurok and Hoopa Tribes' federally reserved water rights, those rights have not been quantified, and no court has considered Reclamation's trust obligation to fulfill those rights post-KBA or, even pre-KBA, independently from Reclamation's duties to the Klamath Tribes and its obligations under the ESA. Finally, and most importantly, no court has squarely analyzed whether the Yurok and Hoopa Tribes are entitled to the release of water previously stored in priority to supplement the Klamath River beyond that which would have been historically available, absent Project storage.

For that reason, there is sufficient authority to support an argument that Reclamation's trust responsibility does not compel it to release Project water in excess of that which would have been naturally available, absent the project.

---

[3] To emphasize, there is no debate as to *whether* Reclamation has a duty to satisfy the federally reserved water rights of the Yurok and Hoopa Tribes, or their relative priority. Rather, it is the lack of quantification of those rights and their interaction with the Project that raises the issues presented in this memorandum.

[4] This, in turn, guides the scope of ESA consultation, which was the subject of the Letter.

[5] Thus, it is unsurprising that courts have historically condoned Reclamation's practice of using ESA consultation as a proxy for determining its tribal trust responsibilities. *See Baley I*, 134 Fed. Cl. at 673.

Courts have routinely recognized Reclamation's broad discretion in determining how best to satisfy "diverse, and often competing, demands for Project water." *Kandra*, 145 F. Supp. 2d at 1196. And while it is true that the courts have emphasized that tribal trust and ESA requirements are generally superior to water rights arising under water delivery contracts, Reclamation does have discretion in determining how it satisfies those superior obligations, in the absence of specific quantification.

To emphasize, the litigation in *Baley*, *Kandra*, and *Patterson* involved, *inter alia*, the reasonableness of Reclamation's position that its trust responsibility was satisfied through ESA compliance in the absence of specific quantification. For example, in *Baley II*, the Federal Circuit discussed at length the fact that the "no jeopardy" standard under the ESA was presumptively less protective of the tribal fishery than the "moderate living" standard to which the tribes were likely entitled. 942 F.3d 1336–37. Nonetheless, the *Baley II* court held that ESA compliance served as a valid proxy for then-unquantified tribal trust requirements, and noted that "[w]hether the Tribes would have had a separate cause of action against the United States had the Bureau not complied with the ESA is not before us." *Id.* at 1341.

*Baley* is one of many cases that upheld the reasonableness of the 2001 Operations Plan and actions taken under it, even though the Yurok and Hoopa Tribes alleged that operations under the plan violated Reclamation's trust obligations. For example, the Yurok Tribe asserted that Reclamation's failure to supplement Klamath River flows under the Operations Plan violated the trust responsibility because low river levels contributed to a large fish die-off in 2002 that adversely affected their federally reserved right to the fishery. *See Pacific Coast Federation of Fishermen's Ass'n v. United States Bureau of Reclamation*, Civ. No. C 02-02006 at 1–2 (N.D. Cal. March 8, 2005) (hereinafter "*PCFFA*"). The court disagreed, holding that because there was no quantified water right that Reclamation had failed to deliver, there was no "specific duty" Reclamation had violated by failing to supplement flows at the request of the Tribe.[6] *Id.* at 17. Put another way, there was no specific quantity of water—independent of the applicable Biological Opinion and Operations Plan—that Reclamation was required to deliver. *Id.* Again, under the Operations Plan, Reclamation had used ESA compliance as a proxy for tribal trust obligations.

Read together, these cases squarely frame the bounds of Reclamation's discretion with respect to the Yurok and Hoopa Tribes. On the one hand, Reclamation is clearly obligated to prioritize tribal water rights over other junior water rights connected to the Project, but on the other, absent a specific quantification of the tribal water rights, Reclamation necessarily has some degree of discretion to decide how best to satisfy those rights. In other words, until the rights of the Yurok and Hoopa Tribes are quantified, there is no definite quantity of water Reclamation must provide, though Reclamation is obligated to ensure the Tribes receive sufficient water to exercise their federally reserved fishing rights.

---

[6] This is not to say that Reclamation's tribal trust obligations require nothing but compliance with generally applicable statutes. Tribal trust requirements are substantive and require Reclamation to operate its project so as to satisfy senior tribal rights before those of any junior appropriator.

Therefore, considering the above, Reclamation must determine how best to satisfy its trust obligation to the Yurok and Hoopa Tribes, who hold senior, but unquantified, rights on the Klamath River.

Reclamation satisfies that trust obligation by providing water that would be available in the tribal fishery, absent the project.[7] Project storage, then, would be delivered pursuant to Reclamation's other obligations, and most importantly, the ACFFOD. Therefore, water previously stored in priority would not be available to draw upon to supplement the natural flow of the river.

This position neither rejects the existence and priority of the Yurok and Hoopa Tribes' water rights, nor allows any other water user connected to the Project to take any water from the tribal share. The Yurok and Hoopa Tribes would only be barred from calling upon water previously stored in priority—water that would not exist absent the Project—to supplement natural flows.

### a. *Storage in Western Water Law*

Not only would this position be a permissible construction of the Tribes' as-yet-unquantified water rights, but it would also be harmonious with Western water law generally (and Oregon law specifically), as well as federal Reclamation Law.

The Bureau of Reclamation was established specifically to assist development of Western water by using Congressionally appropriated funds to construct large-scale storage projects that state or local entities might not be able to take on independently. As a benefit, those state and local entities receive water that otherwise would not exist for irrigation and other purposes. Water users enter into contracts to "pay back" the price of the project in exchange for access to the water facilitated by the Project.

Accordingly, in Section 8 of the Reclamation Act, Congress directed that Reclamation disperse water in accordance with state law. 43 U.S.C. § 372. And while subsequent federal laws sometimes provide Reclamation with duties that conflict with state water law, in the absence of a specific federal conflict, Reclamation still must operate its projects in comity with state water law. *California v. United States*, 438 U.S. 645, 670–71 (1978).

Accordingly, courts—including the U.S. Supreme Court—have historically recognized that water previously stored in priority under state law is not available for release to downstream water users with unquantified water rights, or water rights dependent on natural flow. *See, e.g.*, *Nebraska v. Wyoming*, 325 U.S. 589, 639–40 (1945) (declining to include storage from Reclamation Act facilities in an equitable apportionment, noting "if storage water is not segregated, those who have not contracted for the storage supply will receive at the expense of those who have contracted for it a substantial increment to the natural flow supply…").

---

[7] Currently, decisions on when to bypass inflow to the Klamath River or deliver it to either the Project or into storage in UKL are guided by the 2018 Biological Opinion as amended by the Interim Operations Plan. This memorandum does not address any current operations criteria, but rather focuses on the legal distinction between natural flow and water previously stored in priority as it relates to unquantified downstream rights.

There is no source of law, federal or state, that directs Reclamation to release Project storage—which has now been adjudicated under the KBA—to the Downstream Tribes. And while the Downstream Tribes could have asserted storage rights in the KBA, no such rights were asserted.[8] *Baley I*, 134 Fed. Cl. at 679.

Reclamation has a right, as determined by the ACFFOD, to store water in UKL. Once stored pursuant to Oregon law, Reclamation is significantly constrained in its discretion to release that water for any purpose other than that which is directed by the ACFFOD.[9] In the absence of any federal law to the contrary (including a quantified Indian water right), Reclamation cannot use its discretion to call upon water previously stored in priority.

Therefore, release of water previously stored in priority would be a violation of state law with no specific federal authority to justify it. Because that would run counter to Section 8 of the Reclamation Act, a reasonable interpretation of Reclamation's current duty to the Downstream Tribes is that it must provide natural flow, but not Project storage, in the absence of a quantified right or some other source of federal law that specifically conflicts with the State's currently controlling disposition on storage.

### b. *Distinctions from Past Klamath Cases*

The critical distinguishing factors between what Reclamation is proposing here and *all* of the past cases concerning the Klamath Project are: (1) all of the Klamath-specific cases that analyze tribal water rights and their relation to Project water dealt with operations plans that conflated ESA and tribal trust responsibilities; and (2) those operations plans were in place prior to issuance of the ACFFOD.

As stated above, the Yurok and Hoopa Tribes unquestionably have reserved water rights in the Klamath River, and those rights are indeed senior to all but perhaps the Klamath Tribes.[10] However, in part because those rights have never been quantified, Reclamation must decide how to satisfy those rights through the operation of the Project without the aid of specific target flows, water level targets, or other any other specific operating criteria.[11]

As also indicated above, until the issuance of the ACFFOD, *all* tribal rights were determined by proxy through ESA compliance. The *Kandra*, *Patterson*, and *Baley* courts all permitted such an arrangement, but specifically noted that Project water rights were being actively adjudicated in the KBA. *See, e.g.*, *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1214 fn.3 (9th Cir. 1999). In other words, with respect to tribal water rights, the ESA served as a proxy in the absence of *otherwise quantified rights*.

---

[8] This does not mean, however, that they cannot assert such rights in the future. As the *Baley I* court noted, "[a]lthough reserved rights can be adjudicated by state bodies, and the [Tribes] could have submitted claims to the [KBA] … their failure to do so *did not affect the existence or nature of their federal reserved rights.*" *Baley I*, 134 Fed. Cl. at 679 (emphasis added).

[9] To note, the ACFFOD also controls lake levels Reclamation must maintain for the Klamath Tribes.

[10] Their priority date may also be "time immemorial," but their rights are at least as old as the establishment of their reservations. *See Baley I*, 134 Fed. Cl. at 670.

[11] As noted above, operations are currently guided by the 2018 Biological Opinion as amended by the Interim Operations Plan.

Thus, the operation of the Klamath Project is subject to additional constraints now, compared to the time at which those cases examined it. The KBA, when final, will have fully adjudicated the vast majority of the rights at issue in the line of cases described above—the major exception of course being the rights held by the Yurok and Hoopa Tribes.[12]

Therefore, reliance on those cases for anything other than use of ESA compliance as a project-wide proxy for unquantified tribal water rights during the pendency of a general stream adjudication stretches them beyond their own terms.

That is also important context to consider in light of the United States' opposition to the stored water argument, which was made by Project water users at multiple points in the cases described above. While it is true that the United States opposed a view that Project storage was unavailable for satisfaction of federal responsibilities *as a whole* and *during the pendency of the KBA*, it has never made the argument that downstream, unquantified rights are entitled to water previously stored in priority under the terms prescribed by state law in the ACFFOD.

That is true even of the United States' April 2020 filing in the KBA, opposing a challenge to the ACFFOD's quantification of the Klamath Tribes' right to specific water levels in UKL (hereinafter "Opposition Brief"). There, in defending a quantified tribal water right under the KBA, the United States argued that the Klamath Tribes were necessarily entitled to storage in UKL to satisfy the Tribes' quantified water right. *See* Opposition Brief at 64–75.

But, again, taking the position that a specific federal responsibility—there a *quantified* federally reserved water right—entitles the United States to use storage when it otherwise might conflict with state law is materially different than taking the position that a non-specific federal responsibility—i.e. an *unquantified* federally reserved water right—entitles the United States to release storage in conflict with state law. As stated above, that is a key fact that marries federal and state law under Section 8 of the Reclamation Act. Therefore, Reclamation's position with respect to water previously stored in priority is not inconsistent with either the April 2020 Opposition Brief, or any of the Klamath-specific case law in which storage was previously raised. It is also faithful to traditional Western water law, and fully consistent with Reclamation's trust obligation to the Yurok and Hoopa Tribes, who have senior rights to natural flow from the Klamath River over junior upstream diverters.

### III.    Conclusion

For the reasons expressed herein, Reclamation's trust obligations to the Yurok and Hoopa Tribes require it to provide the Tribes with the full benefit of natural flow of the Klamath River to the extent necessary to satisfy their federally reserved water rights. In the absence of a specific, quantified water federally reserved water right, or other specific federal law, however, water previously stored in priority is bound by the ACFFOD and should be released in accordance with its terms.

---

[12] They were not required to participate in the KBA, and their non-participation did not affect the existence or nature of their rights. Quantification of the Tribes' water rights could change the analysis here.

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "E"



United States Department of the Interior
OFFICE OF THE SOLICITOR
Washington, D.C.  20240

January 14, 2021

Memorandum

To:          Secretary

From:        Solicitor

Subject:     Analysis of Klamath Project contracts to determine discretionary authority in
             accordance with the November 12, 2020 Letter of the Secretary of the Interior

 Pursuant to the direction given in your November 12, 2020, letter, I provide the following analysis of contracts between the Bureau of Reclamation (Reclamation) and water users and associated entities which receive water through the Klamath Project.  This analysis focuses on the degree of discretionary authority provided by the contracts to Reclamation.  As discussed in the SOL October 2020 Memorandum, if a contract provides Reclamation with discretionary authority to take action that could benefit species listed under the Endangered Species Act (ESA), Reclamation must consult under ESA Section 7 on the impacts of that action.  However, if a contract does not provide discretionary authority, Reclamation must include the impacts of the action in the environmental baseline of the consultation.

 This memorandum is intended to implement the direction given in the Secretary's Letter and (2) inform Reclamation as it proceeds in accordance with the guidance provided by the *Reassessment of U.S. Bureau of Reclamation Klamath Project Operations to Facilitate Compliance with Section 7(a)(2) of the Endangered Species Act* (Reassessment) and, in particular, *Section 5.1.5 Coordinating Project Diversions*.  This memorandum incorporates by reference the analysis contained in the SOL October 2020 Memorandum.

I. Introduction and Identification of Key Clauses

 In accordance with the Reassessment, Reclamation must address contractual provisions as part of the consultation on overall Project operations and allocation of water.   The portion of the consultation which involves the contracts affects only the water allocated to the Project.

 SOL has identified six types of contractual provisions which have the potential to either impart discretionary authority or constrain the discretion of Reclamation in ways which could affect ESA listed species.  These provisions are (1) liability waivers; (2) provisions addressing beneficial use to determine the amounts of water delivered under a contract and the dates of delivery; (3) the total amount of water which a contract obligates Reclamation to provide per year or irrigation season; (4) the total amount of water which a contract obligates Reclamation to provide per month; (5) the dates of delivery; and (6) reapportionment clauses.

For contracts which do not impart discretionary authority, and which are therefore included in the environmental baseline, the contracting parties other than Reclamation may still be subject to the ESA Section 9 take prohibition. *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995). Furthermore, whether Reclamation possesses discretionary authority in contract implementation does not affect the underlying water rights of the parties to the contract or other entities.

Between 1908 and 1972, Reclamation, acting through and on behalf of the Secretary, entered into over 150 perpetual contracts with district entities and individual landowners to provide water from the Project for irrigation and related purposes, in exchange for payment of Project costs and other conditions. In total, Reclamation's perpetual contracts for water from the Project (Upper Klamath Lake [UKL], Klamath and Lost River, Clear Lake and Gerber reservoirs) cover 204,239 irrigable acres, including portions of Lower Klamath and Tule Lake NWRs. In addition, there are portions of the Project that are not served under a perpetual water contract (Temporary Water Contracts).[1]

Water supply contracts for the Project fall into one of three categories. In some cases, these contracts encompass lands for which the owners claimed non-federal water rights that predated the Project and which rights were folded into the Project water supply through contract. Those types of contracts are generally called "settlement contracts." In other situations, Reclamation only agreed to deliver water to a specified point, and the contracting entity or individual was then responsible for constructing and operating the non-federal facilities necessary to convey the water to its intended place of use. Those types of contracts are generally called "Warren Act contracts." Lastly, in some cases Reclamation constructed all the works necessary to deliver the water to its intended place of use, in which case the contracts are called "repayment contracts."[2] All three types of contracts are included in the general term "water supply contracts."

II.    Discussion of Key Clauses

1.  Liability waivers

Most contracts between Reclamation and Klamath Project water users contain a liability waiver with language similar to Article 9 of the Sunnyside Irrigation District contract (ILR-174 – 1922-10-24): "On account of drought, inaccuracy of distribution or other cause, there may occur at times a shortage in the quantity of water provided for herein, and while the United States will

---

[1] Under Ninth Circuit case law, consultation is required for non-perpetual contracts. *Nat. Res. Defense Council v. Jewell*, 749 F.3d 776, 785 (9th Cir. 2014).

[2] A subset of repayment contracts are contracts, such as the November 29, 1954 contract with the Klamath Irrigation District, transfer works constructed by Reclamation to the contracting entity, which then assumes Reclamation's responsibilities for operating and maintaining the works, delivering water, and collecting charges. The status of a contract as a transferred works contract does not affect Reclamation's discretionary authority since the contracting entity is bound by federal law and regulations (Article 6) and assumes the contractual obligations of the United States (Article 13), and because Reclamation maintains ultimate control over the transferred works through its reservation of the right to resume operation of the transferred works if the contracting entity violates any contractual provisions (Article 21).

use all reasonable means to guard against such shortages, in no event shall any liability accrue against the United States, its officers, agents or employees, for any damage, direct or indirect, arising therefrom, and the payments due hereunder shall not be reduced because of any such shortage."

As discussed in the SOL October 2020 Memorandum, these are force-majeure clauses, similar to the one which the court in *Natural Resources Defense Council v. Norton*, 236 F. Supp. 3d 1198 (E.D. Cal. 2017) found insufficient to trigger the Section 7 consultation obligation. The first part delineates the events which could prevent the United States from fulfilling its contractual obligation to deliver water. The remainder of the clauses commit the United States to taking reasonable measures to avoid shortage and absolve the United States from liability should a shortage arise notwithstanding those measures. The structure of the clauses as a single sentence indicates that each must be read as a whole. The plain language of the clauses as a whole focuses on protecting the United States from liability if drought, inaccuracy of distribution, or other causes create a shortage which prevents the United States from delivering the amount of water required under the contract, not on authorizing the United States to alter the amount of water when the United States is trying to meet another priority.

Because these liability waivers do not authorize the United States to alter the amount of water delivered, they do not provide sufficient discretion for Reclamation to consult.

2. Beneficial use

Section 8 of the Reclamation Act of 1902 dictates that "[t]he right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."[3]  43 U.S.C. § 372. All Klamath Project water contracts were executed pursuant to the Reclamation Act of 1902, as stated in the preambles to the contracts, including those contracts that also expressly reference the Warren Act. While many of the Klamath Project contracts give irrigation districts the right to divert as much water as is necessary for beneficial use on the irrigable lands they serve, the fact that the contracts were executed pursuant to the Reclamation Act of 1902 necessarily means that the provisions of the Act, including Section 8, govern the contracts.

Generally speaking, "state law governs the distribution of water from federal projects unless Congress expresses a different approach."  *Jicarilla Apache Tribe v. United States*, 657 F.2d 1126, 1133 (10th Cir. 1981) (*citing California v. United States*, 438 U.S. 645 (1978)). Thus,

---

[3] The remainder of Section 8—now codified at 43 U.S.C. § 383—states: "Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested rights acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof."  Courts have interpreted the language concerning interstate streams as a disclaimer—that the Act in no way was intended to affect the disposition of interstate streams, and that "the matter be left just as it was before [the passage of the Act.]"  *State of Wyoming v. State of Colorado*, 259 U.S. 419, 463 (1922) *vacated on other grounds by State of Wyoming v. State of Colorado*, 353 U.S. 953 (1957). Section 8's primary purpose, though, is to require the use and distribution of water to be carried out in accordance with state law, absent specific contrary federal law.

unless Congress expresses an intent to supplant state law with respect to distribution from a particular Reclamation project, the concept of "beneficial use" is set by state law. *See id.*; *see also United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 854 (9th Cir. 1983) ("beneficial use itself was intended to be governed by state law.").

Beneficial use is not static. Rather, "[i]t is settled that beneficial use expresses a dynamic concept, which is 'a variable according to conditions.'" *Alpine Land & Reservoir*, 697 F.2d at 857 (internal citations omitted). Thus, the exact quantity of water necessary to satisfy beneficial use can—and presumably will—change over time. *See id.* Perhaps unsurprisingly, then, disagreements as to how much water is required to satisfy "beneficial use" are not uncommon. *See, e.g.*, *id.* (challenging the District Court's determination of 3.5 acre-feet-per-acre for bottomland farmers, and 4.5 acre-feet-per-acre for benchland farmers). Regardless, as stated above, the question of how much water is necessary to satisfy beneficial use is a factual question, determined by state law. *See, e.g.*, *Jicarilla Apache*, 657 F.2d at 1133 ("the determination of beneficial use is a question of fact.").

Therefore, the Klamath Project contracts that obligate Reclamation to provide sufficient water for beneficial use seem to provide Reclamation with very little discretion. Those contracts, in effect, set both a ceiling and a floor on the amount of water each contracting party is entitled to take from the Project—enough to satisfy beneficial use, under Oregon law. While Reclamation does have considerable authority under some contracts to re-apportion water in times of shortage, for example, it does not have the discretion to adjust the amount required to satisfy "beneficial use" when that is the measure of the right in a given contract.

In *Natural Resources Defense Council v. Norton*, the Eastern District of California examined, *inter alia*, Reclamation's discretion to modify water deliveries on executed contracts based on its own "beneficial use" determination. 236 F. Supp. 3d 1198, 1224–25 (E.D. Cal. 2017). In the contracts at issue in that litigation, Reclamation was similarly obligated to deliver sufficient water to satisfy beneficial use.[4] *Id.* Plaintiffs argued that because beneficial use is not static, and because it "requires consideration of 'alternative uses of the water' which is 'variable according to conditions,'" Reclamation had discretion to change "quantities and allocations in light of current conditions and competing uses for the water." *Id.* at 1225 (internal citations omitted). But the court disagreed. It noted that "[e]ven assuming that Reclamation has the authority to determine whether a particular use is beneficial, nothing [in the contract] suggests Reclamation may adjust contract quantities based on a beneficial use determination made after contract execution." That was so even though the contract itself did not define beneficial use as any particular amount of water. *See generally id.* In other words, even though the court recognized that the amount required to satisfy beneficial use could theoretically change over time, the contract still obligated Reclamation to deliver that quantity—whatever it was—

---

[4] The full provision at issue read: "During the term of this Settlement Contract and any renewals thereof [] it shall constitute full agreement as between the United States and the Contractor as to the quantities of water and the allocation thereof between Base Supply and Project water which may be diverted by the Contractor from its Source of Supply for beneficial use of the land shown on Exhibit B from April 1 through October 31, which said diversion, use, and allocation shall not be disturbed so long as the Contractor shall fulfill all of its obligations hereunder." *Id.*

notwithstanding a hypothetical determination that the water could be better used elsewhere. *See id.*

There is a colorable argument that the contracts at issue in *NRDC* are materially different than those under review in the Klamath Project. First, as the *NRDC* court noted, the contracts at issue in that case were settlement contracts which contained clauses that specified that "allocation *shall not be disturbed*" during the life of the contract. *See id.* Second, and along similar lines, those contracts also contained language that specified the agreement constituted the "full agreement as between the United States and the Contractor as to the quantities of water and the allocation thereof between Base Supply and Project water." *Id.* at 1224–25. The contracts at issue in the Klamath Project contract review are not as specific,[5] and generally only state that Reclamation is obligated to deliver water sufficient to satisfy "beneficial use" each irrigation season. Arguably, without the limiting language present in the *NRDC* contracts, these contracts afford Reclamation more discretion to adjust water deliveries based on a beneficial use determination each irrigation season.

However, that view would be unlikely to prevail in front of a reviewing court. While the language in the contracts does differ, the central question is exactly the same as that in the *NRDC* case—does Reclamation have the authority to modify water deliveries under an executed contract based on a beneficial use theory. Even assuming (as the *NRDC* court did) that Reclamation has the authority to make the beneficial use determination in the first instance,[6] that decision still must be made pursuant to state law. *See NRDC*, 236 F. Supp. 3d at 1225 ("Section 8 of the Reclamation Act of 1902 requires that all water provided pursuant to the Act be put to 'beneficial use,' *as defined by state law*.") (emphasis added); *accord California*, 438 U.S. at 665–67. And just as in the *NRDC* case, the contracting parties here have executed contracts guaranteeing sufficient water for beneficial use, so long as sufficient water is available.[7]

So while Reclamation can, by necessity, determine whether or not a certain portion of the water is "waste," or that a certain portion of land within a district is no longer irrigable,[8] Reclamation does not appear to have the discretion to modify water deliveries under an executed contract based on a determination that beneficial use demands a lower quantity, absent a showing that the particular tract at issue is wasting water, or otherwise needs less to get the full benefit of beneficial use.[9] This is emphasized by the fact that the *Amended and Corrected Findings of Fact and Order of Determination* in the Klamath River Basin General Stream Adjudication

---

[5] Of course, the contract language varies, and this memo is only concerned with those that entitle irrigation districts to divert enough water to satisfy beneficial use.

[6] Indeed, in the Klamath Project, all of the water being delivered is Project water (as opposed to non-project water apportioned by the state under state law), and therefore Reclamation does make this determination. Of course, as this memo explains, that determination is nonetheless guided by state law.

[7] The "availability" determination is a separate issue and is the subject of part II of this memo.

[8] This is, indeed, part of a beneficial use determination. Some contracts contain amendments, for example, changing the determination of irrigable acres, which would necessarily change the amount of water needed to satisfy beneficial use.

[9] This is a wholly separate determination, however, from a determination that the tract *could* use the water, but that the water could be *better* used elsewhere. *See NRDC*, 236 F. Supp. 3d at 1225.

(hereinafter "*ACFFOD*") sets a standard for beneficial use, as specifically applied in the Klamath Basin. *See ACFFOD* at 13.[10]

3.  Total amount of water per year/irrigation season

The total amount of water which Reclamation is obligated by a particular contract to deliver per year or per irrigation season is an area in which Reclamation's discretionary authority, if any, has significant potential to affect ESA listed species because of the importance of the volumes of water in Upper Klamath Lake and the Klamath River below Iron Gate Dam to ESA listed species. Klamath Project contracts specify that Reclamation will deliver (a) a fixed amount of water; (b) up to a specific amount of water; or (c) an amount of water determined by beneficial use. While many contracts explicitly state that the amount of water to be delivered is subject to beneficial use, the fact that all Klamath Project contracts were executed pursuant to the Reclamation Act of 1902 means that all contracts are subject to Section 8 and its requirement that beneficial use is the measure of water.

a.  Fixed amount clauses

The contract with the Van Brimmer Ditch Company (I8r-1065-1909; I8r-1065a-1943) provides a prime example of a contract which requires Reclamation to deliver a fixed amount of water per irrigation season with no reference to beneficial use. Article 2 (as amended) requires the United States to "deliver to [Van Brimmer] during each and every irrigation season, that is, from April fifteenth to October first of each year, a quantity of water, not to exceed fifty second-feet, in which [Van Brimmer] claims the right to the exclusive use[.]" Article 15 of the original contract (which was not amended) provides "It is also understood and agreed that the United States hereby recognizes the right as existing in [Van Brimmer] to the perpetual use of said fifty (50) second feet of water, according to the provisions herein set forth, subject, however, to any possible established priority to the use of said fifty (50) second feet of water, other than such as may be claimed by the United States or those claiming through it."

Article 20 of the1943 amendment further establishes that Van Brimmer cannot claim, and the United States is not obligated to deliver, water in excess of 50 second-feet. "[T]he use of water by [Van Brimmer] in any year in excess of 50 cubic feet per second is not to be the basis of any claim by [Van Brimmer] for similar excess deliveries at any later date, and that the United States and its successors in control of the Klamath Project are not to be obligated at any time to deliver water to [Van Brimmer] in excess of 50 second-feet].]"

The recognition by the United States of Van Brimmer's right to the perpetual use of 50 second-feet of water in Article 15 prevents Reclamation from curtailing water deliveries below that amount. Article 20 provides further evidence of the understanding that the United States is obligated to deliver 50 second-feet of water by stating that the United States is not obligated to deliver more than that amount of water. The specific acknowledgement by the United States of

---

[10] The *ACFFOD* describes water delivery obligations as "duties." Thus, the standard "duty" for irrigation "is not to exceed three and one-half acre-feet-per-acre during any irrigation season, unless otherwise specified ..." *ACFFOD* at 13.

Van Brimmer's right to 50 second-feet in Article 15 provides no discretion for Reclamation to reduce the amount of water which Reclamation must deliver.

As a settlement contract, Van Brimmer contains especially proscriptive provisions specifying the amount of water which must be delivered. While the other contracts which specify fixed amounts of water are not as prescriptive as Van Brimmer, the fact that they specify that Reclamation shall deliver a specific amount of water and are subject to beneficial use means that Reclamation lacks discretion to reduce the total amount of water provided under them, and therefore is not obliged to consult on them. *See* Pine Grove Irrigation District contract (ILR-403-1918-12-21), Article 5 (stating that beneficial use is the measure for water used in the district) and Article 6 (stating in relevant part that "It is expressly understood and agreed that the amount of water to be delivered hereunder shall be two and one-half feet (2.5) acre-feet-per-acre of irrigable land [.]").

b. Ceilings on the amount of water

The contract with the Sunnyside Irrigation District (Ilr-174, dated October 24, 1922) exemplifies the relatively large number of contracts which commit Reclamation to delivering water up to a specific ceiling. Article 5 as amended requires the United States "to impound, store, or otherwise provide water for the irrigation of District lands" and to deliver that water through the C Canal in quantities that shall not "exceed [2.5] acre-feet-per-acre of irrigable land during the usual irrigation season as established on the Klamath Project, being approximately that period from April 15 to September 30 of each year, inclusive; and in no event shall it exceed 0.6 acre-feet of water per irrigable acre in any one month[.]" The subsequent article, Article 6, further provides that the United States shall deliver water "only upon written demand of the District served on the project Manager of the Klamath Project..." Reading these provisions together, Article 5 establishes a ceiling on the total amount of water which the United States must deliver and which the contractor may demand during the irrigation season but does not establish a floor of the minimum amount of water which the United States must deliver.

In isolation from the rest of the contract, it could be argued that the "up to" terminology implies an ability to deliver zero water at the discretion of the agency. However, this argument fails to consider the role of beneficial use in determining the amount of water which Reclamation must provide under the contract. When reading these contracts in their entirety and including Section 8 of the Reclamation Act of 1902, it is apparent that the volume of flow to be delivered has been determined as whatever constitutes beneficial use. As discussed earlier, beneficial use is not static and cannot be practically described in a contract, beyond its upper bound as provided in such contracts. In this manner, it is the contractor and not Reclamation that determines the schedule, volume, and rate for water deliveries, limited by contractual upper bounds and the State of Oregon's determination of beneficial use.[11]

---

[11] In the absence of an explicit floor on the amount of water, a finding that beneficial use does not determine the amount of water which Reclamation must deliver would mean that Reclamation would have unlimited discretion to reduce water deliveries to zero. Such a finding could render the contract illusory and therefore invalid, and could defeat the Congressionally mandated purposes of the Klamath Project. *See* October 2020 Solicitor's Office Memorandum, page 6.

c. Beneficial use as the sole measurement of water

The contract with the Tulelake Irrigation District [14-06-200-5954 (1956-09-10)] exemplifies contracts in which the amount of water to be delivered is defined solely by beneficial use. Article 33(a) provides that "The District shall have the right in perpetuity, subject to the terms and conditions of this contract and consistently with the applicable laws of the State of California, to receive from the Klamath Project all water needed by the District for beneficial irrigation uses within the District. Said water shall be delivered from the works under the control of the United States or its designees or its agents at such times and in such amounts as the District may demand, subject only to the limit of the capacity of the facilities available therefor and the amount of water required for reasonable beneficial use within the District." Because beneficial use is determined in accordance with state law pursuant to Section 8 of the Reclamation Act of 1902, Reclamation lacks the discretion to alter the definition or amount of water determined by state law to be of beneficial use. Reclamation therefore lacks the discretion to consult on the amount of water delivered pursuant to the Tulelake and similar contracts.

4. Total amount of water per month

Many of the contracts include a ceiling on the amount of water which Reclamation is obligated to provide each month. This provision is salient to consultation because the timing of water deliveries is a factor which could benefit listed species.

A typical provision is found in Article 5 of the Sunnyside contract, which states in relevant part that "in no event shall [the supply of water] exceed 0.6 acre-feet of water per irrigable acre in any one month[.]" While stated as a ceiling, the monthly water supply is also subject to the beneficial use standard, both explicitly in another part of Article 13 and implicitly through incorporation of Section 8 of the Reclamation Act of 1902. Since beneficial use determines the amount of water deliveries needed per month, Reclamation lacks the discretion to reduce the amount of water delivered per month to benefit ESA-listed species, and therefore lacks the discretion needed to consult.

5. Dates of delivery

These clauses provide that Reclamation will deliver water (a) during a specific date range; (b) during an approximate period (when contracts state "the usual irrigation season," it is always coupled with a date range); or (c) on a per annum basis. The Van Brimmer contract is an example of a contract with a specific date range. Article 2 (as amended) requires the United States to "deliver to [Van Brimmer] during each and every irrigation season, that is, from April fifteenth to October first of each year, a quantity of water, not to exceed fifty second-feet, in which [Van Brimmer] claims the right to the exclusive use[.]" The requirement to deliver that volume of water from April 15 to October 1 contained in Article 2 prevents Reclamation from altering the dates of delivery, and therefore deprives Reclamation of the discretionary authority needed to consult on the timing of water deliveries.

A number of contracts provide an approximate date range, as exemplified by the Sunnyside contract. Article 5 provides that the District will receive up to a specified amount of

water "during the usual irrigation season as established on the Klamath Project, being approximately that period from April 15 to September 30 of each year, inclusive." Other contracts, such as the Klamath Irrigation District Water User Type B Contracts (private lands) (example: Adams water right application, Certificate No. 02168) specify that water deliveries are on a per annum basis. These state in relevant part "said applicant shall be entitled to receive, subject to the payment of the annual charges for building, operation, and maintenance, [a specified number of][12] acre feet of water per annum per acre of irrigable land herein described, or so much thereof as shall constitute the proportionate share per acre from the water supply actually available for the lands under said project[.]"

While use of the words "approximately" and "per annum" appear to provide Reclamation with the flexibility to alter the dates of delivery, they are subject to the beneficial use standard, at least implicitly through incorporation of Section 8 of the Reclamation Act of 1902. Since beneficial use determines when water deliveries are needed, Reclamation lacks the discretion to alter the dates of delivery to benefit ESA-listed species, and therefore lacks the discretion needed to consult.

6. Reapportionment

Certain of the contracts contain clauses allow reapportionment of water among users with equal priority dates. One key example, because of the size of the District, is Article 33(c) of the Tulelake Irrigation District contract. This clause reads: "In the event a shortage of water from the Klamath Project arises as a result of drought or other unavoidable causes, the United States may apportion the available supply among the District and others having rights of priority equal to the rights of the District." This clause authorizes the United States to reapportion available water supplies among the holders of "contract" rights. It is not an open-ended authorization for the United States to reapportion water to users or uses that are not otherwise covered by a contract for Project water, such as benefiting ESA-listed species. It therefore does not provide sufficient discretionary authority to require consultation.

Another common example is a type of reapportionment clause which exists in many of the contracts entered into pursuant to the Warren Act. Most commonly, this clause is added as a proviso to the article describing the water supply furnished by the United States under the contract. A typical example is Article 7 of the contract with Malin Irrigation District (Ilr-195, dated September 9, 1922), which provides "That all rights to the use and delivery of water acquired by the District under the contract are inferior and subject to the prior rights reserved to the lands of the Klamath project." The origins of this clause stem from a 1910 decision by the Secretary of the Interior to release certain lands from the Project, notably those to be served by pumping water out of the Project's canal system, as well as Section 1 of the Warren Act, 43 U.S.C. § 523, which authorizes the Secretary of the Interior to enter into certain contracts, subject to "preserving a first right to lands and entrymen under the project".

---

[12] The specified number of acre feet varies among the water right applications. For the Adams application, it is 1.8 acre-feet.

The intended operation of this provision in the Malin Irrigation District's contract is reinforced by Article 33(b) of the Tulelake Irrigation District's contact (14-06-200-5954, dated September 10, 1956), which provides that "The rights of the District to water from the Klamath Project pursuant to the terms of this contract shall be equal to those of others executing similar contracts under the Reclamation Act of June 18, 1902, as amended, and shall be prior to those rights conferred pursuant to contracts executed under the Act of February 21, 1911, commonly known as the Warren Act." Accordingly, Reclamation must ensure that Tulelake Irrigation District's contractual right to water from the Klamath Project is satisfied before making water available to Warren Act contractors. Here again is a clause authorizing the United States to reapportion the available water supply from the Klamath Project among the various water contracts within the Project, and not an open-ended authorization for the United States to reapportion water to users or uses not otherwise covered by a contract for Project water. Therefore, to the extent there is discretion afforded Reclamation by such contract provisions, it is limited to allocating water in the event of a shortage among the various water contracts within the Klamath Project.

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "F"



# Reassessment of U.S. Bureau of Reclamation

# Klamath Project Operations

## to Facilitate Compliance with

# Section 7(a)(2) of the Endangered Species Act

This Document is for Decision Purposes Only

U.S. Bureau of Reclamation

California-Great Basin Region (Region 10)

2800 Cottage Way

Sacramento, CA 95825-1898

January 2021

# TABLE OF CONTENTS

**CHAPTER 1 - PURPOSE AND CONTENT** ........................................................... 3

**CHAPTER 2 - BACKGROUND** ....................................................................... 4

   2.1   2018 BA, 2019 BiOPS, and Interim Operations Plan.......................................... 4

   2.2   Consultation, Litigation, and Settlement History............................................. 4

   2.3   Direction from the Secretary Of the Interior................................................ 12

**CHAPTER 3 - LEGAL CONTEXT OF REASSESSMENT** ................................... 13

   3.1   Defining the Agency Action ..................................................................... 13

   3.2   Non-discretionary Actions Not Subject to Consultation.................................. 13

   3.3   Analytical Framework – Legal Authorities and Constraints............................. 14

   3.4   Environmental Baseline .......................................................................... 15

**CHAPTER 4 - BRIEF DESCRIPTION OF THE KLAMATH PROJECT** .............. 16

**CHAPTER 5 - SPECIFIC OPERATION ACTIONS AND ASSESSMENT OF CONSULTATION REQUIREMENT** ............................................................... 19

   5.1   Storing Tributary Inflow ......................................................................... 19

      5.1.1   Releasing Stored Water.................................................................... 22

      5.1.2   Establishing Target Lake Levels........................................................ 24

      5.1.3   Establishing Minimum Release Rates.................................................. 25

      5.1.4   Coordinating Project Diversions........................................................ 25

      5.1.5   Flood Control Operating Criteria....................................................... 28

      5.1.6   Making Water Rights Calls............................................................... 29

   5.2   Operation of the Klamath and Lost Rivers ................................................. 30

      5.2.1   Establishing Minimum River Flows .................................................... 30

      5.2.2   Diverting Water Through and Into the Lost River Diversion Channel............... 31

      5.2.3   Opening and Closing the Klamath Straits Gates.................................... 32

      5.2.4   Pumping and Discharging Water from the Klamath Straits Drain................. 33

   5.3   Operation of Clear Lake and Gerber Reservoirs ......................................... 34

      5.3.1   Storing Tributary Inflow ................................................................. 34

      5.3.2   Releasing Stored Water.................................................................... 36

   5.4   Operation of the Tule Lake Sumps .......................................................... 36

**CHAPTER 6 - APPLICATION OF ENVIRONMENTAL BASELINE** ................. 38

**CHAPTER 7 - SUMMARY OF FINDINGS AND REGIONAL DECISION** ........ 39

# CHAPTER 1 -  PURPOSE AND CONTENT

The U.S. Bureau of Reclamation, California-Great Basin Region ("Reclamation") has performed, and documented herein, a reassessment of actions associated with its continuing operation of the Klamath Project (Project), in southern Oregon and northern California. These actions were thoroughly and critically evaluated for the purpose of informing and supporting future consultation with the U.S. Fish and Wildlife Service ("USFWS") and National Marine Fisheries Service ("NMFS"; collectively the "Services") under Section 7(a)(2) of the Endangered Species Act ("ESA"). This comprehensive reassessment permitted careful consideration of previously proposed Reclamation actions to:

1.  verify compliance with law and regulation;

2.  clearly define the scope of actions;

3.  correctly attribute actions to the appropriate agency;

4.  ensure that non-discretionary actions are excluded from consultation; and

5.  properly characterize the environmental baseline.

This reassessment report provides the legal and technical bases for all determinations. It will serve to support Reclamation's decisions and to provide guidance for future Reclamation staff. This report also serves as a record of agency determination to assist in the preparation of a biological assessment (BA) and the conduct of ensuing ESA consultation, as necessary.

This report does not evaluate or determine the actual effects of the various activities on listed species or their critical habitat. Reclamation will determine the effects of actions proposed for inclusion in ESA consultation during preparation of any subsequent BA(s), as warranted.

This report entails six primary topics. Chapter 2 summarizes the recent ESA consultation history and establishes the direction and need for this reassessment. Chapter 3 outlines the salient regulatory definitions and recent court opinions that provide context for the reassessment. Chapter 4 presents a brief description of Klamath Project operations. Chapter 5 assesses the need for ESA consultation on each pertinent aspect of Klamath Project operations. Chapter 6 applies the concept of environmental baseline to actions proposed in prior consultations. Chapter 7 summarizes the reassessment's findings, and documents Reclamation's decision regarding the need for and/or scope of ESA consultation in connection with the Klamath Project.

The structure and format of this reassessment is based on a similar product the U.S. Army Corps of Engineers prepared in June 2014, for their reservoir operations on the Middle Rio Grande Basin of New Mexico, and recently upheld by the U.S. Court of Appeals for the 10th Circuit in *WildEarth Guardians v. U.S. Army Corps of Engineers*, No. 18-2153 (2020).

# CHAPTER 2 -  BACKGROUND

Chapter 2 provides context and justification for this reassessment of actions associated with operation of the Klamath Project for purposes of consulting with the Services under Section 7(a)(2) of the ESA.

## 2.1    2018 BA, 2019 BIOPS, AND INTERIM OPERATIONS PLAN

Current ESA compliance for Reclamation's continued operation of the Klamath Project is addressed in separate biological opinions (BiOps) issued by the NMFS[1] in 2019 and USFWS[2] in 2020. These BiOps evaluated Reclamation's proposed actions described in a BA, dated December 21, 2018[3], as modified by February and October 2019 amendments, and subsequently, a letter from Reclamation to the Services dated March 27, 2020.

The 2018 BA, as modified, constitutes the "Interim Operations Plan" for the Klamath Project, while Reclamation undertakes a more extensive consultation with the Services. Reclamation reinitiated consultation with the Services by letter dated November 13, 2019, after the agency became aware of erroneous data included in the 2018 BA and relied upon by NMFS in its analysis. The Interim Operations Plan deviates from the operations proposed in the 2018 BA by adding an additional 40,000 acre-feet (AF) to the Environmental Water Account in certain year types. The Interim Operations Plan is intended to remain in effect until Reclamation completes the ongoing consultation with the Services, expected to conclude in the fall of 2022.

This reassessment provides guidance for Reclamation's ongoing Section 7(a)(2) consultation; it does not alter or affect Reclamation's current ESA compliance, as encompassed in the Interim Operations Plan.

## 2.2    CONSULTATION, LITIGATION, AND SETTLEMENT HISTORY

This summary provides a general picture of ESA consultations by Reclamation over more than three decades, particularly with respect to the operation of Upper Klamath Lake and resulting flows in the Klamath River. See section 2 of the 2018 BA for a more comprehensive listing of prior ESA Section 7(a)(2) consultations in connection with the Klamath Project.[4]

In July 1988, USFWS listed Lost River sucker (*Deltistes luxatus*) and shortnose suckers (*Chasmistes brevirostris*) as endangered. Reclamation consulted with USFWS the following year on the effects of aquatic herbicide use within the Klamath Project on these species. This consultation concluded with USFWS issuing a BiOp determining that Reclamation's continued use of acrolein in Klamath

---

[1] *Endangered Species Act Section 7(a)(2) Biological Opinion, and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for Klamath Project Operations from April 1, 2019 through March 31, 2024*, National Marine Fisheries Serv. (Mar. 29, 2019).
[2] *Biological Opinion on the Effects of the Proposed Interim Klamath Project Operations Plan, effective April 1, 2020, through September 30, 2022, on the Lost River Sucker and the Shortnose Sucker*, USFWS (Apr. 10, 2020).
[3] *Final Biological Assessment on the Effects of the Proposed Action to Operate the Klamath Project from April 1, 2019, through March 31, 2024*, U.S. Bur. of Reclamation (Dec. 21, 2018).
[4] To briefly list notable examples, Reclamation consulted with USFWS, in some cases repeatedly, on operation of Clear Lake Reservoir, Gerber Reservoir, and the Tule Lake Sumps, including releases from Anderson-Rose Dam; replacement of Clear Lake Dam; use of pesticides and fertilizers on federal lease lands and federal rights-of-way; private algae harvesting operations on Upper Klamath Lake; Agency Lake-Barnes Ranch pumped storage operations; and modifications to the A Canal headworks and Link River Dam to reduce fish entrainment.

Project canals and drainage ditches, as traditionally applied, was likely to jeopardize the continued existence of Lost River and shortnose suckers and proposing a number of Reasonable and Prudent Alternatives (RPA) intended to avoid jeopardy.

In August 1991, Reclamation completed a consultation on the effects of overall Project operations on Lost River and shortnose suckers and bald eagles. USFWS determined that the proposed operations for 1991 would likely to jeopardize Lost River and shortnose suckers, but not bald eagles. USFWS' BiOp included an RPA requiring a minimum water surface elevation in Upper Klamath Lake of 4,142.1 feet between March 15 and May 5, and 4,242.4 feet between May 6 and June 15.[5]

Drought conditions in 1992 indicated that Reclamation would be unable to achieve the required elevation of 4,142.1 feet by March 15, triggering Reclamation to reinitiate consultation with USFWS on the effects of proposed 1992 operations. The consultation, completed in July 1992, found that Reclamation's proposed operation of the Klamath Project from April 1992 through March 2001 would likely jeopardize Lost River and shortnose suckers, but not bald eagles.

For Upper Klamath Lake, USFWS' 1992 BiOp required as an RPA that Reclamation maintain water surface elevations at not less than 4,141.0 feet and a maximum increase in elevation of one foot from March 1 through April 30 of each year, or until 80 percent of sucker spawning had occurred. Additionally, the BiOp required a water surface elevation of 4,141.0 feet by May 31 and at least 4,139.0 feet from June 1 through the end of February. To comply with the BiOp terms, these latter two elevations could be "compromised" no more than two consecutive years regardless of the time period, and in no more than four years during the ten-year term of the BiOp.

In March 1995, NMFS issued a proposed rule listing Klamath Mountains Province (KMP) steelhead (*Oncorhynchus mykiss irideus*) as a threatened species under the ESA. Reclamation consulted with NMFS on the effects of the 1995 operations plan on KMP steelhead, and in April 1995, NMFS concurred with Reclamation's conclusion that the proposed operations were unlikely to jeopardize the species.

In 1995 Reclamation began operating the Klamath Project in accordance with annual operations plans that specified designated water surface elevations in Upper Klamath Lake and flows in the Klamath River. As a starting point, the flows in the Klamath River were based on the requirements in PacifiCorp's 1956 license from the Federal Energy Regulatory Commission (FERC) for minimum releases from Iron Gate Dam, notwithstanding that it is a non-federal facility approximately 40 miles downstream the Klamath Project.

In July 1995, NMFS issued a proposed rule to list Southern Oregon-Northern California Coast (SONCC) coho salmon (*Oncorhynchus kisutch*) as threatened under the ESA.

Large fish mass-mortality (i.e., "die-off") events in Upper Klamath Lake in 1995 and 1996 in part led Reclamation to reconsider minimum water surface levels in the lake. Beginning in 1997 Reclamation agreed to manage Upper Klamath Lake to achieve a minimum September 30 water surface elevation of 4,139.0 feet. That same year NMFS also officially listed SONCC coho as threatened.

---

[5] All water surface elevations identified in this report are with respect to the Bureau of Reclamation datum specific to the facility.

In March 1998 NMFS determined that listing KMP steelhead was unwarranted, based in part on evidence that the fish were at a lower risk of extinction than at the time of the proposed listing.[6]

In March 1999, Reclamation requested formal Section 7(a)(2) consultation under the ESA on the effects of Project operations on coho salmon. NMFS' resulting July 1999 BiOp determined that Reclamation's proposed annual operations plan would likely adversely affect, but not jeopardize the continued existence of SONCC coho or its critical habitat. NMFS determined, however, that more information was necessary in order to fully understand the relationship between Iron Gate Dam releases and available coho habitat and water quality in the Klamath River, particularly during the summer months. NMFS also relied on the fact that Reclamation had committed to obtain additional information and analyses to assist in developing future operations plans.

In August 1999, a Department of Interior-commissioned scientific assessment of the flow needs of anadromous species in the Klamath River basin – known as Phase I of the "Hardy Report" – provided interim recommendations on minimum monthly flow levels for the mainstem of the Klamath River needed to support aquatic life.[7]

In 2000, Reclamation issued an annual operations plan providing for certain flows at Iron Gate Dam, but Reclamation did not consult with NMFS about the effects due primarily to delays in obtaining the information necessary to inform the consultation. The Pacific Coast Federation of Fishermen's Associations (PCFFA) filed suit in the U.S. District Court for the Northern District of California, and in an April 2001 opinion, the court ultimately granted PCFFA's motion for summary judgment, finding that Reclamation had failed to comply with ESA before implementing the 2000 operations plan.[8]

At the time, Reclamation also had to reconsult over the effect to endangered Lost River and shortnose suckers, with expiration of USFWS' 1992 BiOp. In February 2001, Reclamation issued a BA proposing to operate the Project consistent with historical operations, including for Upper Klamath Lake, thereby meeting or exceeding minimum levels that occurred during the period from 1960 to 1998.

In March 2001, USFWS issued a jeopardy BiOp, with an RPA requiring, among other conditions, that water not be diverted from Upper Klamath Lake for irrigation purposes if surface elevations were anticipated to go below certain designated water surface elevations, ranging between 4,141.0 feet and 4,142.5 feet at nine separate dates throughout the year (January 1, February 15, March 15, April 15, June 1, July 15, August 15, September 15, and October 15), regardless of inflow year type.

USFWS' 2001 BiOp recognized that there would be circumstances in which Reclamation could not meet both the RPA for specific lake levels and NMFS' anticipated RPA for river flows. The BiOp established a process for how these situations would be addressed. An appendix specified that, for 2001, Upper Klamath Lake water surface elevations were not to fall below 4,139.0 feet on September 30.

The April 2001 opinion from the district court also enjoined Reclamation from making irrigation deliveries that year if flows in the Klamath River dropped below the minimum flows recommended in the Phase I Hardy Report until the consultation process with NMFS was complete.[9] Three days later, NMFS issued a jeopardy BiOp on Reclamation's February 2001 BA. NMFS' BiOp included an RPA that

---

[6] This decision was subsequently overturned by the U.S. District Court for the Northern District of California in October 2000, but the agency nevertheless again determined in April 2001 that the species did not warrant listing.
[7] Thomas B. Hardy, *Evaluation of Interim Instream Flow Needs in the Klamath River – Phase I*, Utah State Univ. (1999).
[8] *PCFFA v. U.S.*, 138 F. Supp. 2d 1228 (2001).
[9] *Id*.

provided for flows of 1,850 cubic feet per second (cfs) between April 1 and June 30, followed by 1,000 cfs through September. To comply with this RPA and USFWS' RPA, Reclamation could not make any water available from Upper Klamath Lake for delivery to Project irrigators at the start of the irrigation season.

Phase II of the "Hardy Report" was released in November 2001.[10] The report used site-specific habitat modeling and estimates of the unimpaired flows in the main stem to arrive at a recommendation for flows for each river reach.

Following 2001, the National Research Council (NRC) was asked by the Departments of Interior and Commerce to independently review the scientific and technical validity of the government's BiOps. NRC's interim report was released in February 2002.[11]

Among other findings, NRC's report found no scientific support for the flow recommendations in the NMFS's BiOp.[12] But the report also found that no justification for the proposed action in Reclamation's 2001 BA, concluding that it "could lead to more extreme suppression of flows than has been seen in the past..."[13] Overall, the report concluded that "there is no convincing scientific justification at present for deviating from flows derived from operational practices in place between 1990 and 2000."[14]

With regard to Upper Klamath Lake, the report found that there was no clear empirical evidence for a relationship between water levels and mass-mortality events for fish. At the same time, with regard to Reclamation's 2001 BA, NRC found "no scientific basis for operating the lake at mean minimum levels below the recent historical ones (1990-2000)", and that these operations "would require acceptance of undocumented risk to the suckers."[15]

In February 2002, Reclamation issued a new BA, which proposed, for April 2002 through March 2012, in addition to numerous conservation measures, varying both river flows and lake levels by "water year type." For each type of water year, Reclamation used the historical average flow and lake levels over the previous ten-year period (1990 to 1999) to set its operational targets. In addition, Reclamation proposed to establish a "water bank" to make up to 100,000 total AF of water available to meet river flows. These conditions resulted in levels in Upper Klamath Lake in "critically dry" years between 4,137.1 feet (September) and 4,142.0 feet (March), and an overall mean lake level, across all year types of approximately 4,139.0 feet.

In May 2002 both USFWS and NMFS issued jeopardy opinions on Reclamation's proposed action.

USFWS' RPA did not prescribe specific alternative water levels in the lake, but rather that Reclamation, among other conditions: 1) use the 50-percent, instead of 70-percent, exceedance forecast for seasonal inflows; 2) reduce entrainment of suckers at Link River Dam; and 3) evaluate factors

---

[10] Thomas B. Hardy and R.C. Addley, *Evaluation of Interim Instream Flow Needs in the Klamath River – Phase II*, Utah State Univ. (2001).

[11] National Research Council, *Scientific Evaluation of Biological Opinions on Endangered and Threatened Fishes in the Klamath River Basin* (2002).

[12] *Id*. at p. 27. NMFS later attributed NRC's conclusions to "lack of information on distribution and abundance of coho ... and the lack of studies focused on coho and factors limiting its population in the Klamath River Basin." In its 2002 BiOp, NMFS did not dismiss the NRC report, but did not adopt its conclusions in full.

[13] *Id*.

[14] *Id*.

[15] *Id*. at p. 4.

affecting water quality in Upper Klamath Lake, potential actions to reduce fish die-offs, and ongoing sucker population monitoring.

NMFS' RPA was broken into three phases, gradually leading (by 2010 and 2011) to minimum flows in the Klamath River varying between 1,000 cfs (July-September) and 1,500 cfs (April-May), based in part on the Phase II Hardy Report. The RPA was based around the principle that Reclamation should bear responsibility for only the share of water losses attributable to the Klamath Project. Because the Project represented approximately 57 percent of the irrigated land in the basin, the RPA provided for Reclamation to provide 57 percent of the water needed for coho and to establish an intergovernmental workgroup to "develop" the other 43 percent. The RPA permitted Reclamation to use its "water bank" to provide its share of the water. These flows increased based on the water year type (i.e., dry, below average, average, above average, wet).

In September 2002, a large fish mass-mortality event occurred in the lower Klamath River, resulting in over 34,000 dead fish, mostly adult Chinook salmon. PCFFA subsequently sued NMFS over its 2002 BiOp.

In July 2003, the U.S. District Court for the Northern District of California overturned part of the RPA, finding the requirement that Reclamation provide only 57 percent of the long-term flows to be arbitrary and capricious.[16] The court concluded that the NMFS had considered the effects of actions that were not "reasonably certain to occur" when it determined that the coho would receive 100 percent of the flows through a collaborative process.[17] However, the court determined that the short-term measures – phases 1 and 2 – were not arbitrary and capricious. The court ordered NMFS to revise its BiOp with respect to Phase III of the RPA, but provided that the interim measures, phases 1 and 2, would remain in effect pending a revised BiOp.[18]

The Ninth Circuit, in October 2005, overturned the district court's ruling, finding that NMFS's decision to delay the provision of the full quantity of water for eight years was not supported by the record.[19] The BiOp contained no analysis of the effect on coho during the first eight years of the RPA, despite the species' three-year life cycle. On remand, in March 2006, the U.S. District Court for the Northern District of California ordered Reclamation to comply with 100-percent of the RPA's Phase III flows until completion of a Section 7(a)(2) consultation.[20]

Beginning in 2005, stakeholders in the Klamath Basin began a settlement process to address the conflicts over water that had emerged since the 1990s. These settlement discussions involved all major water user communities and Klamath Basin Tribes and covered a broad number of topics that were included in several documents, including the Klamath Basin Restoration Agreement (KBRA) and the Klamath Hydroelectric Settlement Agreement (KHSA).

With respect to the management of Klamath Project features by Reclamation, the settlement negotiations began to form around certainty in allocations for irrigation purposes, accompanied by a designated plan to reduce irrigation demands in years when the available supply would be inadequate.

In October 2007 Reclamation issued a new BA on proposed operations from April 2008 through March 2018. Reclamation was not at the time required to reconsult with USFWS, but it elected to because

---

[16] *PCFFA v. U.S.*, No. 02-2006 SBA (N.D. Cal. Jul. 15, 2003).
[17] *See PCFFA v. U.S.*, 426 F.3d 1082, 1089 (9th Cir. 2005).
[18] *Id*. at 1090.
[19] *Id*. at 1091.
[20] *PCFFA v. U.S.*, No. 02-2006 SBA (N.D. Cal. May 24, 2006).

Reclamation had encountered difficulties in implementing the proposed action described in the 2002 BA. One reason was because seasonal inflows to Upper Klamath Lake between 2002 and 2007 were different from those that occurred in the 1990s, being generally drier and this made it difficult for Reclamation to operate to an annual UKL elevation curve that closely fit the period of record.

The other problem was with the use of year types and the fact that monthly inflows could vary, regardless of overall net inflow. As a result, there were times that actual monthly inflows were less than what was needed to meet Upper Klamath Lake elevations despite the projection that lake elevations would be met based on the forecast net annual inflow. Additionally, the forecasted net annual inflow did not always accurately represent the actual net inflow.

The 2007 BA proposed minimum Upper Klamath Lake elevations as low as 4,137.5 feet (September). No minimums were specified for October through January. A model indicated that lake levels would remain above 4,138.9 feet in 70 percent of the years. The BA also included an "Interactive Management" process to distribute "surplus water" between the Klamath River and Upper Klamath Lake. For the Klamath River, the BA proposed minimum flows ranging between 1,000 cfs (July-September) and 1,500 cfs (April-May), increasing under wetter conditions.

In April 2008, USFWS issued a non-jeopardy opinion on Reclamation's proposed action. In June 2008, NMFS issued a draft jeopardy opinion with no RPA. A later version of the draft BiOp included an RPA that Reclamation deemed unacceptable in terms of shortages to the Project. After further discussion, a revised RPA was developed that reduced the shortages to the Project, but which Reclamation still felt was unsupported by the science and would conflict with Reclamation's proposed action with respect to Upper Klamath Lake water surface elevations specified in USFWS' 2008 BiOp. In October 2008 Reclamation notified NMFS it was suspending the consultation. Reclamation decided to operate the Project under USFWS' 2008 BiOp and NMFS' 2002 BiOp (Phase III flows).

In February 2010, the non-federal parties, including the Klamath Tribes and the Yurok Tribe, signed the KBRA. As negotiated, the KBRA provided for an annual fixed irrigation supply for the Klamath Project from Upper Klamath Lake and the Klamath River, and a commitment by the respective tribes, subject to certain conditions and considerations, to not exercise their senior water rights to curtail agreed-upon diversions by the Klamath Project.

Shortly after execution of the KBRA, Reclamation requested that NMFS finalize its opinion on Project operations from 2008 to 2010, consistent with the same RPA proposed when the 2008 consultation was suspended. Five days later, NMFS issued a jeopardy BiOp with a two-part RPA, providing for fall-winter flow variability and increased spring flows in average and wetter years. Additionally, the RPA specified minimum flows anticipated to be observed at Iron Gate Dam from March through September, ranging from 805 cfs (July) to 1,325 cfs (April), increasing under wetter conditions. Reclamation conditionally accepted NMFS' BiOp, based in part on its determination that compliance with the RPA could cause water levels in Upper Klamath Lake to be lower than those analyzed in USFWS' 2008 BiOp.

Reclamation deliberated on various paths forward, ultimately arriving at the plan to develop a "coordinated proposed action" in collaboration with the Services, the tribes, and Klamath Project water users. This collaborative process, which began in 2010, was largely facilitated by existing working relationships established during negotiation of the KBRA. In December 2012, following three years of

collaborative technical discussions, Reclamation released a BA, to which USFWS and NMFS responded in May 2013 with a "joint" non-jeopardy BiOp.[21]

The 2012 BA and 2013 BiOp incorporated a novel operational regime that included an "Environmental Water Account" for the Klamath River, a "UKL Reserve" for Upper Klamath Lake, and a fixed "Project Supply" for irrigation. These operational rules had been coded into the programming logic of a hydrologic model, called the Klamath Basin Planning Model (KBPM). The KBPM was developed by a technical team that included hydrologists and scientists who represented Reclamation, the Services, the tribes, and Project water users.

The central purpose of the KBPM was to test new operational concepts in the context of historical hydrology, and to facilitate agreement on operations that would produce acceptable outcomes among the multiple parties. Notably, each of the parties that contributed to development of the KBPM and its novel operational regime set aside several legal considerations that were anticipated at the time to eventually be resolved through the enactment of the KBRA into federal law, including state water law, water supply contracts, federal authorizations, federal tribal trust obligations, and necessary refuge water supplies.

Reclamation had previously developed and used models to evaluate the effects of different proposed actions in response to various hydrologic conditions, and thus impacts to listed species. The major difference was that the KBPM presented a proposed action that departed from basic actions required for serving the Klamath Project, as defined by Congress and embedded in contracts between Reclamation and water users within the Project.

The 2012 BA (as elaborated in the logic code of the KBPM) contained various formulaic means of governing the operation of water storage in, and outflows from, Upper Klamath Lake, which were crafted to achieve mutually agreeable, or at least acceptable, hydrologic outcomes among the parties involved. Therefore, beyond simply being used as a predictive model for evaluating operational alternatives, the KBPM established formulaic rules for operating the Project intended to achieve agreed-upon outcomes, including various frequencies of monthly lake levels (to the hundredth of an inch), daily river flows at Iron Gate Dam (to the cfs), and a water supply for the Project, including the refuges, that was "locked in" (to the AF), at the beginning of the agricultural season.

In practice, attempting to manage the Klamath Project – really the entire upper Klamath Basin – on a daily basis based on a series of set formulas has proven to be operationally challenging, and in some cases impossible, in addition to being unsatisfactory to many affected stakeholders, including Klamath Basin Tribes and water users. In short, the KBPM has proven unworkable because factors that are beyond Reclamation's control influence hydrology, the status of the listed species, and their critical habitat, including fish disease dynamics in the Klamath River and water quality in Upper Klamath Lake.

The novel approach to operating the Project contained in the 2012 BA was predicated in part on the assumption that the formulaic logic of KBPM would eventually be replaced with an operational regime governed by the KBRA.[22] While the proposed action in the 2012 BA did not represent the KBRA, it was intended as a step in transitioning toward operations anticipated to occur under the KBRA.

---

[21] In addition to coho salmon, the 2013 BiOp also analyzed the effects of project operations on the southern Distinct Population Segment (DPS) of green sturgeon (*Acipenser medirostris*) and the southern DPS of Pacific eulachon (*Thaleichthys pacificus*).

[22] The 2012 BA also expressly acknowledged that project operations would likely also need to change following the State of Oregon's issuance of the Findings of Fact and Order of Determination in the Klamath Basin Adjudication.

In January 2016, without any action by Congress to authorize the agreement, the KBRA expired on its own terms. In July and November 2016, the Hoopa Valley and the Yurok tribes respectively, along with other parties, filed litigation against the United States in the U.S. District Court for the Northern District of California. The plaintiffs alleged that Reclamation had failed to reinitiate consultation after the amount of "incidental take" of coho – as measured by disease rates in Chinook salmon – in both 2014 and 2015 exceeded the take limit in NMFS' portion of the 2013 BiOp.

In January 2017, Reclamation reinitiated consultation with the Services. In February 2017, the court ordered that, pending completion of Section 7(a)(2) consultation, Reclamation provide two types of pulse flows ("surface and deep flushing flows" and "emergency dilution flows") in the Klamath River intended to mitigate a disease affecting juvenile salmon, while otherwise complying with the 2013 BiOp, including conditions necessary to protect suckers in Upper Klamath Lake.[23] This was a noteworthy development, in that the 2012 BA was based in part on an anticipated settlement and were now being used as a starting point for defining additional measures. From this point further, the balance achieved through negotiations was no longer possible and any improvement in supply for one party necessitated actions that would be perceived as reductions for others.

The pulse flows the court directed were based on four technical memoranda prepared by USFWS, and a resulting guidance document prepared by the Yurok, Karuk, and Hoopa Valley tribes in January 2017, which provided measures intended to mitigate the effects of *Ceratanova shasta* infection rates in coho salmon and Chinook salmon below Iron Gate Dam.

In December 2018, Reclamation issued a new BA for the proposed period of April 2019 through March 2024, which built off the KBPM, but that included approximately 50,000 AF of additional water designated for release to the Klamath River during the spring-summer period, for use in producing, at the very least, a "surface flushing flow" at Iron Gate Dam of 6,030 cfs for 72 hours.[24] The proposed action also included a "UKL control logic", intended to result in end-of-season elevations that cause Upper Klamath Lake to refill the subsequent year, in order to allow both a flushing flow and provide adequate water surface elevations in the lake for suckers. In March 2019, NMFS and USFWS issued separate non-jeopardy opinions on the 2018 BA.[25]

In July 2019, the Yurok Tribe and other parties filed litigation in the U.S. District Court of Northern California challenging NMFS' 2019 BiOp and Reclamation's compliance with the National Environmental Protection Act.  In September 2019, the plaintiffs amended their complaint, further alleging that Reclamation and NMFS' analysis was based on erroneous technical data (on available coho habitat), derived from the Phase II Hardy Report.

In response to the erroneous data related to available coho habitat, in November 2019, Reclamation formally requested reconsultation with NMFS and USFWS on Klamath Project operations.

In February 2020, Reclamation transmitted a final BA on project operations from April 2020 through March 2024, requesting completion of the consultation by the end of March, though acknowledging that additional time for the consultation would benefit all interested parties.

---

[23] *Yurok Tribe v. U.S.*, 231 F.Supp.3d 450, 490 (N.D. Cal. Feb. 8, 2017).
[24] Reclamation clarified and amended the proposed action multiple times during the consultation, as further described in 2.1.
[25] In addition to suckers, coho salmon, the southern DPS of North American green sturgeon, and the southern DPS of Pacific eulachon, NMFS 2019 BiOp also considered the effects of project operations on the southern resident DPS of killer whales (*Orcinus orca*).

After further discussions among the parties, in March 2020, Reclamation, NMFS, the Yurok Tribe, Klamath Project water users, among other parties agreed to a stipulated stay in the litigation, which was approved by the district court, based on Reclamation following the Interim Operations Plan pending completion of ongoing consultation. The Interim Operations Plan adds approximately 40,000 AF to the volume of water from Upper Klamath Lake designated for release to the Klamath River during the spring and summer period to the 2018 BA, as amended. Based on the agreed upon extended reconsultation, Reclamation also withdrew its February 2020 BA.

The practical result for 2020 was that Reclamation made 155,000 AF of water available from Upper Klamath Lake for irrigation purposes within the Project during the spring-summer season (approximately one-third the historical demand), while simultaneously releasing approximately 407,000 AF to the Klamath River to achieve designated flows at Iron Gate Dam, amidst inflows to the lake of approximately 360,000 AF.

## 2.3    DIRECTION FROM THE SECRETARY OF THE INTERIOR

In July 2020, Secretary of the Interior David Bernhardt, accompanied by Reclamation's Commissioner Brenda Burman, traveled to Klamath Falls, to meet with Klamath Project water users, tribal leaders, elected officials, and staff from Reclamation, USFWS, and the U.S. Geological Survey. During their visit, Secretary Bernhardt and Commissioner Burman committed to begin implementing long-term solutions that more reliably meet the water needs of the Klamath Basin.

Following the Secretary and Commissioner's visit to Klamath Falls, legal counsel for the Klamath Water Users Association and Klamath Irrigation District separately wrote the Secretary, requesting that the Department of Interior's Office of the Solicitor review various legal issues related to Reclamation's operation of the Klamath Project. In response, the Secretary directed the Office of the Solicitor to review certain legal issues surrounding the Project.

In identical letters sent to Klamath Water Users Association and Klamath Irrigation District, dated November 12, 2020, the Secretary furnished a copy of the Office of Solicitor' preliminary findings, indicating that Reclamation's discretion in operating the Klamath Project is likely constrained by the contracts providing water to districts and individuals within the Project. Based on this initial review, the Secretary directed Reclamation, in coordination with the Office of the Solicitor, to review the contracts and other legal authorities governing the Project. Further, the Secretary directed Reclamation to "determine what portion of water in the Project is segregable, and thus set aside for irrigation purposes and unavailable for other purposes." Such analysis, presented herein, requires proper contextualization of the ESA among and along with all federal responsibilities and obligations.

## CHAPTER 3 -  LEGAL CONTEXT OF REASSESSMENT

Chapter 3 summarizes pertinent legal principles, regulatory definitions, and judicial decisions that provide the context for this reassessment.

## 3.1    DEFINING THE AGENCY ACTION

An agency's proposed actions are the subject of any BA. Within the context of ESA Section 7(a)(2) consultation, the term "action" is defined as all activities or programs of any kind authorized, funded or carried out, in whole or in part, by a federal agency.[26] It is Reclamation, not the Services, that defines the proposed action at issue for consultation[27], and those actions should be defined precisely. It is the action agency that first evaluates the potential effects of its actions on listed species and their habitat, and provides this, and other information, to the Services.[28] The Services then conduct their own analyses and provide their opinion as to whether the agency's proposed action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat.[29]

## 3.2    NON-DISCRETIONARY ACTIONS NOT SUBJECT TO CONSULTATION

A federal agency must have discretion over an "action" for ESA Section 7(a)(2) to apply to agency actions.[30] Not all agency actions are discretionary. Discretion may not only be constrained or limited in some manner by legal authorities, but also, as a practical matter, by physical conditions beyond the agency's control (e.g., rainfall).

Where there is no discretion, an agency has no duty to consult.[31] An agency may still exercise independent judgment, but lack some degree of discretion.[32] For example, Reclamation has a responsibility to prevent civil works from damage and destruction, whatever the cause, so that they continue to serve their congressionally authorized purposes. Those actions, albeit subject to independent judgment (i.e., the exact manner to which they occur), are nonetheless non-discretionary.

The authorized purposes of the facilities and the project can further limit Reclamation's discretion in some respects. Congress establishes the purposes for which federal reclamation projects may be used.

Overall, ESA Section 7(a)(2) cannot serve to override a federal statute or contract mandating agency action by subjecting such action to further conditions.[33] Nor does ESA Section 7(a)(2) require an agency to consult on non-federal actions for which the agency has no means of control or discretion over.

---

[26] 50 CFR §402.02.

[27] 50 CFR §402.14(c)(l).

[28] *Id*.

[29] 16 U.S.C. §1536(b); 50 CFR §402.14(g).

[30] 50 CFR §402.03; *Nat'l Assoc. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007).

[31] *Id*. at 665 ("the ESA's requirements would come into play only when and action results from the exercise of agency discretion"); *see also Department of Transportation v. Public Citizen*, 541 U.S. 752, 770 (2004) ("where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect.") Further, the Supreme Court has recognized that the legal causation argument in *Public Citizen* supports "the reasonableness of the FWS's interpretation of §7(a)(2) as reaching only discretionary agency actions." *Nat'l Assoc. of Home Builders*, 551 U.S. at 665.

[32] *Id*. at 668 ("while [an agency] may exercise some judgment in determining [an agency action], the statute does not grant it discretion ...").

[33] *See Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 962 F.2d 27, 33-34 (D.C. Cir. 1992).

### 3.3    ANALYTICAL FRAMEWORK – LEGAL AUTHORITIES AND CONSTRAINTS

Reclamation derives authority for operation of the Klamath Project from the Act of February 9, 1905, which authorized Reclamation to raise and lower water levels in Lower Klamath and Tule lakes, and any waterbodies connected therewith, in carrying out a federal reclamation project in accordance with the Reclamation Act of 1902.[34] In their natural condition, these lakes and the connected waterbodies were interstate navigable waterways, over which Congress has the exclusive right to regulate under the Commerce Clause of the U.S. Constitution.

Congress did not place any requirements, conditions, or other express constraints on this authority over changing water levels, except as generally exist under the Reclamation Act of 1902. From an operational standpoint, the Reclamation Act of 1902 includes two substantive conditions on Reclamation's authority. First, Section 6 provides in part that "title to and the management and operation of the reservoirs and works necessary for their protection and operation shall remain in the Government until otherwise provided by Congress".[35] Second, Section 8 provides that Reclamation, in developing federal reclamation projects, "shall proceed in conformity with" "the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation".[36] Section 8 also protects pre-existing water rights, including reserved water rights.[37] Reclamation's discretion in operating the Klamath Project is constrained by these express congressional directives.

In accordance with Section 6 of the Reclamation Act of 1902, Reclamation must operate the Klamath Project consistent with other federal laws, including, for example, the ESA.[38] Under Section 8, Reclamation must also comply with state law on the control, appropriation, use, and distribution of water in connection with the Klamath Project, provided such state laws are consistent with directives of Congress. Both these mandates confine Reclamation's discretion in operating the Klamath Project. Reclamation has no discretion – except as otherwise directed by Congress – to comply with state law in acquiring and exercising water rights in connection with a federal reclamation project.[39] Lastly, as the Klamath River is an interstate stream, Congress' directive in Section 8 regarding protecting vested rights necessarily pertains to Reclamation's administration of the Klamath Project.

Reclamation's discretion may further be limited by the United States' contracts with non-federal entities for water from the Klamath Project, as well as contracts for transfer of operation and maintenance of federal facilities to non-federal entities. Reclamation has a legal obligation to water users within the Klamath Project to operate the Project consistent with the contracts between the United States and them. These contracts generally furnish a water supply from the Project and provide for operation and maintenance of Project facilities by non-federal entities, subject to certain terms and conditions that vary by contract. There are also a limited number of contracts between the United States and water users with rights predating the Klamath Project, which Reclamation is also obligated to operate in accordance with.

---

[34] 33 Stat. 714.

[35] 32 Stat. 389, 43 U.S.C. §498.

[36] 32 Stat. 390; 43 U.S.C. §383.

[37] *Id.* ("nothing herein shall in any way affect any right of any State or of the Federal government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof"); *United States v. Truckee-Carson Irrig. Dist.*, 649 F.2d 1286, 1298 (9th Cir. 1981), *modified*, 666 F.2d 351 (9th Cir. 1982), a*ff'd in part and rev'd in part on other grounds sub nom.*

[38] Section 10 of the 1902 Act, 43 U.S.C. § 373, also directs the Secretary "to perform any and all acts and to make such rules and regulations as may be necessary and proper" to ensure that Project operations conform to applicable laws. *See United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 212 (9th Cir. 1989); *Truckee-Carson Irr. Dist. v. Secretary*, 742 F.2d 527 (9th Cir. 1984), *cert. denied*, 472 U.S. 1007 (1985).

[39] *Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275, 291-2 (1958). *Also see Hennings v. Oregon*, 50 Ore. App. 121 (Or. Ct. App. 1981) (water must be used for the purpose set out in the permit or certificate).

Reclamation, as an agency of the United States, serves as trustee for tribal and individual Indian lands, assets, resources, and treaty and similarly recognized rights. This trust responsibility extends to three federally recognized tribes in the Klamath Basin – the Klamath, Yurok, and Hoopa Valley tribes – and further limits Reclamation's discretion in operating the Klamath Project.[40]

Pursuant to *Winters v. United States* and subsequent case law applying it (the "*Winters* Doctrine"), the establishment of Indian reservations such as those of the Klamath, Yurok, and Hoopa Valley tribes (or other federal reservations such as national parks or national wildlife refuges) implicitly reserves sufficient water to accomplish the purposes of those reservations.[41] These tribal water rights, although unadjudicated in certain respects, are nonetheless senior in priority to the water rights associated with the Klamath Project.[42] Reclamation has an obligation to operate the Klamath Project and manage water resources (including storage and diversions) consistent with the tribes' senior water rights.[43]

## 3.4    ENVIRONMENTAL BASELINE

The environmental baseline includes the past and present impacts of all federal actions or other human activities in the action area.[44] The environmental baseline also includes the anticipated impact of all proposed federal projects in the action area that have already undergone ESA consultation.[45] Finally, the ESA's consultation requirements are not retroactive to facilities constructed or under construction prior to its enactment.[46] The statutory definition of environmental baseline also includes present impacts, meaning ongoing impacts, of state, tribal, local and private actions affecting the species at the same time as the consultation in progress.[47]

The fact that Reclamation maintains a federal facility that was constructed prior to the ESA for its congressionally authorized purpose is not an action subject to consultation. The continued presence of a dam, canal, drain, or other civil works structure cannot reasonably be said to cause modification to the land, water, or air within the meaning of Section 7(a)(2) of the ESA. Similarly, federal contracts that existed prior to enactment of the ESA, which limit or otherwise do not provide Reclamation some degree of discretion, are part of the environmental baseline.[48]

Impacts attributable to environmental baseline may affect the species, but the effects of environmental baseline are not attributable to an agency's proposed action. However, the environmental baseline, cumulative effects, and the effects of the proposed action are all considered by the Services when they conduct their jeopardy and adverse modification analyses under Section 7(a)(2).[49]

---

[40] *Patterson*, 204 F.3d at 1214.

[41] 207 U.S. 564, 576-77 (1908); *see also Cappaert v. U.S.*, 426 U.S. 128, 139 (1976) (*Cappaert*); *Arizona v. California*, 373 U.S. 546, 597-602 (1963).

[42] *Baley*, No. 18-1323 at 51.

[43] *Patterson*, 204 F.3d at 1214; *Kandra v. U.S.*, 145 F. Supp. 2d 1192 (D. Or. 2001). *See also* Secretary of the Interior, Order No. 3335, "Reaffirmation of the Federal Trust Responsibility to Federally Recognized Indian Tribes and Individual Indian Beneficiaries" (Aug. 20, 2014).

[44] 50 CFR §402.02.

[45] *Id*.

[46] 6 U.S.C. §1536(c)(l). The date for this exemption is November 10, 1978, the date of the ESA amendments.

[47] USFWS, *Endangered Species Consultation Handbook*, p. 4-22 (1998) (describing environmental baseline as "an analysis of the effects of past and ongoing human and natural factors leading to the current status of the species, its habitat (including designated critical habitat) and ecosystem... The baseline includes State, tribal, local and private actions already affecting the species or that will occur contemporaneously with the consultation in progress.")

[48] *See e.g.*, *id*. at p. 4-26 ("ongoing effects of the existing dam are already included in the Environmental Baseline and would not be considered an effect of the proposed action under consultation").

[49] 50 CFR. 402.14(g)(4).

## CHAPTER 4 -  BRIEF DESCRIPTION OF THE KLAMATH PROJECT

Chapter 4 provides a brief description of the Klamath Project in the Klamath Basin of southern Oregon and northern California.

Pursuant to Section 2 of the Reclamation Act of 1902, Reclamation initiated surveys of the Klamath Basin beginning in October 1903.[50] In a report dated November 2, 1903, Reclamation's engineer, John T. Whistler, identified the potential feasibility of an irrigation project serving approximately 200,000 acres. Additional surveys were conducted during the summer of 1904, and based on that information, the Secretary of the Interior subsequently withdrew over 1.1 million acres of public lands in late 1904.

On February 9, 1905, Congress passed an act, subsequently signed into law by President Theodore Roosevelt, providing that:

> *The Secretary of the Interior is hereby authorized in carrying out any irrigation project that may be undertaken by him under the terms and conditions of the national reclamation act and which may involve the changing of the levels of Lower or Little Klamath Lake, Tule or Rhett Lake, and Goose Lake, or any other body of water connected therewith, in the States of Oregon and California, to raise or lower the level of said lakes as may be necessary to dispose of any lands which may come into the possession of the United States as a result thereof by cession of any State or otherwise under the terms and conditions of the national reclamation act.[51]*

Following enactment of this law, a board of consulting engineers convened in Klamath Falls to inspect the proposed works. This board ultimately produced a report to Reclamation's Chief Engineer, dated May 1, 1905, recommending authorization of a project for reclamation and irrigation of 236,401 acres – approximately 180,000 acres of which was then inundated by Tule and Lower Klamath lakes – at an estimated cost of $4.4 million.

The Director of the U.S. Geologic Survey referred the board's report to Secretary of the Interior, who subsequently authorized the Project on May 15, 1905. Accordingly, the authorized purpose of the Klamath Project is to provide a water supply for approximately 230,000 acres of irrigable land and to reclaim lands within the former beds of Tule and Lower Klamath lakes. Accomplishment of this purpose includes the authorized incidental purposes of power and flood control.[52]

Four days after the project's authorization, on May 19, 1905, Reclamation filed a notice with the State of Oregon, pursuant to state law, of its intentions to appropriate and utilize "all the waters of the Klamath Basin, constituting the entire drainage basins of the Klamath River and Lost River, and all of the lakes, streams and rivers supplying water thereto or receiving water therefrom..."[53] This notice forms the basis for all water rights in the State of Oregon in connection with the Klamath Project. Similar water right notices were also filed in California, in accordance with California law.

---

[50] 32 Stat. 388; 43 U.S.C. §411.
[51] 33 Stat. 714.
[52] Regarding flood control, *see* "Authority for Construction of Works to Protect Tulelake Area, including Coppock Bay Lands, from Flooding – Tulelake Division, Klamath Project", Leland O. Graham, Reg. Counsel, U.S. Bur. of Reclamation (Sept. 18, 1947); "Authorization of Construction of Certain Flood Protection Works, Klamath Project", Leland O. Graham, Reg. Counsel, U.S. Bur. of Reclamation (Oct. 8, 1948). Regarding the incidental authorization for power development, *see* "Klamath Power Determination", Michael L. Connor, Comm., U.S. Bur. of Reclamation (May 17, 2013).
[53] Act of Feb. 22, 1905, Or. Gen. Laws, 1905, Ch. 228.

After letting contracts in late 1905, Reclamation began construction on the project's "Main Canal" (i.e., A Canal) in March 1906, and the first deliveries to a small portion of the project began in May 1907. Work proceeded slowly in the first few years due to unexpectedly high construction costs, scarcity of local labor and materials, and limited funds available from the Reclamation Fund.

In the fall of 1910, in accordance with the Act of June 25, 1910[54], a board of engineers of the U.S. Army examined and reported on the Klamath Project. Based on the board's recommendation, President William Howard Taft approved the project as feasible and practicable on January 5, 1911.

Reclamation continued construction of the Klamath Project over the subsequent decades, adding new facilities and extending the service area as engineering obstacles were resolved. Land was gradually uncovered and drained of water. By the early 1960s, construction of the Project was largely complete with facilities to serve the current service area of approximately 230,000 acres, including 47,000 acres within two national wildlife refuges.

In its entirety, the Klamath Project now consists of a complex network of storage and conveyance works including three large dams and associated reservoirs, four smaller diversion dams, 675 miles of canals and laterals, 545 miles of drains, and over 50 separate pumping plants.

The Project's three storage reservoirs – Upper Klamath Lake, Clear Lake, and Gerber – have a combined active storage capacity of approximately 1,180,000 AF. Under the 2018 BA, Reclamation manages the storage and release of water from these reservoirs according to a number of considerations, as described in Chapter 3.3.

Upper Klamath Lake is the Project's primary water source, with over 560,000 AF of storage capacity and a tributary area of over 3,700 square miles. Regulation of storage and releases from the lake is controlled by Link River Dam. There is no volume of storage in Upper Klamath Lake designated exclusively for storing flood flows, although there are specific "flood control elevations" under the 2018 BA, which vary according to current and projected hydrologic conditions and the specific time of year.

Similar in size, Clear Lake Reservoir has a storage capacity of approximately 527,000 AF and a drainage area of approximately 700 square miles. Reclamation has designated 153,000 AF of this capacity exclusively for flood control purposes at all times, meaning the reservoir's storage capacity for irrigation purposes cannot exceed 374,000 AF. Between October 1 and the end of February, exclusive flood control storage increases to 177,000 AF, reducing the space available for storing water for irrigation purposes to 350,000 AF or less.

Lastly, constructed by Reclamation in 1925, Gerber Dam, on Miller Creek, tributary to the Lost River, forms a reservoir with 94,270 AF of active storage capacity for a tributary area of 230 square miles. Under current operating procedures, there is no storage capacity in Gerber Reservoir designated exclusively for flood control purposes; however, stored water is periodically released as necessary to avoid flooding the Tule Lake area.

Reclamation has contractually assigned operation and maintenance responsibility for most of the Project's works to three separate irrigation districts, while retaining responsibility for seven facilities – Link River Dam, Clear Lake Dam, Gerber Dam, the Lost River Diversion Channel, the Lost River Improved Channel, the P Canal, and the Klamath Straits Drain.

Reclamation has also entered into contracts with 150 separate entities (e.g., ditch companies, irrigation districts, drainage districts, improvement districts) and individuals to use water from the Klamath Project. These contracts differ in the source, quantity, time period, and other conditions on the use of the project water. Certain contracts afford Reclamation some degree of discretion over the use of

---

[54] 36 Stat. 835.

water by the entity or individual party to the contract; however, this discretion is often limited or confined, as more fully discussed in Chapter 5, below.

## CHAPTER 5 -  SPECIFIC OPERATION ACTIONS AND ASSESSMENT OF CONSULTATION REQUIREMENT

Chapter 5 presents the findings of the reassessment relative to the need for ESA Section 7(a)(2) consultation for operational actions associated with the Klamath Project, with particular regard to agency discretion. The technical and legal bases for these determinations are presented individually for thirteen "actions" that are either identified for ESA Section 7(a)(2) consultation by Reclamation, or for inclusion in Reclamation BA's Environmental Baseline. A specific recommendation is presented for each action considered.

Notably, inclusion of a given action in the BA environmental baseline only means that the federal government has no discretion to consult under ESA Section 7(a)(2) and does not necessarily assert that related non-federal actions are compliant with the ESA (e.g., Section 9 of the ESA), nor does it resolve all of Reclamation's legal obligations in connection with operating the Klamath Project.

### 5.1    STORING TRIBUTARY INFLOW

The act of storing water, at the most basic level, entails regulating outflow from a reservoir to a rate less than instantaneous tributary inflow. When outflow is less than inflow, the surface elevation on a reservoir will increase as water is actively stored. The act of storing water is always evidenced by increasing water surface elevations.[55]

Reclamation's authorization from Congress is to vary water levels in Upper Klamath Lake and connected waterbodies "as may be necessary to dispose of any lands which may come into the possession of the United States as a result thereof by cession of any State or otherwise under the terms and conditions of the national reclamation act".[56] As storing water involves raising the water level in Upper Klamath Lake, this act is within Reclamation's discretionary authority. However, the _purpose_ of storing water is non-discretionary, in that Congress expressly provided the purpose this act is to serve (i.e., an "irrigation project" undertaken by the Secretary "under the terms and conditions of the national reclamation act").

Reclamation's discretion in storing water in Upper Klamath Lake is further confined by state law. As Upper Klamath Lake lies exclusively within the State of Oregon, in accordance with both the Act of February 9, 1905 and Section 8 of the Reclamation Act of 1902, Reclamation must follow Oregon law in acquiring and exercising water rights in connection with storing water in Upper Klamath Lake, to the extent not inconsistent with federal law.[57]

The United States' water rights for storing water in Upper Klamath Lake are part of the Klamath Basin Adjudication, which is an ongoing process in accordance with Oregon law to determine federally reserved and pre-1909 (state-based) water rights to water from the Klamath River and Upper Klamath Lake and its tributary streams.[58] The United States waived its sovereign immunity under the McCarran Amendment and the State of Oregon had jurisdiction to compel the United States to participate in these still-ongoing proceedings.[59] Reclamation accordingly submitted its claims in regard to storing water in

---

[55] When the water surface elevation of a reservoir remains constant (i.e., unchanged), inflow is equal to outflow.  In this situation, releases will necessarily consist entirely of tributary inflow and reflect the remainder of whatever amount of inflow is not otherwise being consumed and/or diverted.  These allocations are a simple mass-balancing exercise, and therefore non-discretionary.

[56] _Id._; 33 Stat. 714.

[57] _Id._; 32 Stat. 390, 43 U.S.C. §383. _See also Ivanhoe Irr. Dist. v. McCracken_, 357 U.S. 275, 291-2 (1958).

[58] _See_ Or. Rev. Stat. §539.021; _U.S. v. Oregon._, 774 F.Supp. 1568 (D. Or. 1991), _aff'd_, 44 F.3d 758 (9th Cir. 1994).

[59] 43 U.S.C. §666; _U.S. v. Oregon_, 774 F.Supp. at 1578 ("The system of adjudicating water rights used by the State of Oregon results in the ultimate adjudication of all claims and a characterization of the priority of those claims relative to one another, and is therefore comprehensive within the meaning of the McCarran Amendment").

Upper Klamath Lake, and these claims have been administratively determined, as set forth in the State of Oregon's 2014 Amended and Corrected Findings of Fact and Order of Determination (ACFFOD).

Although still subject to ongoing judicial review – and notwithstanding and necessarily reserving the United States' rights to make exceptions to the ACFFOD and duly litigate these issues – the ACFFOD is legally enforceable absent a court-ordered stay.[60] Having waived its sovereign immunity in participating in the Klamath Basin Adjudication, the United States is legally bound by the ACFFOD and its determinations with respect to the United States' relative rights to store water in Upper Klamath Lake to the extent not inconsistent with federal law, including federal reserved water rights.

The ACFFOD places operational and volumetric constraints on the storage of water in Upper Klamath Lake, limiting active storage to between the water surface elevations of 4,136 feet and 4,143.3 feet above sea level, equating to a total volume of 486,830 AF based on Reclamation's 1998 bathymetry.[61] To the extent Reclamation stores water in Upper Klamath Lake it must do so in a manner consistent with the ACFFOD.

Reclamation's discretion in storing water in Upper Klamath Lake is subject to the United States' trust obligations to and reserved water rights of the Klamath Tribes.[62] The Bureau of Indian Affairs, on behalf of the Klamath Tribes, claimed in the Klamath Basin Adjudication various water rights in the upper basin, including for lake levels in Upper Klamath Lake, based on the Klamath Tribes' reserved water rights recognized in the Tribes' 1864 treaty with the United States. The priority date of these rights is time immemorial.[63] These water rights are determined and quantified in the ACFFOD.[64] Exercise of the Klamath Tribes' right to certain water levels in Upper Klamath Lake at various times of the year is the subject of stipulated agreement between the United States, the Klamath Tribes, and water users within the Project, which remains in effect and currently prevents the Tribes' right from being exercised so as to curtail Klamath Project diversions.[65]

Reclamation's discretion in diverting and storing water in Upper Klamath Lake is further subject to the United States' trust obligation to the Yurok and Hoopa Valley tribes.[66] These tribes have rights, reserved by a series of nineteenth century executive orders, to take fish within their reservations in California.[67] These reservations encompass the right to water in the Klamath River sufficient to protect the purposes of the reservation – e.g., the right to harvest fish for ceremonial, subsistence, and commercial purposes in order to support a moderate standard of living.[68]

Reclamation has a legal obligation to protect the federal reserved rights of the Yurok and Hoopa Valley tribes, even if unquantified, to the extent of its discretion to do so.[69] As noted previously, these non-consumptive instream flow rights are senior to the water rights of the Klamath Project.[70] Given the interstate nature of the Klamath River, these rights necessarily encompass water in the mainstem of the Klamath River, including water flowing from the State of Oregon into the State of California, comprised

---

[60] Or. Rev. Stat. §539.130(4).
[61] KBA ACFFOD 07060 and 07117.
[62] *Patterson*, 204 F.3d at 1214. *See also U.S. v. Adair*, 723 F.2d 1394, 1415 (9th Cir. 1983).
[63] *U.S. v. Adair*, 478 F. Supp. 336, 350 (D.Or. 1979); *U.S. v. Adair*, 723 F.2d 1394, 1414-15 (9th Cir. 1983)
[64] *See* KBA ACFFOD 04938 through 04946. *See also Baley*, No. 18-1323 at 48 (affirming the Court of Federal Claims' holding that the Klamath Tribes' implied water rights include water in Upper Klamath Lake).
[65] *See* KBA ACFFOD 04982 through 04990. Notwithstanding this stipulated agreement, Reclamation recognizes its legal obligation to protect the treaty rights of the Klamath Tribes to the extent of its discretion to do so. *Patterson*, 204 F.3d at 1214. *See also Adair*, 723 F.2d at 1411.
[66] *Patterson*, 204 F.3d at 1214.
[67] U.S. Department of the Interior, Office of the Solicitor, Opinion of Oct. 4, 1993, M-36979.
[68] *Id. See also U.S. v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986).
[69] *Baley*, No. 18-1323 at 53.
[70] *Id.*

in part of natural outflow from Upper Klamath Lake.[71] In diverting and storing tributary inflow into Upper Klamath Lake, Reclamation must account for the senior rights of the Yurok and Hoopa Valley tribes.[72]

Reclamation's discretion over the act of storing water in Upper Klamath Lake is also influenced by the contracts between the United States and Klamath Project water users. To the extent Reclamation otherwise has discretion, its contracts appear, subject to varying terms and conditions, to obligate Reclamation to store water to make it available for later irrigation use.

Lastly, Reclamation's discretion over storing water is limited by physical conditions. Reclamation has no control over the actual amount of tributary inflow to Upper Klamath Lake. This condition is dependent upon both natural factors (e.g., precipitation) and the actions of other non-federal entities and individuals (e.g., upstream water users). Likewise, Reclamation has no control on all the sources of outflow from the lake, both natural and human-caused. This includes not only evaporation and seepage, as well as diversions over which Reclamation has no control.

Given these physical conditions, it is critical to properly define the scope of this action. While there is always some level of inflow to Upper Klamath Lake, there is not always inflow available to store. The only tributary inflow available to store is water subject to appropriation. When tributary inflow is diverted to beneficial use under valid existing rights or otherwise consumed, it is not available for appropriation. In this case, there is no action by Reclamation to store or not store water, since water is not physically available.

As a simple example, if 1,000 cfs of water is flowing into Upper Klamath Lake at any given time, and 500 cfs is simultaneously being consumed and/or diverted for beneficial use under valid existing rights, Reclamation's discretion with respect to storing water is limited to the remaining 500 cfs. Reclamation can either store all, some, or none of the 500 cfs of water but has no discretion over the other 500 cfs consumed and/or diverted outside the agency's control.

Likewise, the scope of Reclamation's action is diverting all, some, or none of that remaining 500 cfs into storage, or conversely releasing (i.e., bypassing) it to the Klamath River. The only options are either to store or release tributary inflow.

Taking this example one final step further, if 1,000 cfs is flowing into Upper Klamath Lake at any given time, while 500 cfs is simultaneously being consumed and/or diverted for beneficial use, and 1,000 cfs is being released from Link River Dam, Reclamation's action with respect to storing or not storing water is still limited to the same 500 cfs of tributary inflow that is subject to appropriation. The other 500 cfs being released from Link River Dam in this scenario must necessarily be coming from water previously stored. Storing water is distinct from the act of releasing stored water (*see* 5.1.2).

**Consult on this action.** Although Reclamation's discretion is confined in a number of substantive legal and physical respects, the agency nevertheless has discretion over the act of storing water in Upper Klamath Lake. Given the presence of listed species in Upper Klamath Lake and the Klamath River, Reclamation can likely exercise its discretion over storing water in Upper Klamath Lake

---

[71] *Id*. at 49-50 (acknowledging that Iron Gate Dam "controls the water of the Klamath River that flows to it from Upper Klamath Lake" and holding that the Yurok and Hoopa Valley tribes "have an implied water right that includes the Klamath River and the flows therein as controlled by the Iron Gate Dam"). *See also* 43 U.S.C. §398 (providing that nothing in the Reclamation Act of 1902, 32 Stat. 388, "shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or waters thereof").

[72] *See* 43 U.S.C. §398. Note that Upper Klamath Lake was, in its natural condition, a settling basin, which filled with water before overflowing down the Klamath River. This water constituted part of the flows in the river in California, which existed at the time of the establishment of their respective reservations, to which the Yurok and Hoopa's rights are necessarily appurtenant to.

in a manner that benefits listed species. Consultation on this action should be confined to the act of either storing or not storing (i.e., bypassing) tributary inflow that is otherwise subject to appropriation, consistent with the constraints on Reclamation's discretion.

### 5.1.1    Releasing Stored Water

The act of releasing stored water from Upper Klamath Lake – that is, tributary inflow previously diverted and stored in priority – is physically and legally distinct from the act of storing water.[73] Releasing stored water entails releasing more water than is simultaneously flowing into a reservoir. When outflow is more than inflow, the surface elevation on the reservoir will decrease as stored water is actively released. Decreasing water surface elevations in a reservoir is always indicative of stored water being released.

Reclamation's general authorization from Congress is to vary water levels in Upper Klamath Lake in connection with carrying out a federal irrigation project.[74] As releasing stored water involves lowering the water level in Upper Klamath Lake, this act is within Reclamation's authority. Operation of Upper Klamath Lake as a storage reservoir is also within Reclamation's express authority under Section 6 of the Reclamation Act of 1902.[75]

Congress confined Reclamation's discretion in carrying out this authority, expressly requiring that the agency comply with state law in the "control, use, appropriation, or distribution of water used in irrigation".[76] As Upper Klamath Lake lies exclusively within the State of Oregon, Reclamation must follow Oregon law when releasing stored water from the lake to the extent not inconsistent with the purposes of the Klamath Project and other applicable federal law.

The United States waived its sovereign immunity under the McCarran Amendment based on the stated scope of the Klamath Basin Adjudication as described by the Ninth Circuit Court of Appeals in *United States v. Oregon*, 44 F.3d 758 (1994). Accordingly, the United States filed claims in the Klamath Basin Adjudication to its rights with respect to the use of stored water in Upper Klamath Lake, as well as, claims for other rights.[77] While the Klamath Basin Adjudication necessarily did not encompass rights to live flow and stored water appropriated and used in California, including federally reserved tribal rights to water in the Klamath River, water diverted and stored in Upper Klamath Lake occurs solely in the State of Oregon.

Under the ACFFOD, Reclamation holds the right to store water in Upper Klamath Lake; however, the ACFFOD recognizes a difference between the right to store water and the right to use stored water from the lake.[78] Specifically, "the United States is the owner of a right to store water in Upper Klamath Lake to benefit the separate irrigation rights recognized for the Klamath Reclamation Project".[79] The ACFFOD finds that, except for federally owned lands, the districts and individual landowners that are party to the Klamath Basin Adjudication hold the legal interest in the water rights associated with the

---

[73] *See* KBA ACFFOD 07083 to 07084.

[74] 33 Stat. 714.

[75] 32 Stat. 389, 43 U.S.C. §498.

[76] 43 U.S.C. §383. Note, however, that Section 6 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S.C. §498 serves as a limitation on Section 8, in the event state law conflicts with federal law.

[77] As a McCarran Amendment proceeding, the Klamath Basin Adjudication is necessarily a comprehensive, general stream adjudication in which the rights of all competing claimants are adjudicated. *See U.S. v. Or. Water Resources Dept.*, 774 F.Supp. at 1578 ("The system of adjudicating water rights used by the State of Oregon results in the ultimate adjudication of all claims and a characterization of the priority of those claims relative to one another, and is therefore comprehensive within the meaning of the McCarran Amendment. If the United States is dissatisfied with the outcome of this adjudication, it has resort to the appellate courts of the State of Oregon and the United States Supreme Court if its objections are properly preserved.").

[78] KBA ACFFOD 07083 to 07085.

[79] *Id*. at 07084.

Klamath Project for applying water appropriated from the Klamath River (in Oregon) and Upper Klamath Lake to beneficial use.[80] This includes the right to use both "live flow" (i.e., tributary inflow) and stored water.[81]

To the extent Reclamation releases water previously appropriated and stored in priority from Upper Klamath Lake for a beneficial use, including in the State of California, the use must be consistent with the ACFFOD or applicable federal law. The authorized use for stored water in Upper Klamath Lake under the ACFFOD is designated as irrigation and related purposes, on certain specified places of use within the Klamath Project.[82]

Using stored water that is otherwise subject to the beneficial use by Klamath Project beneficiaries to augment or otherwise produce instream flows in the Klamath River, either in Oregon or California, is not authorized under the ACFFOD. Reclamation therefore cannot release water previously stored in priority and otherwise required for beneficial use by Klamath Project beneficiaries from Upper Klamath Lake for the specific purposes of producing instream flows in the Klamath River either in Oregon or California.

This is not to say that Reclamation is barred from releasing stored water for anything other than beneficial use within the Klamath Project. A clear example is flood control operations. When observed or anticipated inflows to Upper Klamath Lake may cause water surface elevations to exceed designated maximum operating levels, Reclamation must release stored water to make space available to ensure public safety and integrity of Project facilities. This act, however, is non-discretionary, since Reclamation has a responsibility to maintain civil works so they continue to serve their congressionally authorized purposes.[83]

Reclamation may also have discretion to release stored water not otherwise needed for beneficial use within the Klamath Project. For example, even if there is no risk of flooding, there are situations and circumstances when Upper Klamath Lake is effectively full (i.e., water surface elevation near 4,143.3 feet), with a stored water supply in excess of the anticipated beneficial needs within the Klamath Project. As the owner and operator of the reservoir, in accordance with Section 6 of the Reclamation Act of 1902, Reclamation has the discretion to release excess or surplus stored water.[84] This discretion is a function of managing storage levels in Upper Klamath Lake.

Reclamation's contracts with water users within the Klamath Project also to some extent limit the agency's discretion to determine when and in what amounts there is stored water in excess or surplus to their potential beneficial use. Likewise, Reclamation's trust obligations to the Klamath Tribes may limit Reclamation's discretion to release stored water that is otherwise surplus to the needs to Klamath Project, in order to maintain certain hydrologic conditions in Upper Klamath Lake.

However, Reclamation's discretion over the act of releasing water *previously stored in priority* is unaffected by the United States' trust obligation to the Yurok and Hoopa Valley tribes.[85] Again, the act of

---

[80] KBA ACFFOD 07075 to 07082 ("The beneficial users of water appropriated pursuant to the May 19, 1905 Notice hold a legal interest in rights recognized based on this appropriation for the purpose of beneficial use"); 07085 (regarding the United States' interest in beneficial use within LKNWR and TLNWR).

[81] KBA ACFFOD 07061. "Live flow", as described in the ACFFOD and used herein in characterizing water in the Klamath River and Upper Klamath Lake within the State of Oregon, is water in a natural waterbody that is not being stored or otherwise used for beneficial purposes (e.g., instream flows) and is therefore subject to appropriation under any valid water right (regardless of priority, unless a water rights "call" is in effect).

[82] *See* KBA ACFFOD 07057 to 07059, and 07062 to 07066.

[83] 43 U.S.C. §498.

[84] *Id*.

[85] *See infra* n. 72. This statement is not to suggest that the Klamath Basin Adjudication altered or affected the reserved rights of the Yurok and Hoopa Valley tribes in any manner. *See Baley*, No. 18-1323 at 53-54. The tribes'

storing tributary inflow is distinct from the act of releasing previously stored water, and the Yurok and Hoopa Valley tribe appear to have a right to water from the Klamath River, including water flowing from Oregon into California, including water that flows into and then out of Upper Klamath Lake. But that water is different than water previously stored in priority through the operation of a dam constructed after the establishment of the tribes' reservations. There is a tribal trust obligation to the Yurok and Hoopa with respect to the former, but not the latter, discretionary action. This interpretation of federal and state law has been provided to Reclamation by the Department of Interior's Office of the Solicitor.[86]

These circumstances preclude releases of water previously stored in priority in Upper Klamath Lake for satisfying the Yurok and Hoopa Tribes' federally reserved water right. Absent a specific federal law, water previously stored in priority for the Klamath Project is bound by ACFFOD and must be released in accordance with its terms.

This interpretation is logically consistent because the act of storing water reduces the live flow of the Klamath River in California, to which the Yurok and Hoopa Valley tribes have reserved rights. But the act of releasing water that was stored previously and in priority from Upper Klamath Lake does not *reduce* the live flow otherwise available to meet the rights of the Yurok and Hoopa Valley tribes. Therefore, releasing previously stored water does not generally adversely affect these tribes' rights, though the act of storing tributary inflow obviously may.

**Consult on this action.** Although Reclamation's discretion is limited in regard to releasing stored water from Upper Klamath Lake – limited by federal and state law, contractual obligations, and trust obligations – this authority can be exercised in a manner that benefits listed species in the Klamath River, Upper Klamath Lake, or possibly both, and should therefore be consulted on.

### 5.1.2    Establishing Target Lake Levels

Designating and operating Upper Klamath Lake to target water surface elevations is an inherent part of Reclamation's authority to vary lake levels under the Act of February 9, 1905.[87] As discussed in sections 5.1.1 and 5.1.2, raising or lowering Upper Klamath Lake is a function of either storing water or releasing stored water. To the extent Reclamation has discretion over those two acts, the agency likewise has discretion to establish and attempt to operate to target lake levels, subject to all the legal and physical constraints discussed previously.

The limitations on Reclamation's discretion over storing water and releasing stored water in Upper Klamath Lake indicate that Reclamation will not be able to predetermine and operate to exact water surface elevations in the lake (i.e., to the hundredth of an inch on a given day). Reclamation may be able to indirectly influence that value, for example by either storing more or less tributary inflow, to the extent it is available, but Reclamation cannot control all the conditions that determine how much water is stored at any given time. Reclamation can use forecasts to make assumptions about inflows to the lake, and make management decisions accordingly, but actual inflows and consumptive losses will influence storage operations and thus lake levels. Reclamation likewise lacks absolute control over how much water is diverted from the lake for beneficial use. Reclamation's various contracts and other legal interests may give Reclamation the ability to influence this value on an individual basis, but such a right does not exist across the entire Project, or for non-Project diversions from Upper Klamath Lake, as a matter of either

---

rights were not subject to the Klamath Basin Adjudication and the Yurok and Hoopa Valley tribes did not forfeit their reserved water rights by not participating in the adjudication. *Id.* However, having not presented any claim to a right to store and use stored water from a reservoir that lies solely in Oregon, the United States, including Reclamation, cannot now maintain that such a right exists, at least under Oregon law.

[86] *See* memo. from Daniel Jorjani, Principal Dep. Solicitor, Dept. of the Interior, to David Bernhardt, Sec., Dept. of the Interior, "Use of Water Previously Stored in Priority for Satisfaction of Downstream Rights" (January 14, 2021).

[87] 33 Stat. 714.

federal or state law.[88] These factors beyond Reclamation's control will necessarily influence the lake's water surface level to some degree.

**Consult on this action.** Reclamation, as the owner of the right to store water in Upper Klamath Lake, has the right and discretion to establish predetermined levels that it then attempts to operate the lake to. However, Reclamation's rights, along with its physical capacities, do not afford the agency discretion to cause absolute fixed water surface elevations in Upper Klamath Lake. Reclamation can influence the lake's water surface elevation, through the acts of storing water, bypassing tributary inflow, releasing stored water, and exercising any discretion that it may have under contract or otherwise over the beneficial use of water from the lake. But the agency cannot _guarantee_ exact lake levels.

Despite these constraints, assuming that designating and attempting to operate to target water surface elevations in Upper Klamath Lake can potentially benefit listed species in the lake and/or the Klamath River, Reclamation has an obligation to consult on this action.

### 5.1.3    Establishing Minimum Release Rates

Reclamation's authority in connection with the Klamath Project includes varying water levels in both Upper Klamath Lake and the Klamath River, among other waterbodies.[89] There is no express congressional directive providing for minimum release rates from Upper Klamath Lake to the Klamath River; nevertheless establishing such minimums may be incidental to varying water levels in the lake and/or river. Establishing minimum releases from Upper Klamath Lake is therefore within Reclamation's authority, but whether it is in the agency's discretion will depend on the circumstances.

Depending on what the minimum levels are, actually providing these releases from Upper Klamath Lake over the course of a year will be a function of releasing either tributary inflow or, to the extent the former is unavailable, stored water.

Reclamation's discretion to establish minimum release rates from Upper Klamath Lake to the Klamath River is confined in the same manner and to the same degree that Reclamation's discretion to store water and release stored water is confined. There are times when the limitations on Reclamation's discretion to do either such action will limit Reclamation's ability to provide minimum releases from Upper Klamath Lake.

**Do not consult on this action.** Reclamation has authority to establish minimum release rates from Upper Klamath Lake to the Klamath River, but it does not have discretion to provide minimum flows at all times. Reclamation can designate and attempt, within its discretion, to provide minimum releases – and to the extent it does so, this would be an action the agency must consult on. But Reclamation cannot _guarantee_ certain minimum flows being released at all times from Upper Klamath Lake, at least not under existing water rights associated with the Klamath Project.

### 5.1.4    Coordinating Project Diversions

As previously noted, Reclamation's authority in operating the Klamath Project is to vary water levels in Upper Klamath Lake (and connected waterbodies) "as may be necessary to dispose of any lands which may come into the possession of the United States as a result thereof by cession of any State or

---

[88] 43 U.S.C. §383; KBA ACFFOD 07083. Regarding the discretion afforded Reclamation under the various contracts between the United States and Klamath Project water users has been addressed by the Office of the Solicitor. _See_ memo. from Daniel Jorjani, Principal Dep. Solicitor, Dept. of the Interior, to David Bernhard, Sec., Dept. of Interior "Analysis of Klamath Project contracts to determine discretionary authority in accordance with the November 12, 2020 Letter of the Secretary of the Interior, and Use of Water Previously Stored in Priority for Satisfaction of Downstream Federally Reserved Rights" (Jan. 14, 2021).
[89] 33 Stat. 714.

otherwise under the terms and conditions of the national reclamation act".[90] Coordinating the delivery of live flow and stored water from Upper Klamath Lake for irrigation and other beneficial uses within the Klamath Project is clearly part of carrying out this authority.

Diversions to the Klamath Project of both live flow and stored water from Upper Klamath Lake, occurring solely in the State of Oregon, are subject to Oregon law, with which Reclamation must comply under Section 8 of the Reclamation Act of 1902 (even if the ultimate place of use is within California).[91] Reclamation's discretion in coordinating the diversion of live flow and stored water from Upper Klamath Lake for beneficial use within the Klamath Project is therefore limited by the ACFFOD.

The ACFFOD places certain limitations on the volume, rate, location and timing of diversions of live flow and stored water from Upper Klamath Lake.[92] Reclamation's discretion to coordinate deliveries is necessarily confined to these limitations specified in the ACFFOD.

In addition to these quantitative limits, the ACFFOD recognizes a difference in the ownership interests in Klamath Project water rights. Specifically, the ACFFOD finds that, except for federally owned lands, the districts and individual landowners hold the legal interest in the water rights associated with the Project for diverting and beneficially using both live flow and stored water from Upper Klamath Lake.[93] The United States' interest is limited to using the water available from the Project for beneficial irrigation purposes within Tule Lake and Lower Klamath National Wildlife Refuges, as well as re-using return flows captured within Project boundaries for beneficial use.[94]

Therefore, the water rights for the Klamath Project, by themselves, limit Reclamation's discretion to determine the volume, rate, location and timing of diversions of live flow and stored water from Upper Klamath Lake for beneficial use within the Project. Water rights notwithstanding, specific contracts between the United States and water users within the Project may afford Reclamation some degree of discretion over the manner and extent to which water is beneficially used.[95] Likewise, contracts and other rights, such as the United States' real property interests, may also provide Reclamation with some degree of control over the facilities used to divert and deliver water to beneficial users within the project.

Even with respect to federally owned lands within Lower Klamath National Wildlife Refuge (LKNWR) and Tule Lake National Wildlife Refuge (TLNWR; collectively the Refuges), the ACFFOD does not give Reclamation the discretion to determine the volume, rate, and timing of diversions from Upper Klamath Lake and the Klamath River to the Refuges. Under the ACFFOD, Reclamation owns and exercises the right to store water in Upper Klamath Lake to "benefit the separate irrigation rights recognized for the Klamath Reclamation Project..."[96] USFWS was the claimant and is designated by the ACFFOD as the holder of the rights to use the water from the Klamath Project, including both live flow in the Klamath River and stored water from Upper Klamath Lake, for irrigation of lands within both Refuges.[97] Reclamation's role is essentially limited to providing space for storage of water in Upper Klamath Lake for the purpose of satisfying the separate rights of USFWS and other beneficial users within the Klamath Project.

In addition to the 1905 water right for irrigation purposes, the ACFFOD recognizes that USFWS holds separate federal reserved water rights for both LKNWR and TLNWR to divert live flow from the Klamath River for the purpose of waterfowl conservation.[98] These water rights vary in priority date,

---

[90] *Id.*
[91] 43 U.S.C. §383.
[92] *See* KBA ACFFOD 07155 to 07160, and 07284 to 07287.
[93] KBA ACFFOD 07061 and 07075.
[94] KBA ACFFOD 07083 to 07085.
[95] *See infra* n. 88.
[96] KBA ACFFOD 07084.
[97] KBA ACFFOD 07118 and 07127.
[98] *See* KBA ACFFOD 03715 to 03744 and 03786 to 03819.

ranging from December 31, 1925, to September 2, 1964.[99] Similar to the irrigation rights for the Project, the ACFFOD specifies the maximum volume that can be used in a given year, the location and maximum rate of diversions, and the period of allowable use (year-round) under these reserved rights.[100] Stored water in Upper Klamath Lake is not an authorized source of water for these reserved rights within TLNWR and LKNWR.[101]

USFWS has also applied and been granted permission by the State of Oregon to temporarily transfer an irrigation water right appurtenant to 2,831 acres above Upper Klamath Lake for use on up to 4,105 acres within LKNWR.[102] The current approved transfer expires at the end of 2021.[103] The priority date for this water right is September 13, 1920. Under the State's final order approving the transfer, USFWS can divert from the Klamath River to LKNWR via the Ady Canal up to 11,206 AF between April 1 and October 1, at the maximum rate of 30.87 cfs (CFS).[104] USFWS has an application before the State to permanently transfer this water right to LKNWR.

Both Reclamation and USFWS are agencies of the United States Government. Under the Act of September 2, 1964[105] and the 1976 amendments to the National Wildlife Refuge System Administration Act of 1966[106], Congress has conferred upon USFWS all administrative control over LKNWR and TLNWR. Under the ACFFOD, USFWS is the "holder" of the water rights under the Klamath Project appurtenant to the refuges, as well as the federal reserved rights associated with the executive orders or legislative acts establishing these Refuges.[107] Given these authorities, USFWS, not Reclamation, controls whether these water rights are exercised.

Reclamation and USFWS could potentially enter into a memorandum of agreement or something similar, which would specify the parameters under which USFWS would exercise its right to use water for irrigation purposes under the Klamath Project, as well as any or all of the other water rights appurtenant to LKNWR. Reclamation and USFWS have entered into such agreements in the past, but of temporary duration. There is no such agreement currently in place.

Reclamation's other legal interests, for example its control over the Klamath Straits Gates, as described in section 5.2.5, may give Reclamation some indirect influence over the amount, rate, and timing of beneficial use within LKNWR, but Reclamation has neither authority nor discretion to make a fixed determination of the amount of water diverted to LKNWR.

**Do not consult on this action.** The ACFFOD does not afford Reclamation with the right to determine the volume, rate, location, or timing of water available for beneficial use of water within the Klamath Project, including LKNWR and TLNWR. Under Section 8 of the Reclamation Act of 1902, the ACFFOD is controlling in this matter and states that "the right of beneficial use of water in the Project is held by the beneficial users. This applies to the right to the use of both live flow and stored water".[108]

As noted above, Reclamation's contracts or other legal interests, including real property interests, may afford Reclamation some degree of discretion over the exercise of water rights within the Klamath Project for beneficial use; however, there is no such blanket discretion across the entire project as a matter of federal or state law. To the extent individual contracts or agreements provide Reclamation with such

---

[99] KBA ACFFOD 03728-03729, 03739, 03743, 03797, 03803, and 03805.

[100] *Id*.

[101] *Id*.

[102] Or. Water Res. Dept., "Final Order Approving Temporary Changes of Use and Points of Diversion", Transfer Application No. T-12642 (Aug. 8, 2017).

[103] *Id*.

[104] *Id*.

[105] Act of June 2, 1964, Pub. L. 88-567, 78 Stat. 851.

[106] Act of Feb. 27, 1976, Pub. L. 94-223, 90 Stat. 199.

[107] *Infra* n. 96 and 97.

[108] 43 U.S.C. §383; KBA ACFFOD 07061.

discretion for particular areas or parts within the project, Reclamation should consult on those specific contracts or agreements.

### 5.1.5    Flood Control Operating Criteria

Flood control operations with respect to Upper Klamath Lake generally entail releasing water as necessary to prevent water surface elevations from increasing above levels determined to potentially pose a threat to flooding surrounding lands. Under current operations, Reclamation has designated end-of-month "flood control elevations" for Upper Klamath Lake (see Table 1, below), which are interpolated to a daily value for operational purposes.

*Table 1. Current Upper Klamath Lake flood control elevations (in feet above sea level, USBR datum) for the last day of each month, varying by dry or wet year type. A year is characterized as "wet" any time the current NRCS inflow forecast for Upper Klamath Lake for March through September exceeds 710,000 AF.*

| Month | Water Surface Elevation (ft) | |
|---|---|---|
| | Dry Year | Wet Year |
| April through June | 4143.3 | 4143.3 |
| July through September | 4143.1 | 4143.1 |
| October | 4141.4 | 4141.4 |
| November | 4141.6 | 4141.6 |
| December | 4141.8 | 4141.8 |
| January | 4142.3 | 4142.0 |
| February | 4142.7 | 4142.4 |
| March | 4143.1 | 4142.8 |

Reclamation anticipates that actual Upper Klamath Lake water surface elevations will differ to some degree from the designated flood control elevations. Reclamation employs professional judgment in evaluating hydrologic conditions, snowpack, weather forecasts, public safety, and other facts into designating the water surface elevations PacifiCorp should attempt to achieve on a daily basis.

The responsibility to maintain civil works structures so they continue to serve their congressionally authorized purposes is inherent in the authority to construct them, and is, therefore, non-discretionary. Maintenance of the structure could only cease if Congress were to de-authorize the structure or terminate this responsibility. Therefore, the requirement to maintain the structure, and to not let it be damaged and compromised during extreme hydrologic events, is non-discretionary and not subject to ESA consultation. However, the manner (how and when) flood control operations occur may be subject to Section 7(a)(2) consultation if the procedures (as opposed to the results) could affect listed species or designated critical habitat, and the agency has latitude for discretion.

**Consult on this action.** Because flood control operations on Upper Klamath Lake entails increasing or decreasing releases from Upper Klamath Lake (of both stored water and live flow), which could affect listed species and their critical habitat, both in the lake and the river, Reclamation should consult on this action. Reclamation's latitude to adjust flood control operating criteria for the benefit of listed species will necessarily be limited by what sound engineering and other considerations the agency deems prudent and necessary for structural integrity of civil works and public safety.

### 5.1.6    Making Water Rights Calls

As previously noted, the ACFFOD in the Klamath Basin Adjudication is legally enforceable as a matter of state law, absent a judicial stay in its enforcement.[109] In the ACFFOD, the water rights for the Klamath Project have a priority date of May 19, 1905.[110] In accordance with the doctrine of prior appropriation as it exists in the State of Oregon, when the amount of live flow available for appropriation in Upper Klamath Lake and the Klamath River is insufficient to meet the actual irrigation demands within the Project, a call may be made on the Klamath Project water rights. When a call is made, the State of Oregon, through its Water Resources Department, will then investigate and if it determines that a shortage in fact exists, it will regulate the diversions of other water users from the same source with junior water rights (i.e., with a priority date after May 19, 1905).[111]

In the State of Oregon, with respect to the water rights determined for the Klamath Project in the Klamath Basin Adjudication, the regulation of junior water rights holders is intended to increase the amount of live flow available at the point of diversion for the senior water right holder making a call. In order for the call to remain valid and effective, the senior water rights holder must then put the additional live flow to beneficial use.[112] A senior water rights holder cannot bypass or otherwise not beneficially use the live flow made available at the point of diversion as a result of a call on their behalf. If that were to occur, the water rights holder presumably has no lawful basis for making the call.

A valid call on water rights may be made by the holder (i.e., owner) of the water right. The ACFFOD recognizes that the United States owns the right to store water in Upper Klamath Lake, and the districts and individual landowners within the Klamath Project hold the interest in applying water, both stored and live flow, to beneficial use for irrigation and the related purposes designated in the ACFFOD.[113] Outside TLNWR and LKNWR, the United States' interest in the water rights is limited to: 1) the right to store water in Upper Klamath Lake, and 2) the right to re-use water previously appropriated and applied to beneficial use (i.e., "return flows") for another beneficial use.[114]

Accordingly, both the United States (Reclamation and/or USFWS) and the districts and individual landowners within the Klamath Project that were party to the Adjudication can make a call on the water rights associated with the project. But regardless of who makes a call, the determination of whether that call is valid and the extent to which the diversions of other water users will be curtailed is at the State of Oregon's discretion.

Reclamation has discretion over the decision whether or not to make a call on Klamath Project water rights. This right is not exclusive to Reclamation; other entities and individuals may also make a call on their own or in conjunction with Reclamation.

Whether there is an actual shortage in the live flow available at the point or points of diversion for the calling water right is a factual matter, which the State of Oregon will determine in accordance with state law. In accordance with Section 8 of the Reclamation Act of 1902, Reclamation must follow state law with respect to the control, appropriation, distribution and use of water in operating the Klamath Project, to the extent not in conflict with federal law.[115]

The additional water made available at the point of diversion as a result of a call must be beneficially used, to the extent the water user's capacity, or else there is no valid basis for the call. Likewise, state law confers upon the State of Oregon jurisdiction to determine when a call is futile in the

---

[109] Or. Rev. Stat. §539.130(4).
[110] KBA ACFFOD 07056.
[111] Or. Admin. R. §690-250-0100.
[112] *See* Or. Admin. R. §690-250-0020.
[113] *Infra* n. 93 and 94.
[114] *Id*.
[115] 43 U.S.C. §383.

sense of an inadequate amount of water, or no water, reaching the senior water rights holder making the call.[116] Unless the State makes such a determination, *some* additional water must be assumed to be reaching the point or points of diversion. Accordingly, Reclamation can make its own determination about how much additional water is available for diversion and beneficial use within the Klamath Project as a result of a call, but it cannot determine that *no* additional water is available. The authority for that determination lies with the State of Oregon and Reclamation must follow Oregon law in this regard.

**Consult on this action.** Reclamation has discretion to make a water rights call in the event of a shortage. While the water resulting from a call must be beneficially used, which Reclamation has no interest in except as conferred by contract, the process of making a call and the water resulting from a call may benefit listed species. For example, a water rights call, if enforced, would result in additional inflow to Upper Klamath Lake, which, when used to meet instantaneous irrigation demands within the Klamath Project, could delay or reduce the amount of stored water used within the Project, thereby leaving more water in Upper Klamath Lake. This additional water remaining in storage, albeit for the purpose of beneficial use within the Klamath Project, could benefit listed species in the lake.

## 5.2    OPERATION OF THE KLAMATH AND LOST RIVERS

This section discusses Reclamation's discrete actions in connection with operating Klamath Project facilities in connection with the Klamath and Lost rivers.

### 5.2.1    Establishing Minimum River Flows

Reclamation's authority in connection with the Klamath Project includes varying water levels in the Klamath River, among other waterbodies.[117] There is no express congressional directive providing for minimum flows in the Klamath River at any particular location but establishing such minimums may nonetheless be incidental to varying water levels in the river. Establishing minimum flows in the Klamath River is therefore within Reclamation's authority, but whether it is in the agency's discretion will depend on the circumstances. Depending on the rate and measured location of the minimum flows, actually achieving these flows may require water from Upper Klamath Lake, the Lost River Diversion Channel, and/or the Klamath Straits Drain.

Reclamation's discretion over releasing water from Upper Klamath Lake is generally limited to the decision to store and not store tributary inflow from Upper Klamath Lake, as discussed in sections 5.1.1 and 5.1.2. During extreme hydrologic conditions, Reclamation may be required to release stored water from Upper Klamath Lake to protect civil works and public safety, but these conditions are highly unpredictable in advance. There may also be, at times, stored water in Upper Klamath Lake surplus or excess to the needs of the Klamath Project, and Reclamation may have some discretion to release stored water in these instances, which could potentially help support designated flows in the Klamath River. But this situation is dependent on hydrology and other conditions beyond Reclamation's control.

Reclamation can use inflow forecasts and other information to make estimates but will never be able to predict in advance the exact timing, rate, and volume of inflow to Upper Klamath Lake over any given period – and likewise, the exact volume and rate at which water will be released. Reclamation therefore cannot make an absolute commitment to achieving minimum flows in the Klamath River with water from Upper Klamath Lake.

The Lost River Diversion Channel and the Klamath Straits Drain both operate to release water to the Klamath River and can materially contribute to the river's cumulative flow. Likewise, operation of the Klamath Straits Gates can influence the amount of water diverted from the Klamath River through the Ady Canal owned and operated by Klamath Drainage District. These facilities can be operated, as

---

[116] *Infra* n. 111.
[117] 33 Stat. 714.

Reclamation's discretion allows, either independently or in conjunction with Upper Klamath Lake, to potentially contribute to river flows.

**Do not consult on this action.** Reclamation has the authority but lacks the discretion to guarantee absolute fixed minimum flows in the Klamath River. Reclamation can designate target flows in the Klamath River, minimum or otherwise, and then exercise its discretion, particularly over storing water in Upper Klamath Lake, in a manner that attempts to achieve flows – and to the extent it does so, this would be an action the agency must consult on. But Reclamation cannot _guarantee_ certain flows at all times, regardless of the hydrologic conditions and other factors beyond Reclamation's control. Reclamation should therefore not consult on fixed minimum flows in the Klamath River.

As opposed to absolute minimums, establishing "target" flows in the Klamath River, including target minimums, that Reclamation exercises its discretion attempting to produce, would appear to be within the agency's authority and discretion.

### 5.2.2    Diverting Water Through and Into the Lost River Diversion Channel

Reclamation constructed the Lost River Diversion Dam and Channel between 1910 and 1912. The dam operates to raise the water surface in the Lost River to a level necessary to facilitate gravity drainage to the Klamath River via the eight-mile-long Lost River Diversion Channel.

The Lost River Diversion Channel was originally constructed to a capacity of approximately 250 cfs. In 1930, Reclamation enlarged the channel's capacity to 1,200 cfs. In 1950 Reclamation redesigned and further enlarged the channel to the current capacity of approximately 3,000 cfs.

Throughout the year all Lost River flows, including any flood control releases from Clear Lake or Gerber reservoirs, that reach Lost River Diversion Dam, up to the capacity of the diversion channel (3,000 cfs), are diverted to the Klamath River (unless first diverted for irrigation). When flows in the Lost River are in excess of the diversion channel's capacity, the water is spilled over Lost River Diversion Dam to the lower Lost River, where it then flows into the Tule Lake Sumps. The Lost River Diversion Dam was designed for a maximum overflow of 10,000 cfs.

Operation of the Lost River Diversion Channel is integral to one of the basic purposes of the Klamath Project – to reclaim lands within the former 96,000-acre bed of Tule Lake. That purpose stems from Reclamation's authority under the Act of February 9, 1905.[118]

Tule Lake, now having been largely reclaimed by Reclamation, has primarily been homesteaded by small-family farms. Smaller portions of the lakebed have formed into cities and towns. A large portion is dedicated as a national wildlife refuge. Two other national monuments also partly lie within the reclaimed area. Oher public works, like schools, state and federal highways, have been constructed within the reclaimed area.

Reclamation has, over the last century, undertaken a comprehensive scheme for draining and homesteading Tule Lake, and to a lesser extent, Lower Klamath Lake, building the facilities to achieve this result through appropriations from Congress. Reclamation has no discretion to now undo this work, in terms of allowing Tule and Lower Klamath lakes to refill. The discretion to reflood Tule Lake, to the extent it exists, lies with Congress.

**Consult on this action.** Reclamation is solely responsible for operation and maintenance of the Lost River Diversion Channel, in accordance with its authority under the Act of February 9, 1905. But, having now constructed this facility and reclaimed an area formerly inundated by Tule Lake pursuant to the authority and with the appropriations provided by Congress, Reclamation has no discretion over maintaining the facility and protecting the reclaimed area from reflooding.

---

[118] 33 Stat. 714

Any potential discretion over diverting live flow from the Lost River to the Klamath River is largely limited by the physical conditions that govern channel operations. The Lost River Diversion Channel and the associated diversion dam on the Lost River have no material storage capacity. Flows cannot be withheld and then released in some manner that possibly benefits listed species or their critical habitat in the Klamath River. The rate of discharges from the Lost River Diversion Channel into the Klamath River cannot be materially altered, given the design and functional operation of the diversion channel, absent electing to bypass diversion of water from the Lost River, allowing it to flow down to the Tule Lake Sumps (*see* 5.4). Given the presence of listed species in the Tule Lake Sumps, this action may have some benefit to listed species. Altering the rate and amount of water diverted from the Lost River to the Klamath River through the Lost River Diversion Channel may also affect flows in the Klamath River.

Reclamation also has some discretion over the other primary use of the Lost River Diversion Channel – diverting water from the Klamath River and Upper Klamath Lake. Reclamation exclusively owns and operates this facility. Reclamation can adjust gate positions and water levels in the channel to influence diversions otherwise made consistent with state law.

Given the potential for operation of the Lost River Diversion Channel to benefit listed species both in the Tule Lake Sumps and potentially the Klamath River, including designated critical habitat, Reclamation should consult on this action.

### 5.2.3    Opening and Closing the Klamath Straits Gates

In conjunction with Reclamation's plans to drain and potentially homestead lands underlying Lower Klamath Lake, in 1907 the United States entered into an agreement with the California Northeastern Railway and Southern Pacific companies to construct and maintain a railroad embankment across the northern end of Lower Klamath Lake, extending from the Northwest Quarter of Section 26 to the Northwest Quarter of Section 1, in Township 40 South, Range 8 East, Willamette Meridian.

Additionally, the 1907 agreement required the railroad to construct a concrete control structure in the southern end of the railroad embankment at the Klamath Straits, the original channel connecting the Klamath River to Lower Klamath Lake. This concrete structure, constructed in 1912, has five gated openings, approximately five feet wide, collectively referred to herein as the Klamath Straits Gates. Diversions from the river through these gates flow into the Ady Canal, which is operated by the Klamath Drainage District and provides deliveries to approximately 55,500 acres of public (LKNWR) and private land in the Lower Klamath Lake.

Operation of the Klamath Straits Gates has and continues to be under Reclamation's exclusive control. However, Reclamation has a contract with the Klamath Drainage District to keep these gates closed, "barring acts of God, unavoidable accidents or other causes beyond the control of the United States".[119] The contract provides that the gates will be opened at the district's request, when "necessary in connection with the reclamation of lands within the district boundaries, or when this is determined to be necessary by the United States in connection with the reclamation and use of lands in California".

In its original state, Lower Klamath Lake was an interstate navigable waterway, with regular ferry traffic between California and Oregon. The Act of February 9, 1905, 33 Stat. 714, authorizes Reclamation to raise or lower water levels in Lower Klamath Lake and to homestead the area so reclaimed to the extent feasible. Reclamation entered into the 1907 agreement with the railroad for this purpose. This agreement required the railroad to include a concrete structure in the embankment, the Klamath Straits Gates, for which Reclamation still owns and has exclusive control over.

Given Reclamation's authority to raise or lower water levels in Lower Klamath Lake, and therefore to control the Klamath Straits Gates, Klamath Drainage District contracted with the United States in 1917 to have these gates closed. This contract generally provides that the gates will remain

---

[119] Contract No. Ilr-402c, dated April 28, 1943, article 28(a).

closed at all times unless opened at the request of the district or the discretion of the United States for purposes of reclaiming federal lands in and around Lower Klamath Lake.

Reclamation originally had discretion over reclaiming Lower Klamath Lake and the surrounding marshes. Congress later directed, in the Act of September 2, 1964, that the remaining federally owned lands in and around Lower Klamath be reserved as refuges for migratory birds.[120] As discussed in section 5.1.5, USFWS now has administrative jurisdiction over lands within LKNWR and their use as a matter of federal law. Reclamation's interest in the area is limited to operation and maintenance of Klamath Project facilities.

USFWS requires the Klamath Straits Gates to be open in order to be able divert and convey water to LKNWR. This is true for the refuge's water rights in connection with the Klamath Project, as well as federally reserved water rights for refuge purposes. USFWS has a 1940 agreement with Klamath Drainage District to use the Ady Canal for this purpose.[121] A 1977 agreement between USFWS and Reclamation, addressing each agency's administrative responsibilities in LKNWR, recognizes that the right to use the Ady Canal to deliver water to LKNWR is exclusively administered by USFWS.[122]

**Possibly consult on this action.** Reclamation has discretion to open and close the Klamath Straits Gates under its authority to vary water levels in Lower Klamath Lake; however, this discretion is materially limited by the United States' contract with Klamath Drainage District, as well as USFWS' administrative jurisdiction over both LKNWR and the United States' right to use the Ady Canal to deliver water to LKNWR. To the extent Reclamation proposes to open and close the Ady Straits Gates, to the extent not constrained by USFWS' administrative jurisdiction over these lands, Reclamation's discretion may afford some capacity to benefit listed species, in which case there is an obligation to consult on this action.

### 5.2.4    Pumping and Discharging Water from the Klamath Straits Drain

The Klamath Straits Drain is an eleven-mile-long earthen canal with four pumping plants, which conveys excess drainage and runoff from the Lower Klamath Lake area to the Klamath River. The drain was originally built in the mid-1940s, as supplemental works to a joint Reclamation-USFWS construction program that built Pumping Plant D, the Tule Lake Tunnel, the P Canal, and much of the refuge infrastructure.

As originally constructed, the drain had just two pumping plants (designated E and F), each with two pumps with a combined capacity of approximately 200 cfs. An additional pump was added at both plants E and F in the late 1940s, increasing the drain's capacity from 200 to 300 cfs. Then in the 1970s, the drain's capacity was doubled to 600 cfs, with the construction of two new pumping plants (EE and FF), also with three pumps each.

The volume of water pumped to the Klamath River through the Klamath Straits Drain over the last decade has been roughly one-third the historical average (from approximately 90,000 AF annually to 35,000 AF). The amount pumped through the drain has only exceeded 100,000 AF twice in the last 20 years. Prior to 2000 it occurred in more than half of all years.

A major factor in this reduction is the decreased amount of drainage coming from LKNWR. Prior to 2000, the refuge on average discharged over 50,000 AF annually into the Klamath Straits Drain; since then that figure has been about 13,000 AF. This change has been particularly evident in the last decade, during which the refuge has drained less than 1,000 AF annually, except under special arrangements.

---

[120] Pub. L. 88-567, 78 Stat. 851.
[121] Agreement dated May 25, 1940, between the United States, Secretary of the Interior, and Klamath Drainage District.
[122] Reclamation Contract No. 7-07-20-W0089, dated August 2, 1977.

Reclamation and Klamath Drainage District are party to a 1947 contract, providing that Reclamation shall operate and maintain the Klamath Straits Drain and make it "available at all times for the proper drainage of the District lands".[123] Further, the agreement provides that water in the drain must be maintained at a level to provide adequate drainage, "as determined by the Secretary", for all district lands.[124] These obligations on the United States expressly terminate if and when operation and maintenance of the drain is transferred to an organization of water users or the district.

Reclamation and USFWS also have a 1946 agreement pertaining to Reclamation's operation of the Klamath Straits Drain.[125] The agreement generally requires Reclamation to "remove from [LKNWR] all water brought through the Tule Lake tunnel which it necessary to remove in order to permit the efficient carrying on of [USFWS'] functions".[126]

The Klamath Basin Adjudication addresses to some extent the United States' rights with respect to the kinds of "return flows" captured and controlled through a facility like the Klamath Straits Drain. The ACFFOD finds that the United States holds a legal interest in water rights connected to the Klamath Project for the purpose of re-use of return flows.[127]

**Consult on this action.** Reclamation discretion over operation of the Klamath Straits Drain is influenced by Reclamation's 1947 contract with the Klamath Drainage District, as well as the 1946 agreement with USFWS. These agreements require Reclamation to operate the drain to dispose of water that these entities discharge into it. Reclamation therefore has no discretion over the amount of water conveyed through the drain to the Klamath River. Reclamation has discretion, however, to determine how these return flows are subsequently used. This act is within Reclamation's authority over varying water levels in Lower Klamath Lake and connected waterbodies, and the ACFFOD recognizes that this right exclusively belongs to the United States. Reclamation can designate and use these return flows for supporting instream flows in the Klamath River, which can potentially benefit listed species. Therefore, Reclamation has an obligation to consult on this action.

## 5.3    OPERATION OF CLEAR LAKE AND GERBER RESERVOIRS

This section discusses Reclamation's discrete actions in connection with Clear Lake and Gerber reservoirs.

### 5.3.1    Storing Tributary Inflow

Reclamation's authority to construct, operate, and maintain Clear Lake and Gerber reservoirs stems from the Act of February 9, 1905, as a primary purpose of these reservoirs is to aid in the draining and homesteading of Tule Lake.[128] Congress did not confine Reclamation's discretion in carrying out this law, except as generally limited by the Reclamation Act of 1902.[129]

Following authorization of the Klamath Project by the Secretary of the Interior on May 15, 1905, Reclamation gave notice, for and on behalf of the United States of America, of its intentions to appropriate the waters of the Lost River and its tributaries by notices and postings in the states of Oregon and California in the manner authorized by the customs and laws of these states. As previously discussed, on May 19, 1905, Reclamation filed a notice with the Oregon State Engineer, in accordance with Oregon law, to "utilize ... [a]ll of the waters of the Klamath Basin in Oregon, constituting the entire drainage

---

[123] Reclamation Contract No. Ilr-402d, article 10, dated October 11, 1947.
[124] *Id*.
[125] Reclamation Contract No. Ilr-1371a, article 9, dated June 28, 1946.
[126] *Id*.
[127] KBA ACFFOD 07083.
[128] 33 Stat. 714.
[129] 32 Stat. 388.

basins of the Klamath River and Lost River, and all of the lakes, streams, and rivers supplying water thereto or receiving water therefrom, including ... all their tributaries". This notice provides "[t]hat the United States intends to use the above described waters in the operation of works for the utilization of water in the State of Oregon under the provisions of [the Reclamation Act of 1902]".

Also in support of the operations of Clear Lake and Gerber reservoirs, Reclamation posted five specific notices of appropriation of water from the Lost River and its tributaries on behalf of the United States. The posting on the Lost River for Clear Lake Reservoir was made on December 19, 1904, and filed for record in Modoc County, California, on December 28, 1904.[130] This notice provided that the "water is to be used for irrigation, domestic, power, mechanical, and other beneficial uses in and upon lands situated in Klamath (Oregon) and Modoc (California) counties..."[131]

The posting on Miller Creek for Gerber Reservoir was made on March 5, 1905, and was recorded on March 18, 1905, in Klamath County, Oregon.[132] As filed, this notice provided for "... all the unappropriated waters of Miller Creek, both surface and underflow, and more specifically stated as amounting to one thousand cfs ... for irrigation, domestic, power, mechanical, and other beneficial uses ... in Klamath County..."[133]

The water rights associated with the Klamath Project to water from the Lost River and its tributaries remain unadjudicated in either California or Oregon.

The exercise and use of these rights are nonetheless governed by California and Oregon law, as applicable, in accordance with Section 8 of the Reclamation Act of 1902, to the extent not in conflict with federal law.[134] Reclamation also has contracts with certain entities for providing stored water from these reservoirs for irrigation and related purposes.

As previously discussed, the act of storing water, at the most basic level, entails regulating outflow from a reservoir to a rate less than instantaneous tributary inflow. When outflow is less than inflow, the surface elevation on a reservoir will increase as water is actively stored. The act of storing water is always evidenced by increasing water surface elevations.

Reclamation has discretion over the act of storing water in both Clear Lake and Gerber reservoirs. The water rights were claimed on behalf of the United States, and the United States owns these reservoirs, including both the facilities that impound them and the underlying land. Storing and/or bypassing tributary inflow to the reservoirs is a function of managing storage levels in the reservoir.

Although the United States' rights remain unadjudicated, in storing and/or bypassing tributary inflow, Reclamation must comply with the respective laws of the states of Oregon and California regarding the control, appropriation, use and distribution of water used in irrigation. Reclamation cannot therefore exercise this right in a manner inconsistent with its claims, as provided in the various notices and posting relative to the rights to water from the Lost River and its tributaries.

Nonetheless, Reclamation must at times bypass tributary inflow from these reservoirs for flood control purposes, either in connection with the reservoirs themselves or for operation of the Lost River Diversion Channel (and protection of Tule Lake) (*see* 5.2.2). These releases can affect water levels in the reservoir as well as the Tule Lake Sumps. If discharged through the Lost River Diversion Channel, these releases can also affect flows in the Klamath River. The releases are non-discretionary in that Reclamation must protect federal facilities and carry out the purposes of the Klamath Project, including

---

[130] Modoc Co. records, *Water Rights*, vol. 2, p. 15.
[131] *Id*.
[132] Klamath Co. records, *Water Rights*, vol. 11, p. 192.
[133] *Id*.
[134] 43 U.S.C. §383.

reclaiming Tule Lake. Reclamation may, however, some discretion in how exactly these releases are made.

The United States' contractual obligation to Klamath Project water users may also influence the manner in which Reclamation exercises its discretion over storing and/or bypassing tributary inflow to Clear Lake and Gerber reservoirs.

The tribal trust obligations of the Yurok, Hoopa Valley, and Klamath Tribes do not extend to water stored in Clear Lake and Gerber reservoirs, since the water in the Lost River did not physically reach the Klamath River prior to the Klamath Project and therefore this water is necessarily not part of the rights reserved by the United States on behalf of these tribes. Therefore, Reclamation's discretion in storing water from Clear Lake and Gerber reservoirs is not influenced by these obligations.

**Consult on this action.** As designated critical habitat for endangered shortnose and Lost River suckers, Reclamation's act of storing water in Clear Lake and Gerber reservoirs can potentially benefit listed species in these reservoirs, and therefore there is an obligation to consult on this action.

### 5.3.2    Releasing Stored Water

The act of releasing stored water entails releasing more water than is simultaneously flowing into a reservoir. When outflow is more than inflow, the surface elevation on a reservoir will decrease as stored water is actively released. Decreasing water surface elevations in a reservoir is always indicative of stored water being released.

Reclamation's discretion over releasing water from Clear Lake and Gerber reservoirs is also governed by federal and state law. Reclamation must comply with Oregon and California law, as applicable, releasing and using stored water from Clear Lake and Gerber reservoirs. The various rights the United States has claimed in connection with these reservoirs all are for the purpose of utilizing the stored water for irrigation and related purposes within the Klamath Project, as so stated. Reclamation's claimed rights on behalf of the United States do not include the use of water for purposes other than as enumerated in the various notices and postings.

Reclamation's contractual obligations also influence how Reclamation releases stored water from Clear Lake and Gerber reservoirs. Reclamation has no obligation to deliver water to entities or individuals except under contract with the United States.

**Consult on this action.** In releasing water from the reservoirs for flood control purposes (which is non-discretionary), Reclamation may nonetheless have some discretion over *how* this operation occurs, and that discretion may be exercised in a manner that potentially benefits listed species, including in the Klamath River.

### 5.4    OPERATION OF THE TULE LAKE SUMPS

The Tule Lake Sumps (Sump 1A and 1B) are diked portions of the original lake that are now used to store and dispose of excess drainage and runoff. The sumps are also within the boundaries of the Tule Lake National Wildlife Refuge (TLNWR). Reclamation designed and built the dikes surrounding the sumps the 1940s, as part of a joint construction program with the USFWS. Excess drainage and runoff in the sumps is pumped into the Tule Lake Tunnel via Pumping Plant D. Reclamation has transferred operation and maintenance responsibilities for Pumping Plant D to the Tulelake Irrigation District, subject to rules and regulations issued by Reclamation, which generally specify the water surface elevations to be maintained in the sumps for refuge and flood control purposes.[135]

---

[135] Reclamation Contract No. 14-06-200-5954, dated September 10, 1956. U.S. Bur. of Reclamation, *Rules and Regulations for Operation and Maintenance of Klamath Project Works Transferred to Tulelake Irrigation District under Contract No. 14-06-200-5954* (rev. Feb. 21, 1984).

Reclamation has established minimum elevations for Sump 1A, notwithstanding Reclamation has no direct control over inputs to the lake (from numerous non-point sources), and that operation of the main outlet (Pumping Plant D) has been transferred to Tulelake Irrigation District. While Reclamation assumes that these levels can reasonably be met based on historical operations, it may not be possible to maintain Tule Lake Sump 1A elevations during excessively dry periods.

The Tule Lake Sumps constitute the remnants of Tule Lake. Congress authorized Reclamation to raise and lower water levels of Tule Lake. Reclamation lacks some physical control over this condition, not being able to control all inflows (at least downstream the Lost River Diversion Channel). Reclamation also lacks complete control and therefore discretion over operation of Pumping Plant D, the only outlet from the sumps besides natural evaporation, transpiration, and seepage.

Reclamation's agreement with USFWS does not further confine Reclamation's discretion over operation of the sumps, recognizing that these are Klamath Project facilities under Reclamation's administrative responsibility.

**Consult on this action.** Although limited in some respects, Reclamation has discretion over the water levels in the Tule Lake Sumps, as the remnant waterbodies of Tule Lake. Although not designated critical habitat for Lost River and shortnose suckers, both species are present in the Tule Lake Sumps. Reclamation cannot _guarantee_ that certain levels in the Sumps, due to factors outside of Reclamation's control (e.g., evaporation).  But to the extent Reclamation elects to establish target levels in the Tule Lake Sumps, this discretion can be exercised in a manner that benefits listed species. This action should be consulted upon accordingly.

# CHAPTER 6 -  APPLICATION OF ENVIRONMENTAL BASELINE

Review of the specific operational actions described in Chapter 5 was performed in accordance with the goals of this reassessment: ensuring compliance with law and regulation; defining the scope of Reclamation's proposed actions; correcting attributing actions to the appropriate entity; excluding non-discretionary actions from the consultation; and properly characterizing the environmental baseline.

The effects of actions over which Reclamation has no discretion – even though those actions may occur within the service area or involve existing facilities of the Klamath Project – cannot reasonably be characterized as an agency action causing impacts to the species or modification of species' habitat within the meaning of the ESA. Those effects are not an agency action subject to consultation. Rather they are activities or conditions that exist overarching, alongside, or in the background of operation of the Klamath Project, and are therefore properly attributable to the environmental baseline. It is only the agency's discretionary actions that are subject to consultation.

A hypothetical example serves to illustrate this situation. If Reclamation were to propose an agency action of, among others in connection with the Klamath Project, storing tributary inflow in Upper Klamath Lake, it is the act of storing tributary inflow that Reclamation must consult on. Reclamation does not need to extend this act to consulting on Upper Klamath Lake being at designated water surface elevations to a hundredth of an inch under certain hydrologic conditions at certain times of the year, because that action necessarily entails conditions, events, and non-federal actions beyond Reclamation's control (e.g., rain, runoff, diversions).

Similarly, if Reclamation proposes to bypass and release tributary inflow from Upper Klamath Lake under certain conditions, it is the releases from Upper Klamath Lake that the agency must consult on. Reclamation does not need to extend this action to consulting on daily designated flows occurring in the Klamath River approximately forty miles downstream of the Klamath Project, particularly through four private hydroelectric facilities, because that subsequent condition, although influenced by Reclamation's action, is beyond Reclamation's discretionary control.

Reclamation recognizes that the existence of the Klamath Project has altered hydrologic conditions in the Klamath Basin. That alteration, however, has occurred within the context of a congressionally authorized project maintained for congressionally authorized purposes. The ESA Section 7(a)(2) consultation process is not the proper venue to address affects related to the continued presence of Reclamation structures or the activities or conditions outside the scope of the agency's discretion. Those effects are more properly and efficiently addressed through collaborative efforts among all agencies and parties causing impacts to listed species in the Klamath Basin. Reclamation continues to honor its commitment to address those impacts attributable to the environmental baseline, but through collaborative, locally supported processes, such as demonstrated in the KBRA.

# CHAPTER 7 -  SUMMARY OF FINDINGS AND REGIONAL DECISION

The U.S. Bureau of Reclamation, California-Great Basin Region, has performed this thorough reassessment of actions associated with its continuing operation of the Klamath Project, in southern Oregon and northern California. These actions were critically evaluated for the purpose of facilitating consultation with USFWS and NMFS under Section 7(a)(2) of the ESA. This comprehensive reassessment permitted careful consideration of previously proposed Reclamation actions to:

- verify compliance with law and regulation;

- clearly define the scope of the actions;

- correctly attribute actions to the appropriate agency;

- ensure non-discretionary actions were excluded from consultation; and

- properly characterize the environmental baseline.

Application of the above criteria resulted in a determination that there are at least eleven operational actions in connection with the Klamath Project that are properly considered subject to ESA consultation at this time. (Note that other actions, including administration of certain contract provisions) may also be subject to ESA consultation by Reclamation.) Reclamation will verify or re-evaluate the effects of these actions and will conduct ESA consultation *only if* the *manner* ("how" or "when") of performing the action may affect listed species or designated critical habitat. They are:

<u>Operation of Upper Klamath Lake:</u>

1. Storing Tributary Inflow

2. Releasing Stored Water

3. Establishing Target Lake Levels

4. Flood Control Operating Criteria

5. Making Water Rights Calls

<u>Operation of the Klamath and Lost Rivers:</u>

6. Diverting Water Through and Into the Lost River Diversion Channel

7. Lost River Diversion Channel Operations

8. Control of the Klamath Straits Gates

9. Klamath Straits Drain Operations

<u>Operation of Clear Lake and Gerber Reservoirs</u>

10. Storing Tributary Inflow

11. Releasing Stored Water

Further at this time, Reclamation anticipates not consulting on four operational actions pursuant to Section 7(a)(2) of the ESA. They are:

1. Establishing Minimum Release Rates from Upper Klamath Lake

2. Coordinating Project Diversions from Upper Klamath Lake

3. Establishing Minimum River Flows in the Klamath River

4. Establishing Minimum Water Levels in Tule Lake Sump 1A.

Reclamation has the authority but lacks the discretion to _guarantee_ absolute fixed minimum releases from Upper Klamath Lake, flows in the Klamath River, or water surface elevations in Tule Lake Sump 1A. Reclamation can designate target releases from Upper Klamath Lake, target flows in the Klamath River, and target water levels in Tule Lake Sump 1A, minimum or otherwise, and then exercise its discretion – and to the extent it does so, this would be an action the agency must consult on. But Reclamation cannot produce pre-determined flows, lake levels, or sump levels at all times, regardless of the hydrologic conditions and other factors beyond Reclamation's control. Reclamation should therefore not consult on fixed releases from Upper Klamath Lake, flows in the Klamath River, and water levels in Tule Lake Sump 1A.

Again, as opposed to absolute flows or levels, establishing "target" releases from Upper Klamath Lake, flows in the Klamath River, and water levels in Tule Lake Sump 1A, including target minimums, would appear to be within the agency's authority and discretion, and should be consulted on if proposed by Reclamation.

The recommendations provided in this reassessment reflect a thorough and comprehensive review of Reclamation's continuing operations of the Klamath Project. Actions recommended for inclusion in future consultations vary significantly from the far-reaching scope of actions included in past BAs. The broad reach of past consultations appears to have been the result of a number of factors, including:

1. Pre-existence of FERC minimum release requirements from Iron Gate Dam under PacifiCorp's 1956 license for operation of the Klamath Hydroelectric Project (FERC license no. 2082), which could never be met by PacifiCorp except with volumes supplied by the Klamath Project;

2. Reclamation's assumption, prior to issuance of the ACFFOD, that Reclamation unilaterally owned the water rights in connection with the Klamath Project, including the interest in beneficial use of the water;

3. An attempt to negotiate proposed actions for BAs that were agreeable to all stakeholders and attempted to "balance" competing needs and respective rights within the basin, through the form of a Section 7(a)(2) consultation but also in the context of anticipated enactment of a basin-wide settlement; and

4. A view of agency action that was overly broad, especially in light of intervening court decisions.

This latter point was the largest single determining factor in this reassessment.  It is clear, based on applicable authorizing legislation, applicable water rights at issue (both adjudicated and unadjudicated), and the physical conditions in the Klamath Basin that Reclamation's discretion to regulate water surface levels in Upper Klamath Lake and flows in the Klamath River – for the benefit of endangered species or otherwise – is narrower than the scope of Reclamation's recent consultations. Reclamation has (and currently still is under the Interim Operations Plan) attempted to manage the Klamath Project in a manner that achieves pre-determined hydrologic conditions throughout the entire Klamath Basin, based on effects associated with operation of the Klamath Project, as well as other federal, state, and private actions over which Reclamation has no discretionary control.

Klamath Basin, based on effects associated with operation of the Klamath Project, as well as other federal, state, and private actions over which Reclamation has no discretionary control.

Accordingly, and for the reasons stated herein, it is recommended that consultation be limited to actions consistent with the analysis and determinations stated above.

**Principal Author:**

GEORGE
DRISCOLL
Digitally signed by
GEORGE DRISCOLL
Date: 2021.01.15
07:16:05 -08'00'

1/15/21

George Moss Driscoll                              Date
Senior Water Contracts Specialist
Klamath Basin Area Office

**Through:**

JEFFREY
NETTLETON
Digitally signed by
JEFFREY NETTLETON
Date: 2021.01.15
08:01:48 -08'00'

Jeffrey Nettleton                                 Date
Area Manager
Klamath Basin Area Office

**Through:**

JEFFREY
PAYNE
Digitally signed by
JEFFREY PAYNE
Date: 2021.01.15
08:20:19 -08'00'

Jeffrey T. Payne                                  Date
Deputy Regional Director
California-Great Basin Region

**Concurrence:**

☑ Concur        ☐ Non-Concur

Ernest A
Conant
Digitally signed by
Ernest A Conant
Date: 2021.01.15
08:42:34 -08'00'

Ernest A. Conant                                  Date
Regional Director
California-Great Basin Region

**Quality Control Reviewers**

Jeffrey L. Nettleton
Area Manager
Klamath Basin Area Office

Jared L. Bottcher
Deputy Area Manager
Klamath Basin Area Office

Kristen Hiatt
Chief, Environmental Compliance Branch
Klamath Basin Area Office

**Product Development Team**

Ray Sahlberg
Regional Water Rights Officer
California-Great Basin Region

Steven R. Palmer
Special Assistant
California-Great Basin Region, Bay-Delta Office

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "G"

**From:** NATHAN RIETMANN <nathan@rietmannlaw.com>
**Subject: Complaint of illegal water use**
**Date:** April 22, 2020 at 8:26:05 AM PDT
**To:** Staley Darsee <Darsee.Staley@doj.state.or.us>, Moulun Renee M
<renee.m.moulun@doj.state.or.us>

Darsee/Renee -

Klamath Irrigation District is hereby formally making a report that the United States
Bureau of Reclamation is illegally diverting stored water in Upper Klamath Lake reservoir
without a water right through the Link River and Keno Dams to the detriment of KID and
other secondary water rights holders in Upper Klamath Lake reservoir. See
here:https://waterdata.usgs.gov/nwis/uv/?site_no=11507500&parameter_cd=00060. We
ask that the watermaster immediately curtail this water use in accordance with law unless
or until the United States obtains a water right authorizing the use.

Nathan



**NATHAN R. RIETMANN**
**Rietmann Law, P.C.**
1270 Chemeketa St. NE
Salem, Oregon 97301
Ph: 503-551-2740
Fax: 1-888-700-0192
nathan@rietmannlaw.com

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "H"

5/14/2020 7:47 AM
20CV17922

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

**KLAMATH IRRIGATION DISTRICT,**

Petitioner,

v.

**OREGON WATER RESOURCES DEPARTMENT**, *an agency of the state of Oregon,* **THOMAS BYLER,** *in his official capacity as Director of Oregon Water Resources Department,* and **DANETTE WATSON**, *in her official capacity as Watermaster for the Oregon Water Resources Department*

Respondent.

Case No. 20CV17922

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**WATER RIGHTS CASE**

**ORIGINAL FILING FEE: $281, ORS 21.135(1), (2)(g)**

---

**INTRODUCTION**

1.

Plaintiff KLAMATH IRRIGATION DISTRICT ("KID") is bringing this action pursuant to ORS 183.490 and ORS 540.740 seeking an injunction compelling Defendants OREGON WATER RESOURCES DEPARTMENT ("OWRD"), THOMAS BYLER ("Byler"), and DANETTE WATSON ("Watson") to carry into effect the Amended and Corrected Order of Determination ("ACFFOD") in the Klamath Adjudication by ordering the United States Bureau of Reclamation not to divert stored water through the Link River Dam for instream purposes unless or until: (1) it obtains a water right or instream lease authorizing the use of water for such purpose, (2) obtains a stay of the ACFFOD pursuant to ORS 539.180, or (3) Reclamation obtains a final judgment providing that federal law authorizes the United States Bureau of Reclamation to use stored water in UKL reservoir for instream purposes *without securing a water right in accordance with state law and the Reclamation Act.* Pursuant to ORS 540.750, this matter is to be heard within 15-days of the issues being joined and a temporary restraining order may issue upon 3-days' notice thereof. KID is hereby providing notice that it is seeking a temporary

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1  restraining order compelling OWRD to use all of its authorities at its disposal to stop stored

2  water in UKL reservoir from being unlawfully diverted through Link River Dam without a water

3  right.

4                                        **PARTIES**

5                                            2.

6          Plaintiff KLAMATH IRRIGATION DISTRICT ("Plaintiff" or "KID") is an irrigation

7  district and quasi-municipal corporation organized under ORS Chapter 545 and located within

8  the boundaries of the Klamath Reclamation Project in Klamath County, Oregon. KID holds

9  water rights in UKL reservoir and is obligated to divert and deliver water from UKL to

10 approximately one-thousand Oregonians and Oregon small businesses which own farms

11 encompassing approximately 122,000 acres of irrigable land in the Klamath Basin.

12                                           3.

13         Defendant OREGON WATER RESOURCES DEPARTMENT ("OWRD") is an

14 executive-administrative branch of government under the Oregon Water Resources Commission

15 pursuant to ORS 536.039.  Defendant OWRD is responsible for carrying out the policies of the

16 Oregon Water Resources Commission and administering and enforcing ORS 540.210 and other

17 Oregon laws concerning the water resources of the state at the direction of Defendant Thomas

18 Byler. The authority of Defendant OWRD is circumscribed by statute.

19                                           4.

20         Defendant THOMAS BYLER ("Byler") is the duly appointed director of OWRD.  In

21 such capacity, Defendant Byler serves as the administrative head of OWRD, administers and

22 enforces the laws of the state concerning the water resources of the state, and is empowered to

23 engage in other related functions consistent with ORS 536.037.  These related functions include

24 executing the laws relative to the distribution of water, which includes enforcement of water

25 rights under ORS 540.210 and other laws and exercising general control over OWRD's

26 watermasters.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1                                      5.

2          Defendant DANETTE WATSON ("Watson") is the watermaster for the OWRD in

3   District 17, which encompasses Upper Klamath Lake. In such capacity, Defendant Watson is

4   responsible for enforcing the water laws of the state, including enforcement of water rights in

5   accordance with ORS 540.210.

6                            **FACTUAL ALLEGATIONS**

7                                      6.

8          The Klamath Project is a project of the U.S. Bureau of Reclamation ("Reclamation")

9   designed to help irrigate and expand the number of farmable acres in southern Oregon and

10  northern California.  It is one of the oldest Reclamation projects in the nation, and is unique from

11  most other Reclamation projects in that it was solely authorized as a single-purpose irrigation

12  project to meet the nation's objective of developing the West.

13                                     7.

14         The United States Congress enacted the Reclamation Act in 1902 to provide funding for

15  irrigation projects in arid regions of the western United States.

16                                     8.

17         Pursuant to Sections 7 and 8 of the Reclamation Act, Reclamation is required to obtain

18  water rights for Reclamation projects in accordance with state law, through appropriation,

19  purchase, or "condemnation under judicial process."

20                                     9.

21         Sections 7 and 8 of the Reclamation Act also require Reclamation and its agents to

22  comply with state laws relating to the control, use, or distribution of water.

23                                     10.

24         In 1905, the Oregon Legislative Assembly sought to advance the purposes of the

25  Reclamation Act and the development of a Reclamation project in the Klamath Basin, by

26  enacting Chapter 5, Oregon Laws of 1905 and Chapter 228, Oregon Laws 1905.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2170
nathan@rietmannlaw.com

1                                          11.

2        Following authorization of the Klamath Project, facilities were constructed, previously

3    existing facilities were improved and incorporated into the Klamath Project, and individual

4    landowners began applying water to beneficial use on their lands after entering into contracts

5    with the United States to repay the costs of the irrigation works developed by the United States.

6                                          12.

7        KID was formed in 1917 and thereafter entered into a contract with Reclamation in 1918

8    to repay the costs of construction, operation, and maintenance of the Klamath Project.   The

9    contract has since been amended several times, most notably in 1954.  By virtue of its contract

10   with Reclamation, KID has a perpetual obligation to operate and maintain certain irrigation

11   works owned by the United States and an affirmative non-discretionary legal and contractual

12   obligation to deliver water to fulfill the appurtenant water rights of its own landowners.   KID

13   also has a non-discretionary legal and contractual obligation to deliver water needed to fulfill

14   water rights held by certain districts and landowners located outside KID's own boundaries.

15   KID's contract specifically contemplates that ownership of the transferred works it currently

16   operates and maintains, as well as any water rights held by Reclamation that are associated with

17   KID, will be eventually be transferred to KID.

18                                         13.

19       On February 24, 1909, the Oregon Legislative Assembly enacted the Water Rights Act,

20   including the provisions found at ORS 536.050, 537.120, 537.130, 537.140 to 537.252, 537.390

21   to 537.400, 538.420, 540.010 to 540.120, 540.210 to 540.230, 540.310 to 540.430, 540.505 to

22   540.585 and 540.710 to 540.750.

23                                         14.

24       Pursuant to ORS 537.110, all water within the state from all sources of water supply

25   belongs to the public.  However, subject to existing rights, individuals may obtain the right to use

26   the public's water by applying for and obtaining a water right.  Under Oregon law, the use of the

public's water is a property right.  *See e.g.*, ORS 307.010(1)(b)(D)).  The property right is said to

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1  be usufructuary because, although a water right grants the right to use the public's water,

2  ownership of the water itself remains vested in the public.  Oregon courts have recognized that

3  the right to the use of water constitutes a vested property interest which cannot be divested

4  without due process of law.

5                                                    15.

6      ORS 539.007(11) defines water rights established prior to the adoption of the Water

7  Rights Act on February 24, 1909 as undetermined vested rights.  The Water Rights Act provides

8  at ORS 539.010(4) that undetermined vested rights are not to be impaired or affected by any of

9  its provisions.  However, ORS 539.010(4) of the Water Rights Act also provides that the scope

10  and attributes of all undetermined vested rights are to be determined through an adjudication

11  conducted in accordance with ORS Chapter 539.

12                                                   16.

13      In 1975, the State of Oregon initiated a general stream adjudication pursuant to ORS

14  Chapter 539 of the waters of the Klamath Basin (hereafter "Klamath Adjudication").  The

15  Klamath Adjudication satisfies the requirements of the McCarran Amendment, 43 U.S.C. § 666,

16  and encompasses, *inter alia*, all pre-1909 state, federal, and tribal claims to the use of water

17  stored in UKL reservoir and the portions of the Klamath River encompassed within the

18  adjudication.

19                                                   17.

20      On March 7, 2013, thirty-eight (38) years after commencing the Klamath Adjudication,

21  Defendant OWRD issued its Findings of Fact and Final Order of Determination ("FFOD") and

22  filed it with the Klamath County Circuit Court, thus completing the administrative phase of the

23  adjudication.

24                                                   18.

25      In February 2014, OWRD filed an Amended and Corrected Findings of Fact and Final

26  Order of Determination ("ACFFOD") with the Klamath County Circuit Court.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1                                    19.

2          The ACCFOD provides that Reclamation is the owner of a right to store water—

3   specifically, a maximum annual volume of 486,828 acre-feet of water in UKL reservoir to

4   benefit the separate water rights held by KID and other water right holders.

5                                    20.

6          The ACFFOD does not recognize Reclamation as having any right to use water stored in

7   UKL reservoir for instream purposes.

8                                    21.

9          The ACFFOD recognizes that KID, its landowners, and other districts and landowners

10  within the Klamath Project own water rights entitling them to use live flow and water the United

11  States stores in UKL reservoir for the purposes of irrigation and other beneficial uses. Each acre

12  of land with an appurtenant water right is entitled to use up to 3.5 acre-feet per acre. Since there

13  are approximately 40,000 acres of land within KID that have appurtenant water rights, KID has a

14  nondiscretionary obligation to divert up to 140,000 acre-feet each irrigation season to fulfill the

15  water rights of its own patrons. KID also has a nondiscretionary obligation to deliver water from

16  UKL reservoir to other irrigation districts and landowners who hold many tens of thousands of

17  acres of land with appurtenant water rights as set forth in the ACFFOD.

18                                   22.

19         The ACFFOD is presently enforceable under Oregon law, and must be followed by all

20  owners of determined claims pending the judicial review phase of the Klamath Adjudication

21  before the Klamath County Circuit Court.  ORS 539.130; ORS 539.170.  To date, the Klamath

22  County Circuit Court has not issued a stay to any party pursuant to ORS 539.180.

23                                   23.

24         Despite the issuance of the FFOD, and the subsequent issuance of the ACFFOD,

25  Reclamation has persisted in using stored water in UKL for instream purposes for which it has

26  no right under Oregon law or the federal Reclamation Act.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1                                    24.

2        Accordingly, it is clear that KID and Reclamation have significant conflicts over the right

3   to use stored water in UKL.

4                                    25.

5        ORS 540.210(1) provides that:

6        Whenever any water users from any ditch or reservoir, either among themselves
         or with the owner thereof, are unable to agree relative to the distribution or
7        division of water through or from the ditch or reservoir, either the owner or any
         such water user *may apply to the watermaster of the district in which the ditch*
8        *or reservoir is located, by written notice, setting forth such facts, and asking*
         *the watermaster to take charge of the ditch or reservoir for the purpose of*
9        *making a just division or distribution of water from it* to the parties entitled to
         the use thereof.
10

11                                   26.

12       In April of 2018, KID was experiencing a water shortage and repeatedly demanded in

13  writing that OWRD take exclusive charge of Upper Klamath Lake pursuant to ORS 540.210 and

14  divide and distribute the water therefrom in accordance with the respective and relative rights of

15  the various users of water from the reservoir. Defendant failed to act on these requests and failed

16  to grant or deny the requests in writing.

17                                   27.

18       Thereafter, KID filed suit against the OWRD in Marion County Circuit Court, Case No.

19  18CV18112. Following a hearing on the merits, the Court granted judgment in KID's favor and

20  issued an order compelling OWRD to take charge of UKL pursuant to ORS 540.210. However,

21  OWRD asserted it could not make a decision without extensive and unnecessary factual

22  investigation.  By delaying acting until it could gather this information it claimed to need,

23  OWRD avoided making any decision before KID's practical need for relief terminated with the

24  end of the irrigation season.  The issue was thereafter rendered moot, and OWRD ceased

25  pursuing any action.

26

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

28.

This year (2020) is proving to be another year of water shortage and, again, Reclamation is using stored water from UKL reservoir without a water right in violation of Oregon law and the Reclamation Act. For example, in a draft Environmental Assessment Document ("EA"), provided to Plaintiff on or about April 13, 2020, Reclamation indicated that it would use stored water in UKL reservoir for instream purposes without any water right, beginning with a 50,000 acre-foot "flushing flow" to be sent down the Klamath River within a period of a few short days. KID subsequently learned that Reclamation intended to conduct the flushing flow on or about April 16, 2020.

29.

Therefore, on April 3, 2020, KID again asked Defendants, including specifically Defendant Watson, the watermaster of the district in which UKL reservoir is located, to take charge of UKL reservoir pursuant to ORS 540.210 "according to the relative and respective rights of the various users from the… reservoir."

30.

As of April 13, 2020, KID had not received any response from OWRD in regard to its request that OWRD take charge of UKL for purposes of controlling the distribution of water. Accordingly, KID sent correspondence, through its attorney, noting that it would bring legal action if necessary to compel OWRD to perform its non-discretionary duty to take charge of UKL and control the distribution of water in advance of the flushing flow.

31.

Thereafter, Reclamation changed the timing of its flushing flow from April 15, 2020 to an unknown time prior to May 1, 2020.

32.

On Thursday, April 16, 2020 at 3:01 p.m., OWRD issued an intermediate order entitled "NOTIFICATION OF DISTRIBUTION AND INVESTIGATION IN AID OF DISTRIBUTION" ("Intermediate Order").

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1                              33.

2        OWRD's Intermediate Order did not take charge of UKL reservoir pursuant to ORS

3  540.210 to resolve KID's very specific complaint that Reclamation was imminently prepared to

4  unlawfully divert stored water without a water right in violation of the ACFFOD, ORS 540.720,

5  ORS 540.410, and other Oregon laws.

6                              34.

7        Instead, OWRD's Intermediate Order set forth a process of investigating KID's request

8  that OWRD take charge of UKL reservoir, by issuing subpoenas before May 1, 2020, conducting

9  hearings, and otherwise investigating whether there is a surface water shortage caused by the

10  purported management of stored water.  OWRD is well aware of the fact that the unlawful

11  diversion of water that KID was immediately concerned with was is scheduled to happen prior to

12  this May 1, 2020 date, and the failure to act before Reclamation's releases would deprive KID

13  and the farmers it serves of their property interests in their water rights.

14                              35.

15       On April 17, 2020, KID petitioned this Court for an emergency alternative writ of

16  mandamus in Marion County Circuit Court Case No. 20CV15606 that would compel Defendants

17  to take exclusive charge of UKL reservoir and ensure water is distributed from UKL reservoir in

18  accordance with the relative rights thereon (i.e. the ACFFOD).

19                              36.

20       On April 21, 2020, this Court issued an alternative writ of mandamus compelling OWRD

21  to take charge of UKL reservoir and distribute the water thereof in accordance with the relative

22  water rights thereon (i.e., ACFFOD).

23                              37.

24       In an order date April 23, 2020, OWRD asserted it had taken charge of UKL as of April

25  16, 2020.  It also ordered Reclamation to "cease releasing stored water from UKL reservoir

26  ***except in accordance with the relative and respective state law rights calling upon the stored***

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   *water*" until Reclamation shared with OWRD certain information identifying the authority it

2   *claimed* authorized it to use stored water in UKL reservoir.

3                                             38.

4          Despite the issuance of the writ of mandamus by this Court, OWRD's April 23, 2020

5   order did nothing to control the distribution of water through the Link River Dam, as OWRD

6   was obligated to do under ORS 540.210, ORS 540.720, and the writ issued by this Court.

7   Instead, the order allowed Reclamation to conduct the flow exactly as planned without OWRD

8   making any decision as to whether the flow was in accordance with the ACFFOD and Oregon

9   law or not. This is made obvious by the fact that Reclamation has continued to use water from

10  UKL to satisfy its ESA obligations—specifically, the release of a large quantity of stored water

11  as a so-called "flushing flow"—even after OWRD purportedly "took charge" of UKL.   The

12  graph below, available publicly on the U.S. Geological Survey's website, shows that after

13  OWRD purportedly "took exclusive charge" of UKL on April 16, 2020 and ordered Reclamation

14  to cease releasing stored water, Reclamation nevertheless released its flushing flow, beginning

15  on April 23, 2020 and continuing until May 3, 2020.  As this graph clearly shows, the discharge

16  over Link River Dam during this period increased sharply.  This increased quantity of water

17  released reflects the release of stored water from UKL without a water right and such increased

18  flows cannot be attributed to live or natural flow of the Klamath River.

19



Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1                                                    39.

2          Defendants have "taken charge" of UKL in name only.  Defendants have done nothing to

3   prevent the actual release of water in an unlawful manner, despite clear evidence that

4   Reclamation is flouting Defendants' order.

5                                                    40.

6          Defendants have the legal authority under Oregon law to do more than merely issue

7   orders which are worded so as to be toothless to being with, and can and are being ignored to the

8   extent they may be interpreted as having any teeth.  Defendants and their agents may take control

9   of headgates and other devices for water distribution, may pursue legal actions to prevent

10  unlawful releases of stored water, and may seek punitive measures against individuals who flout

11  their authority.  (*See, e.g.*, ORS 540.045 [setting out watermaster duties]; ORS 540.060 [granting

12  watermaster power to arrest and file complaints]; ORS 540.210(4); ORS 540.310 [noting that

13  each ditch or canal must have a headgate that can be locked and kept closed by the watermaster];

14  ORS 540.320 [authority of watermaster to close ditches];ORS 540.330 [same].)  However, they

15  have not taken *any* of these steps or otherwise sought to ensure that Reclamation complies with

16  OWRD's "order."

17                                                   41.

18         Defendants cannot assert that they have taken "exclusive charge" of UKL reservoir by

19  issuing an order that is simply being ignored and taking no steps to enforce their order.  It is clear

20  that Defendants have neither physical nor actual control of UKL reservoir.

21                                                   42.

22         Further, Defendants have insisted they must conduct an investigation prior to taking

23  charge of UKL reservoir and determining the distribution of water therefrom.  Plaintiff maintains

24  no such investigation is necessary.  In fact, such an investigation of the relative rights of the

25  parties to this dispute has already *been* conducted over the past four decades:  it culminated in

26  the ACFFOD, which establishes and sets out the respective, enforceable rights of the parties.  No

    further investigation is necessary.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1                                                    43.

2          Even if some factual investigation must take place prior to the determination of how

3  water should be distributed—for instance, to distinguish between live flow and stored water in

4  UKL—this information is readily available to OWRD, which requires that all owners of

5  structures that obstruct the natural flow of the river maintain measuring devices such that the

6  natural flow of the river can be easily determined.  *See* ORS 540.330.

7                                                    44.

8          Lastly, regardless of the level of factual investigation required, Defendants must "take

9  exclusive charge" of UKL upon the filing of the complaint, not upon the completion of an

10  investigation.  Defendants have clearly failed to do so here, since Reclamation continues to

11  release water without a secondary water right notwithstanding Defendants' "order" to cease

12  doing so.  Defendants have taken no action to enforce their "order," despite the availability of

13  avenues to do so, and thus cannot claim to have taken "exclusive charge" of the reservoir.

14                                                   45.

15          As such, Plaintiff seeks this court to grant injunctive and declaratory relief requiring

16  Defendants to discharge their statutory duty and take "exclusive charge" of UKL reservoir,

17  which necessarily entails preventing Reclamation from distributing water without a water right in

18  a manner that is contrary to the ACFFOD.

19                                                   46.

20          Defendant's failure to carry into effect the ACFFOD is causing KID and the landowners

21  it serves irreparable harm as Defendants are the regulatory agency with exclusive authority to

22  carry into effect the ACFFOD and enforce the water rights set forth therein, which are private

23  property under Oregon law.

24          **FIRST CAUSE OF ACTION – VIOLATION OF THE ADMINISTRATIVE**

25                       **PROCEDURES ACT (Against All Defendants)**

26                                                   47.

          Plaintiff reasserts and realleges ¶¶ 1 to 46 as though fully set forth herein.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

48.

Under ORS 540.210(2), Defendants, particularly including Defendant Watson, have a duty to "take exclusive charge" of UKL for the purposes of making a just distribution of the water contained therein pursuant to the Oregon water rights determined in the ACFFOD.

49.

While Defendants have issued orders purportedly directing Reclamation to cease releasing stored water without a corresponding water right, the orders are written so as to ensure Reclamation may comply without bringing its water use into compliance with law, and to the extent they may be interpreted otherwise, Reclamation has ignored these orders and Defendants have taken no steps to enforce or enact these orders.

50.

As such, Defendants have not taken charge of UKL, as they have neither physical nor actual control of the outflow of stored water from UKL.

51.

Under ORS 183.490, a court may "compel an agency to act where it has unlawfully refused to act or make a decision or unreasonably delayed taking action or making a decision."

52.

Under ORS 540.210(2), Defendants have no discretion or authority not to take exclusive charge of UKL reservoir.  *See* ORS 540.210(2) ("The watermaster **shall** then take exclusive charge of the ditch or reservoir . . . .") (emphasis added).

53.

Defendants have unlawfully refused to take exclusive charge of UKL reservoir, or are unreasonably delaying taking exclusive charge of UKL reservoir by actually taking control of the distribution of water and distributing it in accordance with the ACFFOD.

54.

KID is entitled to order and judgment compelling Defendants to immediately take exclusive charge of UKL and distribute water in accordance with the ACFFOD.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1                               55.

2       KID is entitled to an award of its attorney fees pursuant to ORS 183.497 and other law

3 because OWRD has acted without reasonable basis in law or fact.

4       **SECOND CAUSE OF ACTION – INJUNCTION PURSUANT TO ORS 540.740 (Against**

5                                   **Defendant Watson)**

6                               56.

7       Plaintiff reasserts and realleges ¶¶ 1 to 46, as though fully set forth herein.

8                               57.

9       ORS 540.740 permits any person to seek an injunction against a watermaster if they can

10 show "that the watermaster has failed to carry into effect the order of the Water Resources

11 Commission or decrees of the court determining the existing rights to the use of water."

12                              58.

13       Defendant Watson has refused to take adequate steps to stop or enjoin the unlawful uses

14 of water by Reclamation to which Plaintiff possesses a water right.  Specifically, Plaintiff's

15 entitlement to use up to 3.5 acre-feet of water per year per irrigable acre, either for irrigation

16 purposes or leasing purposes for in-stream rights, has been unilaterally seized by Reclamation,

17 who is using it for instream purposes without a lease and without any monetary payment or

18 lawful condemnation of this right.  Despite complaints to Defendant Watson, no steps have been

19 taken to actually stop this unlawful seizure of water rights.

20                              59.

21       Because these water rights were determined in the ACFFOD, Defendant Watson's failure

22 to intervene is a failure "to carry into effect the order of the Water Resources Commission"

23 under ORS 540.740.

24                              60.

25       Therefore, Plaintiff is entitled to an injunction against Defendant Watson directing her to

26 carry into effect the ACFFOD by using all powers of enforcement at her disposal to stop the

United States from unlawfully diverting stored water from UKL reservoir through Link River

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    Dam without having obtained a water right or instream lease authorizing the use, or a stay of the

2    ACFFOD pursuant to ORS 539.180, or a final judgment providing that federal law authorizes the

3    United States Bureau of Reclamation to use stored water in UKL reservoir for instream purposes

4    *without securing a water right in accordance with state law and the Reclamation Act.*

5                                   **PRAYER FOR RELIEF**

6           **WHEREFORE**, Plaintiff prays for judgment and an order against each Defendant as

7    follows:

8           1.      On each of the causes of action, for injunctive and declaratory relief as may be

9    shown to be proper, including but not limited to issuance of a temporary restraining order; and

10          2.      Any other relief that this Court deems just and proper.

11

12   Dated: May 14, 2020                        RIETMANN LAW P.C.

13

14                                              *s/ Nathan R. Rietmann*
                                                Nathan R. Rietmann, OSB #053630
15                                              1270 Chemeketa St. NE
                                                Salem, Oregon 97301
16                                              503-551-2740
17                                              nathan@rietmannlaw.com
                                                Attorneys for Petitioner
18

19

20

21

22

23

24

25

26

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "I"

Verified Correct Copy of Original 10/13/2020

STATE OF OREGON
Marion County Circuit Courts

OCT 13 2020

FILED

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

**KLAMATH IRRIGATION DISTRICT,**

Petitioner,

v.

**OREGON WATER RESOURCES DEPARTMENT**, *an agency of the state of Oregon,* **THOMAS BYLER,** *in his official capacity as Director of Oregon Water Resources Department,* and **DANETTE WATSON**, *in her official capacity as Watermaster for the Oregon Water Resources Department*

Respondent.

Case No. 20CV17922

**ORDER GRANTING PETITIONER'S PARTIAL MOTION FOR SUMMARY JUDGMENT AS TO COUNT 2**

**THIS MATTER** came before the Court on the *Complaint for Declaratory and Injunctive Relief* ("Complaint") filed by Petitioner Klamath Irrigation District ("KID") on May 14, 2020. The Second Claim for Relief set forth in the Complaint sought an injunction pursuant to ORS 540.740 against Danette Watson, in her official capacity as the Oregon Water Resources Department's Watermaster for District 17. On May 29, 2020, Petitioner KID filed a "*Petitioners' Motion for Partial Summary Judgment*" on its Second Claim for Relief as well as supporting declarations. On June 10, 2020, Respondent Watson filed her "*Response to Motion for Summary Judgment and Cross-Motions for Judgment (Injunction Claim)*" and supporting declarations. On June 12, 2020, Petitioner KID filed a "*Motion for Temporary Restraining Order*" and supporting declarations. Both parties thereafter made written submissions in support and opposition to the Motion for Temporary Restraining Order, which they also directed at the cross-motions for summary judgment on Petitioners' Second Claim for Relief. Oral Arguments were held on June 18, 2020. The Court issued a preliminary opinion on July 30, 2020.

Page 1 -   **LIMITED JUDGMENT ON SECOND CLAIM FOR RELIEF**

1

2

3    The Court invited and received additional briefing and held further Oral Argument on

4    August 27, 2020.    The Parties subsequently filed additional briefings which were

5    accepted and reviewed by the Court.    The Court issued its Amended Opinion letter on

6    September 30, 2020.    A copy of the Court's September 30, 2020 Amended Opinion

7    Letter is attached hereto and is incorporated herein by reference.

8

9        **NOW, THEREFORE, IT IS HEREBY ORDERED:**

10    Accordingly, pursuant to ORS 540.740, Watson is ordered to immediately stop the

11    distribution, use and/or release of Stored Water from the UKL without determining that

12    the  distribution, use and/or release is for a permitted purpose by users with existing

13    water rights of record or determined claims to use the Stored Water in the UKL.

14        The term "existing water rights of record" has the meaning provided in ORS

15    540.045(4). The term "determined claim" has the meaning provided in Section 1,

16    chapter 445, Oregon Laws 2015 (which is published in the Oregon Revised Statutes as a

17    note following ORS 539.170).

18

19        **IT IS SO ORDERED.**

20

21        DATED this 13th day of October, 2020.

22

23

24

25                                 Channing Bennett, Circuit Judge

26

Verified Correct Copy of Original 10/13/2020



**CIRCUIT COURT OF OREGON**
**THIRD JUDICIAL DISTRICT**
**MARION COUNTY COURTHOUSE**
**P.O. BOX 12869**
**SALEM, OR 97309-0869**

CHANNING BENNETT
Circuit Court Judge
PHONE: (503) 588-7950
FAX: (503) 588-5115

> STATE OF OREGON
> Marion County Circuit Courts
>
> OCT 02 2020
>
> FILED

October 2, 2020

**AMENDED OPINION**

Nathan Rietmann
Attorney at Law
nathan@rietmannlaw.com

Darsee Staley
Assistant Attorney General
darsee.staley@doj.state.or.us

*Sent via email only*

Re:   KID v. Oregon Water Resources Department, et al
      Case No.: 20CV17922

Counsel:

This matter came before the court for hearing on June 18, 2020 on Petitioner Klamath Irrigation District's (KID) Motions for Temporary Restraining Order (TRO) and Motion for Partial Summary Judgment; and Respondents' Oregon Water Resources Department (OWRD), Byler and Watson's Cross Motion for Summary Judgment. The Court reviewed the Motions, Responses and Replies of each of the respective parties and had the benefit of oral argument by counsel. At the beginning of oral argument, Petitioner opted to forego hearing on the TRO as it was wholly subsumed by the Motion for Partial Summary Judgment. The Court issued an Opinion Letter on August 18, 2020 and later invited the parties to present comment and/or additional arguments related to the Opinion, the proposed forms of order, and proposed form of limited judgment. Oral argument was held on August 27, 2020 and the parties provided supplemental briefings both before and after the second oral argument. Having reviewed the pleadings with attached affidavits; heard oral argument; heard oral argument on the court's preliminary opinion; reviewed the court's file and being fully advised on the premises, for the reasons more fully articulated below, Petitioners Motion for Partial Summary Judgment is GRANTED; and Respondents' Cross Motion for Summary Judgment is DENIED.

Verified Correct Copy of Original 10/13/2020
Verified Correct Copy of Original 10/2/2020

## FINDING OF FACTS AND CONCLUSIONS OF LAW

This case involves the distribution and use of Stored Water in the Upper Klamath Lake Reservoir (UKL). Stored Water in the UKL is the property of the People of the State of Oregon. See ORS 536.007(12) and ORS 537.110.

The UKL and Link River Dam, one of several dams which control water in the UKL, are part of the United States Bureau of Reclamation's (the "Bureau") Klamath Project as established by Federal and State Law. The Bureau contracts with the State of Oregon, through the OWRD, to manage the Klamath Project. The Bureau has a right to store water in the UKL but does not have an established right or an OWRD issued permit or license allowing for the use of Stored Water in the UKL. See ORS 537.147. Stored Water is a separate and distinct water source under Oregon law. See inter alia ORS 537.336(4), ORS 537.143, and ORS 537.147. ORS 536.007 defines the word "person" to include "the federal government and any agency thereof." Thus, the Bureau is a "person" required to obtain a permit in order to use stored water in the UKL pursuant to 537.147

Petitioner KID is an Irrigation District and quasi-municipal corporation organized under ORS Chapter 545. Plaintiff KID has a secondary use permit, issued by OWRD, allowing the use of Stored Water in the UKL, for Irrigation, a beneficial use. KID, and the members it serves, have a property interest in the Stored Water retained in the UKL. Respondents argue that because Petitioners did not assert at the time of filing, that they have been denied any portion of their permitted allocation of water, they lack standing to challenge the Respondents' release of Stored Water for the unpermitted use by the Bureau.

Respondents' position presents the problem of allowing the Respondents' conduct to escape judicial review. The Respondents' argue that Petitioner only has standing if there is available water at the time Petitioner is permitted to use the water (throughout the irrigation season) and they are deprived of their share of the available water. Respondent correctly states that Petitioner is only entitled to their allotment of water, if water is available. However, the logical conclusion of Respondents' position is that if they allow release to the Bureau, who has no established right or permit to use the Stored Water, and there is no water left for irrigation, then Petitioner has not been deprived of their seasonal allotment because there was no water available at the time of need. Simply stated, Respondents' position is that Petitioners, who have at minimum a beneficial interest, must stand without recourse, while officials of the State of Oregon allow release of Stored Water, contrary to statute, potentially leaving little to nothing for irrigation use. KID, and the landowners it serves, have an established water right (more fully described below) and a secondary use permit, to use Stored Water in the UKL. The Respondents release of Stored Water from the UKL for use by the Bureau, without an established right, permit or license to use the Stored Water, constitutes a Waste.

Verified Correct Copy of Original 10/13/2020
Verified Correct Copy of Original 10/2/2020

Petitioner has standing to challenge Respondents' Waste of Stored Water in which Petitioner has a permitted, beneficial interest.

In 20cv15606, Klamath Irrigation District v. Oregon Water Resources Department, et al, KID filed for an Alternative Writ of Mandamus asking this Court to Order OWRD to take exclusive charge of the UKL pursuant to ORS 540.210. KID asserted, as they do in the instant litigation, that Respondents were allowing the Bureau to use Stored Water from the UKL via release through the Link River Dam, with no established right to do so. KID asserted that the Bureau's unpermitted use of Stored Water in the UKL impaired KID's right to use Stored Water. After hearing, the Alternative Writ of Mandamus was allowed. On April 23, 2020, OWRD, Byler and Watson confirmed that they had complied with the court's Order and took exclusive charge of the UKL pursuant to ORS 540.210. Having taken exclusive charge of the UKL, ORS 540.210 requires OWRD to take charge for the "purpose of dividing or distributing the water therefrom in accordance with the respective and relative rights of the various users of water from the ditch or reservoir and shall continue the work until the necessity therefore shall cease to exist." See ORS 540.210(2)

Notwithstanding having exclusive charge of the UKL and a statutory duty to divide or distribute water from the UKL "in accordance with the respective and relative rights of the various users of water from the . . . reservoir. . ." Respondents' continued to allow the Bureau to use Stored Water from the UKL despite having failed to determine whether the Bureau had any right to the use of the Stored Water. The instant suit was brought when KID was notified that the Bureau was planning to and did release large volumes of Stored Water from the UKL without an established right to use that water. KID has asserted that the Bureau has <u>NO</u> established or permitted right to use the Stored Water in the UKL. The Respondents have not rebutted this assertion as required by ORCP 47C. Nor have Respondents determined the respective and relative rights of the various users of UKL waters, despite a clear statutory duty to do so.

The parties agree that Natural Flow <u>and</u> Stored Water is scarce in the Klamath Basin and all acknowledge that water rights in the Klamath Basin has been the subject of voluminous and vigorous litigation in both State and Federal Courts for more than a century. There is no dispute that KID holds a secondary use permit. KID asks this Court to order that the Amended and Corrected Finding of Fact and Order of Determination (ACCFOD) adjudication, which is currently pending approval in the Klamath County Circuit Court, is the final determination of the respective and relative rights of the various water users of the UKL. Despite arguing in 20cv15606 and through summary judgment in the instant case that the ACCFOD does not apply and should not be considered or imposed by this Court, at oral arguments, on August 27, 2020, after issuance of the Court's Preliminary Opinion, Respondents have reversed their position

Verified Correct Copy of Original 10/13/2020
Verified Correct Copy of Original 10/2/2020

and agree that the ACCFOD is binding on all parties to this dispute. Accordingly, the Court adopts the ACCFOD as binding on this dispute to determine the respective and relative rights of the various users.

All water within the state from all sources of water supply belongs to the public. ORS 537.110. Subject to existing rights, and except as otherwise provided in ORS chapter 538, all waters within the state may be appropriated for beneficial use, as provided in the Water Rights Act and not otherwise. ORS 537.120. Unless specifically exempted, all beneficial uses of water require a permit for appropriation. ORS 537.130. The Water Rights Act allows for the issuance of limited licenses to use or store surface or ground water. ORS 537.143. The Water Rights Act also allows for issuance of a permit to use stored water. ORS 537.147. No party has provided this court with law or fact which allows the Bureau the right to use Stored Water in the UKL without a permit or license. To the contrary, ORS 540.720 provides "No person shall use without authorization water to which another person is entitled, or willfully waste water to the detriment of another. The possession or use of such water without legal right shall be prima facie evidence of the guilt of the person using it."

Despite taking exclusive charge of the UKL pursuant to 540.210, Respondents have failed to determine the respective and relative rights of the various users of Stored Water retained in the UKL. Respondents have thus far refused to apply the ACCFOD agreement despite agreeing that it does, in fact, determine the respective and relative priority for dividing and distributing water in the UKL. The ACCFOD has been binding on the Petitioners and Respondents since 2013.

Despite having taken exclusive control of the UKL pursuant to ORS 540.210, as required by order of this Court in 20cv15606, and knowing that the ACCFOD was binding on the parties to this dispute, Respondents have wrongfully allowed the release of Stored Waters from the UKL for uses by the Bureau without Respondents determining whether the Bureau had a right, permit, or license to appropriate the Stored Water in the UKL.

Respondents asserted at oral argument on August 27, 2020 that pursuant to ORS 540.045(3), the unpermitted release of Stored Water by the Bureau converted the Stored Water to Natural Flow and thus made the release permissible. That position is logically flawed and ignores the plain reading of ORS 540.045(3) and the plain requirements of the Oregon Water Rights Act. ORS 540.045(3) reads:

> "For purposes of regulating the distribution or use of water, any stored water released in excess of the needs of water rights calling on that stored water shall be considered natural flow, unless the release is part of a water

Verified Correct Copy of Original 10/13/2020
Verified Correct Copy of Original 10/2/2020

exchange under the control of, and approved by, the watermaster."

ORS 540.045(3) clearly describes situations where Stored Water is released as part of a regulated distribution or use. If Stored water is distributed pursuant to , an established, permitted or licensed right, but is not wholly consumed by the parties with and established, permitted or licensed right, then the excess Stored Water becomes part of the natural flow of the Stream. Nothing in ORS 540.045(3) can be read to allow OWRD or a Watermaster to allow the distribution or release of Stored water to any party who does not have an established right, permit or license to use the Stored Water. The Court has reviewed the entirety of the Oregon Water Rights Act and has been unable to identify any opt-out provision that would allow Respondents to allow the distribution or use of water to any party, including the Federal Government, without an established right, permit or license to use Oregon Water.

Respondents' failure to prevent the Bureau from using Stored Water in the UKL, without an established right, permit or license, is a deprivation of a precious resource belonging to the People of Oregon. Respondents' failure is also an infringement of property rights of established users, permittees and licensees. Respondent Watson has been fully apprised of and is aware of these facts. Despite actual knowledge, Watson has allowed the release of Stored Water through the Link River Dam for use by the Bureau without an established right, permit or license to use the Stored Water in the UKL. Watson has failed to carry into effect the ACCFOD and this Court's prior Order.

At oral argument on August 27, 2020, Respondents asserted that this Court's order implied duties, responsibilities, and abilities that Watson, the Watermaster, is not legally authorized to exercise or to assert control over areas and parties outside of her jurisdiction. To the Contrary, this Order finds that Watson is in violation of her duties for her willful failure to carry out her duties as Watermaster to apply the ACCFOD, to perform her duties under ORS 540.210 pursuant to this Court's prior order in 20cv15606, and ultimately failed to prevent the Bureau from using the Stored Water in the UKL without an established right, permit or license. The Watermaster has a statutory duty and authority to enforce those duties pursuant to ORS Chapter 540. No more. No less. What is not present in ORS Chapter 540 is any provision that allows the Watermaster to simply fail or refuse to perform the duties given her by the legislature.

Accordingly, pursuant to ORS 540.740, Watson is ordered to immediately stop the distribution, use or release of Stored Water from the UKL without first determining that the distribution, use or release is for a permitted purpose by users with an established right, license or permit to use the Stored Water in the UKL.

Verified Correct Copy of Original 10/13/2020_
Verified Correct Copy of Original 10/2/2020_

Attached, please find the Court's proposed form of Order. The parties may submit objections or proposed revisions on or before October 9, 2020 at 5pm. As previously discussed, determination of summary judgment on Count 2 is not appropriate for entry of a limited judgment, because the parties are identical and the same factual and legal issues are present and remain at issue in Count 1.

Very truly yours,

Channing Bennett
Circuit Court Judge

mh

eC:    Peter Frost, Esquire
       Karl Anuta, Esquire

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "J"



**CIRCUIT COURT OF OREGON**
**THIRD JUDICIAL DISTRICT**
**MARION COUNTY COURTHOUSE**
**P.O. BOX 12869**
**SALEM, OR 97309-0869**

CHANNING BENNETT
Circuit Court Judge
PHONE: (503) 588-7950
FAX: (503) 588-5115

December 17, 2020

Nathan Rietmann                     Darsee Staley
Attorney at Law                     Assistant Attorney General
nathan@rietmannlaw.com              darsee.staley@doj.state.or.us

Re:    KID v. Oregon Water Resources Department, et al
       Case No.: 20CV17922

*Sent via email only*

Counsel:

This matter came before the court on Respondents' Motion for Stay Pending Appeal
following the court's issuance of its Amended Opinion granting summary judgment on
Count 2 of Petitioner's Complaint and Order. For the reasons more fully stated below,
Respondents' Motion for Stay is denied.

First, is a procedural issue. Respondents' have filed an appeal of a limited judgment
allegedly entered after the court granted Petitioner's partial motion for summary
judgment as to count number two. However, no limited judgment has been issued in this
case. After entry of the court's initial opinion letter, further hearing with counsel and the
review of additional briefing, the court advised counsel for the parties that an entry of
limited judgment in this matter was not appropriate because counts one and two are
factually intertwined and the parties for both counts are the same. Counsel for both sides
agreed.  In the last paragraph of the court's amended opinion letter, this Court again
reiterated that the limited judgment was not appropriate and would not be issued.
Instead, the court entered an Order directing the Watermaster, Danette Watson, to

perform her duties under ORS 540.740. This court does not decide nor opine whether this matter is appropriate for interlocutory appeal.

As to the merits, Respondents interpret the court's order on partial summary judgment as somehow directing Respondents, including the Watermaster, to make specific findings regarding the relative rights of parties and distribute water in accordance with those rights. Respondents' misunderstand the nature of the court's order.

Respondents, prior to the instant suit, accepted exclusive jurisdiction pursuant to ORS 540.210 over the Upper Klamath Lake ("UKL"), ". . .for the purpose of dividing or distributing the water therefrom in accordance with the respective and relative rights of the various users of water from the ditch or reservoir and shall continue the work until the necessity therefor shall cease." See ORS 540.210(2). As previously stated in the court's amended opinion letter dated October 2, 2020, incorporated herein by reference, despite having accepted the duties outlined in ORS 540.210, Respondents continue to allow the Federal Bureau of Reclamation (the "Bureau") to use Stored Water in the UKL without determining that the Bureau has an established right or license to use the Stored Water, as differentiated from Natural Flow. Respondents have been invited repeatedly to state any basis that allows the Bureau to use or Distribute Stored Water from the UKL. Despite the specific language of ORS 540.210(3), Respondents have failed or refused to make a determination of the relative and respective rights of the various users much less a determination that the Bureau has a right to use or distribute the Stored Water in the UKL.

Instead, Respondents continue to argue that this court's order directs Respondents to make specific determinations as to division or distribution of water and the respective and relative rights amongst the parties. Throughout the number of hearings in this case, and the prior mandamus action, the court has repeatedly stated that it is making no determination as to who's entitled to use the Store Water in the UKL. The court has repeatedly stated that it is the exclusive duty of the OWRD, the Water Resources Director and the Watermaster. Separately, Respondents have a duty to prevent the distribution or

use of water for purposes other than those outlined in Oregon and Federal law. Notwithstanding, Respondents have refused to make the determinations required by the Oregon Water Rights Act and specifically ORS 540.510.

It may well be that the Bureau of Reclamation has a primary establish right to the use of Stored Waters in the UKL and that the actions complained of in the Petition are within the bounds of the law. Oregon statute, however, does not permit the Respondents to simply assume that the Bureau's position is correct. Instead, the Oregon Water Rights Act and this court's order, pursuant to ORS 540.740, require the Respondents, and in particular the Watermaster, Danette Watson, to prohibit the distribution of Stored Water unless it is for a legally permissible use by parties with an established right or license to use the Stored Water.

There is no doubt that there are a number of competing interests vying for the limited water in the Klamath Basin. All the more reason the Watermaster is required to ensure that the waters of the upper Klamath Lake not be distributed except in accordance with the respective and relative rights of the various uses of water from the ditch or reservoir. Further, Respondents' arguments that the Petitioner has no standing to bring this action is without merit. Respondents conceded in 20CV15606 that Petitioner had an established interest in Stored Water in the UKL. In the face of the Mandamus, Respondents' accepted exclusive jurisdiction over the UKL pursuant to ORS 540.210. It is illogical to now argue that Petitioner have no standing to force Respondents to comply with their statutory duty to make a determination of the relative and respective rights of all the interested parties. Petitioner, having an established interest in the Stored Water in the UKL, certainly has standing to demand that the Watermaster stop the distribution to any person who does not have a right, recognized by OWRD, to take and use the Stored Water.

Nothing in the court's order requires the Watermaster to make any specific determination. The court found, and the parties stipulated, that the ACCFOD, and the relative and respective rights as determined amongst those litigants, is binding on the Respondents and includes the waters of the UKL. Nothing in the Court's order precludes

the Respondents from recognizing rights asserted by other parties and determining relative and respective rights of the other parties with respect to the parties to the ACCFOD.  Respondents, having accepted exclusive jurisdiction over the waters of the UKL, are required to make these determinations.  The Court has so ordered.

Mr. Rietmann shall prepare the appropriate order.

Very truly yours,

Channing Bennett
Circuit Court Judge

mh

eC:    Peter M.K. Frost, Esquire

Declaration of Nathan Rietmann In Support of
Klamath Irrigation District's Motion for
Preliminary Injunction


Exhibit "K"

DENIED. Respondents' Motion restates their misapprehension of this courts Orders in 20CV17922 and 20CV15606. Respondents' accepted exclusive jurisdiction over the UKL pursuant to ORS 540.210. Respondents are required by that statute to divide and distribute the water therefrom in accordance with the respective and relative rights of the various users. Despite this statutory obligation, Respondents have continued to allow the Bureau of Reclamation to take Stored Water without determining the Bureau's right to do so. The Respondents continue to violate the Oregon Water Rights Act by allowing the Bureau to take and use Stored Water in the UKL without determining it is entitled to do so as required by ORS 540.210. Respondents must stop the release until a determination is made pursuant to ORS 540.740. Nothing in the Court's Order dictates how the Respondents make the determination or what criteria is used. *TPC, LLC v. OWRD*, 308 Or App. 177 is not analogous or factually similar to this case. MAKE A DETERMINATION

Signed: 1/8/2021 11:52 AM

Circuit Court Judge Channing Bennett

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**

**FOR THE COUNTY OF MARION**

**KLAMATH IRRIGATION DISTRICT,**

Petitioner,

v.

**OREGON WATER RESOURCES DEPARTMENT**, *an agency of the state of Oregon*, **THOMAS BYLER**, *in his official capacity as Director of Oregon Water Resources Department*, and **DANETTE WATSON**, *in her official capacity as Watermaster for the Oregon Water Resources Department*,

Respondents.

Case No. 20CV17922

RESPONDENTS' MOTION FOR RECONSIDERATION

**ORS 20.140 - State fees deferred at filing**

## MOTION

Respondents move for reconsideration of their Motion to Dismiss based on lack of subject matter jurisdiction. The Court of Appeals ruled on December 30, 2020, that the Marion County Circuit Court lacks subject matter jurisdiction over determined claims "currently subject to pending exceptions before the Klamath County Circuit Court." *TPC, LLC v. Water Resources Dept.*, slip opinion, 308 Or App 177, 198 (December 30, 2020). Petitioner's attempt to use ORS 540.740 to circumvent the exclusive adjudication process must be rejected and the claim dismissed because this Court lacks subject matter jurisdiction.

The Klamath County Circuit Court, in Case No. WA1300001, has exclusive jurisdiction over the ACFFOD. Petitioner's second claim under ORS 540.740 seeks an injunction to compel the watermaster to "carry into effect" the ACFFOD but on terms that are contrary to the ACFFOD. Specifically, the ACFFOD does not confer a right on petitioner to control operation

Page 1 -    RESPONDENTS' MOTION FOR RECONSIDERATION
34859822

1  of the United States Bureau of Reclamation's Klamath Project diversion and distribution works

2  or to prohibit the release of stored water by the Bureau when there is sufficient water present to

3  satisfy petitioner's determined claim under the ACFFOD.  Those issues are presently pending

4  before the adjudication court.  Therefore, this Court lacks subject matter jurisdiction.

5  Respondents request that the Court reconsider the motion to dismiss for lack of subject matter

6  jurisdiction and dismiss petitioner's claim for an injunction under ORS 540.740.

7                          **POINTS AND AUTHORITIES**

8          Respondents moved to dismiss petitioner's injunction claim pursuant to ORCP 21A(1)

9  for lack of subject matter jurisdiction based on KBA exclusivity.[1]  The question presented was

10  the same question before the Court of Appeals in *TPC*, namely "whether the *subject matter* of

11  the petitions herein was nonetheless within the scope of the exclusive jurisdiction of Klamath

12  County Circuit Court, as provided in ORS chapter 539, because petitioners' claims were bound

13  up with the KBA, a proceeding under ORS chapter 539." *TPC*, 308 Or App at 191 (emphasis in

14  original).  The record shows that here, as in *TPC*, the answer is yes.  The Court lacks jurisdiction

15  and the claim under ORS 540.740 must be dismissed.

16          As relevant here, the ACFFOD establishes that (1) the Bureau of Reclamation is the sole

17  owner of a storage right in Upper Klamath Lake (Ex 507) and (2) petitioner is a co-owner with

18  the Bureau and others of a right to use water from Upper Klamath Lake and the Klamath River

19  (Ex 508).  There is no dispute that the ACFFOD *does not* determine (a) the amount of stored

20  water petitioner or its co-owners are entitled to use or (b) "the relative rights of the KPWU

21  entities and the United States to control or operate diversion and distribution works, including

22  headgates, pumps, canals and other structures * * * and does not alter in any way the relative

23  rights of the United States and the irrigation entities to control or operate the irrigation works."

24  Ex 506.  The validity of the ACFFOD's conclusions is pending review in, and subject to, the

25  _____
[1] Respondents also moved to dismiss because ORS 540.740 does not apply to the ACFFOD,
26  petitioner lacked standing and the KBA is another action pending, among other grounds.

Page 2 -    RESPONDENTS' MOTION FOR RECONSIDERATION
            34859822

1   exclusive jurisdiction of the KBA court.  Specifically, the question of whether the ACFFOD

2   *should have determined* control of the works, including the A-Canal and the Link River Dam, is

3   pending before the adjudication court.  Ex 513, p 9 (U.S. Exception 22: the ACFFOD "should

4   provide that the control and operation of Project works extends to the right to administer

5   contracts between the United States and Project water users for the diversion and use of Project

6   water."); *see also* Ex 514, p 9 (Agri-Water Exception 9 to the "conclusion that the claimants are

7   not required to show the capacity of the storage system or the need for the entire amount of water

8   claimed for storage").

9        As in *TPC*, the parties here agree that "Klamath County Circuit Court has exclusive

10   subject matter jurisdiction to review the KBA order."  308 Or App at 192.  To determine whether

11   the subject matter of the *TPC* petitioners' injunction claim was within that exclusive jurisdiction,

12   the Court of Appeals considered authorities from the land use context concerning LUBA's

13   exclusive jurisdiction.  *Id*.  Among other parallels, the Court of Appeals explained that the

14   requested relief – an injunction – made the *TPC* issue analogous to the circumstances in *The*

15   *Flight Shop, Inc. v. Leading Edge Aviation, Inc.*, 277 Or App 638 (2016).  In *Flight Shop*, the

16   Court of Appeals had "noted that the plaintiff's requested remedies of an injunction to prevent

17   defendant from operating its fueling station and an order to remove the fuel tanks 'underscore the

18   impropriety of circuit court intervention,' because whether or not such remedies would be proper

19   would have *required predicting the outcome of the land use decisional process. Id.* at 646-47."

20   308 Or App at 193 (emphasis added).  The same is true here.

21        As written, the ACFFOD expressly concludes that, "[a] determination of the relative

22   rights of the KPWU entities and the United States to control or operate diversion and distribution

23   works, including headgates, pumps, canals and other structures, *is not within the scope of the*

24   *Adjudication * * *.*"  Ex 506 (emphasis added).  Petitioner's claim is based on the contention that

25   the watermaster has failed to carry the ACFFOD into effect and, therefore, this Court can and

26   must "enjoin the unlawful uses of water by Reclamation" by controlling the Bureau's diversion

Page 3 -    RESPONDENTS' MOTION FOR RECONSIDERATION
      34859822

1    and distribution works.  Complaint, ¶¶ 57-60.  This is exactly what the *TPC* court held the circuit

2    court cannot do.

3        In *TPC*, the petitioners'

4            * * * claim, and its requested relief, however, is irreconcilably bound up
         with the KBA, because it required Marion County Circuit Court to decide whether
5        the Hyde Agreement placed a limitation on the Klamath Tribes' KBA-determined
         water right claims. The KBA adjudicator had already rejected that notion,
6        concluding that the no-call provision in the Hyde Agreement was "not pertinent to
         the determination of a water right claim." That decision is currently on review
7        before Klamath County Circuit Court in its review of the KBA order.

8    308 Or App at 197.  Similarly, petitioner's claim here depends on an interpretation of the

9    ACFFOD already rejected by the adjudicator in the conclusion that control of the works is not

10   "within the scope" of the ACFFOD.  The circuit courts lack subject matter jurisdiction to issue

11   an injunction that predicts that the KBA court will ultimately modify the ACFFOD.

12                                   **CONCLUSION**

13       Petitioner seeks a remedy based on the erroneous assumption that the ACFFOD will

14   ultimately determine the relative rights of the Bureau and petitioner "to control or operate

15   diversion and distribution works" and require the Bureau to retain an entire season of stored

16   water petitioner to use, or not use.  This Court lacks subject matter jurisdiction over that

17   decision.  While exceptions to the ACFFOD are pending, the watermaster regulates in

18   accordance with the prior appropriation doctrine and the relative rights in the determined claims

19

20

21

22

23

24

25

26

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

1    as stated in the ACFFOD.  ORS 540.740 applies (if at all) only to make sure that the watermaster

2    carries the ACFFOD into effect as written.  The injunction claim should be dismissed.

3         DATED January _7_, 2021.

4                               Respectfully submitted,

5                               ELLEN F. ROSENBLUM
                           Attorney General

6

7

8                               _s/ Darsee Staley_

9                               DARSEE STALEY #873511
                           Senior Assistant Attorney General

10                              Trial Attorney
                           Tel (971) 673-1880/Fax (971) 673-5000

11                              Darsee.Staley@doj.state.or.us
                           Of Attorneys for Oregon Water Resources

12                              Department, Thomas Byler and
                           Danette Watson

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 5 -    RESPONDENTS' MOTION FOR RECONSIDERATION
        34859822

1                        **CERTIFICATE OF SERVICE**

2          I certify that on January 7, 2021, I served the foregoing **RESPONDENTS' MOTION**

3    **FOR RECONSIDERATION** upon the parties hereto by the method indicated below, and

4    addressed to the following:

5

6    Nathan R. Rietmann                 ___ HAND DELIVERY
        Rietmann & Rietmann, LLP        ___ MAIL DELIVERY

7    1270 Chemeketa St. NE           ___ OVERNIGHT MAIL
        Salem, OR  97301                X   SERVED BY EFILING

8    *Attorneys for Klamath Irrigation District*

9

10                         *s/ Darsee Staley*
                         DARSEE STALEY #873511

11                     Senior Assistant Attorney General
                     Trial Attorney

12                     Tel (971) 673-1880/Fax (971) 673-5000
                     Darsee.Staley@doj.state.or.us

13                     Of Attorneys for Respondents

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 1 -   CERTIFICATE OF SERVICE
             33821408

# DECLARATION OF NATHAN RIETMANN IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION

# Exhibit "L"

# REGISTER OF ACTIONS

## CASE NO. 20CN04464

| Klamath Irrigation District vs Oregon Water Resources Department | § § § § § | | Case Type: | **Procedural Matters - Contempt of Court Remedial** |
|---|---|---|---|---|
| | | | Date Filed: | **10/23/2020** |
| | | | Location: | **Marion** |

---

### RELATED CASE INFORMATION

**Related Cases**
18CV18112 (Contempt)
20CV15606 (Contempt)
20CV17922 (Contempt)
20CN04465 (Related - Same Occurrence)
20CN04466 (Related - Same Occurrence)

---

### PARTY INFORMATION

| | | Attorneys |
|---|---|---|
| **Defendant** | **Oregon Water Resources Department** | **DARSEE STALEY** |
| | | *Retained* |
| | | 971 673-1880(W) |
| | | |
| **Plaintiff** | **Klamath Irrigation District** | **NATHAN R RIETMANN** |
| | | 503 551-2740(W) |

---

### CHARGE INFORMATION

| Charges: Oregon Water Resources Department | Statute | Level | Date |
|---|---|---|---|
| 1.  Contempt of Court/Remedial | 33.055 | N/A | 10/23/2020 |

---

### EVENTS & ORDERS OF THE COURT

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 10/23/2020 | **Motion - Show Cause** |
| | *RE: Contempt, including for Violation of Injunction* |
| | Created: 10/26/2020 8:46 AM |
| 10/23/2020 | **Declaration** |
| | *of Gene Souza in Support of KID Motion for Contempt* |
| | Created: 10/26/2020 8:46 AM |
| 10/23/2020 | **Declaration** |
| | *of Nathan Rietmann Dated October 2, 2020* |
| | Created: 10/26/2020 8:46 AM |
| 10/26/2020 | **Assignment - Trial Judge** (Judicial Officer: Bennett, J Channing ) |
| | *ec: Plaintiff's Counsel 10.27.20* |
| | Created: 10/26/2020 8:46 AM |
| 10/26/2020 | **Motion - Amend** |
| | Created: 10/26/2020 9:42 AM |
| 10/26/2020 | **Declaration** |
| | *of Nathan R. Rietmann Dated October 26, 2020* |
| | Created: 10/26/2020 9:42 AM |
| 10/26/2020 | **Motion - Show Cause** |
| | *(Amended) RE: Contempt, including for violation of injunction* |
| | Created: 10/26/2020 9:42 AM |
| 01/11/2021 | **Motion - Consolidate Cases** |
| | Created: 01/12/2021 2:38 PM |
| 01/13/2021 | **Letter** |
| | Created: 01/15/2021 10:49 AM |
| 01/26/2021 | **Hearing - Conference Call**  (9:00 AM) (Judicial Officer Bennett, J Channing ) |
| | *Counsel via TEAMS conferencing; Date set by court to discuss status of all cases; Notice sent.* |
| | Created: 01/21/2021 8:22 AM |
| 01/26/2021 | **Notes - Correspondence** |
| | *Status Sheet via TEAMS/COVID* |
| | Created: 01/26/2021 10:59 AM |
| 01/26/2021 | **Order - Show Cause** (Judicial Officer: Bennett, J Channing ) |

|  | Signed: 01/26/2021<br>Created: 01/26/2021 11:00 AM |
| 03/15/2021 | **Motion**<br>*to Dismiss Petitions for Contempt*<br>Created: 03/16/2021 8:28 AM |
| 05/03/2021 | *CANCELED*   **Hearing - Show Cause** (9:00 AM) (Judicial Officer Bennett, J Channing)<br>*Continued*<br>*Rietmann & Staley via TEAMS conferencing; Date set with counsel; Notice sent.*<br>Created: 01/26/2021 10:02 AM |
| 05/26/2021 | **Hearing - Show Cause** (9:00 AM) (Judicial Officer Bennett, J Channing)<br>*Rietmann & Staley via TEAMS conferencing; Date reset from 5.3.21 with counsel; Notice sent.*<br>Created: 03/15/2021 3:19 PM |

---

### FINANCIAL INFORMATION

|  |  |  |  |
|---|---|---|---|
| **Plaintiff** Klamath Irrigation District | | | |
| Total Financial Assessment | | | 111.00 |
| Total Payments and Credits | | | 111.00 |
| **Balance Due as of 03/26/2021** | | | **0.00** |
| | | | |
| 10/23/2020 | Transaction Assessment | | 111.00 |
| 10/23/2020 | Counter Payment | Receipt # 2020-44693-TP | Klamath Irrigation District | (111.00) |

# DECLARATION OF NATHAN RIETMANN IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION

# Exhibit "M"

Prepared for the United States
By Bruce D. Bernard, Trial Attorney
Colorado Bar No.12166

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River,
A Tributary of the Pacific Ocean

| | | |
|---|---|---|
| In Re:<br>WATERS OF THE KLAMATH RIVER<br>BASIN, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.:  WS1300001<br><br>**UNITED STATES' MEMORANDUM OF**<br>**POINTS AND AUTHORITIES IN**<br>**SUPPORT OF ITS OBJECTION TO**<br>**PETITION FOR PARTIAL STAY OF**<br>**FINDINGS OF FACT AND ORDER OF**<br>**DETERMINATION BY UPPER BASIN**<br>**CONTESTANTS AS TO OAH CASE 003** |

**Table of Contents**

**I.   INTRODUCTION** ...................................................................................................... 3

**II.   BACKGROUND** ...................................................................................................... 5

**III.   ARGUMENT** ......................................................................................................... 8

  **A.   The Petition Is Deficient On Its Face And Must Be Denied.** ........................................ 8

    **1.   The UBC Petition and related Undertakings are impermissible because a "nominal" bond amount does not even attempt to meet the purpose of ORS 539.180 that a stay bond be set in an amount to reasonably ensure the payment of all damages resulting from the stay.** ...................... 9

    **2.   UBC's damages cannot be capped by the amount of the bond but, instead, UBC must be liable for all damages accrued as a result of the stay.** ...................................................... 12

  **B.   The Court Has Discretion To Deny The Stay Petition And Should Exercise That Discretion Under A Standard Similar To That Applicable A Preliminary Injunction.** ............................. 16

**C.    Application Of These Legal Standards To The Project Water Rights Demonstrates That The Petition Should Be Denied.**................................................................................................20

   **1.    UBC have not shown that any exceptions they may file to the Project's water rights are likely to succeed on the merits.**................................................................................21

   **3.    UBC have not shown that the balance of hardships tips in UBC members' favor.** ............28

   **4.    UBC have failed to establish that staying enforcement of the Project water rights is in the public interest.** ................................................................................................32

   **5.    UBC have failed to establish that they are entitled to the requested stay and the Petition must be denied.** ................................................................................................36

**D.    If The Court Considers Issuing A Stay, UBC's Bond Must Be In An Amount Reasonably Calculated To Compensate The United States and The Project Users For The Amount Of Water That Will Be Lost To The Project Due To The Stay Of Enforcement Of The Project's Senior Water Rights During The Term Of The Stay.** ................................................................37

   **1.    The bond must be sufficient to compensate the United States and the Project users for the loss of their water.** ................................................................................................37

   **2.    UBC's errs in asserting that a nominal bond is appropriate.** ................................................40

   **3.    UBC cannot avoid the requirement for filing a bond in amount that covers expected damages by asserting that the requested stay preserves the status quo and there will therefore be no damages or because the calculation of damages is uncertain.**................................44

   **4.    The Van Camp, Howitt and Driscoll Declarations present highly credible expert analyses of damages that should be utilized by this Court is setting the bond amount.** ............................46

   **5.    If UBC are unwilling or unable to post a bond that covers expected damages during the term of the requested stay, the Petition must be denied.** ................................................53

**IV.    CONCLUSION** ................................................................................................54

## I.    INTRODUCTION

The United States of America, on behalf of the Bureau of Reclamation and the Fish and Wildlife Service (United States), hereby responds to the Petition for Partial Stay of Findings of Fact and Order of Determination filed by the Upper Basin Contestants (UBC) as to OAH Case 003 (Petition), and UBC's Memorandum in Support of the Petition (UBC Memo), both dated April 30, 2013.  The Petition requests the Court to stay enforcement of certain water rights for the Klamath Reclamation Project (Project water rights) (Claims 294, 312, 317, 321-1, 321-4, 321-6, 321-9, KPCC 321-17/293/323-3) as against petitioners.  Petition at 1; UBC Memo at 1-2. These Project water rights that UBC seek to stay include water rights of the United States for the benefit of the Bureau of Reclamation (Reclamation or BOR) (Claims 294, 321-1, 321-4, 321-6, 321-9, KPCC 321-17/293/323-3) and the United State Fish and Wildlife Service (Service or FWS) (Claims 312 and 317) as against petitioners.  All of these Project water rights were confirmed by the Oregon Water Resources Department (OWRD) in the Findings of Fact and Order of Determination (FFOD), and specifically by the Partial Order of Determination (POD) for Case 003 (Claims 294, 312, 317, 321-1, 321-4, 321-6, 321-9, KPCC 321-17/293/323-3). These Project water rights are "in full force and effect" at this time.  ORS 539.130(4).[1]

As an initial matter, the United States notes that the UBC Petition is deficient on its face because it fails to meet the basic requirements of ORS 539.180 for three reasons: (i) the "nominal" bond amount proposed by UBC does not even attempt to meet the purpose of ORS 539.180 that a stay bond be set in an amount to reasonably ensure the payment of all damages resulting from the stay (discussed in subsection III.A.1., below); (ii) UBC's attempt to cap their

---

[1]    UBC characterize the Project water rights as claims but the water right <u>claims</u> filed in this Adjudication were approved in the FFOD and are now <u>water *rights*</u> and fully subject to enforcement.  ORS 539.170 (requiring that division of water by OWRD "shall be made in accordance with the order [FFOD]").  Hence, this response will more accurately refer to the now-approved Project water right claims as the Project water rights.

damage exposure by the amount of their miserly bond ($500 per UBC member) is inconsistent with the requirement in ORS 539.180 that UBC must be liable for all damages accrued as a result of the stay (subsection III.A.2.); and (iii) UBC's proposed "selective enforcement" of the Project water rights by exempting UBC from the state's water rights priority system is contrary to Oregon water law (subsection III.A.3.).  The UBC Petition should be denied for these procedural reasons before the Court even reaches the merits of the arguments.

Moreover, contrary to UBC's position that a stay is mandatory if certain conditions are met,[2] ORS 539.180 affords the Court discretion to deny the UBC Petition as inappropriate.  That discretion should be exercised in this circumstance where UBC seeks the suspension of otherwise enforceable water rights for this federal reclamation project that serves hundreds of water users and thousands of irrigated acres of farmland.  The Court should exercise that discretion to deny a stay outright under a standard similar to that utilized in a preliminary injunction context (subsection III.B, herein.).

In subsection III.C., we demonstrate that UBC have failed to show that they satisfy this legal standard for a stay to issue.  Specifically, UBC have failed to demonstrate each (or indeed, any) of the required four factors that must all be met to support the exercise of the Court's discretion in granting the stay; *i.e.,* UBC have not shown: (i) that they are likely to succeed on the merits of their challenges to the Project water rights in these Circuit Court proceedings; (ii) that they will suffer irreparable injury in the absence of a stay; (iii) that the balance of hardships tips in their favor; or (iv) that the public interest weighs in favor of issuing the stay.

As a final introductory matter we must point out that UBC are entirely incorrect in the premise stated throughout their brief that a stay would "preserve the status quo."  *See* UBC Memo at 1, 2, 4, 9, 11.  Quite to the contrary, the status quo is now enforcement of statutorily

---

[2]    That UBC fails to meet any such conditions is a separate matter discussed in some detail in this brief.

adjudicated water rights pursuant to state law that provides for enforcement of the FFOD at this time.  ORS 539.130(4).  The status quo is not, as UBC would have it, junior water users like UBC engaging in unfettered use of water determined to be held by senior water rights holders.  UBC's premise is untenable.  UBC's suggestion that their requested stay will not damage the United States and Project users because the amount of water available to the Project will be the same as before issuance of the FFOD is patently absurd.  *See* UBC Memo at 9.  The requested stay could only be granted upon the filing of a bond in an amount that reasonably ensures the payment of all damages resulting from the stay.  We demonstrate in subsection III.D. that, if the Court considers granting the requested stay, the bond should be set at $42.16 million.

## II.    BACKGROUND

While an expansive discussion of the legal and factual background of the Klamath Basin Adjudication (Adjudication or KBA) is not necessary in this limited context of a petition for a stay, the United States provides the following summary in response to UBC's Statement of Background.  *See* UBC Memo at 2-5.  Moreover, UBC omit critical portions of that legal and factual history.

UBC provide a partial history of the water rights proceedings before OWRD, including the Office of Administrative Hearings (OAH).  *Id.* at 3.  UBC note that the contests filed by certain of its members were referred to the OAH for resolution and that certain exceptions were filed to the Proposed Order issued by OAH.  *Id*.  UBC's limited discussion of their participation in the administrative process does not paint the full picture of the extent of that participation.  UBC participated from the inception of the Adjudication through the month-long evidentiary hearing, the extensive post hearing briefing, and the filing of exceptions to the Proposed Order.

Claims for water rights for the Klamath Reclamation Project were filed separately by the United States and the Klamath Project Water Users (KPWU) in 1997.  Proposed Order at 4.  The Project claims were based on the May 19, 1905 Notice of Appropriation filed pursuant to the federal Reclamation Act of 1902 (43 USC 371 *et seq.*), and the State of Oregon's Act of February 22, 1905 (Or. Gen. Laws, 1905, Ch. 228) (Oregon's 1905 Act).  Contests to those claims were filed in 2000, including contests by certain of the UBC members.  FFOD at 10; Proposed Order at Appendix 1 (listing each contest by claim number, contest number, and name of contestant).

Proceedings before the OAH commenced in December 2000.  December 28, 2000 letter from OAH identifying the Administrative Law Judge appointed to handle Case 003, setting a pre-hearing conference and other matters, attached as U.S. Ex. 4 to the Declaration of Bruce D. Bernard (Bernard Declaration).  Pre-hearing statements were filed by the parties to Case 003, including UBC.[3]  UBC raised a number of legal issues and filed a lengthy document styled "Analysis of the Bureau of Reclamation Claims," dated November 1, 1999, and propounded extensive discovery requests.  *See* Pre-Hearing Statement of Roger Nicholson, *et al.*, March 20, 2001,  attached as U.S. Ex. 5 to Bernard Declaration.  After the filing of pre-hearing statements, a number of pre-hearing motions were filed, briefed and resolved.  Extensive discovery was conducted.  The parties engaged in settlement discussions throughout 2002, culminating in a significant stipulation narrowing the issues among the Klamath Project Water Users, the Klamath Tribes, and the United States.  *See* POD at 92-95; Proposed Order at 35-39 (referencing Stipulation approved by order entered December 6, 2002, Order on Motion to Clarify Scope of Proceedings, agreed to by all parties and entered April 7, 2003).

---

[3]    In the pre-hearing phase, UBC referred to themselves as the "Nicholson Group."  *See, e.g.*,  Order Denying Reset, March 3, 2004, attached as U.S. Ex. 6 to Bernard Declaration.

A substantial quantum of evidence was filed and presented in this case, including 55 sets of written direct testimony and hundreds of exhibits, totaling many thousands of pages.  *See* Proposed Order at 5, 8-10, Appendix II.  Following the filing of the direct evidence, a month long evidentiary cross-examination hearing took place in April 2004, consisting of live cross-examination, redirect and rebuttal testimony, and rebuttal evidence.  *See id.* at 5, Appendix II. The hearing was followed by extensive post-hearing briefing over the next two years.  The Proposed Order was issued on November 16, 2006.  UBC filed numerous and detailed exceptions to the Proposed Order.  *See e.g.*, United States' Response to Exceptions to Proposed Order at 75-88 (responding to exceptions filed by UBC), attached as U.S. Ex. 7 to Bernard Declaration.  UBC participated fully throughout this entire process and has not identified any issue in their Petition that was not fully considered during the administrative phase of Case 003 spanning over more than eight years.

On March 7, 2013, OWRD issued and filed the FFOD with this Court.  The POD on the Project water rights approved rights for 486,828 acre-feet of active storage in Upper Klamath Lake, and a total storage amount, including inactive storage of 629,870 acre feet, and irrigation of over 200,000 acres within the Project boundaries.  POD at 44, 47-48; UBC Memo at 2.  The POD approved the storage right and reuse rights in the name of BOR, and the use of water for agricultural irrigation on the Lower Klamath and the Tule Lake National Wildlife Refuges (Refuges) in the name of the Service.  The Refuge lands are farmed by Project water users pursuant to one-year leases by the Service (Refuge lease lands) and by individual farmers under cooperative agreements with the Service (Refuge cooperative farm lands).  The POD rejected UBC's exceptions to the Proposed Order.  POD; UBC Memo at 3.

On April 30, 2013, UBC served their Petition seeking a stay of the Project Water rights as against petitioners. UBC's Petition and Memorandum do not identify the bases upon which UBC intend to challenge the POD. UBC's Memorandum simply notes that the POD rejected a number of UBC's contest grounds and exceptions, including exceptions as to the size and extent of the Klamath Project, the diligence with which the Project was developed, and the 1905 priority for the irrigated agricultural lands that are part of the Refuges. UBC Memo at 3, citing UBC Exceptions, Proposed Order and POD. The grounds UBC elect to pursue in their anticipated exceptions to the POD will presumably be among the grounds for their exceptions to the Proposed Order. These issues have been thoroughly briefed, argued, and heard over the last eight years and UBC makes no showing that they have viable grounds for gaining a reversal or significant modification of the POD for the Project water rights.

We proceed now to analyze UBC's Petition in light of this background.

## III.   ARGUMENT

### A.   The Petition Is Deficient On Its Face And Must Be Denied.

The UBC Petition is deficient in three ways that render it subject to denial as a preliminary matter. First, the Petition's nominal bond amount does not even purport to meet the purpose of ORS 539.180 that a stay bond be set in an amount to reasonably ensure the payment of all damages resulting from the stay. Second, also contrary to the plain language of ORS 539.180, UBC impermissibly attempt to "cap" its liability by the bond amount of $500 rather than agreeing to pay all damages. Finally, UBC's Petition would result in selective enforcement of water rights in a manner contrary to Oregon water law. Each of these deficiencies is a blatant

failure to comply with Oregon law, thus, the UBC Petition and attendant Undertakings[4] must both be rejected.

> **1.  The UBC Petition and related Undertakings are impermissible because a "nominal" bond amount does not even attempt to meet the purpose of ORS 539.180 that a stay bond be set in an amount to reasonably ensure the payment of all damages resulting from the stay.**

An ORS 539.180 stay may be issued only in accordance with the statute's requirements, that is, <u>only upon</u> the filing of a bond or irrevocable letter of credit in the amount the court determines is sufficient, and the staying party is held liable for "all damages that may accrue by reason of the determination not being enforced."  ORS 539.180.  The intent of the statute is clear from its plain language and context:[5] a stay bond needs to be set in an amount to ensure the payment of the damages resulting from the stay.  In other words, the bond is to ensure that holders of water rights recognized in the FFOD will be kept whole in the event the FFOD's partial orders of determination confirming the water rights are ultimately affirmed by the Court in its final decree.  When understood in this statutory context and purpose, the standard to calculate the bond is readily apparent.  As aptly noted in OWRD's response to the petitions for stay,[6] the plain meaning of the statute that gives "best effect" to the operative phrases of ORS 539.180 is that "the Court shall determine the amount of the bond based on the need to reasonably guarantee payment of all potential damages," citing *Valencich v. TNT Homes*, 193 Or. App. 47, 54 (2004) ("Litigation bonds are intended to contribute to judicial finality by

---

[4]      On May 3, 13, and 17, 2013, UBC Petitioners filed with the Court a number of documents all titled *Undertaking for a Partial Stay of the Findings of Fact and Partial Order of Determination for OAH Case 003* (Undertaking).  Each Undertaking was associated with individual members of UBC Petitioners and had attached to it a receipt for the deposit of $500. Each deposit was purported to be "in *lieu* of a bond or irrevocable letter of credit, as allowed by ORS 22.020" for named individual members of the UBC Petitioners.

[5]      An appropriate tool of statutory construction is to examine "both the text and context of the statute," which includes "other provisions of the same statute and other related statutes."  *Portland General Elec. Co. v. Bureau of Labor and Industries* (*Portland General*), 317 Or 606, 610-11, 859 P.2d 1143, 1145-46 (1993).

[6]      State's Response to Petitions for Partial Stay, May 29, 2013 (State's Response), at 8.

ensuring the payment of adjudicated liabilities.").  So, here, the Court's responsibility, if it considers issuing a stay, is to require a bond that reasonably assures that the United States and the Project users will be kept whole.

Properly understood, the statute is fully consistent with Oregon statutes providing for provisional relief in other contexts.  *See, e.g.*, ORCP 82.A(1)(a) ("No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs, damages, and attorney fees as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.").  Oregon courts have followed this statutory language in confirming that a bond must be sufficient to cover all reasonable potential damages incurred if an injunction is ultimately reversed.  *Oregon Educ. Ass'n v. Oregon Taxpayers United PAC*, 227 Or App 37, 45, 204 P.3d 855, 860 (2009) ("[T]he purpose of a bond or other security is to protect the party enjoined from damages that occur because of the wrongful entry of the preliminary injunction.") (*citing Kern et al. v. Gentner et al.*, 176 Or 479, 159 P.2d 190 (1945)).

Indeed, the necessity for securing all damages that may accrue under the requested stay is especially critical here – where UBC represent that some of their members will likely end up being unable to pay those damages.  If, as UBC assert, the Project water rights will put these petitioners "directly at risk" of being unable to "sustain their livelihoods," UBC Memo at 3-4, that risk is no less once the Project water rights are confirmed in the final decree, and the time for petitioners to pay the damages associated with a stay finally arrives.

In an attempt to get around ORS 539.180's clear mandate that petitioners must pay "all damages that may accrue by reason of the determination not being enforced," UBC urge the court to reject this statutory requirement and, instead, conclude that the totality of potential

damages should be capped at a "nominal" sum because: (i) <u>before the determination was issued</u> – these water rights could not be enforced; and (ii) damages are just too difficult for UBC to determine. *See id.* at 9-10 (stating the petition maintains the "status quo," *i.e.*, the inability of the Project prior to the determination to make a call); *Id.* at 10-11 (asserting that damages are speculative because many factors, in addition to water rights administration by priority, affect availability and use of water).

UBC's nominal damages approach must be rejected as a thinly veiled attempt to evade the relevant statutory language. The correct understanding of ORS 539.180 requires UBC's bond to cover all damages reasonably ascertainable at this time that may accrue to the United States and the Project users as a result of the stay. Nominal, as UBC must know, means "[n]ot real or actual." *Black's Law Dictionary* (5th ed., 1979), at 946. As the damages surrounding the loss of the Project water rights during the course of the expected stay are real and substantial, *see* subsection III.D.4., below, UBC cannot evade the statutory responsibility with some legal sleight of hand. Moreover, contrary to UBC's attempted rationalizations for a nominal bond amount: (i) it is beyond dispute that issuance of the FFOD significantly changes the current status of matters and made the Project water rights fully enforceable (discussed in subsection D.3., below); and (ii) estimating damages is not speculative when using a legally recognized standard (value of property that cannot be used) and well-qualified professionals to implement it (subsections D.3. & 4.). UBC's request for a stay that would expressly <u>not</u> be secured in an amount that covers the damages that may accrue fails on its face to comply with ORS 539.180 and must be denied.

**2. UBC's damages cannot be capped by the amount of the bond but, instead, UBC must be liable for all damages accrued as a result of the stay.**

Additionally and directly contrary to ORS 539.180, UBC impermissibly seek to "cap" their damages at the amount of the $500 bond per UBC member, in complete disregard of the statutory requirement.  In direct contrast to this "cap" approach, the statute requires UBC to assume liability for <u>all</u> damages the United States and the Project users incur as a result of the stay.  Each individual Undertaking signed by a member or members of UBC is put forward as security for damages that may accrue by reason of enjoining exercise of the Project water rights to an amount "<u>not exceeding, however, the sum of $500 for the totality of damages associated with a stay of all of the claims noted herein</u>."  *See* Undertakings for a Partial Stay of the Findings of Fact and Partial Order of Determination for OAH Case 003, filed May 3, 2013, at 2 (emphasis added) (the 38 Undertakings filed May 3, 13 and 17, 2013 totaling $19,500).  The statutory language, though, requires that any bond be conditioned on the stipulation that the party "will pay all damages" accruing as a result of the stay.  ORS 539.180.  The UBC Petition and Undertakings are therefore deficient on their face and the Petition must be denied.

Moreover, UBC's position forces the illogical and untenable result that UBC can use the Project water rights during the time of the Circuit Court proceedings and then, at the end of the day, when the final decree is issued, and it is confirmed that UBC enjoyed an illegal use of the United States' and Project users' property, all the Court will then say to the United States and the Project users is, "sorry, all you get is the nominal bond amount."

**3. UBC's attempt to selectively enforce the Project water rights by exempting UBC from the priority system is contrary to Oregon water law.**

UBC have submitted a request for a "partial stay of the enforcement of certain portions" of the FFOD, *i.e.*, the Project water rights.  *See* Petition at 1; UBC Memo at 1-2.  UBC's partial

stay request apparently has two components.  The first stay-component is a stay of the Project

water rights, specifically Claim Nos. [7] 294, 321-1, 321-4, 321-6, 321-9, KPCC 321-17/293/323-

3.  Petition at 1; UBC Memo at 2.  The second stay-component is a limited stay of each of these

Project water rights effective only in favor of the named UBC Petitioner(s) and no other water

right holders.  *See, e.g.*, Petition at 1 ("UBC petitions the Court for an order staying the operation

and enforcement against the petitioners") (emphasis added); UBC Memo at 4 (the requested stay

"is only a stay to restrict a call as to the petitioners noted herein") (emphasis added); [Proposed]

Order for Stay Bond and Partial Stay of Findings of Fact and Order of Determination for OAH

Case 003 ("IT IS HEREBY ORDERED that operation of the [FFOD concerning the Project

claims is] stayed as to the following petitioners:") (emphasis added); Undertaking of Clifford

Rabe at 2 (submitting $500 cash "for the payment … [of] all such damages that may accrue unto

[BOR and the identified irrigation district entities and Project users] … by reason of the FFOD

not being enforced against Clifford Rabe….") (emphasis added). [8]

> Although UBC's first stay-component, *i.e.*, an attempt to stay only a portion of the FFOD
– the POD for the Project water rights – is consistent with ORS 539.180 which allows for the
stay of "the operation" of the FFOD "in whole or in part," UBC's second stay-component is not.
Under the latter, UBC propose a limited stay effective only for the benefit of selective water
rights.  Such is an attempt at impermissible selective enforcement of the Project water rights.

> As a starting point, in UBC's seeking selective enforcement, what is being sought is the
protection of all of UBC's water rights from a "call" to enforce the Project water rights (*i.e.*, a
call to the watermaster to require junior appropriators to cease diversions in order to provide

---

[7]      Since no new number has been assigned to the approved water rights, we refer to the approved rights by the
claim number assigned in the OWRD administrative adjudication proceedings.

[8]      All of the 38 Undertakings filed by UBC Petitioners utilize this same limiting language.

sufficient water to meet the senior, May 19, 1905, Project water rights).  Such requested stay

protection as described by UBC would apply to all UBC water rights.  For example, referencing

the State's listing of Wood River water rights at Exhibit A to the State's Response, UBC's

requested stay would protect all of their water rights ranging in priority from 1910 to 1987

(earliest UBC priority junior to 1905 to latest UBC priority), but would not provide any

protection for all other similarly situated water rights.  Thus, for example, a non-UBC water user

with a 1910 or 1914 water right (such as those reflected on Exhibit A to State's Response) might

be subject to a call, yet a UBC water user with a 1987 water right would not.  As the State notes,

exempting UBC and requiring OWRD to "skip over" UBC's junior water rights in meeting the

call would result in OWRD curtailing water rights with priorities senior to those of some of the

UBC petitioners, while the junior UBC rights continued to divert water.  State's Response at 16.

Such selective enforcement would also result in curtailment of other non-UBC junior water

rights in greater quantities than would be required if UBC's water rights were not exempted from

the call.  *See generally* Declaration of Marc E. Van Camp (Van Camp Declaration) attached as

U.S. Ex. 1 to Bernard Declaration; State's Response at 15-16, Exhibit A.  Exempting UBC could

also result in the call reaching water right priorities that would not need to be called-out to satisfy

the call if UBC's water rights were available to meet the call.  *See id.*

Such selective enforcement by individual water right(s) is contrary to Western water law

generally and Oregon water law specifically.  Oregon, like much of the West, follows the prior

appropriation water rights doctrine.  Under the prior appropriation doctrine, the highest priority

water right is fully met before the next (junior) water right is met, thus often described as "first in

time, first in right."  *Benz v. Water Resources Comm'n*, 94 Or App 73, 79, 764 P.2d 594, 599

(1988).  *See Wyoming v. Colorado*, 259 U.S. 419, 488 (1922) (noting that water rights are not

guarantees that water will be available, but rather guarantee a right to take water, in priority, "if the requisite amount of water be there").  In times of water shortage, then, under the prior appropriation system, when a call is made, the most junior water right is shut off first, then the second most junior, and so on.

The practical work of implementing any call made is done by the OWRD watermaster. Following the prior appropriation doctrine, ORS 540.045 informs the watermaster's duties vis-à-vis the water users as follows: "Each watermaster shall: [] Regulate the distribution of water among the various users of water from any natural surface or ground water supply in accordance with the users' existing water rights of record in the Water Resources Department."  ORS 540.045(1)(a).  As a practical matter this means that"[i]n times of water shortage, . . . . water rights holders may 'call' their water rights through the watermaster.  The water master will then shut down use by junior rights holders."  4 *Waters and Water Rights,* Robert E. Beck and Amy L. Kelley, eds., 3rd ed. (2010), J. Neuman, *Oregon* at 13.  Thus, enforcement of a water right in Oregon, by statute, requires curtailment of usage starting from the most junior priority date and moving to the more senior priority date, until the water right being enforced is satisfied or there are no more water rights junior to the water right being enforced to be curtailed.

The effect of UBC's stay request is obvious – it would turn the prior appropriation doctrine on its head, thereby allowing a junior UBC water right holder to step in front of other, more senior water rights holders.  Under UBC's selective enforcement scheme, UBC members would be unaffected by a Project water right call, whatever the priority date of their water rights, while water rights more senior to some of UBC's water rights would be subject to being shut off. Such clear derogation of established Oregon water law is unsupportable, contrary to law, and cannot be allowed by the Court.

In sum, UBC's Petition and Undertakings should be rejected because, on their face, they violate the statutory requirements for an ORS 539.180 stay. However, if the Court does not reject the Petition and Undertakings on this basis, the Court should reject them for the additional reasons described below.

**B.      The Court Has Discretion To Deny The Stay Petition And Should Exercise That Discretion Under A Standard Similar To That Applicable A Preliminary Injunction.**

UBC argue that ORS 539.180 provides for a stay as a matter of right once the Court has determined the amount of the bond. UBC Memo at 2, 5-6. The language of the statute, however, indicates that the Court retains discretion to determine whether to issue the stay in the first instance. Since a stay is a provisional remedy similar to an injunction, the Court should utilize the preliminary injunction standard in an analogous manner to exercise its discretion to determine whether issuance of a stay is appropriate in this context.

The plain language of ORS 539.180 demonstrates that the Court retains discretion whether to grant a petition to stay the enforcement of the FFOD – even in the event that a proper bond could be posted. The statute provides:

> At any time after the determination of the Water Resources Director has been entered of record, the operation thereof <u>may</u> be stayed in whole or in part by any party by filing a bond or an irrevocable letter of credit issued by an insured institution as defined in ORS 706.008 in the circuit court wherein the determination is pending, in such amount as the judge <u>may</u> prescribe, conditioned that the party will pay all damages that may accrue by reason of the determination not being enforced. Upon the filing and approval of the bond or letter of credit, the clerk of the circuit court shall transmit to the Water Resources Department a certified copy of the bond or letter of credit, which shall be recorded in the department records, and the department shall give notice thereof to the watermaster of the proper district.

ORS 539.180 (emphasis added). The statute's use of the term "may," rather than "shall," confirms that the Court retains discretion whether to issue the stay when a bond is filed. *See e.g.*

*Nibler v. Oregon Dept. of Transp.*, 338 Or. 19, 26, 105 P. 3rd 360, 363 (Or. 2005) (stating that the word "may" should be given its ordinary permissive meaning and finding that such meaning provided the plaintiff with discretion to choose an action under the applicable statute). If the Oregon legislature had intended that the statute provide for a stay as a matter of right, it could have substituted the word "shall" for the word "may" in the statute. Linguistic differences are important because "when construing statutes, [a] court first considers statutory text and context and, to extent useful to court's analysis, legislative history." *Pine Ridge Park v. Fugere*, 252 Or App 456, 459, 287 P.3d 1268, 1269 (2012) (*citing State v. Gaines*, 346 Or 160, 171-72, 206 P.3d 1042 (2009)). Also, "words of common usage typically should be given their plain, natural and ordinary meaning." *Portland General*, 317 Or at 611, 859 P.2d at 1146.

Moreover, in other similar contexts, Oregon case law holds that courts generally have discretion regarding whether to grant or deny a petition for stay. *See, e.g.*, *Armatta v. Kitzhaber*, 149 Or.App. 498, 501 943 P.2d 634, (1997) (finding that the court had "inherent authority" to use its discretion to balance the competing interests in staying an injunction); *Harnisch v. College of Legal Arts, Inc.,* 243 Or.App. 16, 27, 259 P.3d 67 (2011) (holding that courts have discretion to stay actions pending the resolution of relevant arbitration proceedings); *Matter of Marriage of McGinley,* 156 Or.App. 449, 450, 965 P.2d 486 (1998) (finding that ORS 19.350 provided the court with discretion regarding issuing a stay regarding future payment of child support).

Finally, even if the Court were to conclude that the statute is unclear as to whether the Court retains discretion whether to grant a petition to stay, any ambiguity should be read to provide the Court with the discretion to decide whether a stay is appropriate in the present context, where the Petition seeks to stay the water rights for a major federal reclamation project

involving fifteen irrigation district entities, serving hundreds of water users, and encompassing over 200,000 irrigated acres in two states, including over 43,000 acres of irrigated lands in two National Wildlife Refuges.  *See* POD at 70; UBC Memo at 2.  The Court should not retreat to an interpretation that ties its hands, but should exercise the discretion suggested in ORS 539.180 to determine whether a stay of Project water rights is appropriate in the present context.

In the State's Response to Petitions for Partial Stay, dated May 29, 2013 (State's Response), the State interprets ORS 539.180 as limiting judicial discretion to determination of the appropriate amount of the bond.  State's Response at 7-8.  Such limited judicial discretion may make sense in straight-forward stay petitions affecting a discrete number of water rights on a given stream and limited in geographic scope.[9]  But, such a limit on judicial discretion is inappropriate in this situation.  Here, the overall magnitude of the scope of the stay sought by UBC would have extensive impacts throughout the entire Upper Klamath Basin.  It covers the entire area above Upper Klamath Lake.  In light of the nature and extent of the Project water rights and the magnitude of the scope of the requested stay, the Court should determine that it has discretion to analyze whether a stay is appropriate in this circumstance before it reaches the determination of an appropriate bond amount.

---

[9]    UBC cite to two stay petitions dating from the early 1900s as support for their assertion that a stay is granted automatically.  UBC Memo at 6 (relying on Burnt River stay, dated 1922, and Rogue River stay, dated 1916).  Both of those stays were fundamentally different than the circumstances present here and illustrate cases where limited judicial discretion may be appropriate.  In particular, these stay petitions were uncontested and involved small amounts of water as between a limited number of state law based water right owners that were affected by the stays for relatively short periods of time.

The Burnt River stay involved irrigation of 14.5 (or 16) acres subjected to a 4-week stay.  *See* Burnt River Adjudication (Oregon State Water Board Apr. 13, 1921) (FFOD), excerpt attached as U.S. Ex.8 to Bernard Declaration, at 99; Ex.15 of Declaration of Elizabeth Howard at 578; Burnt River Adjudication (Baker County, Oregon Circuit Court June 30, 1922) (Decree Amending the Apr. 13, 1921 FFOD), excerpt attached as U.S. Ex. 9 to Bernard Declaration, at 373-374.

The Rogue River stay involved conversion of 22 cfs total from mining to irrigation for a 2 year and 9 month stay *See* Ex.16 of Declaration of Elizabeth Howard at 104; Rogue River Adjudication (Jackson County, Oregon Circuit Court Apr. 26, 1919) (Final Decree), excerpt attached as U.S. Ex. 10 to Bernard Declaration, at 69-70.

In exercising its discretion whether to issue a stay, the Court should apply standards similar to the preliminary injunction context so that such discretion is applied in a systematic, orderly manner.  A stay pursuant to ORS 539.180 is similar to a preliminary injunction in the general legal context because both actions seek to suspend the enforcement of a court order or prevent a certain action until a judicial proceeding is complete.  The similarity between a stay and an injunction was acknowledged in *Pacific Live Stock Co. v. Lewis*, 241 U.S. 440, 454 (1916) ("Although containing no provision for an injunction, the statute under consideration permits <u>the same result</u> to be reached in another way, for it declares that the operation of the board's order 'may be stayed in whole or in part' by giving a bond in such amount as the judge of the court in which the proceeding is pending may prescribe….") (emphasis added).  While it is certainly true that the ORS 539.180 stay process is unique and not in all ways like a preliminary injunction, the court's discussion in the *Pacific Live Stock Co.* decision demonstrates that the processes are quite similar for present purposes.[10]  Utilization of the injunction legal standards to provide legal guidance in this analogous context is appropriate, and no other set of standards so readily suggests itself.[11]

Because Oregon caselaw does not provide clear direction regarding the standard to apply in preliminary injunction cases, the Civil Pleading and Practice Manual directs practitioners to look to the federal preliminary injunction standard.  Oregon Civil Pleading and Practice, Vol. 2, Ch. 34, p. 34-21 (2012 Revision) ("In view of the paucity of Oregon authority concerning

---

[10]    The State interprets this language from the *Pacific Livestock Co.* decision as drawing a distinction between an injunction and a stay under ORS 539.180.  State's Response at 7.  On the contrary, however, a close review of the language demonstrates that the Court was actually noting the similarity between the two processes and, while a 539.180 stay certainly has unique aspects, the general standards utilized in a preliminary injunction context provide useful guidance here in light of the similarities that ultimately provide the "same result."  *Pacific Live Stock Co.*, 241 U.S. at 454.

[11]    UBC's reliance on *Pacific Live Stock Co.*, 241 U.S. at 454, for the premise that a stay must be granted as a matter of right is misplaced because the case simply acknowledged that a stay may be available in a similar manner as an injunction is available in other situations.  UBC Memo at 6 n.5.

specific standards for granting preliminary injunctions, Oregon courts may look to the tests used by federal courts in determining whether to grant preliminary injunctive relief."), *see also Von Ohlen v. German Shorthaired Pointer Club of Am., Inc.*, 179 Or App 703, 710-11, 41 P.3rd 449 (2002) (common law as well as decisions interpreting FRCP 65, the federal counterpart to ORCP 79, are persuasive authority concerning injunctive relief).

According to federal law, the party seeking a preliminary injunction must establish each of the following factors:  (1) likelihood of success on the merits; (2) likelihood that the party will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in that party's favor; and (4) an injunction is in the public interest.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365 (2008).  Because it "is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689, 128 S. Ct. 2207, 2219 (2008) (citation omitted), an injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997) (citation omitted).  If a plaintiff fails to meet its burden on any of the four requirements for injunctive relief, its request must be denied.  *Winter*, 555 U.S. at 23 (denying motion for injunctive relief based on the public interest and balance of hardship factors alone, where court assumed a likelihood of success on the merits of NEPA claims and irreparable injury to endangered species).  The Court should apply these same principles in this case as it considers whether to issue a stay under ORS 539.180 and should deny the requested stay because UBC, the movant seeking the stay, has not demonstrated, by a clear showing, that it meets each (or, really, any) of the four factors.

### C.    Application Of These Legal Standards To The Project Water Rights Demonstrates That The Petition Should Be Denied.

**1.     UBC have not shown that any exceptions they may file to the Project's water rights are likely to succeed on the merits.**

Applying the first of the four preliminary injunction criteria here, the Court should deny UBC's Petition because UBC have not even attempted to establish that their unidentified challenges to the Project water rights are likely to succeed on the merits, *i.e.*, that their success on the merits is more probable than not.  Critically, UBC do not even identify the challenges they intend to present.  Each of the Undertakings merely states that petitioner "intends to file Exceptions to the FFOD on the claims that are anticipated to impact [petitioner's] ability to irrigate . . .and desires that the operation of the FFOD as it pertains to the [enumerated Project water rights] be stayed as to it until said Exceptions have been heard and finally determined." *See, e.g.*, Undertaking of Clifford Rabe at 2.  UBC's Memorandum does not add much.  The Memorandum simply states that certain of the petitioners filed contests to the claims and filed exceptions to the Proposed Order for Case 003.[12]  UBC Memo at 3.  UBC then note that their exceptions generally challenged the size of the Klamath Project, the diligence with which it was developed, and the award of 1905 priorities to the wildlife refuges.  *Id.*  UBC concede that the ALJ and OWRD rejected their challenges in issuing the Proposed Order and the POD on the Project water rights.  *Id.*  Presumably, UBC intend to file these same exceptions to the POD for the Project rights.  These arguments were repeatedly and unsuccessfully advanced by UBC during the administrative phase of this Adjudication.  UBC's arguments are not strong and it is not likely that they will succeed in obtaining a reversal of POD for the Project water rights.

As outlined in detail in the Background above in Section II, all of UBC's arguments were fully and repeatedly put forth, and fully and repeatedly rejected, in the proceedings before

---

[12]     Based on the identical Undertakings filed by the 38 petitioners, it appears that petitioners who did not even bother to file contests to the Project claims intend to file exceptions to the POD for the Project water rights and, on that basis alone, request the Court to stay the Project rights based on the filing of a cash bond capped at $500.

OWRD.  Substantial evidence was presented by the United States and KPWU as to the

development of the Klamath Project and the pre-Project water rights that were acquired by the

United States for the Project.  As the ALJ and OWRD concluded, that evidence clearly shows

that the United States and the Project users relied on the common understanding of the 1905

Oregon Act and developed the massive Klamath Project with diligence.  *See* POD at 39-41.

UBC's arguments are unconvincing and have been rejected at every phase of this proceeding.

UBC have alleged no reason this Court would be inclined to reverse OWRD's approval of these

rights.  Nothing in UBC's Memorandum suggests that it is likely that this Court will reach a

different result.

      Even under the Ninth Circuit's "sliding scale" approach, which allows for a preliminary

injunction to be granted upon a lesser showing on the merits and a stronger showing on the

balance of hardship, UBC cannot satisfy the test.  *See Alliance for the Wild Rockies v. Cottrell*,

632 F.3d 1127, 1134-35 (9th Cir. 2011).  Under this approach,

> "serious questions going to the merits" and a balance of hardships that tips
> sharply towards the plaintiff can support issuance of a preliminary injunction, so
> long as the plaintiff also shows that there is a likelihood of irreparable injury and
> that the injunction is in the public interest.

*Id.* at 1135.  The rationale for the sliding scale approach is that where the harm to be suffered by

the plaintiff <u>sharply</u> outweighs the harm that could be suffered by the other party by virtue of

granting the preliminary injunction, the court should be able to preserve the status quo pending at

least some discovery and hearing on the merits of the case, provided the plaintiff has established

there are "serious questions on the merits."  *See id.* at 1134 (quoting *Save Strawberry Canyon v.*

*Dep't of Energy*, 2009 WL 1098888 (N.D. Cal. Apr. 22, 2009)).  In any event, UBC make <u>no</u>

showing on the merits, fail to establish that the balance of hardships tips even modestly in their

favor, and seek to upset rather than preserve the status quo.  Moreover, the rationale for

employing a sliding scale approach is entirely absent here because the arguments on the merits of any challenge UBC may raise have already been the subject of extensive discovery and hearing and – after extensive briefing and exhaustive argument – have already been considered and rejected by the ALJ and by OWRD.  Even if the Court were to consider this approach, UBC's Petition must be rejected because (i) the sliding scale standard requires that they show a "fair chance of success on the merits," *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985), and UBC have not identified the bases upon which they may challenge the POD and have not even alleged that they have any reasonable prospect of prevailing on any exceptions they may ultimately elect to file; (ii) UBC have not shown and cannot show that the balance of hardships tips sharply in their favor (discussed in subsection 3, below); and (iii) UBC have not established the other two preliminary injunction factors that must still be met under the sliding scale approach -- irreparable harm (discussed in subsection 2, below) and that public interest favors issuance of the preliminary injunction (discussed in subsection 4, below).

### 2.    UBC have not shown that UBC members are likely to suffer irreparable harm in the absence of a stay.

Under the second factor of the preliminary injunction criteria, to prevail in obtaining a stay UBC must establish that it is likely that UBC members will experience irreparable harm in the absence of a stay.  *See Winter*, 555 U.S. at 22 (holding plaintiff seeking preliminary relief must demonstrate that irreparable harm is "likely" and not just a "possibility").  UBC bear the burden to produce evidence of irreparable harm.  *Mazurek*, 520 U.S. at 972 (the movant must meet the burden of persuasion with a clear showing).  However, UBC's Memorandum provides only vague allegations of economic harm, averring in general terms to feared damage to UBC's members' "livelihoods," without citing any evidence to substantiate their claims.  *See* UBC

Memo at 3-4 (Petitioners' "ability to irrigate their lands, to sustain their livelihoods, and to ensure the survivability of their communities, are directly at risk as a result of the claims awarded" to the Project Claimants.).  The individual "Undertakings" submitted by UBC members likewise do not provide any concrete evidence of harm, merely representing that the Project water rights "are anticipated to impact [petitioner's] ability to irrigate," without explaining to what extent, if any, this is likely to result in harm, much less irreparable harm, to the UBC petitioner.  *See, e.g.,* Undertaking for a Partial Stay of the  Findings of Fact and Order of Determination for OAH Case 003, Clifford Rabe, filed May 3, 2013, at 2.[13]  The only declaration attached to the UBC Memorandum is from their attorney, Elizabeth Howard.  None of the UBC members offered declarations explaining their irrigation operations in precise terms with concrete examples of how their businesses would be affected if the water available for irrigation were less.[14]  Because UBC have failed to meet their burden of proof to establish that irreparable harm to UBC members is likely, UBC's Petition should be denied.

Further, UBC's allegations of economic harm, even if substantiated by evidence of the alleged financial harm likely to be suffered by each individual UBC member, are not necessarily sufficient to constitute the requisite showing of "irreparable" harm.  As described above, UBC have made only vague allegations alluding to possible financial harm that might be suffered by UBC members.  UBC have not shown that their alleged economic harm meets the high bar to establish the "irreparable harm" criteria.  *Cf. Nw. Title Loans, LLC v. Div. of Fin. and Corporate*

---

[13]     For ease of reference by the Court, a copy of Mr. Rabe's "Undertaking" is attached as U.S. Ex. 11 to the Bernard Declaration.  All 38 Undertakings filed by UBC Petitioners include identical language.

[14]     Should UBC seek to produce concrete evidence of UBC members' financial circumstances and alleged economic harm in their reply to this response, the Court should reject such offering as untimely because such evidence should have been supplied at the outset and is not appropriate for a reply brief.  Alternatively, if UBC attempt to first make their case in the form of a reply, and the Court accepts this delinquent offering, then the United States and other parties must have an opportunity to respond to such UBC evidence.

*Sec.*, 180 Or. App. 1, 13 (2002) (holding in petition for stay of administrative rule that allegation of being put "out of business" in Oregon was not sufficient "irreparable harm" where petitioner-corporation would still exist and could do business in other states).

In fact, UBC make no showing that they will suffer irreparable harm if the Project water rights are enforced.  Indeed, many of the UBC petitioners have water rights that are senior to the Project's 1905 water rights and that will not be impacted at all by enforcement of the Project rights.  Of the 38 UBC petitioners listed in Exhibit 1 to the Petition, 16 have *Walton* water rights that enjoy an 1864 priority – substantially senior to the Project's 1905 water rights.  *See* FFOD at 24 (*Walton* rights are entitled to a priority date of October 14, 1864).  UBC provided no information regarding the exact nature of the water rights purported to be held by its members, and made no attempt to analyze the actual impact of priority administration on their junior rights, so it is difficult to determine the extent of any impact to them.

Moreover, there is evidence that even some of the UBC members with water rights junior to 1905 may not suffer as UBC claim where their access to groundwater offsets surface water limitations and where drought relief is made available.  Some UBC members have rights to use groundwater for irrigation, in addition to surface water, that may not be regulated in the event of call by the Project water rights.[15]  The example of UBC member Thomas (Tom) Mallams is illustrative.  According to the water rights information available through OWRD's Water Rights Information System, Mr. Mallams has approximately 109 acres that he irrigates primarily with surface water, but he also has a groundwater permit that allows him to supplementally irrigate those 109 acres from a well he uses to irrigate another 31.4 acres of land.  *See* Permit G-15431, Certificate 83139, and Certificate 83140, attached as U.S. Ex. 12 to Bernard Declaration.  Thus,

---

[15]    Exhibit 1 to UBC's Memorandum lists "Water Rights Information" for each UBC member; but the exhibit omits water rights information for UBC members' groundwater use.

so long as Mr. Mallams' groundwater use does not interfere with the Project's surface water rights, enforcement of the Project water rights might have little to no impact on Mr. Mallams' ability to irrigate his lands.

Additionally, any economic harm suffered by UBC members may be mitigated, at least in part, by various forms of drought, disaster, and emergency relief that the federal and state government routinely provides to farmers facing such situations. For example, when Klamath Reclamation Project water users had their water use temporarily shut off in 2001, Congress approved some $20 million in drought relief aid to the farmers. *Klamath Basin Water Conservation Program*, 2001 Supplemental Appropriations Act, Pub. L. 107-20, §2104, 115 Stat. 155, 166 (2001). Already this irrigation season, the Governor of Oregon has issued a drought declaration for Klamath County. Executive Order No. 13-05, April 18, 2013, 52 Or. Bull. 8 (May 1, 2013) (Governor's Drought Declaration), attached as U.S. Ex. 13 to Bernard Declaration. The declaration was issued at the request of the Klamath County Commissioners. *See* Letter from Klamath County Commissioners Tom Mallams, Dennis Linthicum, and Jim Bellet to Governor John Kitzhaber, dated April 16, 2013 (Klamath County Commissioners' Letter), attached as U.S. Ex. 14 to Bernard Declaration.

The Commissioners listed a panoply of possible resources to alleviate the effects of the situation, including:

> State coordinating assistance with federal programs that may provide assistance to our citizens, temporary permits under an expedited process, temporary transfers of existing water rights, temporary in-stream leases, special option agreements, temporary option agreements, temporary substitution of supplemental ground water rights for a primary surface water right, temporary exchange of surface water rights, . . . and various federal assistance programs.

*Id*. at 2. The Governor's Drought Declaration directed the Oregon Department of Agriculture to coordinate and provide assistance in seeking federal resources available to mitigate conditions

resulting from drought and affecting agricultural recovery in the basin.  Governor's Drought Declaration, U.S. Ex. 13 at 1.  UBC's description of feared economic harms makes no mention of the various types of relief programs from which UBC members will likely stand to benefit.

In sum, UBC have not shown that they will incur irreparable harm in the absence of a stay of enforcement of the Project water rights.  UBC's sweeping statements as to the disruptions that would result from curtailment of their out-of-priority junior diversions, are entirely unsupported by any evidence or analysis.

In any event, curtailment of UBC's out-of-priority junior diversions does not constitute cognizable harm – it is simply the long overdue allocation of water in accordance with Oregon's prior appropriation system.  Indeed, all of UBC's complaints are with the effects of prior appropriation on their junior water rights.[16]  UBC have taken advantage of their out-of-priority water use for over a hundred years and seek to keep the Basin free from regulation for another decade or so.  *See* UBC Memo at 9 ("For nearly a century, Claimants have operated without a call on the Upper Basin.").  The elimination of the bonanza that has been enjoyed by UBC's junior rights under a non-regulated system does not constitute "irreparable harm" – it is simply the result of giving effect to water rights priorities.  This is especially the case here – where as demonstrated in subsection 1, above, UBC provides absolutely no reason why a stay will do anything more than delay the day of reckoning.  Moreover, as shown in subsections 3 and 4, below, implementation of regulation protects the relative rights and equities of the parties, as

---

[16]    *See* UBC Memo at 1 ("Petitioners seek to maintain access to the water needed by the individual families and business [sic] included in this petition to support their farms and ranches and ecotourism businesses during the pendency of the adjudication proceeding in circuit court."); UBC Memo at 3-4 ("[Petitioners'] ability to irrigate their lands, to sustain their livelihoods, and to ensure the survivability of their communities, are directly at risk as a result of the claims awarded" to the Project Claimants.); UBC Memo at 4 (stating that a call by BOR on the irrigation withdrawals in the Upper Basin would require "OWRD to shut down the irrigation that is the source of the livelihoods for the Upper Basin's families and landowners.); UBC Memo at 4 (noting that Petitioners request a stay of the Project water rights to avoid curtailment of their irrigation diversions.); UBC Memo at 11 ("should a call be made by Claimants, these petitioners could be faced with the inability to earn income").

well as the public interest. Finally, as addressed in Section D, delaying enforcement will only increase damages to the Project water rights – which UBC appear unwilling or unable to cover.

### 3. UBC have not shown that the balance of hardships tips in UBC members' favor.

The third criterion UBC must establish under the preliminary injunction standard is that the balance of equities (hardships) tips in UBC's favor. *See Winter*, 555 U.S. at 20. As demonstrated below, UBC have not and cannot succeed in establishing that the balance of hardships tips in UBC's favor.[17] Even assuming that UBC members will suffer economic harm if enforcement of the Project water rights against UBC members' more junior rights is not stayed, the balance of hardships here tips steeply <u>against</u> UBC due to: (i) the demonstrated loss of water and economic harm to Project irrigators; (ii) the adverse impact on the United States' ability to deliver water under contracts to privately-owned farms within the Project lands,[18] (iii) the unavailability of water to satisfy the requirements of irrigated lands within the Lower Klamath and Tule Lake Refuges and the consequent economic harm from the loss of crop yield; (iv) unquantified harm to the waterfowl and recreational uses on the Refuges which will not have the benefit of irrigated Refuge lands; and (v) the continued shifting of obligations imposed by the

---

[17]    Under the "sliding scale approach" used by the Ninth Circuit, described in subsection III.C.1., above, the showing here would need to be even stronger – UBC would be required to show that the balance of hardships tips "sharply" in their favor.

[18]    As used in this Memorandum, the term "Project lands" refers to: (i) individually-owned irrigated lands within the Project; (ii) lands on the Lower Klamath and the Tule Lake Refuges that are owned by the United States and leased to farmers (Refuge lease lands), and which are within the Project; and (iii) lands on the Tule Lake Refuge that are owned by the United States and currently farmed by individuals under cooperative agreements with the Service, and which are within the Project (Tule Lake cooperative farm lands). The analyses described in the Van Camp Declaration and the Howitt Declaration pertain to these Project lands all of which are within the service area of the KPWU irrigation entities. "Project lands" as used in this Memorandum do not include the cooperative farm lands within the Lower Klamath Refuge in California that are owned by the United States and currently farmed by individuals under cooperative agreements with the Service, and which are within the boundaries of the Project, but outside the service area of the KPWU irrigation entities (Lower Klamath cooperative farm lands). These Lower Klamath cooperative farm lands were not included in the analyses described in the Van Camp Declaration and the Howitt Declaration, and are separately addressed by the Declaration of George Moss Driscoll discussed below.

Endangered Species Act from UBC to the United States and Project users concerning the protection of the endangered sucker fish that inhabit Upper Klamath Lake.

UBC's general allegations of harm are unsubstantiated and misstated. While UBC assert that their ability to sustain their livelihoods will be put at risk under priority regulation, they provide no support for their broad allegations.[19] As noted above, some of the UBC members have water rights senior to the Klamath Project water rights, some have groundwater rights with which to offset surface water limitations, and various forms of drought, disaster, and emergency relief drought relief may be available. UBC simply provided no information that establishes any actual harm to its members.

On the other hand, the injury that would accrue to the Klamath Project, the Project users,[20] and the Lower Klamath Refuge cooperative farm lands under a stay is demonstrable and substantial. In dry years when it is likely that a call for enforcement of the Project water rights will be made, the Project will be short of water. As established in the Van Camp Declaration, while the actual amount of water shortage to Project lands will vary by year and depending upon hydrologic conditions in the Basin, the shortage of water can be significant. Van Camp Declaration at 8 ¶ 17. Over the five year dry period analyzed by Mr. Van Camp, the shortages to Project lands are as high as 223,000 acre-feet in one irrigation season, and 578,000 acre-feet over the identified five year period. *Id.* Mr. Van Camp concludes, based upon his professional opinion and the analyses presented, that a conservative estimate of the water that would become

---

[19]     *See* UBC Memo at 3-4 ("Their ability to irrigate their lands, to sustain their livelihoods, and to ensure the survivability of their communities, are directly at risk as a result of the claims awarded through the FFOD to the Claimants."); UBC Memo at 4 ("in particular the smallest businesses may be unable to continue their participation in this case as they will be deprived of their ability to make a living and pay the fees and costs associated with the circuit court proceedings.") (Enforcement of the FFOD "would prevent them from irrigating and sustaining their ranches, farms, and businesses in the Upper Basin during the pendency of this case.").

[20]     As used in this Memorandum, the term "Project users" refers to the nonfederal users of Project water, including the farmers of the Refuge lease lands and of the Tule Lake cooperative farm lands.

available to Project lands if junior upstream water rights were curtailed is 90,000 acre-feet per irrigation season. *Id.* at 20-21 ¶ 54. The total amount of the 578,000 acre-foot shortage to Project lands that could be made up over the five year dry period analyzed by Mr. Van Camp is 337,000 acre feet. *Id.* at 8 ¶ 17, at 20-21 ¶ 54. *See also* Declaration of Richard E. Howitt (Howitt Declaration), attached as U.S. Ex. 2 to Bernard Declaration, at 8 ¶ 20. This shortage of water to the Project lands would result in significant economic damage. Moreover, as discussed below, Mr. George Ross Driscoll determined that the Lower Klamath cooperative farm lands would also suffer shortages and significant economic damages.

As analyzed in the Howitt Declaration, the damages to the United States and the Project users from not being able to call-out junior rights over the five year period analyzed total $39.77 million. Howitt Declaration at 12 ¶ 33. In addition, as addressed in the Declaration of George Moss Driscoll (Driscoll Declaration), attached as U.S. Ex. 3 to Bernard Declaration, the additional economic damage to the Lower Klamath cooperative farm lands over this five year period (lands not addressed by the Van Camp and Howitt Declarations) would very conservatively add another $2.39 million to the damage total, for a total sum of $42.16 million. *See* Driscoll Declaration at 6 ¶ 12.

The United States through Reclamation is obligated under contract to deliver Project water for irrigation of Project lands. POD at 31 ¶ 81. As demonstrated by the Van Camp Declaration, if a call cannot be made to satisfy the Project water rights in dry years, water deliveries to Project lands would be severely impacted. While these contracts contain various provisions that relieve the United States from damages caused by a water shortage, water users under these contracts would suffer significant damages from diminished deliveries under their

contracts.  *See* Klamath Irrigation District Contract at 26 (Article 26 – United States Not Liable for Water Shortage), attached as U.S. Ex. 15 to Bernard Declaration.

The anticipated water shortage will also adversely impact the Lower Klamath National Wildlife Refuge and the Tule Lake National Wildlife Refuge.  In addition to diminished deliveries to the Refuges' lease lands and Tule Lake cooperative farm lands that are included as Project lands in Mr. Van Camp's and Dr. Howitt's analyses, the Lower Klamath cooperative farm lands would also suffer increased shortages in an unregulated system.  In certain dry years, without the ability to make a call on junior water rights, Lower Klamath cooperative farm lands that would receive water under regulation would experience greater shortages and in some years would receive no water.  This could impact up to an additional 4,474.4 acres of Lower Klamath cooperative farm lands that are within the Project, but outside of the KPWU service area and not included Mr. Van Camp's and Dr. Howitt's analyses.  Driscoll Declaration at 4 ¶ 8.  The economic damage from this loss of irrigated acreage is conservatively calculated at $2.39 million.  *Id.* at 6 ¶ 12.  And none of the calculated economic losses take into account the economic impacts of diminished habitat, loss of waterfowl use, and diminished recreational opportunities on the Refuges.

Finally, UBC assert that, absent a stay, the burden of compliance with the Endangered Species Act (ESA) through the obligations created under biological opinions issued to the Bureau of Reclamation will "shift, likely in their entirety, to [UBC]."  UBC Memo at 10.  Again, however, UBC provide no support for this broad assertion.  The issue presented by UBC's Petition is one of water rights administration and enforcement of the Project water rights – not a question of the parties' respective obligations under the ESA.  In any event, UBC provides no support for its bald statements that the "burden" of ESA compliance will "shift" to the Upper

Basin water users.  *See id.*  Nor does UBC explain why or how UBC members should be excused from compliance with the ESA.  Indeed, the lack of enforcement of water rights prior to the issuance of the FFOD has added to the "burden" of the Project in meeting legal obligations under the ESA.  UBC's unregulated diversions of water from the tributary sources to Upper Klamath Lake has forced the Project to make more water available for ESA purposes to meet its ESA obligations, resulting in less water available for Project irrigation.  UBC now request that the Court delay water rights regulation for another decade or so UBC can continue their out-of-priority diversions and prolong this undue burden on the Project, its water users, and the Refuges.

In sum, the balance of hardships tips steeply in favor of the United States and the Project users and against UBC.  The significant out-of-priority diversions of water by junior water rights owners, as identified in the Van Camp Declaration, will cause significant water shortage and economic injury to Project water users and the environment, as addressed in the Howitt and Driscoll Declarations.  The certainty and extent of this demonstrated harm to the Project water rights under a stay in enforcement outweighs UBC's general, unsubstantiated allegations of potential injury to UBC from regulation which, in any event, is simply a consequence of allocating water under Oregon's prior appropriation system.

> **4.    UBC have failed to establish that staying enforcement of the Project water rights is in the public interest.**

UBC have also failed to meet their burden to establish the fourth preliminary injunction factor, as they have not shown that the public interest favors a stay of enforcement of the Project water rights.  Apart from unsubstantiated hyperbole about the impact that enforcement of the Project water rights <u>might</u> have on the local community, *see* UBC Memo at 3-4 (speculating that the Project water rights put "the survivability of their communities . . . directly at risk"), UBC's

Memorandum does not address the public interests involve here at all.  While "[t]he effect on the health of the local economy is a proper consideration in the public interest analysis," *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011), UBC entirely fail to consider the adverse consequences that their requested stay would have on the Project and Refuge irrigators who are part of this same broader community.  UBC also fail to take into account the non-economic, institutional and natural resource preservation concerns raised by their request to suspend operation of the prior appropriation system.  The Court must not stay enforcement of the Project water rights unless the public interests in favor of the stay outweigh the public interests that favor not issuing the stay.  *Id.*  Moreover, in balancing these competing public interests, the Court should consider "'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'"  *Id.* (quoting *California Pharm. Ass'n v. Maxwell–Jolly,* 596 F.3d 1098, 1114–15 (9th Cir. 2010)).

In this case two "critical public interests" would be injured by virtue of granting UBC's requested stay:  the integrity of Oregon's water allocation system, and the public interest in protecting the environment and endangered species.  Each of these is discussed in turn, below.

First, there is a strong public interest in upholding Oregon's system of prior appropriation and giving effect to the property rights that have been perfected under that system.  The only rationale provided by UBC in support of their requested stay run directly contrary to this public interest.  UBC essentially ask the Court to give them cover from Oregon's prior appropriation system by holding the Project water rights in abeyance and allowing UBC to continue their out-of-priority water use.  The public interest is served by enforcing property rights in water – not by insulating certain parties from application of these laws to the substantial prejudice of other parties.  Moreover, UBC's requested stay would not protect the community from the economic

effects of water shortage or water curtailment due to regulation – it would simply shift those economic effects from one sector of the community to another.

As explained above, delaying water rights regulation will cause substantial damages to the United States and the Project users.  UBC seek to impose these substantial damages – up to $42.16 million over a five year period – while capping their obligation to reimburse the United States and Project users for all damages that may accrue due to their continued out-of-priority diversions to a miserly $500 each, totaling just $19,000.  UBC's attempt to profit from continued unregulated, out-of-priority water use for years to come by having the Court indefinitely stay Oregon's system of water allocation, while remaining insulated from the actual damages that will accrue flies in the face of the public interest.

Second, protecting habitat for fish, including endangered sucker species, is also in the public interest.  *See, e.g., Alliance for the Wild Rockies*, 632 F.3d at 1138 (recognizing "the well-established 'public interest in preserving nature and avoiding irreparable environmental injury'") (citation omitted).  Further, when Congress drafted the ESA it intended endangered species to be given the "highest of priorities," regardless of the economic implications.  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).  Thus, "the public interest tip[s] heavily in favor of endangered species."  *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987) (citing *Hill*, 437 U.S. at 193-95).  Such a clear expression of congressional intent mandates this Court give the public interest of protecting the endangered species the highest priority.

The ESA obligates federal agencies to "to afford first priority to the declared national policy of saving endangered species."  *Tenn. Valley Auth. v. Hill*, 437 U.S. at 185.  Section 7 of the ESA establishes a consultation process to insure that 'any action authorized, funded, or carried out by [a federal ]agency ... is not likely to jeopardize the continued existence of any

endangered … or threatened species or result in the destruction or adverse modification of [critical] habitat…"  16 U.S.C. § 1536(a)(2).  *PCFFA v. Bureau of Reclamation* (9th Cir. 2005).  Under the ESA, the Klamath Reclamation Project is prohibited from engaging in any action that is likely to "jeopardize the continued existence of" an endangered or threatened species or result in "destruction or adverse modification of [the designated critical habitat]."  *Id.  PCFFA v. Bureau of Reclamation* (DC NDC 2003).  Agency action can be enjoined if it is in violation of the ESA.  *PCFFA v. Bureau of Reclamation* (DC NDC 2002) (citing *Thomas v. Peterson*, 735 F.2d 754, 764 (9th Cir. 1985), *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1056-1057 (9th Cir. 1994)).  *See also Kandra v. United States*, (DOR 2001) (Reclamation may release stored water when required to meet its obligations under the ESA); *Klamath Water Users Protective Association v. Patterson*, 204 F.3d 1206, 1212 (9th Cir. 2000) (Reclamation has authority to manage Link River Dam as necessary to meet its obligations under the ESA).

Reclamation has an obligation under the ESA to comply with the biological opinions issued pursuant to Section 7 of that Act.  That obligation remains with Reclamation whether there is a water shortage or not and whether the Project's senior water rights can be enforced.  If the Project's water rights cannot be enforced, Reclamation's ESA obligation will necessarily be satisfied from a smaller supply of water and Project water users will suffer greater shortages than if their senior water rights could be enforced.  Such a shortage, exacerbated by UBC's out-of-priority water use, would also diminish the quantity of water stored in Upper Klamath Lake.  A reduced supply of water in Upper Klamath Lake would affect Reclamation's ability to meet its obligations under the ESA and could result in adverse effects to endangered Lost River and shortnose suckers protected by the ESA.[21]

---

[21]   *See* Biological Opinion on the Effects of the Proposed Klamath Project Operations From April 2013 Through March 31, 2023 on Five Federally Threatened and Endangered Species.

In sum, UBC have failed to establish that the public interest weighs in favor of granting the requested stay, and indeed it does not.  UBC simply seeks to shift the burden of water shortages and the consequential economic harm from one part of the community to the other.  UBC's request that the Court delay water rights regulation so UBC can continue their out-of-priority diversions and exacerbate shortages of water for use in irrigation in substantial parts of two states, protection of fish and wildlife habitat on two National Wildlife Refuges, and propagation of endangered fish species runs directly contrary to the public interest.  Finally, UBC's parochial interest in being allowed to continue to use water out-of-priority does not outweigh the public interest in upholding Oregon's constitutional system of prior appropriation and protecting endangered species from the very real threat of extinction, especially when courts and Congress have recognized these as paramount public interests that must be protected.

**5.    UBC have failed to establish that they are entitled to the requested stay and the Petition must be denied.**

UBC have failed to demonstrate that they are entitled to the stay they seek.  UBC have not shown that they are likely to succeed on the merits of their oft-rejected arguments.  In the absence of UBC establishing likelihood of success on the merits, all indications are that a stay will, in the end, be nothing more than a court-sanctioned perpetuation of the continued infringement of the Project's more senior rights for the duration of these Circuit Court proceedings.  Staying enforcement of the Project water rights would result in enormous economic hardship on the Project irrigators, diminish crop production and wildlife habitat on the two Refuges, and threaten protected endangered fish – all contrary to the public interest.  The law is clear; the Court must deny UBC's requested stay in its entirety.

**D.  If The Court Considers Issuing A Stay, UBC's Bond Must Be In An Amount Reasonably Calculated To Compensate The United States and The Project Users For The Amount Of Water That Will Be Lost To The Project Due To The Stay Of Enforcement Of The Project's Senior Water Rights During The Term Of The Stay.**

In the alternative, if the Court determines that a stay could potentially be issued upon the filing of a proper bond, the Court must set the bond amount at a sum that would compensate the United States and the Project users for all damages that may accrue during the term of the stay. While it is UBC's burden to establish compliance with ORS 539.180, UBC entirely ducks the task of assessing potential damages.  The statute, however, requires an assessment of damages on its face.  UBC is required to post a bond in such an amount as the court prescribes, conditioned that the petitioner will "pay all damages that may accrue by reason of the determination not being enforced."  ORS 539.180 (emphasis added).  UBC's request that the Court reject this statutory requirement and, instead, issue the requested stay based on Undertakings capped at a nominal collective sum of $19,000 must be rejected.  Under the statute, the amount of the bond should be set based on the potential damages that may accrue during the period of the stay.  In addition, the stay and the associated security provided must be conditioned with the requirement that petitioners will pay all damages that may ultimately accrue.  Here, UBC meet neither requirement.

The analyses of economic damages, presented through the Declarations of Mr. Van E. Camp, Dr. Richard E. Howitt, and Mr. George Moss Driscoll, are based on methods fully supported by Oregon law.  If the Court considers granting the requested stay, the Court should determine the bond amount based on this assessment and set the bond at $42.16 million.

**1.  The bond must be sufficient to compensate the United States and the Project users for the loss of their water.**

As explained in subsection III.A.1, above, a stay may be issued only upon the filing of a bond or irrevocable letter of credit in the amount the court determines, and conditioned on the requirement that the staying party will cover "all damages that may accrue by reason of the determination not being enforced." ORS 539.180. UBC's attempt to "nominalize" the bond amount is untenable and meaningless.

To determine a reasonable amount of prospective damages, the United States with KPWU, have employed a valuation measure firmly recognized in Oregon law – the value of the water rendered unavailable to satisfy the Project water rights due to the stay as determined by market value and the cost to agricultural production. (This analysis estimates economic losses based on the market value of water and of irrigated agricultural crops on private lands, and on Refuge lands which currently are either leased by the Service to farmers or are farmed under cooperative agreements between the Service and farmers; it does not include the value of lost habitat to waterfowl, the impacts on waterfowl, or the effect on recreational use on the farmed Refuge lands.) Conventional remedies or measures of damages like lost market value and interest are used rather than speculating about, or insisting on proof of, the unknowable details future events, such measures accommodate the uncertainty of evaluating what will happen in the future. 1 Dan D. Dobbs, *Dobbs Law of Remedies, Damages-Equity-Restitution* 31 (2d ed. 1993).

The market value approach is used as the measure of damages in several directly comparable situations to that found here. For example, wrongly suffered dispossession of their property (in that case, real estate), the court concluded that one suffering from an "erroneous judgment affecting an interest in property" is entitled "to the reasonable rental value of the property for" the period of dispossession. *Shook v. Vonder Haar*, 134 Or. App. 170, 175, 894 P.2d 1178, 1181 (1995); *accord Lytle v. Payette-Oregon Slope Irr. Dist.*, 175 Or. 276, 287, 152

P.2d 934, 939 (1944) (finding that the wrongly disposed debtor should receive the "reasonable rental value, or the rents, issues and profits of the premises for the period [of dispossession].").

This is also true when one reviews two very similar stay statutes.  *Compare* ORS 539.180 (stays pending appeal of a water rights determination) *with* ORS 19.335 (stays pending appeal of a real property determination).  In both instances a judgment rendered by a lower tribunal is enforceable -- absent the provision of a stay and appropriate bond while the matter is being considered by the next tribunal.  When real property is the subject of the judgment sought to be stayed on appeal, ORS 19.335(2) provides that the bond holder "will pay the value of the use and occupation of the property for the period of possession [while the bond is in place]."  In *LIG Investments LLC v. Roach*, 215 Or. App. 210, 213,170 P.3d 561, 563 (2007), the Court of Appeals found that to "pay the value of the use and occupation of the property" under ORS 19.335(2) meant the "fair market rental value of the property."  Similarly, water rights are property rights and a water right holder denied the use of his enforceable water right is entitled to the full market value of his water right during the period of deprivation.

The United States, relying on KPWU's approach, has thus based its computation of the appropriate amount of the bond on the value of the water that would be available to the Project in absence of an injunction on enforcement of the Project's senior water rights.[22]  The United States respectfully submits that, given that the result of the stay is to allow junior water users the use of water that is, under the FFOD's determinations, currently subject to the Project's water rights – in effect a forced lease of the Project's water rights to the Upper Basin irrigators – the bond amount should be no less than the average between the market value of the water and the cost to agricultural production, a conservative estimate of damages.  This is indeed a conservative

---

[22]    As explained in subsection III.A.3., above, UBC's proposed stay would diminish the yield of the Project's water rights based on all of the upstream out-of-priority diversions, not just those of UBC, because UBC's "selective call" proposal is contrary to Oregon law and impermissible.

estimate because under these analyses the market value of water was determined to be higher than the cost to agricultural production (and thus the average between the two less than the market value).  Utilizing market value makes sense because when the day comes for UBC to make good on their obligation to pay damages pursuant to ORS 539.180, those damages would appropriately be based on the market value; otherwise the irrigators will have profited by staying the Project's water rights (by paying less than the value of the water they got to use during the stay).  *Lytle*, 175 Or. at 290, 152 P.2d at 940 (finding that when property is restored after wrongful dispossession the "reasonable value of [property's] use" and the "rental value of water" were proper measures of damages).

The bond amount should therefore not be less than the $42.16 million sum of: (i) Dr. Howitt's calculated damages to Project lands consisting of private lands, the Lower Klamath and Tule Lake Refuges' leased lands, and the Tule Lake Refuge's cooperative farm lands; and (ii) Mr. Driscoll's calculated damages to Lower Klamath Refuge's cooperative farm lands – both of which analyses were based on the average between market value and the cost to agricultural production.

## 2.     UBC's errs in asserting that a nominal bond is appropriate.

In the last one-third of the UBC Memorandum (pages 7-10), UBC make a number of incorrect legal statements about the Court's authority to set a bond amount, in a vain attempt to justify their "nominal" undertaking filed with the Court.  UBC's assertions fail to alter the core requirement of ORS 539.180 that all damages the enjoined party may accrue during the period of the stay must be encompassed within the bond.  Moreover, as explained below, UBC substantially misread other pertinent law.

In order to provide some legal imprimatur for their proposed "nominal" bond to stay enforcement of the Project water rights, UBC argue that the Circuit Court has discretion in setting the amount of the bond under ORS 539.180.  UBC Memo 7-8.  UBC's argument is in error, though, because it ignores the primary purpose of the bond statute, which is to approximate the damages that would make the wrongfully enjoined water right owner whole.  ORS 539.180.  Similar to the adjudication stay bond statute, all the rules that UBC cite also have as their lodestar the standard that the security must be in an amount that should cover all of the enjoined party's anticipated damages.  See FRCP 65(c) and ORCP 82.A(1)(a).  In a largely diversionary tactic, UBC string together snippets from cases where particular facts warranted the setting of a small bond, but as we show below, none of those special circumstances are present here.

What gets only passing mention in UBC's homage to judicial discretion to set the bond amount is that the Court is required to ensure that the bond amount is reasonably sufficient to compensate and make whole the party whose water rights are stayed.  This is true for all the rules and statues that UBC cite for initially setting the amount of the bond.  ORS 539.180 (bond is to secure petitioner's obligation to pay "all damages that may accrue by reason of the determination [FFOD] not being enforced"); ORCP 82.A(1)(a) & (4) (security by the entity seeking the injunction must be for the likely "costs, damages, and attorney fees as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained"); and FRCP 65(c) (security provided by the moving party must be for the likely "costs and damages sustained by any party found to have been wrongfully enjoined or restrained").  The discretion the Court has must be utilized to assess the evidence presented on the question of the appropriate bond amount, given the relevant standard.  Discretion is not some rootless doctrine that absolves UBC of providing the necessary amount of a bond.

UBC next cite several FRCP 65(c) cases that support the unremarkable -- but utterly inapplicable -- propositions that when "'no evidence'" of damages is presented, no bond should be required and that "'speculative'" evidence of damages should be rejected.  UBC Memorandum at 7.  Each of the cases UBC cite bears no resemblance to the instant situation.  In the case UBC quotes for the point that no bond can issue when no damages are shown, *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003), the enjoined party did not even ask the court to set a bond.  Here, to the contrary, the United States, with KPWU, make a convincing showing in Subsection III.D.4, below, that a large bond is necessary, given the likely great loss of valuable water during dry periods within the term of the requested stay.  In the second UBC case, the district court found that there was a "lack of objective evidence of damages" and hence denied the bond request.  *Language Line Services, Inc .v Language Services Assoc., Inc.*, 500 Fed Appx. 678, 682 (9th Cir. 2012).  Of course, here there is an entirely different factual record.  The United States and KPWU present here extensive testimony from well-qualified experts on the amount of water foregone under a stay and the value of that water.  *See* subsection III.E.4., below.

UBC next note that in some federal preliminary injunction cases a bond has not been required, but UBC totally omit that only a limited class of parties might seek the waiver of a bond under FRCP 65(c), a point that exposes the utter inapplicability of their cited line of cases.  UBC Memo at 7-8.  In both cases cited by UBC, the moving party was a non-profit, public interest, environmental group that invoked citizen enforcement powers under NEPA (National Environmental Policy Act) and the Clean Water Act, in those limited instances, the court required no bond or a small one.  *Cal ex rel. Van DeKamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (no bond); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d

1113, 1118, 1126 (9th Cir. 2004) (requiring non-profit environmental group to provide $50,000

bond).  Obviously, the ORS 539.180 bond statute has no provision for waiving the bond

requirement or for altering its measure, thus the cited cases have no applicability here.  But even

if that were not true, neither UBC nor their stay petition under ORS 539.180 are anything like the

plaintiffs in the cited two cases or the claims they asserted.  First, UBC are not a non-profit,

public interest, environmental group; rather they are for-profit ranchers.  Second, instead of

trying to enforce specific public laws that Congress allowed individuals to use to promote the

public health and welfare, UBC, like the United States and the Project users, are seeking to

protect their water rights so that they can economically prosper.  While UBC may surely seek to

protect their water rights, that does not warrant them an exemption from the requisite bond

requirements.[23]

　　　　UBC end their argument with a transformation of the Court's necessary power to

determine the amount of the bond – in light of the evidence presented on the anticipated damages

– into a general power of the Court to eliminate or sharply reduce the size of the bond based on

"equitable factors."  UBC Memo at 8.  UBC's conclusion here is wrong for at least four reasons.

First, UBC's argument is again unmoored from the plain and unavoidable requirements of ORS

539.180 and the other bond security statutes that they cite, quoted above in the third paragraph of

this subsection, which provide monetary security for the reasonably anticipated damages of the

enjoined party during the course of the stay.  Second, none of the federal preliminary injunction

---

[23]　　　UBC suggest they are unable to post more than a "nominal" bond.  This is not a compelling reason to cast ORS 539.180 aside and put the United States and the Project water users at enormous risk as UBC request.  *See, e.g.*, *Alexander v. Primerica Holdings, Inc.*, 811 F. Supp. 1025 (D.N.J. 1993), an injunction case under FRCP 65(c), where the plaintiff class of salaried retirees sought to block changes to their benefit packages and claimed they were indigent and could not afford any bond.  The court upheld the straightforward calculation by the company that the stay would put the company at risk of damages over $7 million, and repeatedly emphasized the importance of the bond requirement to keep the enjoined party whole as intended by the bond's rationale.  *Id.* at 1034-38.  A similarly straightforward application of ORS 539.180's bond requirements is called for here.

cases UBC have cited provide a general waiver of the bond requirement based on equitable principles. The few exceptions to, or limitations on, the bond requirement that UBC have identified are for situations far different from that here (non-profits working to advance the public interest). Third, any equitable balancing that may occur in the preliminary injunction setting occurs when the court assesses whether to issue a preliminary injunction, *see* subsection III.C.3., above; it does not occur during the bond amount hearing. UBC are improperly mixing separate processes. Fourth, UBC's attempt to use the authorization in ORCP 82A(6) to reduce or eliminate a preliminary injunction bond misses the mark. That provision refers to a limited procedure to modify a bond that has already been set under ORCP 82A(1) or (4), which provide for the bond to fully protect the economic interests of an enjoined party. It has no application to ORS 539.180 or the original determination of the bond.

UBC's attempt to evade the central underlying requirement of ORS 539.180, to keep the enjoined party whole for damages it may suffer during the course of the stay, must be rejected. Such an interpretation offends the plain reading of the statutory requirement in the adjudication statute. Further, the bond requirement in ORS 539.180 is similar to other bond requirement rules. UBC's purported exceptions to the normal bond requirements bear no weight when scrutinized. The full measure of expected damages must be encompassed within the bond set under ORS 539.180.

> **3.**      **UBC cannot avoid the requirement for filing a bond in amount that covers expected damages by asserting that the requested stay preserves the status quo and there will therefore be no damages or because the calculation of damages is uncertain.**

While the burden of showing compliance with ORS 539.180 lies squarely on petitioners, UBC entirely duck the question of damages.[24]  UBC, instead urge the Court to reject the clear statutory direction that the FFOD is fully enforceable from the date of its entry in OWRD's records, *see* ORS 539.130(4); 539.170; 539.180, and conclude UBC's continued out-of-priority use of water constitutes the status quo.  *See* UBC Memo at 1, 2, 4, 9, 11.  UBC errs.  The status quo is that the Project water rights are now enforceable.  Oregon's adjudication statutes could not be more clear on this point.  *See* ORS 539.130(4) (the FFOD "shall be in full force and effect from the date of its entry in the records" of OWRD); ORS 539.170 (while FFOD is pending in circuit court, the division of water shall be made in accordance with the FFOD); ORS 539.180 . Indeed, UBC acknowledge that: "Upon OWRD's filing of the FFOD with this Court on March 7, 2013, the FFOD became in 'full force and effect from the date of its entry in the records of the department, unless and until its operation shall be stayed by a stay bond as provided by ORS 539.180,'" UBC Memo at 3, quoting ORS 539.130(4).

So too should UBC lose credibility in suggesting that the requested stay will not damage the United States and the Project users because "[t]hey will enjoy the same water availability they had before issuance of the FFOD," *See* UBC Memo at 9.  UBC's attempt to convince the Court to ignore the obvious fact that the FFOD is now enforceable is directly contrary to the statute's recognition that staying the enforceability of water rights approved by the FFOD may result in damages "by reason of the determination not being enforced."  ORS 539.180.

Finally, UBC seek to justify their failure to comply with ORS 539.180 by suggesting that the determination of damages would be speculative because damages will be affected by

---

[24]     UBC attempts to veil their failure to meet the requirements of ORS 539.180 by suggesting that it is the burden of the United States and the Project users to establish that the nominal security provided by UBC is insufficient.  *See* UBC Memo at 8 (Claimants must demonstrate what, if any, damages beyond the nominal amount of $500 result from the stay); UBC Memo at 11 (it will be difficult for Claimants to meet their burden of substantiating amount of damages).

numerous factors affecting the availability and use of water.  *See* UBC Memo at 10-11.  The fact

that estimating potential damages over the life of the requested stay is somewhat complicated

and necessarily involves making certain assumptions does not allow UBC to duck the question

by its unsupportable and unbelievable conclusion that damages would be nominal.  As explained

immediately below, Mr. Marc E. Van Camp and Dr. Richard E. Howitt took on the task of

estimating potential damages to Project lands by making reasonable assumptions based on

standard engineering and economic practices.  In addition, Mr. George Moss Driscoll applied the

Van Camp and Howitt analyses to the Lower Klamath cooperative farm lands employing

reasonable and, indeed, conservative assumptions.  The Court should reject UBC's suggestion

that their requested stay be secured by a nominal sum out of hand and utilize the assessments of

Mr. Van Camp, Dr. Howitt, and Mr. Driscoll in setting the amount of the bond.

> **4.   The Van Camp, Howitt and Driscoll Declarations present highly credible expert analyses of damages that should be utilized by this Court is setting the bond amount.**

As presented by the Declarations of Mr. Van Camp and Dr. Howitt, damages are

appropriately determined based on estimating the loss in the yield of the Project water rights that

will result due to UBC's continued out-of-priority diversions during the term of the stay, and

determining the economic damage caused by the loss of water to the Project lands.  These expert

declarations present highly credible, professional estimates of potential damages to the Project

users.  In addition, Mr. Driscoll utilized his professional experience and expertise to apply these

analyses to the Lower Klamath cooperative farm lands and calculate the additional economic

damages from loss of Project water to irrigate those lands.  These analyses of the potential

damages that would be caused by the requested stay are the only analyses before the Court and

should be utilized by the Court in prescribing the bond amount.

While the amount of damages that will accrue during the term of the stay cannot, of course, be definitively established, the Court has a fundamental responsibility to set the bond amount based on the need to reasonably guarantee payment of <u>all</u> potential damages. *See* 539.180. It is therefore necessary to carry out an assessment of those potential damages, based on appropriate and necessary assumptions. As explained by Mr. Van Camp:

> The available water supply for diversion under water rights at [the Project's points of diversion] is affected by precipitation and runoff (rain and snowpack / snowmelt), Klamath Project operations, and upstream water use. None of these factors can be predicted with absolute certainty. However, there are standard engineering tools and practices, widely used in the engineering and water resources planning fields, that allow for conclusions to be drawn regarding the subjects of my declaration, including the impact of water use under junior rights on water availability for KPWU.

Van Camp Declaration at 6 ¶ 12.

### a.    Van Camp Analysis of Water Shortage and Amounts That Can Be Made Up by Enforcement.

Rather than avoiding the question as does UBC, Mr. Van Camp makes reasonable assumptions based on accepted engineering practices and estimates the loss of yield to the Project lands under a stay of enforcement of the Project water rights. Mr. Van Camp analyzed the loss of supply to the Project water rights in two broad steps: (i) analysis of the water shortages to the Klamath Project assuming there is no restriction on upstream uses, *Id.* at 6-8 ¶¶ 13-17; and (ii) determination of the amount of water used under junior water rights that could become available to the Klamath Project if water rights are regulated in the Basin, *Id.* at 8-19 ¶¶ 18-48.

### (i)    Analysis of Water Shortage.

In carrying out this first step of analyzing water shortages to the Project in an unregulated system, Mr. Van Camp evaluated historical hydrologic conditions, and specifically the quantity

of inflows to Upper Klamath Lake (UKL). *Id.* at 6 ¶ 13. Mr. Van Camp utilized Reclamation's Water Resources Integrated Modeling System planning model, referred to as the Klamath Project Planning Model (KBPM), to simulate Klamath Project operations using historic inflows and demands while imposing current or proposed operating criteria or constraints. *Id.* at 7 ¶ 14. Mr. Van Camp simulated water availability with KBPM using variable assumptions as inputs, including the runoff and inflow to UKL, and operation of Project facilities taking into account the constraints imposed on Project operations by the ESA.[25] *Id.* at 7 ¶ 15. Mr. Van Camp identified a five-year historic period that was relatively dry (1990 – 1994) in order to utilize hydrologic conditions that actually occurred during these consecutive years as a reasonable and useful planning period for identifying shortage that could realistically occur in an upcoming period. *Id.* at 7-8 ¶ 16. Using the KBPM and based on BA operations, Mr. Van Camp identified water shortages to the Project under hydrologic conditions of the planning period, assuming no ability to make water right calls, at 67,000 acre-feet, 139,000 acre-feet, 223,000 acre-feet, zero, and 149,000 acre-feet, over those five consecutive years, resulting in a total shortage of 578,000 acre-feet over that five-year period. *Id.* at 8 ¶ 17.

### (ii)   Analysis of Amounts of Water That Can Be Made Up By Enforcement.

Mr. Van Camp then moved to the second step of his analysis, the determination of the amount of water used under junior water rights that could become available to the Klamath Project if water rights are regulated in the Basin. In carrying out this part of the analysis, Mr. Van Camp: (i) identified the upstream junior water right lands, *Id.* at 9-13 ¶¶ 19-27; and (ii)

---

[25]    More specifically, Mr. Van Camp assumed operations of the Project under the Final Biological Assessment; The Effects of the Proposed Action to Operate the Klamath Project From April 2013 Through March 31, 2023, on Federally-Listed Threatened and Endangered Species, USBR December 2012. The Biological Opinions incorporating Project Operations as described in the Final Biological Assessment were issued on May 31, 2013.

estimated consumptive use of applied surface water, taking into consideration the effects of natural and sub-irrigation, *Id.* at 8-19 ¶¶ 18-48.  Based on all these analyses, Mr. Van Camp concluded that a conservative estimate of the quantity of water that would become available to the Project during the April through October irrigation season if the Project's water rights were enforced against upstream junior rights is 90,000 acre-feet per year.  *Id.* at 20-21 ¶¶ -54-55. Applying this figure to the five years in the representative five-year period, a call by the Project water rights could mitigate shortages to the Project by 67,000 acre-feet, 90,000 acre-feet, 90,000 acre-feet, zero, and 90,000 acre-feet, over those five consecutive years, resulting in a total increase in Project deliveries of 337,000 acre feet over that five-year period.  *Id.* at 8 ¶ 17, at 20-21 ¶ 54.  *See also* Howitt Declaration at 8 ¶ 20.

### b.    Howitt Analysis of Economic Damages That Will Accrue if Project Water Rights Are Stayed.

Dr. Richard E. Howitt then analyzed the economic damages that would result to Project water users by allowing continued out-of-priority water use.  In analyzing economic damages, Dr. Howitt utilized two alternative methods to derive the value of the water that would be lost to the Project if its water rights were enjoined, including (i) econometric analysis to estimate the cost to agricultural production, and (ii) statistical analysis of water market data.  Howitt Declaration at 3 ¶ 6.These two economic analysis methods are based on observed data on how farmers have responded in the past to water reductions and the actual economic decisions they have made over 16 years.  *Id.* at 4 ¶ 9.

### (i)    Econometric Approach – Cost to Agricultural Production.

The econometric approach for estimating the cost to agricultural production utilizes a statistical regression based on the time series of crop acreages grown in the areas served by the

Klamath Project over the years 1993 to 2012. *Id.* at 4 ¶ 8. Dr. Howitt utilized 16 years of data

on the areas of crops grown within the Project, yields, prices, water deliveries, and precipitation

to estimate the effect of changes in deliveries on changes in crop acreage grown, while isolating

the effects of other factors such as precipitation and revenues. *Id.* at 4-5 ¶ 10. He developed

regression equations estimate the effect on crop acreage of different annual quantities of surface

water deliveries, annual returns to the crop, and precipitation. *Id.* at 4 ¶ 8. The statistical

relationship is the basis for calculating the percentage change in the acreage of a given crop for a

percentage change in delivery quantity. *Id.* The results represent an aggregate measure over all

agricultural water users of the most likely crop acreage response to shortages in deliveries, given

that the physical distribution infrastructure and operating rules used in the past are maintained in

the future. *Id.* at 4-5 ¶ 10. Dr. Howitt then utilized the returns to land and management (gross

margin) from crop budgets generated by the extension services in Oregon State University and

University of California at Davis to value the call shortage. *Id.* at 4 ¶ 8. Dr. Howitt multiplied

the predicted change in crop acreage by the returns to land and management (gross margin) to

generate the estimated benefits foregone due to the call shortages. *Id.* Dr. Howitt then

calculated the expected present value of the annual losses over the five-year period, and

determined the total loss of benefits from foregone crop production to the farmers served by the

Klamath Project as $35.13 million. *Id.* at 8-9 ¶¶ 20-22.

**(ii)    Water Market Approach – Value of Water Lost Due to Non-Enforcement.**

The water market based method utilizes the willingness to be paid to reduce water use by

the water users served by the Klamath Project, as revealed by the bids that individuals offered to

the land idling program of a "water bank" operated by Klamath Water and Power Agency

(KWAPA) in 2010, 2012 and 2013. *Id.* at 3-4 ¶ 7. This water bank program invites individual

farmers to enter into agreements to forebear from irrigation, or substitute groundwater use for surface water, to reduce diversions of water from the Klamath system. *Id.* at 9 ¶ 24. Dr. Howitt converted the farmers' bids to forego irrigation that are based on dollars per acre, to dollars per acre-foot of consumptive use, by dividing the bid per acre by the consumptive use per acre as determined in MBK Engineers report titled  Summary of the Klamath Project Water Bank Activities, September 2011, prepared for KWAPA and Reclamation. *Id.* at 10 ¶ 26. Dr. Howitt then calculated the quantity of water associated with individual bids by multiplying the number of acres offered in the bid by the consumptive use per acre. *Id.* The analysis utilized a total of 531 bids received over the three years: 244 in 2010, 189 in 2012, and 98 in 2013. *Id.* at 10 ¶ 27. This data set reveals the price and quantity of water at which different growers were willing to forego irrigation on their lands in those years and based on this substantial number of observations on the real willingness of Project farmers to accept payment instead of irrigation water, and as such, provides a strong database for the production based analysis. *Id.* From this data, Dr. Howitt calculated the present value of the annual water losses incurred by Project users over the five-year period and determined that the total loss is $44.41 million. *Id.* at 12 ¶ 32.

**(iii)    Howitt Conclusions as to Damages.**

Dr. Howitt noted that, despite the completely different sets of economic data utilized in the two approaches, the econometric crop production approach and the water marked based method result in similar estimated values, *i.e.*, $35.13 million and $44.41 million, respectively. *Id.* at 12 ¶ 33. Dr. Howitt then concluded that since both methods are valid approaches, in his professional opinion, it is appropriate to use the average of the two approaches, i.e., $39.77 millions as the value of losses to the Project lands over this five-year period. *Id.*

**c.    Driscoll Analysis of Additional Damages to Refuges.**

Mr. George Moss Driscoll utilized the analyses of Mr. Van Camp and Dr. Howitt to calculate the economic damages that would result to the Lower Klamath cooperative farm lands if the Project water rights were not enforced.  Mr. Driscoll carried out his analysis in two steps: (i) determination of water shortage to Lower Klamath cooperative farm lands that could be made up by enforcement of the Project water rights; and (ii) calculation of economic damages that would result by allowing continued out-of-priority water use.

**(i)    Water Shortage That Can Be Made Up By Enforcement.**

Mr. Driscoll determined that there are 4,474.4 acres of Lower Klamath cooperative farm lands irrigated on the Lower Klamath National Wildlife Refuge that receive irrigation water through the Project when the collective demands of the Project users on Project lands are being satisfied.  Driscoll Declaration at 4 ¶ 8.  Mr. Driscoll noted that, if the water shortages to Project lands are less than the 90,000 acre-feet shortage that can be made up by enforcing the Project water rights, additional water can be delivered the Lower Klamath cooperative farm lands.  *Id.* at 4-5 ¶¶ 9-10.  Mr. Driscoll observed that, for instance, in year one of the five-year dry period utilized by Mr. Van Camp, the shortage to Project lands was 67,000 acre-feet and that there would therefore be an ability to call for an additional 23,000 acre-feet.  He determined that, based on the water duty of 3.5 acre-feet per acre adjudicated by the POD, the 4,474.4 acres of Lower Klamath cooperative farm lands would require 15,660.4 acre-feet.  *Id.* at 5 ¶ 10.  Mr. Driscoll therefore concluded that in a year such as year one of this five year dry period, the entire water demand of the 4,474.4 acres of Lower Klamath cooperative farm lands could be satisfied by enforcing the Project water rights.  *Id.*  Although the Project's water rights are satisfied in year four of the five-year period analyzed by Mr. Van Camp, that analysis did not indicate whether there would be sufficient water to meet the additional requirements of the Lower

Klamath cooperative farm lands in such a year. *Id.*  Mr. Driscoll, therefore, did not address those additional potential damages. *Id.* at 5-6 ¶ 10.

### (ii)    Cost of Non-Enforcement to Agricultural Production.

Mr. Driscoll calculated the economic damage that would result from non-enforcement relative to the Lower Klamath cooperative farm lands. *Id.* at 6-8 ¶¶ 11-14.  Mr. Driscoll utilized Dr. Howitt's analysis based on the econometric crop production approach and the water market based method. *Id.* at 6 ¶ 11.  Mr. Driscoll determined that, based on Dr. Howitt's analyses, the production based value associated with each acre-foot of irrigation water within the Project is $113.93, and the cost to agricultural production is $191.97 per acre foot of water. *Id.* at 6-7 ¶ 12. Mr. Driscoll then calculated that the average damages between Dr. Howitt's econometric approach and the water bank statistical approach is $152.95 per acre-foot of water. *Id.* at 7 ¶ 12. Finally, Mr. Driscoll multiplied this value of $152.95 per acre-foot by 15,660.4 acre-feet, resulting in a total damage sum of $2.39 million. *Id.* at 7 ¶ 13.  Mr. Driscoll concluded that this figure is the estimate of the minimum economic damages that would result to the Lower Klamath cooperative farm lands from non-enforcement of the Project water rights for the Lower Klamath Refuge. *Id.* at 7-8 ¶ 14.

### d.    Total damages.

Based on these expert analyses, if the Court considers granting the requested stay, the Court should determine the bond amount based on these analyses and set the bond based on the sum of damages to the Project lands, $39.77 million, and to the Lower Klamath cooperative lease lands, 2.39 million, for a total bond of $42.16 million.

### 5.    If UBC are unwilling or unable to post a bond that covers expected damages during the term of the requested stay, the Petition must be denied.

The ability or willingness of petitioners to cover potential damages cannot drive the Court's determination of the amount of the bond the Court should prescribe.  *See* note 21, *supra*. Nor does the allegation that enforcement of water rights would threaten the economic livelihood of some petitioners justify capping petitioners' liability in direct contravention of the statute.  To the contrary, the tenuous economic viability of petitioners and their alleged inability to continue their businesses under the prior appropriation system dictates that the Court give keen scrutiny to ensuring that the amount of the bond covers all potential damages.  The United States and Project users can only be kept whole if the amount of the bond is set at a sum that covers all potential damages and if the stay and required security is conditioned on the requirement that petitioners will pay all damages that ultimately accrue.

If UBC are unable or unwilling to meet the requirements of ORS 539.180 by securing all the damages that may accrue under the requested stay, the Petition must be denied.  If the Court considers granting the stay, a minimum initial bond of $42.16 million must be required.

## IV.     CONCLUSION

The Petition for Stay must be denied.

In the alternative, if the Court determines that a stay may potentially be issued upon the filing of a proper bond, the Court should require UBC Petitioners first file a bond or irrevocable letter of credit in an initial amount of not less than $42.16 million., such amount subject to increase for cause, and the stay conditioned on the requirement that Petitioners will pay all damages that may accrue by reason of the POD not being enforced, with the liability of Petitioners, including their successors and assigns, being joint and several.

Respectfully submitted this 10th day of June, 2013.

**By the United States**:

Robert G. Dreher
Acting Assistant Attorney General
Environment & Natural Resources Division

By Trial Counsel

_____
Bruce D. Bernard, Colorado Bar No. 12166
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO  80202
Telephone:  303.844.1361
Fax:  303.844.1350
bruce.bernard@usdoj.gov

s/ Stephen R. Palmer
_____
Stephen R. Palmer, Special Attorney
Washington Bar No. 17404 and California Bar No. 241089
U.S. Department of Justice
Environment & Natural Resources Division
Office of Solicitor, Pacific Southwest Region
2800 Cottage Way, E-1712
Sacramento, California 95825
Telephone: 916.978.5683
Fax: 916.978.5694
steve.palmer@sol.doi.gov

s/ Barbara Scott-Brier
_____
Barbara Scott-Brier, Special Attorney, Iowa No. AT0007090
U.S. Department of Justice
Environment & Natural Resources Division
Office of the Solicitor, Pacific Northwest Region
U.S. Department of the Interior
805 SW Broadway Street, Suite 600
Portland, Oregon 97205
Telephone:  503.231.2139
Fax:  503.231.2166
barbara.scott-brier@sol.doi.gov

**ATTORNEYS FOR THE UNITED STATES OF AMERICA**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

**IN THE MATTER OF THE WATERS OF THE KLAMATH RIVER BASIN**

Case No. WA1300001

**DECLARATION OF RODNEY CHEYNE IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION**

I, Rodney Cheyne, hereby declare as follows:

1.      I am a farmer who is a member of the Klamath Irrigation District ("KID"). I have personal knowledge and am competent to testify to the facts set forth below.

2.      I am a fourth generation independent farmer in the Klamath Basin in Oregon. My great-grandfather began farming on the acreage my family owns in 1909. I personally own 227 acres of farmland here in the Klamath Basin. Other members of my family own another 80 acres or so of farmland on top of that that I also farm. We sometimes operate under the "doing business as" name of Rodney Cheyne Farms.

3.      I run the farm with my father and uncle. I manage the finances for the farm, and am very familiar with how the business operates, the debt the farm carries, the revenues generated in a typical year, and the overall financial health of the farm.

4.      I farm hay, grass, wheat, alfalfa, barley, and other grains. Additionally, I have had a herd of Angus cattle that we have continuously managed since 1936. My herd currently has about a hundred head of cattle.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

5.      Beyond the farming I do on my family's property, I also farm approximately 700 acres of rented land.  I also do custom haying and farming on approximately another 1,000 acres. In total, I manage approximately 2,000 acres of farmland.

6.      Some of the crops we raise are annual crops, and some are perennial.   In particular, the grass and alfalfa we grow are multi-year crops.  Because of this, water shortages in a particular year can impact not only year-to-year crops, but crops that require a longer-term investment and commitment.

7.      The land I farm is irrigated by the Klamath Project.   Under the Klamath Adjudication, I have an adjudicated right to use 3.5 acre-feet of water per acre over the course of an irrigation season for the acreage I own.  The irrigation season usually begins right around April 15, and runs through October 15.  I use the water rights I have whenever I am permitted to, and that full amount of water is particularly necessary if the weather is hot and dry or if our cattle are pastured on the fields.

8.      Because, in recent years, water availability has been reduced by Reclamation, the financial health of the farm has suffered significantly.  Currently, I have only one full-time employee, and I hire no seasonal laborers.   I would hire more employees, but with the uncertainty around water availability, I can't take the risk of hiring additional employees I might not be able to pay.

9.      Farming involves significant up-front costs with long delays before the crops actually result in revenue.  I have very substantial and fixed costs that must be paid, regardless of whether I am permitted to irrigate in a given year.  These include mortgages on the farmland, servicing debt on my farming equipment, expenses for seed (since most of my planting must occur before I find out whether Reclamation is planning to flush stored water down the river), fertilizer, power, and water.   Fees associated with water include assessments paid to the irrigation districts to maintain canals and drains, which must be kept in working order even if no water flows through them that year.

{7756/007/01218926.DOC}
Page 2 -    DECLARATION OF RODNEY CHEYNE

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1      10.    In a good year of farming, my farm produces approximately $700,000 to

2   $800,000 in gross revenue.

3      11.    I have, however, operated at a net loss in each of the prior several years.  These

4   losses are due to the lack of water available to me.  My 2020 taxes showed a loss of $37,862.

5   My 2019 taxes showed a loss of $65,255.  My 2018 taxes showed a loss of $149,702.

6      12.    My farm has at least $200,000 in fixed costs annually, particularly payments on

7   mortgages and equipment.  This does not include the cost of living for myself, my wife, or my

8   four children.

9      13.    Land idling and financial programs help to offset the losses, but they do not

10  resolve the problem and they do not result in the farm turning any type of a profit.  For instance,

11  in 2020, I idled 257 acres, and received approximately $185 per acre for idling the land.

12  However, much of the idled land was rented at a price of $200 per acre, meaning I lost money on

13  the rent alone.  This is still better than idling the land owned by my farm, which is mortgaged,

14  because the mortgage costs approximately $300 per acre.

15     14.    The financial relief we do receive is not guaranteed, and is nowhere near the value

16  of my water rights.  An acre of crops that I grow with that water generates anywhere between

17  $500 and $1,400 in revenue.

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

{7756/007/01218926.DOC}
Page 3 -    DECLARATION OF RODNEY CHEYNE

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    15.    Based on the current state of finances for my farm, if I do not receive an adequate

2  amount of water in 2021, it is very likely my farm will not survive, even with financial relief.  If

3  we do not receive any—or we only get a little—water from the Klamath Project, we cannot grow

4  crops.  If we don't grow crops, we have no income or revenue. Without a revenue stream, I will

5  be unable to pay for mortgages or debt on my land and equipment, and they will be foreclosed

6  upon.  Even if I receive some payment at some point down the road for these injuries, it will be

7  too late.

8        I declare under penalty of perjury under the laws of the State of Oregon that the foregoing

9  is true and correct.

10

11                                    Rodney Cheyne

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

**IN THE MATTER OF THE WATERS OF THE KLAMATH RIVER BASIN**

Case No. WA1300001

**DECLARATION OF KEN SCHELL IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION**

I, Ken Schell, hereby declare as follows:

1.       I am a farmer who is a member of the Klamath Irrigation District ("KID"). I have personal knowledge and am competent to testify to the facts set forth below.

2.       I am the owner and operator of Schell Ranch. I'm a third generation farmer in the Klamath region. My grandfather started this ranch in 1962. I have been on my ranch for 58 years.

3.       The ranch we own consists of 110 acres. We also typically rent land to farm on, which has, until recently, included 400 acres of pasture and 300 acres of alfalfa and hay.

4.       I predominantly raise hay and cows. My herd historically has been anywhere between 150 to 200 mother cows at a time. The cows calve in the spring, and so I often have more than 200 cows at a time, including the calves. I have had a herd of cows for 50 years now.

5.       Because of the water shortages induced by Reclamation, however, I am giving up on raising cows entirely. Reclamation sends the stored water that I and others are supposed to use down the river for the fish, and that has left us unable to irrigate. Because the pasture land I keep the cows on cannot be irrigated, due to Reclamation flushing our water down the river, I am being forced to sell my entire herd. I expect it to be fully liquidated by next January.

{7756/007/01219084.DOC}

Page 1 -   DECLARATION OF KEN SCHELL

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    6.    For the last twenty years, Klamath farmers such as myself have not known

2    whether we will have water, how much water we will have, when we will get the water, or when

3    it will be turned off. It is simply not possible to have a successful farming business or to raise

4    livestock in those conditions.

5    7.    When the pastures can't be irrigated, the cows can't eat. Even when I can find

6    feed for the cows, the water shortages caused by Reclamation in recent years have been so severe

7    that I have been unable to even put water in the ditches to allow the livestock to drink.

8    8.    One of the fields I pastured my cows on had a well, which allowed me to at least

9    get the cows water to drink. Other lands that I have rented do not have this. In that situation,

10    even if I could find feed for the cows, I would need to truck water in to give them water to drink.

11    It is simply not sustainable.

12    9.    Last year is a good example of the difficulties I have had raising cows. Last year

13    I moved the cows to three different ranches trying to find enough feed for them to survive on.

14    Each time I move the cows, I have to round them up and load them into a trailer, which can only

15    hold 30 to 33 of them at a time. Thus, moving them requires a considerable number of trips and

16    comes at great expense. It is also stressful and difficult on the animals.

17    10.    The added costs that I have because of Reclamation's water shortages have raised

18    my cost of raising a calf significantly, up to almost $800 per calf. Since a calf only sells for

19    between $800 and $1,000, and some calves inevitably die during a year, no matter what you do,

20    this cost is too much for my business to bear. Because of that, I am liquidating my herd.

21    11.    I do not want to sell my cow herd off. I have had a herd for 50 years, and love

22    farming cows. However, I am forced to liquidate the herd to avoid going broke.

23    12.    I have a considerable investment in the cows that will be liquidated. This

24    includes not only the cows themselves, but the equipment to use in connection with them,

25    including stock trailers, chutes, and other items, all of which I will end up selling.

26    13.    This is not a decision I came to lightly, but it was necessary in light of the water

shortages that Reclamation has been causing over the past 20 years, which only seem to be

{7756/007/01219084.DOC}

Page 2 -  DECLARATION OF KEN SCHELL

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   getting worse. It has been a struggle to operate this farm, and I can only do it for so long with
2   the frequent water shortages Reclamation causes.

3       14.    The problem with the water shortages Reclamation causes aren't new. Things
4   have been bad enough in the past that I have, at times, had to work a full-time job just to
5   subsidize the farm. When the water shortages first started, I went and worked on a crew running
6   an excavator, which I would do from the early mornings through mid-day, and then come home
7   and farm. I did that for five years.

8       15.    Even today, my wife works in a dentist's office. Without her income, it would be
9   difficult for us to get by. The gross revenue from the farm in a good year is between $150,000
10  and $225,000. But many of the more recent years have not been good years, because of the
11  water shortages caused by Reclamation. Two years ago, I lost $10,000. Last year, I lost between
12  $6,000 and $8,000. This means that the farm is not generating any money for me to live off of.
13  In fact, it isn't even generating enough money to pay for itself.

14      16.    Because I am liquidating half of my business, I can likely make it through three
15  years with Reclamation flushing our stored water down the river and allowing us to use only
16  small amounts before I go under. If Reclamation actually prevents us from irrigating at all, it
17  won't even be that long. And this is only because I'm already in the process of liquidating much
18  of my farm.

19  / / /
20  / / /
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /

{7756/007/01219084.DOC}
Page 3 -   DECLARATION OF KEN SCHELL

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    17.    Something I would like this court to know is that late starts to the irrigation

2    season are almost as devastating to hay and grass farmers as no irrigation seasons are. When I

3    get a late start in irrigating, the grass has mostly gone dormant, and can't easily be woken back

4    up and convinced to grow again. I lose all or most of the first cutting, which is usually the

5    biggest yield. When the yield is cut back that far, there simply isn't a way to make it up that

6    year.

7        I declare under penalty of perjury under the laws of the State of Oregon that the foregoing

8    is true and correct.

9

10

11    Ken Schell

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

**IN THE MATTER OF THE WATERS OF THE KLAMATH RIVER BASIN**

Case No. WA1300001

**DECLARATION OF SHANE CHEYNE IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION**

I, Shane Cheyne, hereby declare as follows:

1.      I am a farmer who is a member of the Klamath Irrigation District ("KID"). I have personal knowledge and am competent to testify to the facts set forth below.

2.      I am the sole proprietor and only member of Gold Bell Farms LLC.  I farm a couple of hundred acres of land—between 200 and 400 acres, depending on the year—in the Klamath Basin.  I manage the finances for the farm, and am very familiar with the amount of debt held, the revenues of the farm, costs of operation and maintenance, and the overall financial health of the business.

3.      My family has been farming in the Klamath Basin since the early 1900s when the Klamath Project was first developed.  My grandfather helped dredge the A Canal—the main canal the Project uses to deliver water, back when it was first being built.  The farm I live on has been in continuous operation since the beginning of the Project. Continuing this heritage is important to me.

4.      Predominately, I farm hay, alfalfa, grain, potatoes, and cattle.  I also maintain pastures on which to graze my cattle.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

5.      Our irrigation season is typically April through October.  Under my adjudicated water rights, I have the right to use up to 3.5 acre-feet of water per acre each year to maintain my crops.

6.      My understanding is that farmers like myself will probably receive little to no water this year.  While I have an adjudicated water right to use up to 3.5 acre-feet of water per acre during the irrigation season, I would be lucky to see even 0.5 acre-feet of water on some of my land. Other lands will almost certainly not receive any water.

7.      The main reason for the impending water shortage is Reclamation is planning to distribute huge quantities of stored water from UKL for instream purposes—i.e., it is flushing that water down the Klamath River—without a state or federal water right recognized in the adjudication. The stored water that Reclamation is diverting for instream purposes without a water right is water that KID, myself, and others own the right to use under the water rights recognized in the adjudication.

8.      Water shortages affect different crops in different ways.  For instance, my perennial crops, such as alfalfa, are typically maintained for multiple years in the same field before they are re-planted.  Our typical alfalfa rotation is between four and seven years. However, if I am not allowed to irrigate, the older alfalfa stands will simply die off if they do not get water.  The younger stands may be able to survive a season of water shortage, but will last significantly fewer seasons, because of the water stress.  Additionally, because the plants are stressed due to insufficient water, they typically need great amounts of other inputs, such as fertilizers or pesticide, to make up for the damage caused by the lack of water.

9.      Some of the lands I own are mortgaged, and some are not.  Mortgages, loans, and other debt for equipment or operations are all fixed costs that I must pay every year, regardless of whether I am able to farm.

10.      My annual gross revenue in a typical to good year is between $280,000 and $500,000.  However, the last several years have not been good years, in large part due to the unavailability of water.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

11.     In the past, financial relief has been offered in the form of paid land idling.  Last year, I believe it was around $170 per acre to idle land.  This amount does not even begin to cover the costs of maintaining the land, including rent/mortgage, crop insurance, or assessments, which must be paid regardless of whether the land is farmed or not.

12.     I have lived through a number of prior years where farmers were not permitted to irrigate their fields, which almost bankrupted me.  In 2000, before water rights had been determined in the adjudication, Reclamation induced a water shortage, and had to sell almost everything I owned to keep my business afloat.  I probably should have filed for bankruptcy, but did not.

13.     In 2010, Reclamation delayed the start of the irrigation season by 30 days, and it caused tremendous losses to myself and other farmers.  Even a delay in the start of the irrigation season causes significant damages to us, because we cannot get adequate water to the crops at the beginning of their growing season.  Many simply die, or go dormant, and do not produce that year.

14.     I have had to downsize my farm significantly because of Reclamation-induced water shortages.  In fact, since 2010, I have worked an additional full-time job—most recently as a project manager for a construction company—in order to subsidize myself, my farm, and my family, all while still continuing to farm.  If I received the water I was entitled to under the state's adjudication, I would not need this job to subsidize the farming.

15.     The opposite is true too:  if I did not work full-time at a salaried job, I would not be able to continue farming, due to the water shortages Reclamation is causing.

16.     The water shortages Reclamation is causing harm my farming business beyond merely the lost opportunity to grow and sell crops.  My customers depend on having a steady supply of product to meet their needs, and when I cannot grow crops due to a water shortage, they cover their needs by contracting with other suppliers who can grow crops.  Once I've lost those customers, it is difficult or impossible to get them back the next year.  In my experience, customers will not accept a crop supplier that they cannot rely on.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    17.    If Reclamation creates a water shortage this year, I will be forced to attempt to

2    install infrastructure to transport water and come to some agreement with a well-owner to pump

3    water through their well and transport it to my crops.  If that cannot or does not happen for some

4    reason, my crops will simply die off.  Either event would fully deplete my available cash

5    reserves for the farm.  Additional business costs, such as the equipment payments, would need to

6    be paid for from my salaried position.

7    18.    Even if I manage to stave off bankruptcy this year without water, having drained

8    all of my cash reserves means that if there is another water shortage next year, I would certainly

9    need to file for bankruptcy.

10    19.    If there is no or very little water or substantial payments for land idling, my

11    business would not survive this year without my full-time salary. If I cannot use the stored water

12    in UKL that I hold the water rights to, I cannot grow crops, and therefore cannot generate

13    revenue to pay debt and maintain the business.  Even if we get some small amount of water and

14    financial assistance, my business would be very luck to survive this year and another year with a

15    water shortage.

16    20.    The Reclamation created water shortages are extremely stressful on me, because I

17    don't know whether I will be able to make ends meet when they happen.  I was almost

18    bankrupted once, after the water shortages in 2001, and it took me more than a decade to recover

19    from that.  Water shortages after that in 2010 have required me to work a salaried, full-time job

20    on top of farming.

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

{7756/007/01219399.DOC}
Page 4 -    DECLARATION OF SHANE CHEYNE

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1     21.    I have always wanted to pass my farming business down to my children. Several

2 of my children have expressed interest in running the business, but with the consistent water

3 shortages, I do not feel like I can recommend this business to them in the Klamath Basin as a

4 career decision. I've told them that if they want to farm, they should look for land elsewhere. No

5 father wants to be in the position of advising their children they cannot reasonably expect to be

6 able to continue their family's longstanding heritage and way of life.

7     I declare under penalty of perjury under the laws of the State of Oregon that the foregoing

8 is true and correct.

9

10

11    Shane Cheyne

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF KLAMATH

**IN THE MATTER OF THE WATERS OF THE KLAMATH RIVER BASIN**

Case No. WA1300001

**DECLARATION OF GENE SOUZA IN SUPPORT OF KLAMATH IRRIGATION DISTRICT'S MOTION FOR PRELIMINARY INJUNCTION**

I, Gene Souza, hereby declare as follows:

1.       I am the executive director of the Klamath Irrigation District ("KID"). I have served as the executive director and district manager of KID, as well as the operations committee chair of the Klamath Water Users Association ("KWUA"), since February 2019, following my retirement from the U.S. Army.  I hold a B.A. from the University of Oregon and an M.A. from the American Military University.  I have personal knowledge and am competent to testify to the facts set forth below.

2.       In my role with KID, I am ultimately responsible for all operational aspects of the District, including district operations, maintenance and use of irrigation works, water delivery, and other affiliated tasks.  Because of my global responsibilities for ensuring that irrigators receive their water, I keep close track of and monitor our system on a daily basis.  This includes daily references to the measured and estimated inflows into Upper Klamath Lake ("UKL"), as well as outputs through both the A Canal and the Link River Dam.

3.       The A Canal is the main diversionary works for irrigation water for KID and other districts to whom it transports water.

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1         4.      The Link River Dam is the dam that impounds water in UKL. It is owned by

2 Reclamation. Reclamation controls when, how, and how much water is released through the

3 Link River Dam.

4         5.      Additionally, because of my responsibilities with KID, I am very knowledgeable

5 about the Klamath Adjudication, which began in 1975 and was initially completed in 2013. I am

6 also very familiar with the Amended and Corrected Findings of Fact and Order of Determination

7 ("ACFFOD") issued by the Oregon Water Resources Department ("OWRD") in 2014. Since

8 2014, the ACFFOD has governed water rights in the Klamath Basin. The ACFFOD is presently

9 being reviewed by the Klamath County Circuit Court as part of the judicial phase of the Klamath

10 Adjudication.

11         6.      KID delivers water to its own members as well as other landowners and districts

12 outside its own boundaries. In 2020, KID and its constituent members received less than their

13 adjudicated water right permits them to receive over the course of the irrigation season. KID

14 members and the landowners and districts it serves outside its boundaries own water rights that

15 entitle them to use up to 3.5 acre-feet of water per acre per irrigation season. In 2020, the amount

16 of water KID members were actually permitted to use was significantly lower, around 2 acre-feet

17 per acre. Meanwhile, KID was unable to deliver more than 0.25 acre feet of water per acre for

18 many of the lands KID is contractually obligated to serve outside its boundaries, including:

19 10,342 acres of land in Klamath Basin Improvement District, 3,991 acres of land in Shasta View

20 Irrigation District, 2,981 acres of land within Enterprise Irrigation District, 904 acres of land in

21 Pine Grove Irrigation District, as well as other lands in Poe Valley Improvement District,

22 Sunnyside Irrigation District, and numerous individuals to whom KID owes water delivery

23 obligations. The reason these districts/individuals did not receive additional water deliveries,

24 whereas KID lands received some, is the various contractual arrangements between the parties

25 are understood to give KID priority to water delivery in times of shortages. But, as noted above,

26 circumstances in 2020 were so dire, due to the amount of stored water Reclamation unlawfully

diverted from UKL without a water right contrary to the ACFFOD, that even depriving all of

{7756/007/01219451.DOC}

Page 2 -    DECLARATION OF GENE SOUZA

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1    these districts and farmers of water delivery did not enable KID to fully satisfy the water rights

2    demands of its own landowners.

3         7.    In April 2020, Reclamation orchestrated the release of approximately 32,889 acre-

4    feet of stored water from UKL in a spring "flushing flow," purportedly to help improve juvenile

5    salmon survival rates.  No water rights holder requested this release of water.  This release was

6    far in excess of total inflows into UKL at that time of year, and therefore necessarily included the

7    release of stored water.  In total, this release included approximately 30,000 acre-feet of stored

8    water.  However, neither Reclamation nor PacifiCorp have the right to the beneficial use of

9    stored water in UKL.

10        8.    Although I caused KID as an organization to notify OWRD that this release was

11   not permitted under the ACFFOD, OWRD did not take any action to stop Reclamation from

12   flushing stored water down the river. In fact, Reclamation continued to discharge stored water

13   from UKL throughout the irrigation season, ultimately using approximately additional 90,414

14   acre-feet of stored water for instream purposes without a water right contrary to the ACFFOD.

15   This 123,303 acre-feet of water would have been sufficient to irrigate 45,668 acres of land within

16   KID and the lands outside its boundaries it is contractually obligated to serve.

17        9.    KID ultimately ended up filing suit against OWRD to compel it to act.  Although

18   the Marion County Circuit Court found in KID's favor, to my knowledge, OWRD has yet to take

19   any actions to force Reclamation to stop releasing stored water.  In fact, a hearing is set for May

20   on an order to show cause in re: contempt against OWRD for failing to comply with that court's

21   prior orders.

22        10.   Similar releases of stored water—which were flushed through Link River Dam

23   and down the Klamath River for Reclamation's purposes, and not based on a request from a

24   water rights holder—also occurred in 2019.

25        11.   The bulk of KID's water shortages in 2019 and 2020 were due to the release of

26   stored water in UKL through Link River Dam by Reclamation.  Significant quantities of stored

     water were released, not to satisfy any water right recognized in the ACFFOD, but simply for

{7756/007/01219451.DOC}

Page 3 -   DECLARATION OF GENE SOUZA

1    Reclamation's own purposes to protect salmon species.  Had the extra stored water not been

2    flushed down the river and instead released to irrigators, KID's farmers would largely have been

3    able to irrigate as normally permitted under their water rights.

4        12.    In the past, Reclamation has obtained a limited license of water rights in order to

5    meet its needs to supplement flow levels in the Klamath River.  True and correct copies of such

6    documents granting such limited licenses of water rights are included as **Exhibit A** and **Exhibit**

7    **B** to this declaration.

8        13.    Reclamation did not offer in 2020 to purchase or lease water rights held by KID

9    and its members.  Instead, it simply released the stored water it wanted to release down the

10    Klamath River.

11        14.    The 2021 irrigation season will begin in April 2021, and Reclamation is clearly

12    planning to release stored water for instream purposes without purchasing or leasing any water

13    rights again.  Documents circulated by Reclamation to Klamath Basin water users concerning the

14    forthcoming water year show a dramatic, temporary rise in Link River flows in April 2021.  A

15    true and correct copy of these documents are included at **Exhibit C** to this declaration.  This is

16    intended to reflect the "flushing flow" that Reclamation will release.  Since the release will

17    vastly exceed the inflows to UKL, it necessarily includes a release of vast amounts of stored

18    water which should be directed to Klamath Project irrigators, under the ACFFOD.

19        15.    These extremely large spring flows are not released to meet any call from a water

20    rights holder, but are instead released to support Reclamation's own interests in providing

21    adequate flows for salmon species.

22        16.    Reclamation has indicated in other conversations that we can expect it to continue

23    releasing stored water for its own purposes throughout the 2021 irrigation season.

24        17.    Additionally, at a meeting on March 11, 2021 and at other meetings conducted

25    throughout the spring of 2021, Reclamation officials have made clear that even if OWRD orders

26    Reclamation to stop releasing stored water without a corresponding water right to use that stored

{7756/007/01219451.DOC}
Page 4 -    DECLARATION OF GENE SOUZA

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

1   water, Reclamation will not comply with that order.  As such, the only avenue of relief left to

2   KID is to seek an injunction from this court.

3         18.    As part of preparing to sign this declaration, I have reviewed the declarations of

4   Rodney Cheyne, Justin Grant, Shane Cheyne, Paul Crawford, Andy King, Grant Knoll, and Ken

5   Schell, all of whom state that they will likely either go under this year, be on the brink of

6   insolvency, or be forced to liquidate parts of their farm if Reclamation continues to appropriate

7   water rights unlawfully as it has been doing.  This is not surprising to me.  I am aware of

8   numerous farmers among our members who suffer from similar risks of bankruptcy.

9         I declare under penalty of perjury under the laws of the State of Oregon that the foregoing

10   is true and correct.

11

12

Gene R Souza

13   Gene Souza

14

15

16

17

18

19

20

21

22

23

24

25

26

{7756/007/01219451.DOC}

Page 5 -   DECLARATION OF GENE SOUZA

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

Oregon Water Resources Department

**Final Order on Reconsideration**
**Limited License Application LL-1517**

Official File Copy
Received

Date Received: 5/30/2014
Date of Letter: 5/22/2014
Control Numcer: 14019224
File Code: WTR-4.10
Folder I.D.: 1287107
Project: 12

| Code | Initial | Date | Action |
|------|---------|------|--------|
| 200 MD | | | |
| 300 JC | | | |
| 100 TRG | | | |
| 100 SF | | | |
| 100 JC | | | |

0043961
STATE OF OREGON
WRD
WATER RESOURCES DEPARTMENT

### Appeal Rights

This is a final order in other than a contested case. This order is subject to judicial review under ORS 183.484. Any petition for judicial review must be filed within the 60-day time period specified by ORS 183.484(2). Pursuant to ORS 536.075 and OAR 137-004-0080 you may either petition for judicial review or petition the Director for reconsideration of this order. A petition for reconsideration may be granted or denied by the Director, and if no action is taken within 60 days following the date, the petition was filed, the petition shall be deemed denied.

### Requested Water Use

On April 9, 2014, the Water Resources Department received completed application **LL-1517** from US Bureau of Reclamation for the use of up to 2500 cubic feet per second for a total of 262,500 acre-feet from Upper Klamath Lake, located in the NW ¼, SE ¼, Section 30, Township 38 South, Range 9 East, W.M., for streamflow augmentation, for the period April 15, 2014, through September 30, 2014.

### Authorities

The Department may approve a limited license pursuant to its authority under ORS 537.143, 537.144 and OAR 690-340-0030.

ORS 537.143(2) authorizes the Director to revoke the right to use water under a limited license if it causes injury to any water right or a minimum perennial streamflow.

### Findings of Fact

1. The forms, fees, and map have been submitted, as required by OAR 690-340-0030(1).

2. The Department provided public notice of the application, on April 15, 2014, as required by OAR 690-340-0030(2).

3. This license request is limited to an area within a single drainage basin as required by OAR 690-340-0030(3).

4. The Department has determined that there is water available for the requested use.

5. The Department has determined that the proposed source has not been withdrawn from further appropriation.

**EXHIBIT A**

0043962

6.  Because this use is from surface water and has the potential to impact fish, the Department finds that fish screening is required to protect the public interest.

7.  Because the use requested is longer than 120 days and because the use is in an area that has sensitive, threatened or endangered fish species, the use is subject to the Department's rules under OAR 690-33. These rules aid the Department in determining whether a proposed use will impair or be detrimental to the public interest with regard to sensitive, threatened, or endangered fish species. No comments were received that would cause the Department to require additional conditions or limitations.

8.  The Department has received comments related to the possible issuance of the license. These comments were submitted by the Medford and Rogue River Valley Irrigation Districts. These comments pertain to the authority of the Department to issue a limited license seeking the use of uncertified stored water. In addition, such a limited license would be the functional equivalent of a change of use and place of use application for a Klamath adjudication claim. Also included in the comments are concerns that a limited license should be subordinate to the District right. The conditions in the order below protect existing rights.

9.  Pursuant to OAR 690-340-0030(4)(5), conditions have been added with regard to notice and water-use measurement.

***Conclusions of Law***

The proposed water use will not impair or be detrimental to the public interest pursuant to OAR 690-340-0030(2), as limited in the order below.

***Order***

Therefore, pursuant to ORS 537.143, ORS 537.144, and OAR 690-340-0030, application **LL-1517** is approved as conditioned below.

1.  The period rate and volume of use for **LL-1517** shall be from May 1, 2014, through September 30, 2014, for the use of up to 2500 cubic feet per second for a total of 262,500 acre-feet from Upper Klamath Lake, for the purpose of streamflow augmentation.

2.  The licensee shall give notice to the Watermaster in the district where use is to occur not less than 15 days or more than 60 days in advance of using the water under the license.  The notice shall include the location of the diversion, the quantity of water to be diverted and the intended use and place of use.

3.  The licensee shall maintain a monthly record of all water use, including the total number of hours of release, the total volume released, and the categories of beneficial use to which the water is applied. During the period of the license, the record of use shall be submitted to the Watermaster and the Department monthly, including a final water-use report upon project completion.

4.  The Director may revoke the right to use water for any reason described in ORS 537.143(2), and OAR 690-340-0030(6). Such revocation may be prompted by field regulatory activities or by any other information.

**EXHIBIT A**

0043963

5. Use of water under a limited license shall not have priority over any water right exercised according to a permit or certificate, and shall be subordinate to all other authorized uses that rely upon the same source 537.143(2)

6. The licensee shall install, use, and maintain fish screening and by-pass devices as required by the Oregon Department of Fish and Wildlife to prevent fish from entering the proposed diversion. See copy of enclosed fish screening criteria for information.

7. A copy of this license shall be kept at the place of use, and be available for inspection by the Watermaster or other state authority.

NOTE: This water-use authorization is temporary. Applicants are advised that issuance of this final order does not guarantee that any permit for the authorized use will be issued in the future; any investments should be made with that in mind.

Issued May 22, 2014

*E. Timothy Wall.*

E. Timothy Wallin, Water Rights Program Manager
*for* Phillip C. Ward, Director

Enclosures - limited license, fish screen criteria

cc: Scott White, District 17 Watermaster
    Mike Harrington, ODFW
    Eric Nigg, DEQ
    Hydrographics
    File

If you need further assistance, please contact the Water Rights Section at the address, phone number, or fax number below. When contacting the Department, be sure to reference your limited license number for fastest service.

Remember, this limited license does not provide a secure source of water. Water use can be revoked at any time. Such revocation may be prompted by field regulatory activities or many other reasons.

Water Rights Section
Oregon Water Resources Department
725 Summer Street NE, Suite A
Salem OR 97301-1271
Phone: (503) 986-0817        Fax:        (503) 986-0901

**EXHIBIT A**

0043964

# FISH SCREENING CRITERIA FOR WATER DIVERSIONS

This summary describes ODFW fish screening criteria for all fish species.

**Screen material openings for ditch (gravity) and pump screens** must provide a minimum of 27% open area:

> **Perforated plate**: Openings shall not exceed 3/32 or 0.0938 inches (2.38 mm).
> **Mesh/Woven wire screen**: Square openings shall not exceed 3/32 or 0.0938 inches (2.38 mm) in the narrow direction, e.g., 3/32 inch x 3/32 inch open mesh.
> **Profile bar screen/Wedge wire**: Openings shall not exceed 0.0689 inches (1.75 mm) in the narrow direction.

**Screen area** must be large enough to prevent fish impact. Wetted screen area depends on the water flow rate and the approach velocity.

> **Approach velocity**: The water velocity perpendicular to and approximately three inches in front of the screen face.
> **Sweeping velocity**: The water velocity parallel to the screen face.
> **Bypass system**: Any pipe, flume, open channel or other means of conveyance that transports fish back to the body of water from which the fish were diverted.
> **Active pump screen**: Self cleaning screen that has a proven cleaning system.
> **Passive pump screen**: Screen that has no cleaning system other than periodic manual cleaning.

**Screen approach velocity for ditch and active pump screens** shall not exceed 0.4 fps (feet per second) or 0.12 mps (meters per second). The wetted screen area in square feet is calculated by dividing the maximum water flow rate in cubic feet per second (1 cfs = 449 gpm) by 0.4 fps.

**Screen sweeping velocity for ditch screens** shall exceed the approach velocity. Screens greater than 4 feet in length must be angled at 45 degrees or less relative to flow. An adequate bypass system must be provided for ditch screens to safely and rapidly collect and transport fish back to the stream.

**Screen approach velocity for passive pump screens** shall not exceed 0.2 fps or 0.06 mps. The wetted screen area in square feet is calculated by dividing the maximum water flow rate by 0.2 fps. Pump rate should be less than 1 cfs.

*For further information please contact:*

Statewide Fish Screening Coordinator
Oregon Dept. Fish and Wildlife
3406 Cherry Avenue NE
Salem, OR 97303
(503) 947-6229

**EXHIBIT A**

0043965

BEFORE THE WATER RESOURCES DEPARTMENT
OF THE STATE OF OREGON

ORDER ON RECONSIDERATION                    ) SUMMARY
LIMITED LICENSE APPLICATION LL-1517         ) ORDER

APPLICATION FOR A LIMITED LICENSE TO USE SURFACE WATER

| Name | Watermaster District | License Number |
|------|----------------------|----------------|
| US Bureau of Reclamation | 17 | LL-1517 |

1. Applicant applied to Oregon Water Resources Department (the "Department") on April 9, 2014 for Limited License Application LL-1517. The Department issued a Final Order approving LL-1517 on May 1, 2014.

2. The Department on its own motion reconsidered the Final Order for LL-1517 on May 21, 2014. The Department hereby withdraws its Final Order for LL-1517 for the purpose of reconsideration. A Final Order will be issued in the future.

Dated at Salem, Oregon on May 21, 2014.

*E. Timothy Wall.*

E. Timothy Wallin, Water Rights Program Manager, *for*
Phillip C. Ward, Director

*PLACED IN U.S. MAIL* **MAY 22 2014**
*BY OREGON WATER RESOURCES DEPARTMENT*

**EXHIBIT A**

0038177

Oregon Water Resources Department

**Final Order**
**Limited License Application LL-1581**



### Appeal Rights

This is a final order in other than a contested case. This order is subject to judicial review under ORS 183.484. Any petition for judicial review must be filed within the 60-day time period specified by ORS 183.484(2). Pursuant to ORS 536.075 and OAR 137-004-0080 you may either petition for judicial review or petition the Director for reconsideration of this order. A petition for reconsideration may be granted or denied by the Director, and if no action is taken within 60 days following the date, the petition was filed, the petition shall be deemed denied.

### Requested Water Use

On May 4, 2015, the Water Resources Department received completed application **LL-1581** from U.S. Bureau of Reclamation for the use of up to 2,500 cubic feet per second for a total of 275,872 acre-feet from Upper Klamath Lake, located in the NW ¼, SE ¼, Section 30, Township 38 South, Range 9 East, W.M., for instream uses, for the period May 1, 2015, through September 30, 2015.

### Authorities

The Department may approve a limited license pursuant to its authority under ORS 537.143, 537.144 and OAR 690-340-0030.

ORS 537.143(2) authorizes the Director to revoke the right to use water under a limited license if it causes injury to any water right or a minimum perennial streamflow.

### Findings of Fact

1. The forms, fees, and map have been submitted, as required by OAR 690-340-0030(1).

2. The Department provided public notice of the application, on May 5, 2015, as required by OAR 690-340-0030(2).

3. This license request is limited to an area within a single drainage basin as required by OAR 690-340-0030(3).

4. The Department has determined that there is water available for the requested use.

5. The Department has determined that the proposed source has not been withdrawn from further appropriation.

6. Because this use is from surface water and has the potential to impact fish, the Department finds that fish screening is required to protect the public interest.

**EXHIBIT B**

0038178

7. Because the use requested is longer than 120 days and because the use is in an area that has sensitive, threatened or endangered fish species, the use is subject to the Department's rules under OAR 690-33. These rules aid the Department in determining whether a proposed use will impair or be detrimental to the public interest with regard to sensitive, threatened, or endangered fish species. No comments were received that would cause the Department to require additional conditions or limitations.

8. The Department has received comments related to the possible issuance of the license from Klamath Drainage District (KDD). The comments pertain to recognition that the Bureau of Reclamation is responsible for action under the Endangered Species Act and potential drought conditions. KDD does not wish to hinder Reclamation's efforts to protect instream flows, and does not object to this license request to the extent that any license issued is conditioned and exercised so as to prevent injury or impairment of any of KDD's existing rights. The authorization of license LL-1581, as conditioned below, will satisfactorily address the issues raised in those comments.

9. Pursuant to OAR 690-340-0030(4)(5), conditions have been added with regard to notice and water-use measurement.

*Conclusions of Law*

The proposed water use will not impair or be detrimental to the public interest pursuant to OAR 690-340-0030(2), as limited in the order below.

*Order*

Therefore, pursuant to ORS 537.143, ORS 537.144, and OAR 690-340-0030, application **LL-1581** is approved as conditioned below.

1. The period, rate, and volume of use for **LL-1581** shall be from May 26, 2015, through September 30, 2015, for the use of 2,500 cubic feet per second for a total of 275,872 acre-feet from Upper Klamath Lake, for the purpose of instream use.

2. The licensee shall give notice to the Watermaster in the district where use is to occur not less than 15 days or more than 60 days in advance of using the water under the license. The notice shall include the location of the diversion, the quantity of water to be diverted and the intended use and place of use. In the case of this application, this order serves as the notice described above.

3. The licensee shall maintain a monthly record of all water use, including the total number of hours of release, the total volume released, and the categories of beneficial use to which the water is applied. During the period of the license, the record of use shall be submitted to the Watermaster and the Department monthly, including a final water-use report upon project completion.

4. The Director may revoke the right to use water for any reason described in ORS 537.143(2), and OAR 690-340-0030(6). Such revocation may be prompted by field regulatory activities or by any other information.

**EXHIBIT B**

0038179

5. Use of water under a limited license shall not have priority over any water right exercised according to a permit or certificate, and shall be subordinate to all other authorized uses that rely upon the same source.

6. The licensee shall install, use, and maintain fish screening and by-pass devices as required by the Oregon Department of Fish and Wildlife to prevent fish from entering the proposed diversion. See copy of enclosed fish screening criteria for information.

7. A copy of this license shall be kept at the place of use, and be available for inspection by the Watermaster or other state authority.

NOTE: This water-use authorization is temporary. Applicants are advised that issuance of this final order does not guarantee that any permit for the authorized use will be issued in the future; any investments should be made with that in mind.

Issued May 26, 2015

*E. Timothy Wallin*

E. Timothy Wallin, Water Rights Program Manager
*for* Director, Oregon Water Resources Department

Enclosures - limited license, fish screen criteria

cc: Scott White, District 17 Watermaster
    Mike Harrington, ODFW
    Eric Nigg, DEQ
    Hydrographics
    File

If you need further assistance, please contact the Water Rights Section at the address, phone number, or fax number below. When contacting the Department, be sure to reference your limited license number for fastest service.

Remember, this limited license does not provide a secure source of water. Water use can be revoked at any time. Such revocation may be prompted by field regulatory activities or many other reasons.

Water Rights Section
Oregon Water Resources Department
725 Summer Street NE, Suite A
Salem OR 97301-1271
Phone: (503) 986-0817        Fax:      (503) 986-0901

**EXHIBIT B**

0038180

# FISH SCREENING CRITERIA FOR WATER DIVERSIONS

This summary describes ODFW fish screening criteria for all fish species.

**Screen material openings for ditch (gravity) and pump screens** must provide a minimum of 27% open area:

> **Perforated plate**: Openings shall not exceed 3/32 or 0.0938 inches (2.38 mm).
> **Mesh/Woven wire screen**: Square openings shall not exceed 3/32 or 0.0938 inches (2.38 mm) in the narrow direction, e.g., 3/32 inch x 3/32 inch open mesh.
> **Profile bar screen/Wedge wire**: Openings shall not exceed 0.0689 inches (1.75 mm) in the narrow direction.

**Screen area** must be large enough to prevent fish impact. Wetted screen area depends on the water flow rate and the approach velocity.

> **Approach velocity**: The water velocity perpendicular to and approximately three inches in front of the screen face.
> **Sweeping velocity**: The water velocity parallel to the screen face.
> **Bypass system**: Any pipe, flume, open channel or other means of conveyance that transports fish back to the body of water from which the fish were diverted.
> **Active pump screen**: Self cleaning screen that has a proven cleaning system.
> **Passive pump screen**: Screen that has no cleaning system other than periodic manual cleaning.

**Screen approach velocity for ditch and active pump screens** shall not exceed 0.4 fps (feet per second) or 0.12 mps (meters per second). The wetted screen area in square feet is calculated by dividing the maximum water flow rate in cubic feet per second (1 cfs = 449 gpm) by 0.4 fps.

**Screen sweeping velocity for ditch screens** shall exceed the approach velocity. Screens greater than 4 feet in length must be angled at 45 degrees or less relative to flow. An adequate bypass system must be provided for ditch screens to safely and rapidly collect and transport fish back to the stream.

**Screen approach velocity for passive pump screens** shall not exceed 0.2 fps or 0.06 mps. The wetted screen area in square feet is calculated by dividing the maximum water flow rate by 0.2 fps. Pump rate should be less than 1 cfs.

*For further information please contact:*

Statewide Fish Screening Coordinator
Oregon Dept. Fish and Wildlife
3406 Cherry Avenue NE
Salem, OR 97303
(503) 947-6229

**EXHIBIT B**



# 2021 Hydro Outlook

## February 23, 2021

1

**EXHIBIT C**

# UKL current hydro conditions

2



**EXHIBIT C**

# NRCS Upper Klamath Basin Snow/Water Report

| Data based on the first reading of the day (typically 00:00) for Tuesday, February 23, 2021 | | | | | | |
|---|---|---|---|---|---|---|
| **Basin Site Name** | **Elev (ft)** | **Snow Water Equivalent** | | | **Water Year-to-Date Precipitation** | | |
| | | **Current (in)** | **Median (in)** | **Pct of Median** | **Current (in)** | **Average (in)** | **Pct of Average** |
| **KLAMATH** | | | | | | | |
| Fish Lk. | 4660 | 11.4 | 10.2 | 112 | 24.3 | 26.5 | 92 |
| Chemult Alternate | 4850 | 8.7 | 8.6 | 101 | 14.5 | 17.8 | 81 |
| Gerber Reservoir | 4890 | 1.4 | 1.1c | 127 | 6.2 | 9.5c | 65 |
| Taylor Butte | 5030 | 4.2 | 6.8 | 62 | 7.9 | 13.1 | 60 |
| Crowder Flat | 5170 | 2.1 | 4.1c | 51 | 7.6 | 10.4c | 73 |
| Billie Creek Divide | 5280 | 22.8 | 19.9 | 115 | 30.3 | 33.6 | 90 |
| Diamond Lake | 5280 | 15.3 | 15.6 | 98 | 28.4 | 30.9 | 92 |
| Sun Pass | 5400 | 15.3 | N/A | * | 20.8 | N/A | * |
| Sevenmile Marsh | 5700 | 24.0 | 27.3 | 88 | 33.0 | 40.6 | 81 |
| Quartz Mountain | 5720 | 1.1 | 1.3c | 85 | 5.8 | 9.7c | 60 |
| Silver Creek | 5740 | 8.2 | 10.2 | 80 | 11.0 | 16.7 | 66 |
| Strawberry | 5770 | 4.0 | 4.5 | 89 | 9.6 | 13.0 | 74 |
| Cold Springs Camp | 5940 | 20.5 | 26.9 | 76 | 20.5 | 36.5 | 56 |
| Fourmile Lake | 5970 | 19.7 | 25.4 | 78 | 31.6 | 35.1 | 90 |
| Annie Springs | 6010 | 29.7 | 32.3c | 92 | 36.3 | 45.3c | 80 |
| Crazyman Flat | 6180 | 10.5 | 13.2R | 80 | 12.7 | 21.8R | 58 |
| Swan Lake Mtn | 6830 | 13.7 | N/A | * | 14.9 | N/A | * |
| Summer Rim | 7080 | 6.3 | 13.4 | 47 | 7.8 | 15.9 | 49 |
| **Basin Index (%)** | | | | **86** | | | **76** |

3



EXHIBIT C

# NRCS SWE Chart





**EXHIBIT C**

# Klamath Basin Climate Stations

as of 2/23/21

| Monday, February 22, 2021 | | | | | |
|---|---|---|---|---|---|
| Station & POR | WY to Date PPT (in) | Avg PPT (in) | % of Avg | CBTT | Elev (ft) |
| Lorella (2002-2018) | 3.69 | 6.28 | 59% | LORO | 4159 |
| Beatty (2005-2018) | 4.03 | 5.98 | 67% | BATO | 4319 |
| Agency (2001-2018) | 8.09 | 9.29 | 87% | AGKO | 4149 |
| KFalls (1999-2018) | 4.96 | 6.79 | 73% | KFLO | 4099 |
| Airport (1981-2010) | 4.09 | 7.99 | 51% | | 4095 |

5



**EXHIBIT C**

# Williamson River Flows





EXHIBIT C

# Williamson River Flows

| Date | POR Year | POR Minimum Daily Mean (CFS) | WY 2021 Daily Mean (CFS) |
|---|---|---|---|
| 10/31 | 1995 | 514 | 513 |
| 11/9 | 1938 | 520 | 517 |
| 11/10 | 1938 | 531 | 518 |
| 11/11 | 1995 | 532 | 517 |
| 11/12 | 1937 | 537 | 514 |
| 11/26 | 1995 | 540 | 526 |
| 11/30 | 2005 | 524 | 516 |
| 12/1 | 1937 | 525 | 517 |
| 12/2 | 1934 | 549 | 509 |
| 12/3 | 1937 | 543 | 520 |
| 12/4 | 1937 | 520 | 518 |
| 12/29 | 1991 | 520 | 500 |
| 1/24 | 1937 | 543 | 543 |
| 1/26 | 1949 | 540 | 528 |
| 1/27 | 1933 | 537 | 497 |
| 2/1 | 1933 | 549 | 545 |
| 2/8 | 1933 | 549 | 541 |
| 2/20 | 1933 | 555 | 555 |
| 2/21 | 1932 | 561 | 556 |



**EXHIBIT C**

# UKL Cumulative Net Inflow
## Oct 1 – Feb 22 POR & WY2021

as of 2/23/21

| WY | Cumulative UKL Net Inflow (TAF) | WY | Cumulative UKL Net Inflow (TAF) |
|---|---|---|---|
| **2021** | **350.002** | 1995 | 477.803 |
| 1992 | 356.788 | 2003 | 477.954 |
| 1991 | 375.983 | 1981 | 489.794 |
| 1994 | 381.860 | 2015 | 503.977 |
| 2014 | 393.090 | 2002 | 520.656 |
| 2020 | 401.075 | 2007 | 522.718 |
| 2005 | 408.592 | 1988 | 525.827 |
| 1993 | 411.928 | 2011 | 540.348 |
| 2019 | 413.819 | 1987 | 570.340 |
| 2018 | 416.980 | 2017 | 599.848 |
| 2010 | 428.035 | 2000 | 623.304 |
| 2012 | 435.690 | 1998 | 649.394 |
| 2001 | 454.756 | 1985 | 696.014 |
| 2009 | 455.011 | 1983 | 696.599 |
| 2013 | 458.963 | 1999 | 705.910 |
| 1989 | 459.192 | 1986 | 716.991 |
| 2008 | 459.383 | 2006 | 770.784 |
| 1990 | 461.818 | 1996 | 780.029 |
| 2004 | 462.024 | 1984 | 797.972 |
| 2016 | 475.786 | 1982 | 810.775 |
| | | 1997 | 1019.652 |

8



**EXHIBIT C**

as of 2/23/21



9



**EXHIBIT C**

as of 2/23/21





EXHIBIT C

# Forecasted 2021 hydro conditions

11



**EXHIBIT C**

# 2021 NRCS Upper Klamath Lake Water Supply Forecast

|  | March-September Inflow (TAF) | | |
|---|---|---|---|
| Exceedance > | 30% | 50% | 70% |
| 1-Jan | 575 | 465 | 355 |
| 15-Jan | 535 | 430 | 320 |
| 1-Feb | 480 | 390 | 300 |
| 15-Feb | 520 | 430 | 335 |

Mid-month forecast are unofficial and not used in water supply allocation calculations



12

**EXHIBIT C**

# 2021 Water Supply Outlook
## UKL Supply, EWA, Project Supply
## NRCS Feb 1

as of 2/23/21

TAF

| Exceedance | 30% | 50% | 70% |
|---|---|---|---|
| NRCS Mar-Sep Forecast* | 480 | 390 | 300 |
| UKL Supply | 604 | 518 | 432 |
| EWA | 400 | 400 | 400 |
| Total Augmentation | 40 | 0 | 0 |
| Project Supply | 181 | 118 | 32 |

*NRCS forecast issuance date: **February 3, 2021**

These projections are provisional and subject to change

13



**EXHIBIT C**

# 2021 Water Supply Outlook
## UKL Supply, EWA, Project Supply
## NRCS February Mid-Month

as of 2/23/21

TAF

| Exceedance | 30% | 50% | 70% |
|---|---|---|---|
| NRCS Mar-Sep Forecast* | 520 | 430 | 335 |
| UKL Supply | 642 | 556 | 468 |
| EWA | 400 | 400 | 400 |
| Total Augmentation | 43.7 | 40 | 0 |
| Project Supply | 217 | 133 | 68 |

*NRCS forecast issuance date: **February 15, 2021**

These projections are provisional and subject to change

14



**EXHIBIT C**

# UKL Elevation
## 2021 NRCS Feb 1 30%, 50% & 70% Exceedances
## Operational Default



These projections are provisional and subject to change

15



**EXHIBIT C**

# Iron Gate Flow
## 2021 NRCS Feb 1 30%, 50% & 70% Exceedances



These projections are provisional and subject to change

16



**EXHIBIT C**

# UKL Elevation
## 2021 NRCS Mid-February 30%, 50% & 70% Exceedances
## Operational Default



These projections are provisional and subject to change

17



EXHIBIT C

# Iron Gate Flow
## 2021 NRCS Mid-February 30%, 50% & 70% Exceedances



These projections are provisional and subject to change



18

**EXHIBIT C**

# UKL Elevation
## 2021 NRCS Feb 1 50% & 70% Inflow Exceedance
## UKL Optimization

- Delayed Project start date to June 1
- Flushing flow removed
- IGD miminums reduced by 200 cfs/day in March

• PC Borrow/Payback
  • Total borrow = 15 TAF in March
  • Total payback = 15 TAF during June - August



These projections are provisional and subject to change



**EXHIBIT C**

# Iron Gate Flows
## 2021 NRCS Feb 1 50% & 70% Exceedance
## UKL Optimization



These projections are provisional and subject to change

20



**EXHIBIT C**

# UKL Elevation
## 2021 NRCS Mid-February 50% & 70% Exceedance
## UKL Optimization

- Delayed Project start date to June 1
- Flushing flow removed
- IGD miminums reduced by 200 cfs/day in March

- PC Borrow/Payback
  - Total borrow = 15 TAF in March
  - Total payback = 15 TAF during June - August



These projections are provisional and subject to change

21



**EXHIBIT C**

# Iron Gate Flows
## 2021 NRCS Mid-February 50% & 70% Exceedance
## UKL Optimization



These projections are provisional and subject to change



**EXHIBIT C**

# UKL Elevation
## 2021 NRCS Feb 1 50% & 70% Exceedance
### River Optimization

- Delayed Project start date to June 1
- Flushing flow triggered on April 15
- Flushing flow daily volumes maximized based on max LRD releases

• PC Borrow/Payback
 • Total borrow = 15 TAF in April into May
 • Total payback = 15 TAF during June - August



These projections are provisional and subject to change

23



**EXHIBIT C**

# Iron Gate Flows
## 2021 NRCS Feb 1 50% & 70% Exceedance
## River Optimization



These projections are provisional and subject to change

24



**EXHIBIT C**

# UKL Elevation
## 2021 NRCS Mid-February 50% & 70% Exceedance
## River Optimization

- Delayed Project start date to June 1
- Flushing flow triggered on April 15
- Flushing flow daily volumes maximized based on max LRD releases

- PC Borrow/Payback
  - Total borrow = 15 TAF in April into May
  - Total payback = 15 TAF during June - August



These projections are provisional and subject to change

25



**EXHIBIT C**





**EXHIBIT C**

1

2    IN THE CIRCUIT COURT OF THE STATE OF OREGON

3    FOR THE COUNTY OF KLAMATH

4    In the Matter of the Determination of the Relative Rights of the Waters of the Klamath River,
A Tributary of the Pacific Ocean

5

6    In Re: WATERS OF THE KLAMATH RIVER          Case No. WA1300001
7    BASIN.
                                                 **NOTICE OF APPEARANCE OF COUNSEL
8                                                AND SUBSTITUTION OF COUNSEL FOR
                                                KLAMATH IRRIGATION DISTRICT**
9

10

11

12

13    **A.    NOTICE OF APPEARANCE OF COUNSEL FOR KLAMATH IRRIGATION
14          DISTRICT**

15        Notice is hereby provided to the Court and parties that the following attorneys hereby

16    appear for Klamath Irrigation District in Case No. WA1300001.  Contact information for notice,

17    service, and otherwise is listed below:

18

19        RIETMANN LAW, P.C.
20        Nathan R. Rietmann (OSB #053630)
          1270 Chemeketa Street NE
21        Salem, OR 97301
          Phone:  (503) 551-2740
22        Email:  nathan@rietmannlaw.com

23              DATED this 29th day of March, 2021

24

25

26
Page 1 – NOTICE OF APPEARANCE OF COUNSEL
        COUNSEL FOR KLAMATH IRRIGATION DISTRICT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

RIETMANN LAW, P.C.


s/ Nathan R. Rietmann
_____
Nathan R. Rietmann, (OSB #053630)
*Attorney*

Page 2 – NOTICE OF APPEARANCE OF COUNSEL
        COUNSEL FOR KLAMATH IRRIGATION DISTRICT

Rietmann Law P.C.
1270 Chemeketa St. NE
Salem, Oregon 97301
503-551-2740
nathan@rietmannlaw.com

## CERTIFICATE OF SERVICE

1

2        On March 30, 2021, I caused to be served a true and correct copy of NOTICE OF

3   APPEARANCE OF COUNSEL FOR KLAMATH IRRIGATION DISTRICT to be served using the

4   Oregon Judicial Department Odyssey File and Serve system for service to the electronic service

5   contacts registered in this case at the email addresses as recorded on the date of service in the eFiling

6   system, and by first class mail on those listed on the current service list at the postal addresses provided

7   by the Klamath County Circuit Court.

8   DATED:  March 29, 2021              RIETMANN LAW P.C.

9                                       s/Nathan R. Rietmann

10                                      _____

11                                      Nathan R. Rietmann, OSB #053630
                                        1270 Chemeketa St. NE
12                                      Salem, Oregon 97301
                                        503-551-2740
13                                      nathan@rietmannlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 3 – NOTICE OF APPEARANCE OF COUNSEL
        COUNSEL FOR KLAMATH IRRIGATION DISTRICT